UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO: 1:21-cr-491 |
| | ) | |
| v. | ) | JUDGE CALABRESE |
| | ) | |
| CHARLES SCOTT, ET AL., | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT CHARLES SCOTT'S MOTION FOR RELEASE PENDING APPEAL

Pursuant to 18 U.S.C. § 3143(b) and Federal Rule of Criminal Procedure 46, Defendant Charles Scott, by and through his undersigned counsel, respectfully moves this Court for release pending appeal for the reasons described in the accompanying Memorandum.

Dated: April 7, 2025

Respectfully submitted,

*/s/ David M. DeVillers*
David M. DeVillers (0059456)
Samantha R. Pugh   (0101035)
BARNES & THORNBURG LLP
41 South High Street, Suite 3300
Columbus, Ohio  43215-6104
Telephone:    (614) 628-0096
Facsimile:    (614) 628-1433
david.devillers@btlaw.com
Samantha.Pugh@btlaw.com

*Attorneys for Defendant Charles Scott*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

BACKGROUND .......................................................................................................... 3

I.      Factual Background .......................................................................................... 3

A.     First Alleged Conspiracy (2016–2019) .......................................................... 3

B.     Second Alleged Conspiracy (2021) ................................................................ 4

II.     Procedural History ......................................................................................... 5

A.     Trial ................................................................................................................ 5

B.     Sentencing ..................................................................................................... 7

LEGAL STANDARD ................................................................................................... 9

ARGUMENT ............................................................................................................... 11

I.      Mr. Scott is Not a Flight Risk and Does Not Pose a Danger to the Community .............. 11

II.     Mr. Scott's Appeal Raises a Substantial and Novel Question Concerning the
Application of the Newly Enacted Acquitted-Conduct Sentencing Guideline That, If
Answered in His Favor, Would Satisfy the Criteria in 18 U.S.C. § 3143(b)(1)(B) .......... 13

A.     Mr. Scott's Appeal Raises a Substantial Question of Law ................................ 13

**1.**     The jury instructions, the jury verdict, and the plain text of Section 1B1.3(c) suffice
to preclude the Court from considering the Government's allegation that Mr. Scott
intended to deprive investors of property or joined a scheme to do so ............................ 13

**2.**     The arguments and evidence at trial show that the jury rejected the Government's
allegation that Mr. Scott intended to deprive investors of their property, and thus
further confirm that Section 1B1.3(c) barred the Court from accepting the
Government's contrary allegation ..................................................................................... 16

B.     Mr. Scott's successful appeal and the resultant elimination of the 16-point sentencing
enhancement would cause him serve, if any, a term of imprisonment for less time than
the likely duration of his appeal ...................................................................................... 18

CONCLUSION ........................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*United States of America v. Barama*,
23-2087 (Ninth Circuit appeal challenging securities fraud conviction
spanning 17 months) ................................................................................................19

*United States of America v. Chartier*,
22-3125 (Second Circuit appeal challenging securities fraud conviction
spanning 21 months) ................................................................................................19

*United States v. Aleo*,
681 F.3d 290 (6th Cir. 2012) ...................................................................................20

*United States v. Bartoli*,
21-4045 ....................................................................................................................19

*United States v. Baum*,
785 F. Supp. 570 (E.D. Va. 1992) ...........................................................................12

*United States v. Freeman*,
42 F. App'x 808 (6th Cir. 2002) .........................................................................10, 12

*United States v. Herrera-Zuniga*,
571 F.3d 568 (6th Cir. 2009) ...................................................................................20

*United States v. Mari*,
47 F.3d 782 (6th Cir. 1995) .......................................................................................6

*United States v. Sittenfeld*,
128 F.4th 752 (6th Cir. 2025) ...................................................................................10

*United States v. Sittenfeld*,
No. 23-3840, 2024 WL 3025509 (6th Cir. May 15, 2024) ....................1, 10, 16, 18

*United States v. Zimny*,
857 F.3d 97 (1st Cir. 2017) ......................................................................................10

*USA v. Jeffrey McHatton*,
22-10329 (Ninth Circuit appeal challenging securities fraud conviction
spanning 24 months) ................................................................................................19

**Statutes**

15 U.S.C. §§ 78J(B), 78FF ...........................................................................................8

18 U.S.C. § 1343 ................................................................................................. *passim*

18 U.S.C. § 3553 ................................................................................................. 20

U.S.S.G. § 1B1.3 ................................................................................................ *passim*

U.S.S.G. § 2B1.1 ................................................................................................ 13

U.S.S.G §5C1.1 ................................................................................................ 9, 19

**Other Authorities**

17 C.F.R. § 240.10B-5 ........................................................................................ 8

Federal Rule of Criminal Procedure 46 ............................................................ 20

*Judiciary Sentencing Information Platform,* U.S. Sentencing Comm'n,
    https://jsin.ussc.gov/analytics/saw.dll?Dashboard ................................... 20

## INTRODUCTION

Charlie Scott is a 70-year-old business owner suffering from short-term memory loss, anxiety, depression, and insomnia. Mr. Scott has no criminal history whatsoever and has scrupulously complied with the conditions of his release throughout this case. Following a split jury verdict that acquitted Mr. Scott of wire fraud but convicted him of securities fraud, the Court sentenced Mr. Scott to a 42-month prison term. Mr. Scott recently appealed his conviction (which he intends to challenge on evidentiary and jury-instruction grounds) and his sentence (which he intends to challenge as a misapplication of the new acquitted-conduct sentencing guideline). Because Mr. Scott indisputably does not pose a danger or flight risk, and because his appeal raises substantial questions of law that are likely to eliminate or significantly reduce his sentence, Mr. Scott respectfully requests that the Court order him released pending appeal.

The law authorizes release pending appeal where the defendant is unlikely to flee or pose a danger to the public and the appeal, rather than being for purposes of delay, raises a "substantial question" that, if resolved in the defendant's favor, is likely to result in reversal, a new trial, a sentence that does not include a term of imprisonment, or a sentence shorter than the expected duration of the appeal. U.S.C § 3143(b)(1). All these requirements are satisfied here.

Mr. Scott's age, medical condition, and past history of compliance with the Court's orders leave no doubt that he will not flee, nor pose a danger to the public. And if Mr. Scott's appeal is successful, comparative cases make it clear that his sentence (if he received one at all) would be shorter than the duration of his appeal.

Accordingly, the final requirement for release pending appeal is that Mr. Scott's appeal presents a substantial question of law. This requirement can be established by showing that the appeal "present[s] 'a close question or one that could go either way,'" and "does not require a court to think reversal is probable or likely." *United States v. Sittenfeld*, No. 23-3840, 2024 WL 3025509,

at *1 (6th Cir. May 15, 2024) (quoting *United States v. Sutherlin*, 84 F. App'x 630, 631 (6th Cir. 2003), and citing *United States v. Pollard*, 778 F.2d 1177, 1181–82 (6th Cir. 1985)). This standard is a distinctly *lower* standard than finding the defendant will likely prevail on the merits of his appeal (such as for a stay pending appeal).

Mr. Scott's appeal satisfies this standard. As noted, Mr. Scott intends to challenge both his conviction and his sentence. He intends to challenge the conviction as, *inter alia*, resulting from the inappropriate admission of evidence (particularly following his alleged co-conspirator pled guilty and thereby left the case on the morning of trial) and the Court's jury instruction on deliberate ignorance. And he intends to challenge the sentence as resting on a misinterpretation of the now-five-month-old sentencing guideline barring consideration of acquitted conduct—which would have resulted in a recommended sentence of 10–16 months if the Court had interpreted the guideline as Mr. Scott urged. Because the trial transcript has not yet been prepared, Mr. Scott cannot yet present the evidentiary and jury-instruction arguments. This Motion therefore focuses on the guideline issue.

The guideline issue alone suffices to establish a substantial question. This Court's own comments at sentencing underscore that there is little-to-no authority explaining how to interpret the recent acquitted-conduct guideline, and the Court acknowledged that "reasonable people [could] disagree" on how the guideline should apply to Mr. Scott. (Sent. Tr., Feb. 12, 2025, at 36:4–5). Even apart from the other issues Mr. Scott intends to raise on appeal, this guideline issue is plainly a "substantial" one that warrants Mr. Scott's release. Withholding that relief would likely render Mr. Scott's appeal an empty exercise. This Court should not allow that to happen.

# BACKGROUND

## I.    Factual Background

Mr. Scott was first indicted in this matter on September 16, 2021, for two counts of Conspiracy to Commit Securities Fraud, two counts of Securities Fraud, and two counts of Wire Fraud. (Superseding Ind., Sept. 16, 2021, Dkt # 33). The factual allegations underlying these counts span two distinct alleged conspiracies—one from 2016 through 2019 and one in 2021—both of which concern circumstances surrounding the position in the U.S. stock market of a corporation known as U.S. Lighting Group (USLG).

### A.    A. First Alleged Conspiracy (2016–2019)

The Government's allegations against Mr. Scott start in 2016, when he made a substantial investment in USLG. (Gov't Trial Brief, Aug. 9, 2024, Dkt # 392 at 5). On June 28, 2016, as part of a plan to take USLG public, Mr. Scott purchased 1,225,000 shares of a public company known as Luxurious Travel Corporation (LXRT). (*Id.* at 5–6; 2nd Superseding Ind., June 29, 2023, Dkt # 206 at 12). About two weeks later, LXRT and USLG effectuated a reverse merger whereby USLG assumed LXRT's public status, and LXRT effectively dissolved. (Dkt #392 at 5–6). From there, the Government alleged that USLG CEO Paul Spivak enlisted a team of unregistered stockbrokers to promote USLG stock by cold-calling potential investors and misleading those investors regarding the value of USLG shares while earning undisclosed commissions. (Dkt # 206 at 5–6).

The Government alleged Mr. Scott knew about these illegal brokers and worked alongside them to falsely inflate the price of USLG stock by purchasing and selling USLG free-trading shares in ways designed to create the illusion that the stock was trading in the open market. (Dkt # 392 at 7). The Government also accused Mr. Scott of purchasing USLG free trading shares on behalf of Mr. Spivak, who was restricted from doing so himself due to his position as USLG CEO. (*Id.*; Dkt # 206 at 7–8). Mr. Scott subsequently sold those shares and reinvested the proceeds by purchasing

3

additional restricted shares in USLG. (Dkt # 392 at 7). The Government theorized that Mr. Scott's reinvestment was an attempt to conceal what was actually a kickback to Spivak. (*Id.*). As depicted in the Second Superseding Indictment, this alleged conspiracy ended in 2019. (Dkt # 206 at 11).

### B.    Second Alleged Conspiracy (2021)

The Government's second alleged conspiracy began in 2021, when Mr. Spivak transitioned from his previous team of unregistered brokers and began a relationship with an FBI Confidential Human Source (CHS), whom he believed to be a stock promoter with wealthy investment contacts. (Dkt # 206 at 31–34; Dkt # 392 at 8). As part of Mr. Spivak's plan to boost USLG stock with the help of the CHS, Mr. Spivak directed the CHS to purchase the 1,700,000 USLG free-trading shares that Mr. Scott owned at that time. (Dkt # 392 at 10). Contemporaneously, the CHS purchased the same number of shares from alleged co-conspirator Joe Church. (Dkt # 206 at 31–34).  In exchange for brokering that deal, Mr. Spivak agreed to pay the CHS in 1,585,000 shares of USLG stock, per the terms of a fraudulent consulting agreement. (*Id.*). In sum, the CHS and Mr. Spivak agreed that the CHS was to buy shares from Mr. Scott, promote the stock to inflate their price, and then sell off the shares at that inflated price. (*See* Dkt # 206 at 30). The exchange of these shares was effectuated by a series of wire transfers. (*Id.* at 32).

The Government's case against Mr. Scott rested on the allegation that Mr. Scott was selling his shares to the CHS at the behest of Mr. Spivak to circumvent SEC regulations that precluded Mr. Spivak from trading himself. (*Id.*). While Mr. Scott's actions during this alleged conspiracy show that he believed his activities were lawful, the Government asserted otherwise. For example, although Mr. Scott sought the opinion of an attorney to ensure the promotion scheme was legal, the Government argued that this legal opinion was fabricated as a cover for what Mr. Scott (who is not an attorney) supposedly knew was illegal. (Dkt # 206 at 7–8). Further, during his interactions with the CHS, Mr. Scott inquired about soliciting the CHS's investment contacts to invest in his

personal company, CareClix Holding, Inc. (Dkt # 206 at 31). Notwithstanding the banality of this request, the Government argued Mr. Scott's inquiry was an attempt to expand the fraud scheme. (*Id.*). Notably, no actual investor lost money in relation to the 2021 alleged conspiracy. (*See id.*).

## II.    Procedural History

The Court set a two-phase trial (one for each conspiracy), with the phases run consecutively in immediate succession before the same jury. (Omnibus Op. and Ord., May 31, 2024, Dkt # 327).

### A.    Trial

By the time the first phase of the trial began, two of the other alleged co-conspirators had pled guilty, leaving only Mr. Spivak and Mr. Scott. The first phase of the trial ran from August 20, 2024, to September 10, 2024 and included twenty-six witnesses in the government's case-in-chief, including other alleged co-conspirators. After hearing this evidence, the jury convicted Mr. Spivak of one count of Conspiracy to Commit Securities Fraud and two counts of Wire Fraud; it acquitted Mr. Spivak of 29 additional counts. (Verdict Form, Sept. 17, 2024, Dkt # 446). Conversely, the jury *acquitted* Mr. Scott of *all* the charges against him—*i.e.*, Conspiracy to Commit Securities Fraud (Count 1) and Securities Fraud (Count 13). (*See id.*; Dkt # 206).

In the second phase of the trial, Mr. Scott faced charges of Conspiracy to Commit Securities Fraud (Count 2), Securities Fraud (Count 20), and two counts of Wire Fraud (Counts 45 & 47). (Dkt # 206; Dkt # 327). These counts were limited to the conduct alleged to have occurred from February 15, 2021 through June 7, 2021. (Dkt # 206 at 29–36, 38–39).

The second phase of the trial was scheduled to begin the morning after the first phase concluded—September 11, 2024. (*See* Unnumbered Docket Entry on Sept. 11, 2024). That morning, before the second phase started, Mr. Spivak entered a guilty plea, which left "Mr. Scott to stand trial in phase two alone." (*Spivak*, No. 1:21-cr-00491-JPC-1, Dkt # 540 at 3). Following the Court's acceptance of Mr. Spivak's guilty plea (and thus his departure as a party from the trial),

Mr. Scott, through counsel, renewed an objection made at the beginning of the first phase, which sought to exclude statements of co-conspirators who had pled guilty and were no longer acting in furtherance of the conspiracy. The Court overruled this objection, and the Government introduced against Mr. Scott numerous statements from Mr. Spivak and other convicted co-conspirators.

Mr. Scott also renewed significant objections to the jury instructions in the second phase of trial, specifically with respect to the inclusion of an instruction on "deliberate ignorance." Counsel noted that the jury could apply this instruction to erroneously convict Mr. Scott on the basis of mere negligence, carelessness, or ignorance— rather than the requisite willful intent to defraud. The deliberate ignorance instruction, counsel explained, was thus inappropriate under *United States v. Mari*, 47 F.3d 782, 785 (6th Cir. 1995). The Court overruled this objection as well.

The crux of Mr. Scott's defense in the second phase was that he never intended to defraud any investor. Rather, he was a genuine investor in USLG who hoped for its success the way any investor would. Indeed, Mr. Scott was heard on recorded calls with the CHS confirming the legality of the promotion scheme and reiterating that he did not "want to hurt our shareholders." (Gov't Ex. 445-A). Likewise, CareClix is a legitimate company which Mr. Scott was seeking to expand, and he had hoped to build rapport with the CHS such that the CHS would connect him with a "whale" of an investor who might consider investing in CareClix. (*See* Scott Ex. 439).

Ultimately, the jury acquitted Mr. Scott of both Wire Fraud counts but convicted him of Conspiracy to Commit Securities Fraud and Securities Fraud. (Verdict form, Sept. 17, 2024, Dkt # 447). Because Wire Fraud required the Government to prove Mr. Scott intended to deprive investors of money or property whereas Securities Fraud did not, there is an obvious explanation for the jury's split verdict: It *rejected* the Government's allegation that Mr. Scott intended to take money from USLG shareholders. Instead, the jury accepted the Government's argument, made

6

throughout the case and in closing argument, that Mr. Scott assisted Mr. Spivak in trading stock on the open market while knowing (or remaining in deliberate ignorance) that Mr. Spivak was not allowed to do so in his position as CEO of USLG—an argument that, under the Court's jury instructions, sufficed to convict on the Securities Fraud and Conspiracy to Commit Securities Fraud counts but did *not* suffice to convict on the Wire Fraud counts.

### B.      Sentencing

The Court held a sentencing hearing on February 12, 2025. Prior to that hearing, Mr. Scott filed objections to the pre-sentence report and a sentencing memorandum. These filings raised several arguments, and Mr. Scott's most consequential argument contested the Government's attempt to increase his offense level by 18 points on the theory that Mr. Scott intended "to inflate the price from roughly $0.25 per share to $1 per share"—which, according to the Government, resulted in a total intended loss to investors of more than $3.5 million. (Government Sent. Mem., Jan. 30, 2025, Dkt # 537 at 4–5). Mr. Scott pointed out that a recent amendment to the U.S. Sentencing Guidelines foreclosed the Government's theory. (*See* Scott Sent. Mem., Jan. 29, 2025, Dkt # 536 at 5; Sent. Tr. at 10: 5–25, 11–12, 13: 1–4). That amendment provides:

> Relevant conduct does not include conduct for which the Defendant was criminally charged and acquitted in federal court unless such conduct also establishes in whole or in part the instant offense of conviction.

U.S.S.G. § 1B1.3(c).*

Mr. Scott argued that this new acquitted-conduct guideline barred the Court from accepting the Government's accusation that Mr. Scott intended to deprive investors of any property because he was *charged and acquitted* of that accusation. (Sent. Tr. at 10:5–25, 11–12, 13:1–4). Mr. Scott's

---

* There is no dispute this amendment applies here. As the Court noted, "for purposes of calculating the correct guideline, the Court applies amendment 826, a new Section 1B1.3(c) [to the U.S. Sentencing Guidelines]. It does not take into account acquitted conduct[.]" (Sent. Tr. at 9:6–9).

argument was straightforward: Wire Fraud, for which Mr. Scott was *acquitted*, explicitly includes as an element intended financial loss. 18 U.S.C. § 1343. In contrast, the Securities Fraud counts for which Mr. Scott was convicted do *not* include intended financial loss as an element. 15 U.S.C. §§ 78J(B), 78FF; 17 C.F.R. § 240.10B-5.

Indeed, the jury necessarily found that Mr. Scott did *not* intend to defraud investors of their money—a conclusion confirmed by the jury instructions. (Sent. Tr. at 12:13–23). The jury issued its split verdict after receiving a deliberate ignorance instruction (over Mr. Scott's objection) that instructed them that deliberate ignorance on Mr. Scott's part as to whether his actions would cause financial loss to investors was not a defense. (*Id.* at 14:15–18). The jury instructions also told jurors the value of securities was irrelevant for the Securities Fraud counts, while explicitly instructing them they could convict as to the Wire Fraud counts *only* if they found Mr. Scott intended to cause a financial loss. (*Id.* at 31:23–32:9).

In response, the Government argued the acquitted-conduct guideline was essentially irrelevant to Mr. Scott, insisting that "[b]ecause the only phase 2 acquittals were for conduct of which he was also convicted—both in a conspiracy count and a substantive securities fraud count—none of his phase 2 conduct is excluded from his relevant conduct." (Dkt 537 at 3; Sent. Tr. at 19:7–24). The Government maintained its calculation that the intended loss of the alleged conspiracy—an estimated $3.5 million—merited an 18-point increase in offense level. (Dkt 537 at 4–5; Sent. Tr. at 10:5–9).

When confronted with this issue at sentencing, the Court observed (correctly) that there is not "much out there beyond the text of the rules." (Sent. Tr. at 34:2–3). The Court noted that because there are no applicable committee notes, application notes, or caselaw, there was "not a lot to go on," and thus some "guidance on how to navigate the issue would be helpful." (*Id.* at

8

33:20–25, 35:5–6). The Court nevertheless pressed ahead to a decision, and began by agreeing with the Government that the "evidence in phase 2 of the trial established … that Mr. Scott … intended to sell the entirety of [his] holdings … and then those [purchasing] conspirators … would then resell those shares to investors with the ultimate goal of raising the stock price." (*Id.* at 34:11–18). Although the Court noted there "might be some tension" on the "set of facts with acquitted conduct," it determined that the new acquitted-conduct guideline does not "operate[] as a carveout" that would limit the Court's ability to agree with the Government's factual account. (*Id.* at 35:7–12). The Court thus concluded, notwithstanding the acquitted-conduct guideline, Mr. Scott was "liable for all the intended loss of th[is] conspiracy." (*Id.* at 35:8–12). But in doing so, the Court emphasized this was a conclusion with which "reasonable people could disagree." (*Id.* at 36:4–5).

Accordingly, after downgrading the intended-loss amount to $3.25 million, the Court imposed a 16-point enhancement to Mr. Scott's offense level. (*Id.* at 36:23–25, 37:12–16.). This placed Mr. Scott at an offense level of 29 and criminal history category I, "yielding a guideline range of 87 to 108 months." (*Id.* at 68:16–17). Notably, without the 16-point enhancement, Mr. Scott would have been a Zone C offender with a guidelines sentence of just 10–16 months incarceration—and eligibility to serve up to half of that sentence in home confinement under U.S.S.G §5C1.1. After considering its calculated guideline range, the Court departed substantially downward, sentencing Mr. Scott to a term of 42 months in the custody of the Bureau of Prisons. (*Id.* at 96:13–18). The Court then stated that "even if the guideline range had been incorrect . . . [it] would have imposed the same sentence under Section 3553(a) based on [its] consideration of the record as a whole and the 3553(a) factors." (*Id.* at 102: 13–17).

## LEGAL STANDARD

Under 18 U.S.C. § 3143(b), a court "shall order the release" of a defendant pending appeal, if the Court finds that (1) the defendant is "not likely to flee or pose a danger to the safety of any

other person," *id.* § 3143(b)(1)(A), and (2) his appeal is "not for the purpose of delay" but rather "raises a substantial question of law or fact" that, if resolved in his favor, will "likely" result in reversal, a new trial, a sentence that does not include a term of imprisonment, or a sentence shorter than the expected duration of the appeal, *id.* § 3143(b)(1)(B).

Satisfying both prongs creates an "entitlement to release from custody pending appeal," subject to any appropriate conditions of bond. *United States v. Zimny*, 857 F.3d 97, 101 (1st Cir. 2017). A defendant may establish that he is neither a flight risk nor a danger to the community if, among other things, the court allows him to voluntarily report. *See United States v. Freeman*, 42 F. App'x 808, 808–09 (6th Cir. 2002) ("Although the district court did not make a specific finding, there does not appear to be any serious evidence that the defendant poses a danger or is a risk of flight. She was permitted the privilege to voluntarily report to begin serving her sentence.").

To establish a "substantial question," the appeal must "present 'a close question or one that could go either way.'" *United States v. Sittenfeld*, No. 23-3840, 2024 WL 3025509, at *1 (6th Cir. May 15, 2024) (quoting *United States v. Sutherlin*, 84 F. App'x 630, 631 (6th Cir. 2003)). It must also be likely that success on appeal would result in satisfaction of any of the criteria within Section 3143(b)(1)(B). *Id.* (citing *United States v. Pollard*, 778 F.2d 1177, 1181–82 (6th Cir. 1985)). Importantly, establishing a "substantial question" "does not require a court to think reversal is probable or likely." *Sittenfeld*, 2024 WL 3025509, at *1 (citing *Pollard*, 778 F.2d at 1181–82). Indeed, courts within this circuit grant release pending appeal even in cases where they ultimately reject the appeal on the merits. *Compare Sittenfeld*, 2024 WL 3025509, at *1 (granting release pending appeal) *with United States v. Sittenfeld*, 128 F.4th 752 (6th Cir. 2025) (rejecting merits of appeal). This underscores that the standard for release pending appeal is a distinctly *lower* standard than finding the defendant will likely prevail on the merits of his appeal.

10

## ARGUMENT

This is a quintessential case for release pending appeal. There is no question Mr. Scott presents no danger or flight risk, and his appeal is not for purposes of delay. In addition to the new trial arguments based upon, *inter alia*, the erroneous introduction of evidence and improper instruction on deliberate ignorance, Mr. Scott's appeal will present a novel question concerning the application of a new guidelines amendment—a question the Court acknowledged "reasonable people could disagree" about. (Sent. Tr. at 36:4–5). Beyond Mr. Scott's evidentiary and jury-instruction arguments, which would reverse his sentence, success on the guidelines argument would result in a prison term less than the expected duration of his appeal. Absent intervention, Mr. Scott will serve most or all of his sentence before his appeal is complete, effectively nullifying his appellate rights. Courts routinely grant release in such cases. This Court should do the same.

## I.      Mr. Scott is Not a Flight Risk and Does Not Pose a Danger to the Community

Mr. Scott is 70 years of age with "strong family support and no criminal history." (Sent., Tr. at 92:1–3; 94:6–7). He has surrendered his passport to pre-trial services and resides on his personal farm in Virginia, which he manages with the help of his son who returned home from college to support his family through this case. (*Id*. at 83:7–23; Order Setting Conditions of Release, Nov. 16, 2021, Dkt # 62). Mr. Scott is also in the process of receiving professional medical treatment for short-term memory loss, anxiety, depression, and insomnia. *See* Dr. Peter G. Bernad Letter (April 2, 2025), attached as Exhibit A. Mr. Scott simply possesses no characteristic that could possibly suggest he is a flight risk. He does not have the means or nature to run from his responsibilities with respect to this case and is a man with deep respect for this Country's justice system, notwithstanding the ways it has failed him. (Sent. Tr. at 84:14–22).

Furthermore, Mr. Scott was released on a $100,000 unsecured appearance bond at the time of his arraignment on November 16, 2021. (Appearance Bond, Nov. 16, 2021, Dkt # 61). The only

conditions of that bond were that Mr. Scott comply with the collection of his DNA, notify pre-trial services prior to any change in address, surrender his passport, transfer any firearms in his possession to a responsible party, refrain from possessing a firearm, and appear at all scheduled court appearances. (Dkt # 62). In the more than three years since being made subject to that bond, Mr. Scott has not had a single violation. He has appeared for every court appearance as required, even though he resides in Virginia—a fact that further confirms he continues to pose no flight risk. *See, e.g., United States v. Baum*, 785 F. Supp. 570, 571 (E.D. Va. 1992) (finding defendant was not a flight risk and ordering release pending appeal because "Defendant has promptly and properly appeared at all scheduled meetings of the court, at all appointments with Pretrial Services, Probation and Parole, and with his defense counsel.").

Notably, after imposing Mr. Scott's sentence, the Court, without objection, allowed Mr. Scott 60 days to self-report to the Bureau of Prisons (Sent. Tr. at 101:22–25; 102:1–2, 21–23), further confirming Mr. Scott is not a flight risk. *See Freeman*, 42 F. App'x at 808–09 (self-reporting considered evidence against classification of defendant as flight risk or dangerous to community). Indeed, after hearing testimony from Mr. Scott and his domestic partner of 37 years, the Court found Mr. Scott's "age, lack of criminal history, and long-standing contributions to [his] community…demonstrate less of a need to protect the public from future crimes." (*Id*. at 96:2–9).

In sum, based on his age, medical condition, history of compliance with the Court's orders, and the Court's own findings, there can be no serious contention that granting Mr. Scott release pending his appeal would endanger the community or result in his flight.

**II.     Mr. Scott's Appeal Raises a Substantial and Novel Question Concerning the Application of the Newly Enacted Acquitted-Conduct Sentencing Guideline That, If Answered in His Favor, Would Satisfy the Criteria in 18 U.S.C. § 3143(b)(1)(B)**

**A.     Mr. Scott's Appeal Raises a Substantial Question of Law**

Mr. Scott's appeal will argue the new acquitted-conduct guideline, Section 1B1.3(c), barred a finding that he "purposely sought to inflict" harm on investors and thus required finding no "intended loss" under the sentencing guidelines, U.S.S.G. § 2B1.1(b)(1)(C)(ii). This argument is a straightforward application of the guideline's text. It *at least* raises a substantial question.

The "intended loss" guideline defines "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1(b)(1)(C)(ii). Where a defendant undertook "a criminal plan, scheme, endeavor, or enterprise," the "relevant conduct" guideline allows courts to impute to the defendant the conduct of others that was "(i) within the scope of the jointly undertaken criminal activity[,] (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Accordingly, to increase Mr. Scott's offense level, the Government needed to show that he *personally* intended to deprive investors of their property or participated in a criminal scheme to deprive investors of their property. Section 1B1.3(c), foreclosed the Government from doing so.

**1.     The jury instructions, the jury verdict, and the plain text of Section 1B1.3(c) suffice to preclude the Court from considering the Government's allegation that Mr. Scott intended to deprive investors of property or joined a scheme to do so**

Section 1B1.3(c) states that relevant conduct for the determination of the guideline range "does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." § 1B1.3(c). The text of this provision consists of two clauses (an independent clause followed by a subordinate "unless" clause) that direct courts to undertake a two-step analysis.

The first clause of Section 1B1.3(c) sets forth the general rule: In calculating the guideline range, courts may *not* consider "conduct for which the defendant was criminally charged and acquitted in federal court." U.S.S.G. § 1B1.3(c). There is no dispute Mr. Scott was criminally charged with personally intending to deprive investors of their property and with participating in a scheme to deprive investors of their property. The Government repeated this accusation throughout the trial, and the Second Superseding Indictment likewise alleges that Mr. Scott, together with several coconspirators, "*engaged in a criminal scheme when they conspired and agreed to defraud investors and potential investors in USLG* by issuing millions of shares to themselves and then artificially controlling the trading volume and price of the shares to sell the stock and enrich themselves, causing losses to investors." (Dkt 206 at 1 (emphasis added)).

There is also no dispute the jury *acquitted* Mr. Scott of personally intending to deprive investors of their property or participating in a criminal scheme to do so. The Wire Fraud instruction specifically told the jury to acquit Mr. Scott if they found that he did not participate in "*a scheme to defraud in order to deprive another of money or property* in connection with the purchase or sale of USLG stock." (Dkt #390 at 52) (citing Pattern Crim. Jury Instr. 6th Cir. 10.02 (Mar. 2023)). And that is precisely what the jury did.

Accordingly, Section 1B1.3(c)'s first clause barred the Court from finding any "intended loss"—"unless" Section 1B1.3(c)'s second clause applies. It does not. The second clause limits the first clause's general carveout rule: A court *can* consider acquitted conduct *only if* the conduct "also establishes in whole or in part, the instant offense of conviction." U.S.S.G. § 1B1.3(c). Mr. Scott's alleged intent to deprive investors of property—either personally or as part of a scheme to do so—*did not establish* the Securities Fraud or Conspiracy to Commit Securities Fraud counts.

14

Critically, neither the Securities Fraud count nor the Conspiracy to Commit Securities Fraud count presented to the jury at the second phase of the trial required the jury to find an intent to deprive investors of property. The jury was instructed that it could convict Mr. Scott of Securities Fraud if the Government proved beyond a reasonable doubt that he acted with "intent to defraud"—which the instructions defined to mean "to act knowingly and with the intent to deceive"—in using instrumentalities of interstate commerce to (1) "employ[] any device, scheme, or artifice to defraud" *or* (2) to "ma[k]e any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements … not misleading," *or* (3) to "engage[] in any act … which operates or would operate as a fraud or deceit upon any person." (Dkt #390 at 34, 37 (citing 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5)). The jury was also instructed that it could convict Mr. Scott of Conspiracy to Commit Securities Fraud if the Government proved beyond a reasonable doubt that (1) "two or more persons conspired, or agreed, to commit the crime of Securities Fraud," (2) that Mr. Scott "knowingly and voluntarily joined the conspiracy," and (3) "that a member of the conspiracy did one of the overt acts described in the Second Superseding Indictment for the purpose of advancing or helping the conspiracy." (Dkt #390 at 26).

*None of these elements for either of these counts* required the jury to find Mr. Scott intended to deprive investors of property, or find Mr. Scott joined a conspiracy to deprive investors of property. On the contrary, the instructions expressly allowed the jury to convict Mr. Scott of both counts upon finding that he knowingly and voluntarily joined a conspiracy to engage in an act that would operate as a fraud or to omit a material fact necessary to make a statement not misleading— regardless of whether he or the conspiracy intended to deprive anyone of any property.

In short, while the Wire Fraud counts required the jury to find a specific intent to deprive investors of property, the Securities Fraud and Conspiracy to Commit Securities Fraud counts did

*not*. Accordingly, the Government's allegation that Mr. Scott personally intended to deprive investors of their property or participated in a scheme to do so did not "establish[] in whole or in part, the instant offense of conviction." U.S.S.G. § 1B1.3(c). Pursuant to Section 1B1.3(c), the Court should not have considered that allegation in calculating the guideline range—and thus should not have added 16 points to Mr. Scott's offense level. At the very least, the correctness of the Court's conclusion on this score is a "close question" that satisfies the "substantial question" requirement of 18 U.S.C. § 3143(b). *Sittenfeld*, No. 23-3840, 2024 WL 3025509, at *1.

> **2.      The arguments and evidence at trial show that the jury rejected the Government's allegation that Mr. Scott intended to deprive investors of their property, and thus further confirm that Section 1B1.3(c) barred the Court from accepting the Government's contrary allegation**

Even beyond the elements listed in the jury instructions (which alone suffice under the plain text of Section 1B1.3(c)), the facts and arguments presented at trial confirm that the jury *acquitted* Mr. Scott of intending to deprive investors of property—the precise intent that the Court used to enhance Mr. Scott's offense level.

At the sentencing hearing, this Court accepted the central allegations the Government advanced at trial: The Court stated that the evidence from the second phase of the trial established that "Mr. Scott . . . intended to sell the entirety of [his] holdings as part of the undercover operation and investigation, and then those conspirators, so to speak, would then resell those shares to investors with the ultimate goal of raising the stock price to allow USLG shares ultimately to trade on the NASDAQ." (Sent. Tr. at 34:13–18). The Court then concluded that the guidelines authorized it to hold Mr. Scott "liable for all the intended loss of the conspiracy." (*Id.* at 35:8–12).

The jury, however, plainly *rejected* those allegations. If they did not, they would have convicted Mr. Scott of Wire Fraud. After all, the "pump and dump" conspiracy on which the Court's sentence relied plainly would have constituted "a scheme to defraud in order to deprive

16

another of money or property in connection with the purchase or sale of USLG stock." (Wire Fraud Instruction, Dkt 390 at 52). The jurors acquitted Mr. Scott of Wire Fraud because they *rejected* the Government's allegations on this score. And they did so for good reason: At trial, Mr. Scott argued vigorously that at no point did he intend to defraud any investor; he was instead a genuine investor in USLG who (like any investor) hoped for its success. (Tr. Sent., 67:4–9). Indeed, recorded calls with the CHS included statements from Mr. Scott confirming the legality of the promotion scheme, reiterating that he did not "want to hurt our shareholders," (Gov't Ex. 445-A), and seeking investment from the CHS into his legitimate business, CareClix. (*See* Scott Ex. 439).

The jury's split verdict indicates that, rather than accept the Government's allegation that Mr. Scott joined the "pump and dump" conspiracy, the jury instead found more narrowly that Mr. Scott simply knowingly assisted Mr. Spivak in selling restricted shares. The jury was instructed that Securities Fraud includes "deceit upon [a] person in connection with the sale of stock." (Dkt. 390 at 37). And the Government argued that a person buying a company's stock should know that the company's CEO is also selling free-trading stock—and thus the Government contended that assisting Mr. Spivak in concealing that fact constituted securities fraud. The Government's argument and the instructions therefore told the jury that if it believed Mr. Scott knowingly assisted Mr. Spivak in selling restricted shares, it could convict him for Securities Fraud and Conspiracy to Commit Securities Fraud—*even if* it concluded that Mr. Scott was not part of any scheme to deprive investors of property. And that is ultimately what the jury did.

In the face of these arguments, all of which were raised at sentencing, (Tr. Sent. at 13–16), the Government never attempted to explain the jury's split verdict—much less explain how the allegations in its sentencing memorandum were consistent with the jury's verdict, the instructions, and the arguments raised at trial. (*Id.* at 19–23).

The point of Section 1B1.3(c) is to bar courts from considering allegations at sentencing that have been rejected by a federal jury. Here, the jury plainly rejected the allegation that Mr. Scott intended (or participated in a scheme that intended) to deprive investors of property. Section 1B1.3(c) thus barred the Court from considering that alleged intent in calculating the guideline range. This point, too, presents at least a "close question" sufficient to entitle Mr. Scott to release pending appeal under 18 U.S.C. § 3143(b). *Sittenfeld*, No. 23-3840, 2024 WL 3025509, at *1.

**B.    Mr. Scott's successful appeal and the resultant elimination of the 16-point sentencing enhancement would cause him serve, if any, a term of imprisonment for less time than the likely duration of his appeal**

The final requirement under 18 U.S.C. § 3143(b) is that Mr. Scott's appeal would, if successful, result in reversal, a new trial, a sentence that does not include a term of imprisonment, or a sentence shorter than the expected duration of the appeal. As noted, in addition to challenging the Court's interpretation of the sentencing guidelines, Mr. Scott intends to challenge the Securities Fraud convictions, including based on objections to the Court's failure to reevaluate the admission of evidence following Mr. Spivak's guilty plea and the Court's deliberate-ignorance instruction (issues that will only add to the complexity of, and time required to resolve, his appeal). But these points cannot be articulated without the trial transcript, which has yet to be prepared. Nonetheless, even considering the guidelines argument *on its own*, Mr. Scott's success on appeal would result in a term of imprisonment, if any, that is less time than the likely duration of his appeal.

To recap, this Court calculated Mr. Scott's intended-loss amount as $3.25 million, for which he received a 16-point enhancement, which resulted in a guidelines range of 87–108 months. (Sent. Tr. at 36:23–25, 37:12–16, 68:16–17). The Court then departed downward and sentenced Mr. Scott to a term of 42 months in the custody of the Bureau of Prisons. (*Id.* at 96:13–18). In contrast, *without* the 16-point enhancement, Mr. Scott would have been a Zone C offender with a guidelines range of just *10–16 months and* eligibility for a split incarceration/home-confinement

18

sentence. *See* U.S.S.G. § 5C1.1(d) ("If the applicable guideline range is in Zone C …, the minimum term may be satisfied by … a sentence of imprisonment that includes a term of supervised release …, provided that at least one-half of the minimum term is satisfied by imprisonment.").

Even taking that guidelines range at face value—ignoring the possibility of a downward departure or split sentence—the resulting sentence is less than "the expected duration of the appeal process." 18 U.S.C. § 3143(b)(1)(B)(iv). Appeals for challenges to securities fraud convictions regularly take *years* to be resolved. *See, e.g.*, *United States of America v. Chartier*, 22-3125 (Second Circuit appeal challenging securities fraud conviction spanning 21 months); *United States of America v. Barama*, 23-2087 (Ninth Circuit appeal challenging securities fraud conviction spanning 17 months); *USA v. Jeffrey McHatton*, 22-10329 (Ninth Circuit appeal challenging securities fraud conviction spanning 24 months). Indeed, such appeals within the Sixth Circuit have taken as much as 28 months to be resolved. *See United States v. Bartoli*, 21-4045 (appeal challenging length of sentence for conviction of securities fraud). Accordingly, even on conservative presumptions, these timelines demonstrate Mr. Scott would likely serve his entire proper sentence during the pendency of the appeal. 18 U.S.C. § 3143(b)(1)(B).

Finally, success on the guideline issue would likely result in a sentence shorter than the expected duration of the appeal notwithstanding the Court's statement that "[it] would have imposed the same sentence under Section 3553(a) based on [its] consideration of the record as a whole and the 3553(a) factors." (Sent. Tr. at 102:13–17). As explained above, a correct application of the acquitted-conduct guideline deems Mr. Scott a Zone C offender with a guideline range of 10–16 months incarceration and eligibility for a split incarceration/home-confinement sentence. Imposing an above-guidelines sentence of 42 months for a Zone C offender—especially one with no prior criminal history and in conjunction with a large restitution order—would be unreasonable.

*See United States v. Herrera-Zuniga*, 571 F.3d 568, 590 (6th Cir. 2009) (noting that sentences outside guideline range are not afforded presumption of reasonableness).

The unreasonableness of such an upward variance is especially evident in light of sentences imposed on defendants who committed similar crimes. *See United States v. Aleo*, 681 F.3d 290, 301 (6th Cir. 2012) (looking to sentences of defendants who committed similar crimes in assessing reasonableness). During the last five years, there were 817 defendants whose primary guideline was § 2B1.1, with a Final Offense Level of 12 and a Criminal History Category of I (excluding defendants who received a substantial assistance departure). *Judiciary Sentencing Information Platform,* U.S. Sentencing Comm'n, https://jsin.ussc.gov/analytics/saw.dll?Dashboard. "For the 389 defendants (48%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 7 month(s) and the median length of imprisonment imposed was 6 month(s)." *Id.* Accordingly, based on Mr. Scott's specific factors under 18 U.S.C. § 3553 and the comparative sentences for similarly situated defendants, the Court's imposition of a 42-month sentence would be unreasonable. It is therefore likely that, if Mr. Scott prevails on appeal regarding the proper interpretation of the new acquitted-conduct guideline, his sentence would be reduced to a term shorter than the likely length of his appeal.

## CONCLUSION

Accordingly, pursuant to 18 U.S.C. § 3143(b) and Federal Rule of Criminal Procedure 46, Mr. Scott respectfully moves this Court for release pending appeal.

Respectfully submitted,

*/s/ David M. DeVillers*
David M. DeVillers (0059456)
Samantha R. Pugh   (0101035)
BARNES & THORNBURG LLP
41 South High Street, Suite 3300
Columbus, Ohio  43215-6104
Telephone:     (614) 628-0096
Facsimile:     (614) 628-1433
david.devillers@btlaw.com
Samantha.Pugh@btlaw.com

*Attorneys for Defendant Charles Scott*

## **CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that the foregoing document has been served on all counsel of record via the Court's ECF filing system on this 7th day of April, 2025.

*/s/ David DeVillers*
David DeVillers