1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA, )    Case No. 21-cr-491
                          )
            Plaintiff,    )
                          )    September 12, 2024
        vs.               )    8:57 a.m.
                          )
CHARLES SCOTT,            )    **Phase 2, Day 2**
                          )
            Defendant.)

- - - - -

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE J. PHILIP CALABRESE,

UNITED STATES DISTRICT JUDGE,

AND A JURY.

- - - - -

Official Court Reporter:   Susan Trischan,RMR,CRR,FCRR,CRC
                           7-189 U.S. Court House
                           801 West Superior Avenue
                           Cleveland, Ohio    44113
                           (216) 357-7087

Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.

```
1    APPEARANCES:

2    For the Government:        Elliot D. Morrison, AUSA
                                Megan R. Miller, AUSA
3                               Stephanie Wojtasik, AUSA
                                Office of the U.S. Attorney
4                               Northern District of Ohio
                                801 West Superior Avenue
5                               400 U.S. Court House
                                Cleveland, Ohio   44113
6                               (216) 622-3600

7


8
     For Defendant Scott:      David M. DeVillers, Esq.
9                              Samantha Pugh, Esq.
                               Barnes & Thornburg
10                             Ste. 3300
                               41 South High Street
11                             Columbus, OH 43215
                               614-628-1446
12


13
                               - - - - -
14

15

16

17

18

19

20

21

22

23

24

25
```

1        THURSDAY, SEPTEMBER 12, 2024, 8:57 A.M.

2              THE COURT:  Please be seated.

3              So I've been talking with IT, apparently

4        there's a national Microsoft problem at the moment so any

08:57:46  5    platform, including our support platform for the court

6        reporter is at best spotty and likely down.

7              There's no ETA on that at the moment, so

8        it's not a Court problem, so sorry about that.  My -- so

9        in terms of proceeding with the jury and the witnesses

08:58:05 10    and the like, I want to get a little bit more clarity on

11        what might happen because to the extent there's audio

12        files or AV files or even just all of you, like,

13        checking, like, logging into your networks and the like,

14        I don't have any -- I know that I can't take notes and so

08:58:22 15    forth or access my notes at the moment, but you all might

16        have problems as well.

17              So we'll at least get a little bit of

18        clarity before we move forward.

19              So that's the update on the technology from

08:58:34 20    my end, but I think there were some issues you wanted to

21        talk about which we might as well address while we're in

22        limbo.

23              MR. DeVILLERS:  Yes, Your Honor.

24              It's my understanding of the Court's

08:58:45 25    standing order that we're not allowed to talk to

1    witnesses about their testimony in between testimony.

2                    And we got 302s, new 302s the past couple

3    days from Mr. Church.  We completely understand why they

4    would want to talk to Mr. Church about stuff in 2021, but

08:59:04  5    they went back and started talking to him about what

6    happened in 2018 at least twice, and lo and behold, you

7    know, this whole e-mail chain with Ms. Petitti about

8    trying to see if they can -- they can promote stock and

9    can or can't do it, that's no longer a legitimate thing,

08:59:26 10    that was a paperover.

11                    And there's -- I'm -- just the tip of the

12    iceberg, it's my understanding that's the Court's order

13    they're not supposed to do that, and they did.

14                    And we would object to Mr. Church

08:59:38 15    testifying at all in this trial because what will happen

16    is they'll say, "Well, we won't talk about 2018," but

17    then he'll get up and say -- they'll ask, "Was your

18    understanding this," and that's how they've been getting

19    bunches of stuff in, and they're going to get that in by

08:59:52 20    asking that question, going back to what they talked to

21    him about the past couple days.

22                    MR. MORRISON:  If I may, Your Honor, I find

23    this argument to be completely ludicrous.

24                    The entire reason we had these

09:00:01 25    conversations with Mr. Church recently is because we were

1    not permitted to talk to him during his testimony in the

2    first phase.

3                   And during his testimony in the first

4    phase, it came to light that the defense was -- and I

09:00:12    5    don't put this on Mr. DeVillers because it was

6    Mr. Axelrod who had been withholding a waiver of

7    privilege as to that conversation with Ms. Petitti.

8                   We had been previously unable to discuss

9    what those conversations with Ms. Petitti had been, and

09:00:27   10    then on cross-examination he was presented with this

11    e-mail and asked to just, you know, explain how they had

12    gone to Ms. Petitti for advice.  They're, you know,

13    walking up to this advice of counsel line.

14                   However, as much as we would have liked to

09:00:43   15    talk to him about that, without then knowing that at that

16    moment they were waiving privilege in connection with

17    those discussions, we couldn't because he was testifying.

18                   After he completed his testimony, that rule

19    does not apply any more.

09:00:56   20                   And so in preparing for his testimony in

21    this phase, we did talk to him and, frankly, we talked to

22    him twice because the first time was -- I had totally

23    forgotten that this was an issue, and then in reviewing

24    my notes I remembered, oh, my goodness, we can actually

09:01:11   25    ask him these questions now.

1       So we spoke to him last night with his

2   attorney, and went to great lengths to try and provide a

3   report of that conversation to the defense.

4       I don't think there's anything

5   inappropriate either about having those conversations

6   with him to prepare for his testimony when it has yet to

7   begin, nor about asking him about the arrangement from

8   2018, especially when we couldn't have discussed it with

9   him before and when the recordings that are at issue here

10  and now refer back to that original arrangement in 2018

11  and discuss how he came to receive those shares and

12  discuss the issue of how Mr. Church and Mr. Scott were

13  trying to set up a promotional campaign.

14      And that, in effect, the description is

15  "The source is going to do what they were going to do

16  anyway."  And that's what was happening in 2021.

17      And so putting a framing on that of what

18  did you understand about what you were doing and why you

19  were going to have the source do it instead of you do it,

20  I think is perfectly fair game and nothing inappropriate

21  about the conversations we've had.

22      MR. DeVILLERS:  Your Honor, not only did

23  they have the opportunity to ask him about those, those

24  e-mail chains, they did in redirect.

25      And he answered the questions.

1          And now they're coming up with, "Oh, I

2     didn't like that answer so we're going back to talk to

3     him and see if he'll change his answer," because they

4     asked him these questions.

5          THE COURT:  So I guess there's two

6     different issues from my standpoint, so let me break them

7     down and focus on them.

8          I think the issue is on the second half of

9     this and so I'll drill down for a moment on that, and I

10    might need to go back to some notes and the like of mine,

11    which might be a little tricky for the time being.

12         On the first issue about my standing order

13    on witnesses, first of all, there's a split of authority

14    out there in the world about whether witnesses who are

15    testifying can talk to counsel or not.

16         I put -- include that language in my order

17    for the purpose of putting everybody on notice that my

18    view is, right or wrong, on the side that once a witness

19    is testifying, everything is about their testimony.

20         And so, like, counsel talking to them,

21    coaching them, et cetera, is not proper.  And I think

22    that in the context of a deposition, for example, I think

23    it's fair game to get -- like, there's no privilege there

24    in my view, so I'm putting everybody on notice of that.

25         In a case like this where we have matters

1    phased, what I would say is I don't think anyone who's on

2    a witness list for phase two, but already testified in

3    phase one, remains on the stand actively or

4    constructively.

09:04:02  5              So I don't see a problem, when Church comes

6    off the stand, with him talking to his lawyer or anybody

7    else.  Now, that can all be inquired into.

8              So that is the first set of issues, as I

9    see it.

09:04:17 10              The second set of issues, though, I think

11   is really more this notion of what was the testimony that

12   he gave in phase one relative to Morgan Petitti and the

13   conversations about securing the opinions and so forth,

14   and kind of where are we going in phase two on that.

09:04:37 15              And so that's where -- that's where, you

16   know, I think I would need to go back and look in my

17   notes on his testimony and maybe even the transcript of

18   what he actually said versus where he's going to go now.

19              You know, the one, the one thing that does

09:04:51 20   come to mind on that is that the jury heard all that, and

21   so at some level whatever he says now, you know,

22   might -- I mean, certainly would be open to attack, it

23   seems to me, but I, you know, that's just a passing

24   thought without access to anything he said the first time

09:05:21 25   around.

1        MR. MORRISON:  And to be clear on it, we

2    went back and asked him about the e-mail because it was a

3    marked exhibit, but we did not ask him about -- and they

4    can correct me, maybe I misremembered this but we both

09:05:33  5    have the transcript -- I do not believe I asked him what

6    were the conversations you had with Ms. Petitti leading

7    up to this e-mail because, again, at the time, I had not

8    understood that to be a topic I could get into because it

9    had been -- there had been a privilege asserted by

09:05:46  10    Mr. Spivak as to Ms. Petitti vociferously up, down and

11    sideways, including allegations of Government misconduct.

12        And so, again, I don't -- I'm not

13    suggesting Mr. DeVillers made those allegations, but we

14    were in a position where I didn't think I could ask those

09:06:04  15    questions.

16        THE COURT:  Let me ask this.

17        MR. DeVILLERS:  I was going to throw the

18    dig in that's why they should have severed this case to

19    begin with, but they did and so they are stuck with what

09:06:16  20    happened.  Just because it was Mr. Spivak, they are still

21    stuck with it.

22        THE COURT:  You know, it's interesting, I

23    don't know the answer to this question.

24        Petitti is counsel to the company so that's

09:06:38  25    where the privilege lies, but is there a common interest

1      privilege around the transaction?

2                MR. MORRISON:  The reason why we did not

3      get into those conversations around the transaction was

4      the view of Mr. Church's attorney and of our filter team

09:06:51 5      that there was a potential privilege, not conclusively,

6      but that there was a -- effectively a joint venture by

7      them to start a call room business of sorts, right, and

8      that in that joint venture of the three of them there

9      could be a common interest privilege or a sort of an

09:07:08 10      informal partnership privilege.

11                And for that reason, Mr. Church's attorney

12      informed us that these communications had happened, but

13      they didn't feel comfortable unilaterally waiving the

14      privilege and so they didn't want to get into it, and we

09:07:25 15      agreed not to get into it.

16                THE COURT:  Yes, it's a little murky under

17      privilege law.  Best not to plumb those depths.

18                MR. DeVILLERS:  I believe on direct they

19      did specifically ask him about a plan to market.  They

09:07:36 20      didn't get into e-mails.

21                THE COURT:  You mean with Dean or --

22                MR. DeVILLERS:  With, no, in the first

23      trial.

24                THE COURT:  Phase one.

09:07:42 25                MR. DeVILLERS:  Phase one, they got into,

1    with Mr. Church, a plan on direct examination between

2    Mr. Scott and him to market the stock.

3              THE COURT:  Right.  That was in 2018.

4              MR. DeVILLERS:  They didn't show the

09:07:55 5    e-mails.

6              And this is what they are talking about

7    now, this is what they went back and are talking about

8    because they didn't like his answers.

9              MR. MORRISON:  There's a big difference

09:08:03 10   between talking about the business plan and talking about

11   the attorney advice related to the business plan.

12             MR. DeVILLERS:  No, there isn't.

13             MR. MORRISON:  One is privileged; the other

14   is not.

09:08:10 15            MR. DeVILLERS:  No, they are not

16   privileged.  They are not my client's privilege.  My

17   client waived and gave it to you in discovery.

18             I'm not talking about Spivak.  I'm talking

19   about my client.  You decided to try this with him.

09:08:26 20            MR. MORRISON:  Your client provided an

21   e-mail, but did not provide us the substance of these

22   conversations, which until literally last night we did

23   not know about.

24             And so to the extent that there was an

09:08:36 25   argument for waiver by your client, I understand there

1        could have been an implied waiver by your client by

2        turning over that e-mail, right?

3                    However, it's not as though anything was

4        explained to us about what lead up to that e-mail, nor

09:08:49  5        was there any similar waiver by Mr. Spivak until after

6        Mr. Church testified and we raised this issue of we feel

7        like we're being whipsawed here.

8                    On the one hand, they claim there's

9        privilege as to Ms. Petitti.  And again not you, but

09:09:05  10        Mr. Axelrod claims there's privilege as to Ms. Petitti

11        and then wants to use this e-mail.

12                    THE COURT:  What was the exhibit number

13        from phase one?

14                    MR. MORRISON:  16, Defendant Scott's

09:09:16  15        Exhibit 16.

16                    THE COURT:  Let me go back and take a look

17        at that.

18                    I mean, I guess the question is -- well, I

19        mean, this is why I'm kind of hung up on the second

09:09:32  20        issue, as I put it on the table.

21                    I mean, what's the -- I mean, how does this

22        come up, you know, actually as Church is testifying?  The

23        question is going to be, you know, tell me about your

24        program with Mr. Scott to promote and market the stock.

09:09:50  25                    MR. MORRISON:  And specifically that the

1    way that it comes up via both Mr. Spivak and Mr. Scott

2    and Mr. Church is there's a pre-existing plan to find a

3    way to market the stock before the source comes into

4    play.

09:10:03  5              The source comes into play, and the thought

6    is, well, it would be a whole lot better to have him do

7    it because it's illegal to do, and we know that because

8    of this conversation with Ms. Petitti.

9              That is Mr. Church's perspective I

09:10:18 10   anticipate, that effectively --

11             THE COURT:  So the testimony from phase one

12   is something like this -- again I don't have the

13   transcripts in front of me or my notes; we're working off

14   of memory -- on these points it's something like, "Church

09:10:30 15   says Mr. Scott was always careful and wanted to do things

16   by the book.  He's the one who wanted to consult the

17   lawyers and so forth."

18             And as I recall, there was a, after this, I

19   think there was, "Okay, this one isn't going to work so

09:10:52 20   we're going to go back and rejigger the plan and do it

21   some different way."

22             So that's kind of where the record stands

23   from what the jury has heard at this point.

24             MR. DeVILLERS:  I think the record was they

09:11:02 25   completely abandoned the idea of marketing at all and

1    didn't do it.

2                   MR. MORRISON:  Well, they went back to

3    Mr. Mallion to do the marketing.

4                   MR. DeVILLERS:  That's what you said in

09:11:10  5    closing argument.  That's not what anyone else said.  All

6    right.

7                   There's no evidence that my client wanted

8    to go back to Mr. Mallion.  There's zero evidence of

9    that.

09:11:17 10                   MR. MORRISON:  That's what Mr. Church

11    testified, they did.

12                   MR. DeVILLERS:  No, he didn't.

13                   THE COURT:  Well, I'll check the transcript

14    as soon as we can access it, which will hopefully be

09:11:24 15    soon.

16                   But let me look at that exhibit.

17                   I mean, I guess so I think what I'm trying

18    to understand is just, like, what's the specific

19    testimony that Church would give in phase two that's

09:11:39 20    somehow implicated by the statements in the last couple

21    days?

22                   Because it seems to me that to the extent

23    there's a concern that he's now testifying differently

24    than he did before, I would trust that Mr. DeVillers will

09:11:56 25    tear him a new one and, you know, there's going to be

1    consequences in front of the jury for whatever Church

2    says today that's -- or today or tomorrow that's

3    different from what he said a week or two ago.

4              But I'm not sure if there's an issue more

09:12:15  5    poignant than that.

6              MR. MORRISON:  I agree on that.

7              We have different memories of what that

8    testimony was, and Mr. DeVillers and I, we both, all of

9    us have the transcript and can use it to our advantage or

09:12:28 10    disadvantage.

11              THE COURT:  We constructively have the

12    transcript.

13              So is there a different specific issue,

14    Mr. DeVillers?

09:12:35 15              MR. DeVILLERS:  No.

16              I think -- I think you have the issues,

17    Judge.  Just it's -- it seems to me it's a completely

18    blatant ignoring of your standing order.

19              I mean, I get talking about 2021, but they

09:12:51 20    went back and just talked to him about 2020, 2018, and

21    now his testimony has changed.  It's not "maybe changed."

22              And there are two 302s they have the past

23    couple days.  One we don't have yet, we have a rough, but

24    I would ask the Judge to review those if they're willing

09:13:06 25    to provide them to you.

1          MR. MORRISON:  Happy to, yeah.

2              I mean, again, we wanted to make sure to

3     not ambush Mr. DeVillers with this, and so as soon as we

4     had the conversation, we provided him a draft, like, just

09:13:19  5     a blank Word document basically because there's no time

6     to get it into the official form.

7          THE COURT:  If it's a Word document, we are

8     not going to see it for some time.

9          MR. MORRISON:  Yeah, don't worry, converted

09:13:33 10     on PDF.

11          THE COURT:  Well, if you can.  I don't know

12     if the printer is on a Microsoft platform like SharePoint

13     or something.

14          MR. MORRISON:  Yeah.

09:13:41 15          THE COURT:  But that might be an issue.

16              But let me -- I suppose at some level it

17     only becomes an issue if, in questioning, the United

18     States gets back into 2018 with Mr. Church.

19              I mean, if the whole examination is,

09:13:52 20     "Mr. Church, let's resume in 2021," you know, I don't

21     know if it comes up at all.

22              If it does come up, you know, from your

23     perspective, Mr. DeVillers, it might be slowpitch

24     softball, but we'll see.

09:14:11 25              All right.  Was that the issue you needed

1    to raise?

2                    Is there anything else we can --

3                    MR. DeVILLERS:  Yes, Your Honor.

4                    THE COURT:  -- fill air time with while we

09:14:18  5    are waiting?

6                    MR. DeVILLERS:  The evidence 106, you know,

7    we provided them -- we didn't want to play the whole 40

8    minutes.

9                    THE COURT:  Right.

09:14:24 10                    MR. DeVILLERS:  So we have three snippets

11    anywhere between seven, ten, probably about 18 minutes of

12    it, maybe a little bit longer, and it's my understanding

13    that they just said no, they have no intention of playing

14    that now.

09:14:36 15                    So I'm not sure what -- what's changed

16    since yesterday, but they're not going to do it.

17                    MS. MILLER:  Your Honor, we asked to see

18    the portions of the transcript that Mr. DeVillers felt

19    were misleading as required under Rule 106 based on the

09:14:56 20    portion that we played.

21                    I think there might be some

22    misunderstanding of the particular clip that the

23    Government played.

24                    The Government played a two -- well, the

09:15:06 25    Government played a clip that came from a

1    two-minute-and-45-second call on April 19th, 2021.

2              What Mr. DeVillers has suggested to correct

3    a misimpression is a 35-minute clip from a prior call on

4    April 16th of 2021.

09:15:27  5              Now, certainly we understand from the Rule

6    that it's not dispositive of whether it is the same

7    statement, but we don't believe that Mr. DeVillers has

8    identified any particular misimpression in what was

9    played, and certainly it's not cured with a 35-minute

09:15:44 10   colloquy, if you will, that was his -- Mr. Scott's

11   employee Bob simply talking about what the company does

12   and all of the great things that the company has to do

13   with money and the employees that it has and what not.

14              We understand that that's the defense

09:16:00 15   theory of the case, but that's not what is required under

16   Rule 106.

17              So we don't believe that that is

18   appropriate for correcting any misimpression that the

19   Government has created.

09:16:13 20              Certainly, if Your Honor finds otherwise,

21   then Mr. DeVillers is free to cross-examine with those

22   portions, but the Government, one, doesn't think that

23   they are appropriate under Rule 106, and doesn't intend

24   to play them in its case in chief.

09:16:26 25              MR. DeVILLERS:  Your Honor, there's -- they

1    are insulting our intelligence and they are suggesting

2    that the idea of the statement was, "Yeah, you've got to

3    get in before the herd," wasn't anything other than what

4    they are alleging, that there's some sort of

09:16:40  5    subconspiracy regarding CareClix and some sort of pump

6    and dump scheme.

7              I mean, that's the only reason they would

8    play that.

9              So to suggest otherwise, I mean, it's just

09:16:48 10    disingenuous.

11             MS. MILLER:  I was insulting --

12             MR. DeVILLERS:  May I continue?

13             MS. MILLER:  I just wanted to say I was

14    insulting our exhibit structure; not you.  That's all.

09:16:58 15    But our exhibit structure was complicated, so that's all.

16             MR. DeVILLERS:  Fair enough.

17             But the concept of all -- and Mr. Scott

18    and -- and Bob are in this with their informant, and they

19    are talking about the company, they are talking about

09:17:12 20    investing in the company, they are talking about the

21    reality of the company is not some sort of shell for a

22    pump and dump.

23             And this is misleading, and the only way to

24    cure it is for -- and we would ask them to play it

09:17:22 25    because it seems to us that that would -- it would

1    prejudice us by doing it on cross-examination.

2                    THE COURT:  Let me ask this.

3                    Is there a shorter -- so I think it was

4    roughly, I don't know, two-minutes-45-seconds, we'll call

09:17:41 5    it three minutes of a clip.

6                    Is there, like, so it does seem that 19

7    minutes, 18 minutes, something like that to put three

8    minutes into context is a little disproportionate and the

9    like, but is there a shorter clip that just basically

09:17:58 10    says CareClix is not a shell company for purposes of a

11    pump and dump or some such thing?

12                    MR. DeVILLERS:  I'll work on that, Judge,

13    now that we've got some time.  I'll see if I can shore it

14    down.

09:18:11 15                    THE COURT:  Hold on.

16                    Let me -- is there an update, Angela?

17                    THE CLERK:  Yes, we're back on.

18                    THE COURT:  Oh, we're back on?

19                    (Discussion had off the record).

09:20:42 20                    THE COURT:  So we do appear to be back up

21    online, so that's good news.

22                    Why don't we do this?  If you could, oops,

23    now that we have the -- presumably we all have the

24    ability to be online, if you just want to send me those

09:21:02 25    302s or send them to Angela, I'll take a quick look at

1      them.

2                        I'll go back and look at some of my notes

3      on a couple of these issues, and maybe at this point we

4      should plan to start in maybe 15 minutes or so and tell

09:21:24  5      the jury, you know, we're just rebooting at this point.

6                        I had images of losing, like, a whole day

7      today so this is actually probably about the best, the

8      best news in a young day.

9                        So give me a few minutes to go through the

09:21:45 10      notes in light of this discussion, and maybe we'll come

11      back in about 15 minutes or so and plan to get underway.

12                        THE CLERK:  All rise.

13                        (Recess taken.)

14                        THE COURT:  Please be seated.

09:41:57 15                        So I will continue to work through these

16      issues and we'll talk about them again before Church

17      testifies, but in the interests of moving things along

18      let's bring in the jury.

19                        MR. MORRISON:  Your Honor.

09:42:08 20                        MR. DeVILLERS:  Your Honor, I think we have

21      an agreement on a time period for 439.  That's 35 minutes

22      to 43:20.

23                        MS. MILLER:  We maintain our position that

24      it's still not the Rule of Completeness.

09:42:20 25                        If the Court wants to permit it, they can

1    play it on cross-examination.

2              MR. DeVILLERS:  It would be eight minutes

3    and 20 seconds.

4              THE COURT:  Okay.

09:42:29  5         MR. MORRISON:  We'll get the witness in,

6    Your Honor?

7              THE COURT:  Yes.

8              (Jury in.)

9              THE COURT:  Please be seated.

09:44:59 10         Good morning, Ladies and Gentlemen.

11             I apologize for the delay in starting this

12   morning.  By way of explanation, the Court experienced a

13   catastrophic Microsoft failure by the Court.  I don't

14   mean this Court.  I mean the United States Courts

09:45:16 15  nationally.

16             And in defense of the Courts, the

17   information available to me indicates it was a Microsoft

18   national problem.

19             It's been resolved.  We are back online so

09:45:31 20  far as we know technologically, so thank you for your

21   patience.

22             I apologize.

23             I will remind you, Mr. Dean, you're under

24   oath.

09:45:39 25         Counsel, you may resume your examination

1    when you're ready.

2                   MS. MILLER:  Thank you, Your Honor.

3              DIRECT EXAMINATION OF JASON DEAN (RESUMED)

4    BY MS. MILLER:

09:45:46  5   Q.   Good morning, Mr. Dean.

6    A.   Good morning.

7    Q.   Good morning.

8                   Does that work for you, Sue?  Great.

9                   Good morning, Mr. Dean.  How are you?

09:45:58 10   A.   Good morning.

11                  I'm well.  How are you?

12   Q.   Thank you.

13                  When we left off yesterday afternoon, you

14   had just been discussing the mid-April, 2021 time period.

09:46:07 15                  Do you recall that?

16   A.   Yes.

17   Q.   And specifically, we had listened to a recorded

18   conversation between yourself and Mr. Scott on April

19   19th, 2021.

09:46:19 20                  Do you recall that as well?

21   A.   Yes, I do.

22   Q.   And that was in relation to Mr. Scott's company

23   with the ticker symbol SOLI, is that right?

24   A.   Yes.  That's correct.

09:46:30 25   Q.   And did that ticker symbol have an actual company

Dean - Direct                                    208

1    name that you learned from Mr. Scott?

2    A.    Yes.

3    Q.    What was that?

4    A.    Soleil was the company name of the issuer and

09:46:43  5    CareClix was the asset, the revenue-generating or future

6    revenue-generating company underneath it.

7    Q.    About a week following your discussion with

8    Mr. Scott, did you receive any documentation from him in

9    connection with your ongoing and anticipated work for

09:47:01 10    CareClix?

11    A.    Yes.

12    Q.    What was that documentation?

13    A.    There were e-mails back and forth with company

14    description and files pertaining to the business at hand.

09:47:14 15    Q.    Could we pull up Government's Exhibit 181, please?

16         All right, sir.  In going forward today,

17    fair to say we're probably going to show you a series of

18    e-mails and recorded conversations as we did yesterday?

19         Is that right?

09:47:41 20    A.    Yes, I believe so.

21    Q.    And did you have the opportunity to review all of

22    that documentation and all of those recordings before you

23    came into Court to testify today?

24    A.    Yes, I believe so.

09:47:52 25    Q.    To the best of your recollection, do they

Dean - Direct

209

1    truthfully and accurately portray the e-mails, text

2    messages, and recorded conversations that you plan to

3    discuss today?

4    A.    Yes.

09:48:03  5    Q.    And then we don't have to do that for each exhibit

6    going forward at this point.

7    A.    Thank you.

8    Q.    Now, sir, what is on the screen before you?

9    A.    It's an e-mail from myself to Josh Flood, copying

09:48:32 10    Charles Scott.

11              It's a SPA, Stock Purchase Agreement, with

12    me requesting them to send wire instructions so that

13    Matt's office can initiate the wire.

14    Q.    And more generally speaking, this is part of those

09:48:48 15    e-mail communications with yourself, Mr. Scott and

16    Mr. Flood.

17              Fair?

18    A.    Yes.

19              MS. MILLER:  Could we turn to Page 11 of

09:48:55 20    this exhibit and publish, please, Your Honor?

21              THE COURT:  You may.

22    BY MS. MILLER:

23    Q.    Zooming in on this top portion, Ms. Wojtasik.

24              Mr. Dean, what date are we looking at here?

09:49:07 25    A.    Tuesday, April 27th, 2021.

Dean - Direct

210

1    Q.   All right.  So picking up where we left off

2    yesterday afternoon, this is about a week after your

3    discussion with Mr. Scott regarding CareClix?

4    A.   Yes.

09:49:20  5    Q.   Okay.  Tell us about the nature of this e-mail,

6    please.

7    A.   This is a e-mail from Joshua Flood -- Josh Flood,

8    excuse me.  Attached is a signed NDA with Mr. Scott.

9    Q.   Okay.  And specifically does it CC someone on the

09:49:38  10   e-mail?

11   A.   Yes.  Mr. Scott was cc'd as well.

12   Q.   What's Mr. Scott's e-mail here?

13   A.   It's -- sorry, it's M-R-Scott, S-C-O-T-T,

14   @CareClix.com.

09:49:52  15   Q.   And this is a different e-mail from those that

16   we've previously seen with respect to Mr. Scott?

17   A.   Yes.

18   Q.   Okay.  You see at the bottom here there is an

19   attachment.

09:50:01  20             What does that indicate?

21   A.   That indicates that there is a CareClix

22   nondisclosure agreement attached.

23   Q.   Page 12 of this exhibit, please, zooming in on that

24   top section, please, Ms. Wojtasik.

09:50:16  25             Sir, is that that nondisclosure agreement

Dean - Direct                                    211

1   that you just referenced?

2   A.    Yes.

3   Q.    Who were the parties to this agreement?

4   A.    The parties to the agreement are:  CareClix

09:50:32 5   Holdings Inc., formerly Soleil Systems, and Jason Dean,

6   myself.

7   Q.    In Paragraph 1, generally speaking, what was the

8   purpose of Mr. Scott sending this nondisclosure agreement

9   to you?

09:50:46 10  A.    It's a general confidentiality agreement.

11  Q.    What did it -- what was your understanding of what

12  you and Mr. Scott would be discussing in connection with

13  this NDA?

14  A.    We would be discussing the business plans of the

09:50:59 15  company going forward.

16  Q.    You may take that down, Ms. Wojtasik.

17            Thank you.

18            Now, the following day, sir, did you have

19  an opportunity to text with Mr. Scott?

09:51:10 20  A.    Yes.

21  Q.    Could we pull up Government's Exhibit 182, Page 3,

22  please?

23            MS. MILLER:  And may we publish this,

24  please?

09:51:23 25            MR. DeVILLERS:  No objection.

```
           1              THE COURT:  You may.

           2    BY MS. MILLER:

           3    Q.    Zooming in on that first text message,

           4    Ms. Wojtasik, thank you.

09:51:30   5              Do you see this April 28th date here, sir?

           6    A.    Yes.

           7    Q.    What does Mr. Scott text to you?

           8    A.    He sends a text that says, "Jason, would you mind

           9    installing Signal?  Signal is encrypted for text

09:51:47  10    messaging and voice calls.  Thanks, Charlie."

          11    Q.    And it seems fairly obvious from the text of this

          12    text, but what did you understand Signal to be?

          13    A.    Signal is an app which the -- has end-to-end

          14    encryption, and a messaging platform to transfer messages

09:52:09  15    and communicate back and forth.

          16    Q.    Did you have an opportunity to speak with Mr. Scott

          17    a few days later on the telephone?

          18    A.    Yes.

          19    Q.    Could we pull up Government's Exhibit 443A, please?

09:52:26  20              MS. MILLER:  And may we publish?

          21              THE COURT:  You may.

          22              MS. MILLER:  You may play this, thank you.

          23              (Tape playing).

          24    BY MS. MILLER:

09:53:05  25    Q.    Mr. Dean, why were you referencing Signal in this
```

Dean - Direct                                    213

1     phone call?

2     A.    Again, Signal is an app with end-to-end encryption.

3     It's much more private and harder to access the

4     information by outsiders.

09:53:16  5     Q.    You also referenced a burner phone.

6                     What is that?

7     A.    A burner phone would be a phone that's not

8     associated with my name or with anyone's name, kind of a

9     disposable phone that doesn't show up on my phone bill or

09:53:32 10     anything else.

11    Q.    Why did you mention a burner phone in your

12    conversation with Mr. Scott?

13    A.    Mr. Scott had inferred he wanted completely private

14    communication between the two of us.

09:53:44 15    Q.    Continuing that same day, sir, may we pull up

16    Government's Exhibit 443B?

17                    And may we play and publish?

18                    THE COURT:  Yes, you may.

19                    (Tape playing).

09:55:20 20    BY MS. MILLER:

21    Q.    First of all, sir, orient us to what this

22    discussion was in relation to.

23    A.    In general, about the access of freely tradeable

24    shares for Matt to purchase, and that Mr. Scott was

09:55:32 25    looking for some money for the company as well.

Dean - Direct                                214

```
        1    Q.    Why were you discussing freely tradeable shares?

        2    A.    Again, in light of Matt would want to have access

        3    to shares he could deposit and sell into any upswings

        4    more quickly than buying just restricted shares from the

09:55:53 5    company.

        6    Q.    Mr. Scott said to you, "I see how you guys

        7    operate."

        8              What did you understand him to mean by

        9    that?

09:55:58 10   A.    My understanding was that based upon --

        11             MR. DeVILLERS:  Objection.

        12             Speculation.

        13             THE COURT:  Can you rephrase?

        14   BY MS. MILLER:

09:56:14 15   Q.    Did you recall Mr. Scott saying to you, "I see how

        16   you guys operate"?

        17   A.    Yes.

        18   Q.    Had you been in a position to demonstrate how you

        19   operate to Mr. Scott?

09:56:24 20   A.    Yes.

        21   Q.    How were you operating?

        22   A.    We were waiting through Mr. Spivak in the purchase

        23   of freely tradeable shares to -- to make cash access for

        24   Matt much more quickly and trading available in the stock

09:56:41 25   much more quickly for Matt Bianchi.
```

Dean - Direct

215

1    Q.    Had you discussed what you were doing for USLG and

2    Mr. Spivak with Mr. Scott?

3    A.    In some degree, yes.

4    Q.    Okay.  And did you have an understanding of whether

09:56:54  5    Mr. Scott was aware of your involvement with USLG and

6    Mr. Spivak?

7    A.    Yes.  My understanding was that since

8    Mr. Spivak --

9              MR. DeVILLERS:  Objection.

09:57:03 10              Foundation.

11              THE COURT:  Overruled.

12    BY MS. MILLER:

13    Q.    What was your understanding, sir?

14    A.    My understanding, through the direct communication

09:57:23 15    with Mr. Spivak, Mr. Spivak communicating with Mr. Scott

16    and communicating back with me, that he understood how we

17    were operating in terms of getting the freely tradeable

18    blocks of stock to access the market immediately.

19    Q.    "He" being Mr. Scott understood?

09:57:39 20    A.    Yes.

21    Q.    You also discussed an investment bank, and I

22    believe Mr. Scott said, "They're bagging us right now."

23              What did you understand was going on with

24    this investment bank from your discussions with

09:57:53 25    Mr. Scott?

Dean - Direct

216

1    A.    My interpretation was that the investment bank was

2    intending to raise a significant amount of money for the

3    company.  The number he had mentioned was up to $15

4    million.

09:58:04  5              And my understanding of him saying they're

6    bagging him would be that they're either doing valuations

7    that Mr. Scott thought were unfair, i.e. buying the stock

8    too cheaply from the company, or charging too much in

9    fees.

09:58:21 10   Q.    Continuing to Government's Exhibit 443C, please.

11              And we're still on the same April 30th,

12   2021 phone call with yourself and Mr. Scott, is that

13   right, sir?

14   A.    Yes.

09:58:37 15              MS. MILLER:  May we publish and play?

16              THE COURT:  You may.

17              (Tape playing).

18   BY MS. MILLER:

19   Q.    And stopping there at about a minute and 22

10:00:13 20  seconds, when Mr. Scott indicates to you, "We haven't put

21   out any news, Jason," what did you understand that

22   reference to "news" to be?

23   A.    I understood that as they hadn't put out any news

24   releases telling the market what the company developments

10:00:27 25  were.

Dean - Direct

1    Q.    At the beginning of this call, you're discussing

2    the relationship between free trading shares and

3    profitability.

4                    Why were you connecting those two concepts?

10:00:40  5    A.    With the freely tradeable shares, again, we would

6    be in a position to deposit the stock right away, and as

7    the anticipated press releases came out and the

8    promotion, we would be able to turn a very quick profit

9    right out of the gates.

10:00:54  10    Q.    From Mr. Scott's words to you, what did you

11    understand the stock of SOLI or CareClix was trading at

12    at this juncture?

13    A.    According to this call around 20 or $0.30.

14    Q.    And then you indicated there's a 30 to 50 times

10:01:12  15    that that makes us very happy.

16                    What were you talking about?

17    A.    That's referencing the profit that would be

18    anticipated if the stock performed to the $10 a share

19    from the 20 or $0.30 range that he was talking about us

10:01:25  20    buying the stock.

21    Q.    And were you to have any role in this?

22    A.    Yes.

23    Q.    What was your role to be?

24    A.    My role was to facilitate a large acquisition of

10:01:35  25    shares through Matt Bianchi, and help bring in the

Dean - Direct                                   218

1    promoters to take the stock higher.

2    Q.    May we please continue?

3              (Tape playing).

4    BY MS. MILLER:

10:02:34  5    Q.    You heard Mr. Scott indicating you should continue

6    your discussion on Signal, correct?

7    A.    Yes.

8    Q.    And that's that encrypted app that you previously

9    discussed?

10:02:41 10    A.    Yes.

11    Q.    What had you been discussing immediately prior to

12    Mr. Scott saying you should switch to Signal?

13    A.    Free tradeable shares.

14    Q.    And specifically doing what with the free tradeable

10:02:56 15    shares?

16    A.    Acquiring them and turning a large profit.

17    Q.    You also compared Mr. Scott's deal to what you were

18    doing for Mr. Spivak.

19              Did you not?

10:03:09 20    A.    Yes.

21    Q.    Did Mr. Scott demonstrate any surprise that you

22    were working with Mr. Spivak?

23    A.    No.

24    Q.    What did you mean when you said you're more excited

10:03:24 25    about Mr. Scott's deal than Mr. Spivak's?

1    A.    I was indicating to him that I thought there might

2    be even more upside in the transaction with Mr. Scott

3    than what we were talking about with Mr. Spivak.

4    Q.    And Mr. Scott indicated, "No, don't tell Paul."

5                    What did you understand him to mean by

6    that?

7    A.    My understanding is that he wanted me to keep the

8    two transactions separate and not share information with

9    Mr. Spivak on what we were doing specifically for him,

10   for Mr. Scott.

11   Q.    Continuing, still on this April 30th, 2021 phone

12   call, could we pull up Government's Exhibit 443D, please?

13                   MS. MILLER:  And may we publish and play?

14                   THE COURT:  You may.

15                   (Tape playing).

16   BY MS. MILLER:

17   Q.    Sir, Mr. Scott indicated to you, "He has a pretty

18   good idea of what you're doing and how you do."

19                   What were you doing at the time?

20   A.    What we were doing is we were laying a line out

21   there telling him we were going to buy a huge block of

22   freely tradeable stock in the company.

23                   We were going to promote the stock once the

24   news came out, and take large profits.

25   Q.    Had you previously discussed the availability of

1    freely tradeable shares with Mr. Scott in relation to

2    USLG?

3    A.    Yes.

4    Q.    And what was Mr. Scott's involvement with the free

10:05:08  5    trading shares of USLG?

6    A.    He was holding freely tradeable shares on behalf of

7    Mr. Spivak or the company, depending on what conversation

8    he had, for USLG.

9    Q.    When you were discussing structuring your

10:05:21 10    involvement in CareClix, was that similar or dissimilar

11    to what you had proposed with respect to USLG?

12    A.    There were a lot of similarities in the fact that

13    he had a person holding stock that could be made

14    available freely tradeable for us to serve our needs for

10:05:40 15    the entire program, the purchase of the freely tradeable

16    stock, through promotion, and the subsequent investment

17    in the company.

18    Q.    Were you proposing utilizing Matt, the whale?

19    A.    Yes.

10:05:53 20    Q.    How about Bryan, the magician marketer?

21    A.    Yes.

22    Q.    All right, sir.  Now, going forward about

23    two-and-a-half weeks to the middle of May, did you --

24              MR. DeVILLERS:  Objection, Your Honor.

10:06:12 25              May we approach?

            1           THE COURT:  Yes.

            2                (Proceedings at side-bar:)

            3           THE COURT:  There's not yet a question

            4    pending, so I think it's more general.

10:06:32    5           MR. DeVILLERS:  It's a 106 argument, too.

            6           The same conversation he specifically says

            7    we don't need or want promoters.

            8           I mean, it's completely misleading.  This

            9    whole thing was, "Oh, yeah, he wants us to promote, he

10:06:44   10    wants us to promote."

           11           He says in that same conversation he does

           12    not.

           13           THE COURT:  You can put it on --

           14           MR. DeVILLERS:  I can.  I want to -- you

10:06:52   15    know, they will object when I -- I'm making a record now.

           16           MS. MILLER:  And, Your Honor, we would just

           17    add that he's known that -- what exhibits and what

           18    transcripts we've been planning to ask.

           19           We specifically asked last May if he could

10:07:04   20    identify any portions that he feels are misleading so

           21    that we wouldn't have to continue to waste the Court's

           22    time.

           23           We've been trying to go through and

           24    truncate this case to the best possible, but we don't

10:07:13   25    believe that Rule 106 requires them to get in every

Dean - Direct                           222

 1    single statement that supports the defense's theory.

 2                    It's a very narrow circumstance for if

 3    there is a misleading statement.

 4                    They have not identified with any

 5    specificity by the transcript, by the time stamp number,

 6    by the audio file, so we would ask that before they get

 7    up and just play willy-nilly any portions of this, that

 8    they have to identify with specificity what they claim is

 9    misleading and how their proposed statement cures that.

10                    MR. DeVILLERS:  I don't think the

11    transcript is misleading.  I think his testimony is

12    misleading.

13                    I was characterizing it.  That's what's

14    misleading, and that's what I was trying to do.

15                    THE COURT:  If there's a statement on the

16    transcript to the effect of, "Mr. Scott does not want or

17    need promoters or some such thing," I think that that is

18    fine on cross.

19                    And if nothing else, I don't even know that

20    that's a 106 issue.  I think that's a straight up

21    impeachment and credibility issue, so.

22                    (End of side-bar conference.)

23    BY MS. MILLER:

24    Q.    All right.  Mr. Dean, turning forward to about

25    two-and-a-half weeks, that places you around May 14th,

1   2021.

2                    Is that fair?

3   A.    Yeah.

4                    Excuse me.  Yes.

10:08:31  5   Q.    And did you continue to have discussions with

6   Mr. Scott regarding your anticipated involvement in

7   CareClix?

8   A.    Yes.

9   Q.    Could we pull up Government's Exhibit 445A, please?

10:08:47  10                    MS. MILLER:  And may we publish and play?

11                    THE COURT:  You may.

12                    (Tape playing).

13                    MS. MILLER:  Can we stop there at about a

14   minute and a couple seconds?

10:10:01  15   BY MS. MILLER:

16   Q.    All right, sir.  You hear a discussion about press

17   releases?

18   A.    Yes.

19   Q.    Tell us your understanding of your discussion with

10:10:08  20   Mr. Scott about press releases.

21   A.    My understanding of this discussion was that he had

22   quite a few press releases that put the company in a

23   favorable light that he would put out at a time to be

24   determined later, and it is part of what our program

10:10:24  25   would look like.

Dean - Direct                                224

1    Q.    Why were you discussing the timing of press

2    releases?

3    A.    The timing of press releases is key in a package

4    like this to coordinate with, as I discussed earlier or

10:10:40  5    yesterday, to make sure there's enough promotional

6    activity, e-mail campaigns, things to put a lot of eyes

7    on this security.

8    Q.    At this point then does your conversation turn to

9    USLG and an update on that?

10:10:51  10    A.    Yes.

11    Q.    Could we please continue to play?

12                    (Tape playing).

13    BY MS. MILLER:

14    Q.    Now, Mr. Scott and you discussed "1.7 wholesale."

10:12:55  15                    What was that a reference to?

16    A.    I think it was "1.7 I'll sell," which was what he

17    meant when he said that.

18                    I heard it differently than what the

19    transcript came up as.

10:13:07  20    Q.    And what did you understand that 1.7 to be in

21    reference to?

22    A.    That he had 1.7 million shares of USLG to sell.

23    Q.    Now, what did Mr. Scott indicate he would do with

24    the proceeds of that sale after he sold the 1.7?

10:13:19  25    A.    That he would route that money back to Paul Spivak.

Dean - Direct

225

Q.    Did you -- and you indicated he seems very happy

with the arrangement.

What were you referencing when you made

that statement?

A.    I was referencing Paul Spivak, and that Paul seems

very happy with the arrangement of Mr. Scott selling

stock and sending money back to Mr. Spivak after the

sale.

Q.    You also heard Mr. Scott say that, "Paul won't have

anything to do with it."

Fair?

A.    Yes.

Q.    What did you understand Mr. Scott to be saying in

the context of this entire discussion?

A.    In the context of this discussion, he seemed to be

backing off of the previous assertions that Paul Spivak

controlled everything and controlled all the sales.

He said that, "I control when I sell and

what I do, and I'll work that out with you, but Paul will

still get his piece."

Q.    Was this a communication on a regular phone or on

Signal?

A.    This was a regular phone.

Q.    Was there a difference in your discussions when you

were on a regular phone versus Signal, or I guess let me

1    put it this way.

2                When you were using a regular phone with

3    Mr. Scott, did Mr. Scott demonstrate any reluctance to

4    discuss certain topics?

10:14:33  5    A.    Yes.

6    Q.    What are some of those topics?

7    A.    Freely tradeable stock.

8    Q.    And ultimately, what did Mr. Scott indicate would

9    happen with those freely tradeable stock that he owned

10:14:44 10    from USLG?

11    A.    That he would sell the shares and route part of the

12    money back to Paul Spivak.

13    Q.    Now, a few days later, sir, did you have the

14    opportunity to meet with Mr. Scott in person?

10:14:58 15    A.    Yes.

16    Q.    Where was that meeting?

17    A.    I flew up to Washington, D.C. and met with him at

18    his office in Alexandria, Virginia.

19    Q.    And before you went to Alexandria, Virginia, did

10:15:12 20    you, in fact, meet with Mr. Spivak prior to that?

21    A.    Yes.

22    Q.    Okay.  Could we please turn to May 18th, 2021,

23    Government's Exhibit 447A?

24                MS. MILLER:  And may we publish and play,

10:15:27 25    Your Honor?

Dean - Direct                                      227

```
         1              THE COURT:  You may.

         2                   (Tape playing).

         3              MS. MILLER:  Could we stop there at 20

         4    seconds, please?

10:16:01 5    BY MS. MILLER:

         6    Q.    You heard Mr. Spivak say he's going to give you

         7    some stock, correct?

         8    A.    Yes.

         9    Q.    Had you discussed with Mr. Spivak before him giving

10:16:09 10   you any stock?

        11    A.    Just this is something that came up very recently.

        12                   Mr. Spivak was enticing me to push the

        13    process along faster with Matt by offering me stock to

        14    get it done.

10:16:23 15   Q.    Specifically, what was the nature of that offer?

        16    A.    The nature of the offer was for him to issue me, I

        17    believe the number was -- if, if the full transaction was

        18    consummated -- around 1.5 million shares give or take,

        19    and he has some ideas, Mr. Spivak said, to not make it

10:16:42 20   match to a specific percentage but to pay me for making

        21    the transaction happen with -- with Matt Bianchi.

        22    Q.    Was he going -- sorry.

        23                   Was he going to give those shares to you

        24    regardless of what happened, or were they contingent on

10:16:55 25   an outcome?
```

Dean - Direct                                                228

1    A.    No, they were contingent on the outcome of success

2    of Matt buying the stock from Mr. Church and Mr. Scott,

3    and also of Paul -- Mr. Spivak actually receiving the

4    proceeds or part of the proceeds from the sales of the

10:17:13  5    stock.

6    Q.    And did you understand that you would get that

7    after the consummation of those steps?

8    A.    Yes.

9    Q.    May we please continue?

10:17:21 10              (Tape playing).

11    BY MS. MILLER:

12    Q.    Now, when Mr. Spivak says, "We're walking outside,

13    leave them here," what's going on at this point?

14    A.    At the beginning of the conversation we were in his

10:18:46 15    conference room discussing a transaction very clearly to

16    buy out Mr. Scott and Mr. Church.

17              Midway through the conversation he became

18    paranoid and said, "Let's go outside and have a talk."

19    He was concerned about the potential of eavesdropping by

10:19:06 20    Government agencies through the phones.

21              He said flat out at one point, "You know,

22    you never know who can hear you."

23    Q.    So the reference to "leave them here," what was

24    that about?

10:19:17 25    A.    He was telling me to leave the two cell phones I

Dean - Direct                                    229

1    had with me on the desk and walk outside without them.

2    Q.    How did he know you had cell phones on you?

3    A.    I laid them right on the desk when we sat down for

4    the meeting.

10:19:29  5    Q.    Did you, in fact, leave your cell phones and walk

6    outside?

7    A.    Yes, I left them both.

8    Q.    Were you able to continue to record your

9    conversation with Mr. Spivak on a different device?

10:19:38 10    A.    Yes, I had a second recording device in my pocket

11    that was picking up.

12                It's not quite as clear as the phone device

13    I had on the desk in front of him, but there was a device

14    in my pocket that was a secondary recording device I had

10:19:53 15    on me.

16    Q.    And what do you understand was the purpose of you

17    going outside with Mr. Spivak to talk as opposed to

18    staying in the conference room?

19    A.    As I understood it he wanted complete privacy and

10:20:03 20    didn't want to take any chances of the conversation being

21    intercepted.

22    Q.    Could we please go to Government's Exhibit 446A,

23    still on this same May 18th, 2021 date, please?

24                MS. MILLER:  And may we publish and play?

10:20:19 25                THE COURT:  You may.

Dean - Direct                                          230

1              (Tape playing).

2     BY MS. MILLER:

3     Q.    All right.  Stopping here at about 30 seconds.

4                 Sir, what's that kind of whooshing noise

10:21:03  5     that we hear?

6     A.    That's the recording device kind of swooshing

7     around in my pocket.  It's a highly sensitive thing so

8     each step I made was the swoosh you would hear as we were

9     walking outside Mr. Spivak's facility in Euclid.

10:21:17 10     Q.    And you're physically walking at this point?

11     A.    Yes, we're outside the building walking back

12     towards, like, the back parking lot area.

13     Q.    It's difficult to hear some of the portions of

14     that, but what was Mr. Spivak generally discussing as

10:21:27 15     you're exiting the building?

16     A.    He was picking up right where we left off inside

17     where he wants me to arrange with Matt Bianchi and Bryan

18     Kane to buy out Mr. Scott and Mr. Church in their

19     entirety as soon as possible, and making arrangements to

10:21:43 20     pay me for the transaction.

21     Q.    Please continue with the recording.

22                 (Tape playing).

23     BY MS. MILLER:

24     Q.    And stopping around 1:30, please, Ms. Wojtasik.

10:22:50 25                 Now, what does Mr. Spivak indicate he's

Dean - Direct                                              231

1    going to give to you?

2    A.    1.5 million shares of stock for making the

3    transaction happen between Matt Bianchi, Bryan Kane,

4    Charles Scott, and Forrest Church.

10:23:06  5    Q.    He said he's going to give it to you for

6    consulting.

7                 What did you understand that to mean?

8    A.    I understood that he was going to craft a

9    consulting agreement as a justification on his filings

10:23:17 10    for why he's issuing me the shares, to cover up what we

11    were really doing.

12    Q.    Were you doing any legitimate consulting at the

13    time?

14    A.    None whatsoever.

10:23:29 15    Q.    Had you discussed doing any legitimate consulting

16    in the future?

17    A.    No.

18    Q.    Now, there's again a difficult portion to hear, but

19    you talk about "They can't tie it together.  It's

10:23:42 20    perfect."

21                 Do you recall what you were referencing in

22    that portion of the conversation?

23    A.    Yes.

24                 I was referencing the -- the payment to me

10:23:52 25    relative to the share transaction, and the fact that a

Dean - Direct                                232

1    consulting agreement would cover that up.

2    Q.    How so?

3    A.    It would cover it up by making it look like I was

4    providing legitimate consulting work to the company as a

10:24:04  5    reason for a block of stock that size to be issued to me.

6    Q.    Could we please continue with the recording?

7                  (Tape playing).

8                  MS. MILLER:  Stopping there at 2:40.

9    BY MS. MILLER:

10:25:26  10   Q.    What did you understand Mr. Spivak to mean when he

11   said, "It ain't going to be one-and-a-half million"?

12   A.    He felt that 1.5 million shares would

13   mathematically correlate to, exact to a percentage, in

14   this case 25 percent, looks like a nice round number.

10:25:44  15                 And his concern, and I think later in this

16   conversation but also in previous conversations, he'd

17   mentioned that the SEC looks for attractions like this

18   and they look for specific exact percentages on

19   transactions, and that's how they know that it's a bogus

10:25:59  20   transaction.

21   Q.    What's the problem with having a transaction like

22   that?

23   A.    You can't pay somebody in my position to put

24   together a transaction like this.

10:26:11  25                 I'm not a broker.

```
       1    Q.    Any other problems?

       2    A.    Big problem with disclosure, that you're not

       3    disclosing it to the -- to the purchaser of the stock,

       4    Matt Bianchi or Mr. Kane.

10:26:24  5              If there is any type of financial

       6    consideration whatsoever, you're supposed to disclose

       7    that.

       8    Q.    And for that matter, anyone else on the market who

       9    wanted to purchase these shares?

10:26:32 10  A.    Yes.  Yes.

      11              And the further problem is the lack of

      12    disclosure to the market because an investor looking at

      13    the quarterly filings of USLG would be expecting that I

      14    was actually doing some kind of work for USLG to do

10:26:49 15  whatever kind of consulting they said they hired me for,

      16    similar to a CFO's salary or whatever payment structure

      17    there is.

      18              An investor would expect there would be

      19    some kind of value delivered in return to the company for

10:27:00 20  a block of shares like that going out.

      21    Q.    May we continue with the recording, please?

      22              (Tape playing).

      23              MS. MILLER:  Stopping there around 4:10.

      24    BY MS. MILLER:

10:28:36 25  Q.    There's a discussion, sir, about assuming you're
```

Dean - Direct                                    234

1    going to get busted.

2                    What did you understand you might get

3    busted for?

4    A.    I understood that to mean we could get busted for

10:28:47  5    securities fraud by the SEC or the FBI.

6    Q.    What was the nature of your discussion with

7    Mr. Spivak about getting busted?

8    A.    The nature of the discussion was he knew clearly

9    what we were doing is completely illegal and to assume

10:28:58 10   we're going to get busted and have documentation to try

11   and cover our tracks then well before we got busted.

12   Q.    Is that part of what you were doing in discussing

13   this consulting agreement?

14   A.    Yes.

10:29:12 15   Q.    Please continue.

16                    (Tape playing).

17                    MS. MILLER:  Stopping here around 4:53,

18   please.

19   Q.    What are you discussing here with Mr. Spivak.

10:29:59 20   A.    We're discussing what type of services that I would

21   allegedly provide in exchange for this consulting

22   agreement, so when he files it as part of his disclosure

23   with the company, that it looked legitimate.

24   Q.    Do you have any background in RV sales?

10:30:13 25   A.    No, none whatsoever.

Dean - Direct                               235

```
       1    Q.    Boating sales?

       2    A.    No.

       3    Q.    Mobile home sales?

       4    A.    None.

10:30:19  5    Q.    And you indicated, I think, the more abstract, the

       6    better.

       7                 What did you mean by that?

       8    A.    I meant in that sense that the more abstract the

       9    consulting agreement looked, the easier it might be to

10:30:30 10    explain later.

      11                 In my mind at that point was that if

      12    there's a contract sitting there that said I was hired to

      13    do RV sales and I just got paid 1.5 million shares at

      14    $0.30 a share, $450,000, that when some point later it

10:30:47 15    comes up I didn't sell a single RV or a single boat or

      16    providing any services that were specifically outlined,

      17    it would be a big problem for both of us.

      18    Q.    Please continue with the recording.

      19                 (Tape playing).

10:31:51 20                 MS. MILLER:  Stopping there at 5:47.

      21    BY MS. MILLER:

      22    Q.    Now, there's mention of SEC and audits.

      23                 What was going on at that portion?

      24    A.    In that portion we're discussing, you know, more

10:32:02 25    ways to get through an SEC audit and ways to make the
```

1   transaction look legitimate.

2   Q.    When Mr. Spivak indicates "We're going to get

3   dinged, but we'll more than make up for it," what did you

4   understand that to be referring to?

5   A.    When a company issues stock to any consultant, they

6   have to write the value of the stock off at the time.

7               So in this case, if the stock's valued at

8   $0.30, 1.5 million shares would be $450,000 worth of

9   stock so that's going to be dinged or taken down off the

10  company's profitability.

11              The company has to show that as a loss

12  because they paid for that service.  So if the company

13  made a million dollars hypothetically that year, they

14  would have to write down their income by that transaction

15  amount, the $450,000 stock issuance.

16  Q.    And how would Mr. Spivak more than make up for that

17  loss?

18  A.    It would seem as though he thinks it would more

19  than make up for it in the value that he would have of

20  money coming into himself or the company.

21  Q.    Through your services?

22  A.    Through -- yeah, through my placement of the

23  transaction with Mr. Bianchi and Mr. Kane.

24  Q.    Please continue.

25              (Tape playing).

| | |
|---|---|
| 1 | MS. MILLER:  Stopping there at about 7:05. |
| 2 | BY MS. MILLER: |
| 3 | Q.    Did you and Mr. Spivak agree on something for a |
| 4 | consulting agreement? |
| 10:34:32 5 | A.    Nothing specific yet, but it seems as though his |
| 6 | mind is going towards a European contract for future |
| 7 | development or expansion. |
| 8 | Q.    Do you have any experience in international |
| 9 | expansion? |
| 10:34:43 10 | A.    No. |
| 11 | Q.    Is that something you were going to legitimately do |
| 12 | for the company? |
| 13 | A.    No. |
| 14 | Q.    Could we please continue? |
| 10:34:50 15 | (Tape playing). |
| 16 | MS. MILLER:  Stopping there at 8:08. |
| 17 | BY MS. MILLER: |
| 18 | Q.    What had to happen, according to Mr. Spivak, before |
| 19 | you could get paid? |
| 10:36:01 20 | A.    That he would have to get the $900,000 back from |
| 21 | Mr. Scott. |
| 22 | Q.    Where did you understand your portion of the |
| 23 | payment would come from? |
| 24 | A.    It would be a stock issuance from Mr. Spivak after |
| 10:36:13 25 | he got the 900,000. |

Dean - Direct                                    238

```
          1    Q.    Now, you also heard Mr. Spivak reference a

          2    consulting agreement.

          3                 Is that right?

          4    A.    Yes.

10:36:27  5    Q.    And what did he indicate in terms of the structure

          6    of that consulting agreement?

          7    A.    The structure he wanted to go with then was for me

          8    to create an entity in Europe that wouldn't be

          9    recognized, and it would be for some kind of

10:36:43 10    international expansion that he would fill out and figure

         11    out.

         12    Q.    Please continue.

         13                 (Tape playing).

         14                 MS. MILLER:  Stopping there at 8:37.

10:37:19 15    BY MS. MILLER:

         16    Q.    Mr. Spivak gave you some homework?

         17    A.    Yes.

         18    Q.    What was that homework?

         19    A.    To go to Mr. Kane and Mr. Bianchi and get this

10:37:27 20    thing done as quickly as possible.

         21    Q.    Once Mr. Scott and Mr. Church then bought the

         22    stock, what did you understand from Mr. Spivak would

         23    happen to money from those stock sales?

         24    A.    They would transfer money to him to buy more shares

10:37:43 25    at $0.15 a share.
```

1    Q.    At that point what would be in it for you?

2    A.    I would get my consulting contract signed and I

3    would get 1.5 million shares, plus whatever weird number

4    he adds on top of it so it doesn't look like an exact

10:37:59  5    percentage.

6                    I would get my stock at that point.

7    Q.    And that was to happen as soon as those $0.15 a

8    share payments hit Mr. Spivak's bank account?

9    A.    Yes.

10:38:07  10    Q.    Please continue.

11                    (Tape playing).

12                    MS. MILLER:  Stopping at 10:50.

13    BY MS. MILLER:

14    Q.    Mr. Spivak discussed putting the agreement in the

10:39:49  15    name of a corporation versus your personal name.

16                    From that discussion, why did you

17    understand Mr. Spivak to be suggesting that?

18    A.    He wanted to cover up who was actually getting the

19    shares, you know, both from a perspective of to match the

10:40:07  20    consulting agreement, but also to keep it from

21    Mr. Bianchi that I got shares in exchange for setting

22    this whole thing up.

23    Q.    Why would you be keeping it from Mr. Bianchi?

24    A.    It would upset Mr. Bianchi to know I was getting

10:40:20  25    shares of stock for him -- as a commission for him buying

Dean - Direct                                     240

1    it.

2    Q.    And in addition to upset him, would that be a legal

3    problem?

4    A.    Yes, it would.

10:40:27    5    Q.    And so when you said, "This covers both sides,

6    Government and those guys," what did you mean by that?

7    A.    By "Government," it would cover up our trail with

8    the SEC or FBI, at least nominally, and it would also

9    cover up our trail with Mr. Bianchi so he wouldn't

10:40:44   10    associate the name on the shareholder list with me.

11    Q.    Can we please continue?

12                     (Tape playing).

13    BY MS. MILLER:

14    Q.    Mr. Spivak discussed with you the ways in which he

10:44:24   15    wanted you to communicate with him.

16                     What was your understanding of that?

17    A.    My understanding of it was he wanted to make it as

18    hard for any Government agency to listen in as possible.

19    Q.    He referenced FaceTime.

10:44:37   20                     When were you to use FaceTime?

21    A.    Anytime we were talking about anything sensitive or

22    anything illegal.

23    Q.    At the end of the day, what did you and Mr. Spivak

24    decide would make sense on the consulting agreement for

10:44:51   25    these shares?

Dean - Direct                                    241

1    A.    We decided that we would set up a foreign entity to

2    issue the shares to -- in the name, a new company that no

3    one would recognize the name of, and give us a little

4    more cover on what we actually just did.

10:45:05 5    Q.    You talked also about the entirety of the deal.

6                  Can you explain what you and Mr. Spivak had

7    discussed as the entirety of the deal?

8    A.    Yeah, the entirety of the deal, you know, the whole

9    program in a nutshell was that I would get my two

10:45:21 10   friends, Mr. Bianchi and Mr. Kane, to buy the entire wad

11   of six million shares for $1.8 million.

12                 We would then start a promotional campaign

13   once they had the shares in place, and Mr. Spivak would

14   pay me some number, one-million-500-and-some-weird-change

10:45:43 15   in consulting shares for arranging the entire

16   transaction, and we would hide it from the Government and

17   Mr. Bianchi and anyone else.

18   Q.    And that was after you purchased Mr. Church's and

19   Mr. Scott's outstanding free trading shares?

10:45:55 20   A.    Yes.

21                 We were to purchase the three million share

22   block from Mr. Church and three million share block from

23   Mr. Scott.

24   Q.    And only after Mr. Spivak received money back from

10:46:03 25   Mr. Church and Mr. Scott?

Dean - Direct                                    242

1      A.    Yes.

2                   As he laid it out there, once he got the

3      money, that's when I would get my shares.

4      Q.    You may take that down, Ms. Wojtasik.

10:46:13  5                   Now, turning forward about a week, you

6      indicated that after you met with Mr. Spivak, you had an

7      opportunity to go to Alexandria, Virginia and meet with

8      Mr. Scott.

9                   Is that correct?

10:46:26 10    A.    Yes, it is.

11     Q.    Okay.  And that was on May -- about May 26th, 2021?

12     A.    Yes.

13     Q.    How long was that meeting?

14     A.    I would say it was about a two to three-hour

10:46:36 15    meeting at Mr. Scott's offices in Alexandria.

16     Q.    Tell us who all was there.

17     A.    He had quite a few employees there.

18                  The main people that I spoke to was

19     Mr. Scott and Josh Flood.

10:46:49 20                  I did meet a number of other people coming

21     and going that work for the company; a few of the doctors

22     that work there on the TeleMed side; other employees,

23     just people coming and going.

24                  And we had a conversation on the phone with

10:47:03 25    his CFO as well.

Dean - Direct                                        243

1    Q.    Okay.  And so you said "Employees, doctors."

2                Was Mr. Scott running a business --

3    A.    Yes.

4    Q.    -- as you understood it?

10:47:13 5    A.    Yes.

6    Q.    Okay.  And what did you understand his business to

7    be?

8    A.    A TeleMed business where people, rather than going

9    to a doctor's office, they could go, you know, through

10:47:24 10   the computer and consult with a doctor and be diagnosed

11   with whatever prescriptions they needed or further health

12   care so they wouldn't have to actually go into a doctor's

13   office.

14   Q.    And did you have any reason to believe that that

10:47:38 15   business wasn't actually occurring or there weren't

16   actually employees?

17   A.    I had no reason to believe there was anything

18   illegitimate about that business itself.

19   Q.    Now, what was the purpose of you going to

10:47:49 20   Alexandria to meet with Mr. Scott?

21   A.    It was at his request so I could see everything he

22   had going on with the business and understand it a little

23   bit more.

24                And he felt that that would help me cater

10:48:06 25   the program and move things forward, explain it better to

Dean - Direct                                    244

1    my people.

2    Q.    What program were you considering with respect to

3    Mr. Scott and CareClix?

4    A.    He was familiar with what we had set up with

10:48:16  5    Mr. Spivak, and in his words he said, "I want to do the

6    same thing.  I know how you operate.  I know what you do.

7    I'd like to do the same thing."

8    Q.    Could we please go to Government's Exhibit 451A?

9              And this is a recorded portion of that May

10:48:38 10    26th, 2021 meeting with Mr. Scott and yourself?

11    A.    Yes.

12    Q.    And Mr. Flood was present for this portion as well?

13    A.    Yes.

14              MS. MILLER:  Could we please publish and

10:48:48 15    play?

16              THE COURT:  You may.

17              (Tape playing).

18              MS. MILLER:  Stopping there at about eight

19    seconds.

10:49:10 20    BY MS. MILLER:

21    Q.    When Mr. Scott is mentioning "deals" and "he should

22    be trying to get me rich," what was the context of that

23    conversation?

24    A.    The context is we were talking about the deal with

10:49:20 25    Paul Spivak and USLG.

Dean - Direct                          245

1    Q.    And so the "He" in that "He should be trying to get

2    me rich," who did you understand that to be?

3    A.    Paul Spivak.

4    Q.    Please continue.

10:49:28  5              (Tape playing).

6                   MS. MILLER:  Stopping there at 30 seconds.

7    BY MS. MILLER:

8    Q.    Mr. Scott says he understands that you're going to

9    make a lot of money, is that right?

10:49:57 10  A.    Yes.

11   Q.    Make money doing what?

12   A.    By buying the freely tradeable block of stock,

13   depositing it, promoting it, and selling it.

14   Q.    And Mr. Scott says, "You're going to give me a

10:50:08 15  little bit"?

16   A.    Yes.

17   Q.    "Give me a little bit" of what?

18   A.    There's still a spread in there for him.

19              You know, we're contemplating buying the

10:50:17 20  stock at $0.30 a share from him.  He's putting -- he's

21   buying stock back from Mr. Spivak at $0.15 a share, so

22   there's money there for him to be made as well.

23   Q.    He also says, "I'm super cool with that."

24              Is that correct?

10:50:29 25  A.    Yes.

Dean - Direct                                    246

1    Q.    And then he indicates, "You know, plus it

2    continues."

3              What did you understand him to be referring

4    to when he said, "Plus it continues"?

10:50:38 5    A.    My understanding is that he was referring to the

6    ability to do it again in six months when the new block

7    he's buying at $0.15 comes off restriction.

8    Q.    And that's something you had discussed with

9    Mr. Scott and Mr. Spivak?

10:50:49 10    A.    Yes.

11    Q.    Please continue.

12              (Tape playing).

13    BY MS. MILLER:

14    Q.    From this discussion with Mr. Scott, did you have

10:51:56 15    an understanding of whether he and Mr. Spivak were close?

16    A.    Yes.

17    Q.    And he described him essentially as a brother?

18    A.    Yes.  Very, very close.

19    Q.    Could we please continue in this same conversation

10:52:09 20    at Government's Exhibit 451B?

21              Sorry, not the same exhibit; the same date,

22    May 26th?

23              MS. MILLER:  And may we publish and play?

24              THE COURT:  You may.

10:52:19 25              (Tape playing).

Dean - Direct                                          247

1    BY MS. MILLER:

2    Q.    You referred to a boat.

3              What boat were you referring to?

4    A.    It's a boat in Ft. Lauderdale that the FBI arranged

10:52:56 5    a meeting between -- that we discussed that I mentioned

6    yesterday between myself, Mr. Spivak, his wife, his

7    daughter, and some of Matt's people, Matt Bianchi's.

8              It was all part of the lure to create Matt

9    Bianchi, you know, the folklore of this wealthy, wealthy

10:53:17 10   guy that we did business with, that he had this fancy

11   boat to take everybody on.

12   Q.    And when you mentioned that boat to Mr. Scott, did

13   he jump in and use another word for that boat?

14   A.    Yes, he referred to it as a yacht.

10:53:29 15   Q.    All right.  And did you get the sense after that

16   that Mr. Scott and Mr. Spivak had separately discussed

17   Mr. Spivak's outing on the boat?

18   A.    Yes, very clearly.

19   Q.    And how so?

10:53:39 20   A.    That Mr. Scott knew that it was a very large boat,

21   it was -- actually could be considered a yacht, and that

22   it was expensive and impressive.

23   Q.    Could we please continue on that same May 26th,

24   2021 date with Government's Exhibit 451C?

10:53:58 25             MS. MILLER:  And may we publish and play?

Dean - Direct                                248

1              THE COURT:  You may.

2                   (Tape playing).

3    BY MS. MILLER:

4    Q.    Mr. Scott's reference to the Paul deal, what were

10:54:21  5    you talking about?

6    A.    USLG stock.

7    Q.    You indicate you're doing a three-day fueler

8    program.

9                   What's a fueler program?

10:54:29 10    A.    That's the initial promotion we were going to get

11    started on the stock.

12    Q.    Did Mr. Scott ask you any clarifying questions or

13    indicate he didn't know what you were talking about?

14    A.    No.

10:54:40 15    Q.    And did you have the sense that Mr. Scott was aware

16    of the deal with Mr. Spivak?

17    A.    Yes, that was my sense.

18    Q.    Continuing on this same date with Government's

19    Exhibit 451D, please.

10:54:58 20              MS. MILLER:  And may we publish and play?

21              THE COURT:  You may.

22                   (Tape playing).

23    BY MS. MILLER:

24    Q.    Now, Mr. Scott mentions "A lion's share."

10:55:37 25              What did you understand him to be referring

Dean - Direct                                    249

1   to?

2   A.    The majority.

3   Q.    Of what?

4   A.    The shares of stock of USLG.

10:55:43  5   Q.    Was it your understanding that Mr. Scott

6   was -- that that had been part of the plan with Mr. Scott

7   and Mr. Spivak?

8   A.    Yes.

9   Q.    And you talked about Mr. Scott's deal in relation

10:55:56  10   to Mr. Spivak's deal.

11                   What were you referring to there?

12   A.    The symbol SOLI.

13   Q.    What was your deal with respect to the symbol SOLI?

14   A.    We were talking about structuring the exact same

10:56:12  15   cookie cutter deal or very similar deal to what we were

16   doing with Mr. Spivak.

17   Q.    Keeping with this same date, could we please go to

18   Government's Exhibit 451E?

19                   MS. MILLER:  And may we publish and play?

10:56:30  20                   THE COURT:  You may.

21                   (Tape playing).

22                   MS. MILLER:  Can we stop there at 12

23   seconds, please?

24   BY MS. MILLER:

10:56:52  25   Q.    Mr. Scott asked, "How do we get you guys paid?"

1          Paid for doing what, sir?

2      A.    For putting together a similar program for SOLI

3      that we put together with USLG.

4      Q.    That program, could you be more specific?

10:57:07  5      A.    It's specifically to buy a block of freely

6      tradeable stock, start an investor relations promotional

7      campaign to drive the stock of the price higher, and to,

8      at his suggestion, he wanted to make sure there was some

9      money that came into the company upfront as well, the

10:57:26 10      company being SOLI.

11      Q.    Please continue.

12                (Tape playing).

13      BY MS. MILLER:

14      Q.    And then continuing on this same date, May 26th,

10:57:47 15      2021, could we please move to Government's Exhibit 451F?

16                MS. MILLER:  May we publish and play?

17                THE COURT:  You may.

18                (Tape playing).

19                MS. MILLER:  Stopping here around 26

10:58:30 20      seconds.

21      BY MS. MILLER:

22      Q.    First of all, who is Bob that we hear here?

23      A.    Bob is the CFO of SOLI.

24      Q.    You indicated at some point he joins the meeting.

10:58:42 25                Was it via phone call or zoom?

Dean - Direct

251

1    A.    Yes, this was a phone call we were on with Bob.

2    Q.    Okay.  At the beginning of this phone call there

3    was a conversation about "Lots of news but the price is

4    killing us."

10:58:53    5              Could you give us your understanding of

6    that discussion?

7    A.    Yes.

8              It was that SOLI had a lot of news to put

9    out, but they were frustrated because the share price was

10:59:01   10    extremely low at that point.

11    Q.    When you say "news," what -- what news are you

12    referring to?

13    A.    Press releases about the company and how its

14    business was doing.

10:59:14   15    Q.    You also indicate or there is a reference to,

16    "He'll see this as highly promotable."

17              Could you explain that?

18    A.    Yes.

19              We looked at it as a highly promotable

10:59:28   20    business because the TeleMed sector was picking up, it

21    was getting kind of hot in the overall markets, and it

22    seemed the company was forming some relationships with

23    some really well-known companies.

24              He referenced WebMD as a deal they had

10:59:42   25    pending or was very, very close to signing, he thought

Dean - Direct

252

1     they would get done pretty soon.

2     Q.    Now, what's the relationship, as you understand it,

3     between being highly promotable and what you were going

4     to do?

10:59:54  5     A.    The sexier the story, the more highly promotable

6     the stock is.

7                    You know, when you can associate a company

8     with other big name companies like WebMD, it makes it,

9     when they send out the e-mail blast and they do the

11:00:10 10     promotion of the stock, it makes it much more effective

11     because people see, see the association like that and

12     say, "Yeah, I'll buy the stock."

13                    And they click the button and they buy the

14     stock.

11:00:19 15     Q.    There was also a reference to "most all the

16     brokerage firms and because a caveat" -- I think it says

17     "interest" on the transcript but I'm pretty sure it's

18     emptor."

19                    What was going on there?

11:00:30 20     A.    Yes, there's a company called OTC Markets that

21     regulates a lot of the trading and trading

22     classifications of penny stocks.

23                    SOLI was not current on their financial

24     filings with the SEC.  As you could hear that we

11:00:50 25     discussed, they were working on getting current on those.

1            And when you're not current and you haven't

2    posted the information required in a timely fashion to

3    the SEC, at times OTC Markets puts a caveat emptor.  It's

4    a skull and crossbones on their site when you go to pull

11:01:08  5    up your quote.

6            Basically buyer beware of buying this stock

7    because there's not current accurate information

8    available to the market to digest.

9            The secondary problem that the caveat

11:01:23 10    emptor creates is that most of the discount brokerage

11    firms that your average investor would trade on, Charles

12    Schwab, Fidelity, TD Ameritrade, places like that, they

13    will not allow an investor to go in and buy that stock on

14    their website because of the caveat emptor designation by

11:01:43 15    OTC Markets.

16            So if you got e-mail in that moment about

17    SOLI and said, "This looks pretty cool, I want to buy

18    it," TD Ameritrade, for example, would reject your order.

19    They wouldn't let you buy because the information is not

11:01:57 20    available.

21    Q.    And so did you have an understanding of whether

22    SOLI was in caveat emptor status?

23    A.    Yes.  It had the caveat emptor status at that

24    point.

11:02:06 25    Q.    Was that part of your discussion in terms of your

Dean - Direct                                    254

1    package or your promotion, that you would address that

2    situation?

3    A.    It was necessary to be addressed.

4              It wasn't specifically that my group would

11:02:17 5    address it.

6              They had to wrap up with their auditors

7    they've talked about a number of times where the auditor

8    had to complete the audit of the company and file the

9    financials with the SEC.

11:02:27 10             And then once the SEC acknowledges they've

11   received the financials, then that caveat emptor could be

12   removed by the OTC Markets and it could resume normal

13   trading where normal people could buy the stock.

14   Q.    What would be the relationship of putting out press

11:02:44 15   releases when a company is on caveat emptor status?

16   A.    It would be relatively useless to put out news

17   releases with the caveat emptor on it because even if

18   somebody liked what they saw on the news release, they

19   really couldn't buy the stock on the open market.

11:03:01 20   Q.    Could we please continue with the recording?

21              (Tape playing).

22              MS. MILLER:  Could we stop there for a

23   moment, please, at 53 seconds?

24   BY MS. MILLER:

11:03:32 25   Q.    When you're talking about, "My guy and his sweet

Dean - Direct                                    255

1    spot," who were you referencing?

2    A.    Matt Bianchi.

3    Q.    You said, "The sweet spot was half to three

4    million."

5              Sweet spot for doing what?

6    A.    One-and-a-half to three million the sweet spot was.

7    That was his normal comfort range to invest in a company

8    if he likes it.

9    Q.    Please continue with the recording.

10              (Tape playing).

11   BY MS. MILLER:

12   Q.    Okay.  And there's a reference to "A blend of

13   freely."

14              What was that, "A blend of freely"?

15   A.    Freely tradeable stock and some restricted stock

16   that we buy off the company to infuse some money into the

17   company as well.

18   Q.    Why did you indicate that Matt would like a blend

19   of freely tradeable shares and restricted stock?

20   A.    He would want the freely tradeable shares so that

21   as the company lost the caveat emptor sign and the

22   anticipated runup in the stock, he could sell some shares

23   into the open market and recapture some of his cash and

24   lock in some short-term profits and not being locked out

25   for the six months that the stock would be restricted if

Dean - Direct                                    256

1        we bought it all from the company directly.

2        Q.    Immediately after you mentioned this freely

3        tradeable shares that Matt would like, did Mr. Scott have

4        a response?

11:04:44 5       A.    Yes.

6        Q.    What was his response?

7        A.    He was all for putting together an arrangement.

8        Q.    Okay.  And did he want to continue to discuss this

9        with you on the telephone?

11:04:51 10      A.    He preferred face-to-face.

11       Q.    Did you get a sense of whether he was reluctant or

12       hesitant to discuss on the phone?

13       A.    Yes.

14       Q.    Tell us about that.

11:05:02 15      A.    At one point in the call with Bob, the CFO, we

16       brought up freely tradeable shares, and he and Bob got

17       very uncomfortable and said, "We can't talk about that on

18       an open phone line."

19       Q.    May we go, please, to Government's Exhibit 451G?

11:05:22 20                    THE COURT:  Before we go there, perhaps

21       this would be a good time to take our morning break a

22       little bit late, but we started late.

23                    So if this is a good time, we'll take a

24       short break and stand in recess.

11:05:36 25                    THE CLERK:  All rise.

Dean - Direct

257

```
                    1              (Jury out.)

                    2              THE COURT:  We will stand in recess.

                    3              (Recess taken.)

                    4              THE COURT:  Let's bring in the jury.

        11:30:43    5              (Jury in.)

                    6              THE COURT:  Please be seated.

                    7              Mr. Dean, I'll remind you that you're under

                    8    oath.

                    9              Ms. Miller, you may resume your

        11:32:05   10    questioning.

                   11              MS. MILLER:  Thank you, Your Honor.

                   12    BY MS. MILLER:

                   13    Q.    Ms. Wojtasik, could you please pull up Government's

                   14    Exhibit 451F?

        11:32:13   15              And, sir, this is the exhibit that we just

                   16    listened to but we were having some difficulty with our

                   17    audio at the end of it, so I want to make sure that

                   18    you're fully able to hear the end of this recording.

                   19              Okay, sir?

        11:32:24   20    A.    Yes.

                   21    Q.    All right.  Ms. Wojtasik, is it possible to scroll

                   22    at -- and start at approximately 25 seconds?  So we could

                   23    get oriented in this, sir.

                   24              (Tape playing).

        11:33:33   25
```

Dean - Direct                    258

1    BY MS. MILLER:

2    Q.    Now, did you hear Mr. Scott say something at the

3    end of this clip?

4    A.    Yes.

11:33:39 5    Q.    What had you been discussing right before

6    Mr. Scott's final words that we heard here?

7    A.    We were discussing packaging up freely tradeable

8    stock into a transaction with the company along with some

9    restricted stock to serve the program the way Matt would

11:33:56 10   want it done.

11   Q.    What did Mr. Scott say at the end of this recording

12   as you heard it?

13   A.    He said, "Remember we're on the phone."

14   Q.    And what did you understand that to mean?

11:34:05 15   A.    I understood that he did not want to talk about

16   these things on an open phone line.

17   Q.    Could we please turn to Government's Exhibit 451G?

18                MS. MILLER:  And we apologize in advance,

19   but we'll have to do the next couple without transcripts.

11:34:28 20                May we publish and play, Your Honor?

21                THE COURT:  You may.

22                (Tape playing).

23   BY MS. MILLER:

24   Q.    Could we stop there, Ms. Wojtasik, please at about

11:35:17 25   44 seconds?

```
 1              Sir, what's going on in this conversation?
 2    A.    In this conversation I asked them if there was
 3    freely tradeable shares available to facilitate the
 4    program that we'd discussed, and Joshua Flood is talking
11:35:34  5    along with Mr. Scott about a total of 11 million shares
 6    that could be made available right away.
 7    Q.    And these are shares of CareClix?
 8    A.    Yes.  SOLI symbol which is CareClix, yes.
 9    Q.    SOLI, thank you.
11:35:47 10              And Mr. Flood indicates that he has one
11    million but a relationship with ten million.
12              What did you understand that to be a
13    reference to?
14    A.    My understanding of what he was saying was that he
11:36:00 15    had control of those shares.
16              MR. DeVILLERS:  Objection.
17              Speculation.
18              THE COURT:  Overruled.
19    BY MS. MILLER:
11:36:10 20    Q.    You may answer the question, sir.
21    A.    My understanding was that Mr. Flood had control of
22    both blocks, the one million share and the ten million
23    share block, and could make those shares available for
24    the type of program we wanted to run.
11:36:23 25    Q.    You also made a reference, sir, to something being
```

Dean - Direct                    260

1    just under five percent.

2                What were you referring to there?

3    A.    When I asked them how many shares were outstanding

4    in the company, they said 220 to 230 million shares.

11:36:40  5                11 million shares mathematically represents

6    a number right at or slightly under five percent of the

7    issued and outstanding shares in the company.

8                The five percent is significant because at

9    that number, I don't -- none of us have to report any

11:36:57 10   significant transactions with the SEC.

11   Q.    When you say "report," what types of things would

12   you have to report at five percent?

13   A.    If you're over five percent owner of the stock,

14   you're supposed to do a filing with the SEC and disclose

11:37:14 15   yourself as a five percent owner, as a significant

16   shareholder of the company.

17   Q.    Could we please continue with the recording,

18   Ms. Wojtasik?

19                (Tape playing).

11:38:12 20   BY MS. MILLER:

21   Q.    All right, sir.  In this latter half of this clip,

22   what were you and Mr. Scott and Mr. Flood talking about?

23   A.    We were talking about, again, acquiring the 11

24   million shares of freely tradeable stock, negotiating a

11:38:28 25   price or discussing possible pricing.

          1                He indicates that he thinks we'll make a

          2    lot of money on this stock in the very near term, and he

          3    talks about the potential of Mr. Flood doing a

          4    transaction similar to what Mr. Spivak -- that's what he

11:38:47  5    said -- similar to Paul, where my assumption is the exact

          6    same thing that they were doing with USLG where the

          7    shareholder who sold the freely tradeable shares to us in

          8    the block would then route some of the money back to the

          9    company.

11:39:03 10    Q.    Mr. Scott made a comment that, "I think we can get

         11    you paid better than we can get money into the company."

         12                What did you understand Mr. Scott to mean

         13    by that?

         14    A.    He thinks it's easier for us to make money trading

11:39:15 15    and promoting and making money on this freely tradeable

         16    block than it is for them to raise money directly for the

         17    company.

         18    Q.    And then he said something like, "Getting money to

         19    us is not easy unless we did something like Paul's doing

11:39:28 20    with Josh."

         21                What did you understand that to be a

         22    reference to?

         23    A.    Yeah, that he wanted to or was suggesting that the

         24    way that the company could get money back was doing the

11:39:38 25    exact same thing that Mr. Scott and Mr. Church were doing

Dean - Direct                                    262

1    with USLG, where they would sell the -- the freely

2    tradeable block to us as outside shareholders, and then

3    they would give some of that money back or a portion of

4    that money back to the company.

11:39:55  5    Q.    Continuing to Government's Exhibit 451H, but

6    staying in this same May 26th, 2021 in-person meeting.

7                    MS. MILLER:  And may we play and publish?

8                    THE COURT:  You may.

9                    (Tape playing).

11:41:12 10   BY MS. MILLER:

11   Q.    Sir, at the beginning of this conversation, are you

12   discussing the amount of free trading shares that

13   Mr. Scott has in USLG?

14   A.    Yes.

11:41:29 15   Q.    And how many approximately does he say that he has?

16   A.    He said approximately 1.7 million to two million

17   shares.

18   Q.    Does he indicate a discussion that he had with

19   Mr. Spivak?

11:41:40 20   A.    Yes.

21   Q.    What does he say?

22   A.    He said that Paul directed him to sell here and to

23   sell to us.

24   Q.    Did Mr. Scott give any indication of whether he was

11:41:50 25   on board with that?

1    A.    Yes.  He indicated he was very much on board.

2    Q.    Then you made a comment, "You seem pretty adamant,"

3    something, something.

4              What did you say, sir?

11:42:00 5    A.    I said that Mr. Spivak, Paul, seems very adamant

6    about getting this thing done quickly.

7    Q.    Okay.  And you also mentioned to Mr. Scott that he

8    seems to be on board with getting the ball moving?

9    A.    Yes.

11:42:12 10   Q.    And getting the ball moving doing what?

11   A.    That's going back to our game plan with USLG where

12   we would buy the blocks of restricted stock, start

13   promoting them on the open market.

14              Mr. Scott and Mr. Church would funnel money

11:42:26 15   back to Paul Spivak or the company USLG, and it

16   ultimately would pay me for my services, the 1.5 million

17   shares and change.

18   Q.    Mr. Scott then indicated, "If you guys make money,

19   I'm happy, plus we're going to continue to do some

11:42:43 20   things."

21              What did you understand him to mean with

22   that?

23   A.    My understanding is that he wanted to see this as

24   an ongoing relationship, that he was happy with the

11:42:52 25   structures in the discussions we were having, and he

Dean - Direct                                264

1  wanted to do this again in the future.

2  Q.   Did he demonstrate any pushback to you about the

3  prospect of selling the entirety of his 1.7 million

4  shares in USLG?

11:43:03  5  A.   No.

6  Q.   Now, sir, on that same date did you follow up with

7  Mr. Spivak via text message about how your meeting with

8  Mr. Scott in Alexandria went?

9  A.   Yes.

11:43:18  10  Q.   Could we please pull up Government's Exhibit 1322,

11  Page 35?

12              Focusing in on those bottom two text

13  messages, please, Ms. Wojtasik.

14              MS. MILLER:  And may we publish, Your

11:43:42  15  Honor?

16              THE COURT:  You may.

17  BY MS. MILLER:

18  Q.   All right, sir.  What date are we looking at here

19  with Mr. Spivak's first text?

11:43:51  20  A.   May 26th.

21  Q.   That's the same date you visited with Mr. Scott?

22  A.   Yes.

23  Q.   What does Mr. Spivak indicate?

24  A.   Mr. Spivak texted, "How did it go with Charlie?"

11:44:02  25  Q.   And you respond the following day with what?

Dean - Direct                                    265

```
        1    A.    Yes, the following day I responded and said, "Hey,

        2    buddy, great meeting with Charlie yesterday.  Schedule is

        3    slammed today but I will try to give you a call tomorrow

        4    for a status update."

11:44:17 5    Q.    And were you able to talk to Mr. Spivak on the

        6    phone a few days later on June 2nd, 2021?

        7    A.    Yes.

        8    Q.    Could we turn to Government's Exhibit 453B, please?

        9              MS. MILLER:  And may we publish and play?

11:44:39 10             THE COURT:  You may.

       11              (Tape playing).

       12              MS. MILLER:  Stopping there at about 20

       13    seconds.

       14    BY MS. MILLER:

11:45:11 15   Q.    Mr. Spivak's asking you about coming up with a

       16    corporation name.

       17              What's this in reference to?

       18    A.    This is in reference to a corporation name for us

       19    to put on the consulting agreement that we discussed

11:45:22 20   earlier.

       21    Q.    What name did you come up with?

       22    A.    Fidelity AG.

       23    Q.    What country?

       24    A.    Switzerland.

11:45:29 25   Q.    Why did you use Switzerland?
```

Dean - Direct                                    266

```
         1   A.     Switzerland has supreme privacy laws.

         2   Q.     Can we please continue?

         3                   (Tape playing).

         4                   MS. MILLER:  Stopping at about 1:40 there.

11:47:01 5   BY MS. MILLER:

         6   Q.     Mr. Spivak lays out, "Here's what's going to

         7   happen," and what's the plan he lays out to you?

         8   A.     Yeah, he lays out the whole plan that Matt Bianchi

         9   and my team was going to buy out the freely tradeable

11:47:15 10  shares 100 percent from Mr. Church and Mr. Scott.

        11                   They're going to wire him back $900,000 of

        12   the proceeds to buy stock at $0.15 a share.  At that

        13   point Mr. Spivak was going to cut me my commission block

        14   of 1.5, 1.6 million shares.

11:47:34 15                  He fluctuates almost every conversation.

        16   Q.     Can we please continue?

        17                   (Tape playing).

        18                   MS. MILLER:  Can we stop there at 3:15,

        19   please?

11:49:19 20  BY MS. MILLER:

        21   Q.     Now, Mr. Spivak is indicating he doesn't want Steve

        22   to know.

        23                   Who is Steve?

        24   A.     Steve is the CFO of USLG.

11:49:26 25  Q.     What doesn't Mr. Spivak want the CFO to know about?
```

1    A.    He doesn't want him to know that the transaction is

2    basically a kickback or a commission for me.

3    Q.    You also indicate that you don't want Matt to know

4    as well?

11:49:41 5    A.    Yes.

6    Q.    For the same reasons you previously discussed?

7    A.    Yes.

8    Q.    Could we please continue?

9              (Tape playing).

11:50:25 10    BY MS. MILLER:

11    Q.    That reference Mr. Spivak made at the end, that's

12    the same consulting agreement that you've been previously

13    discussing?

14    A.    Yes.

11:50:32 15    Q.    Continuing through on this June 2nd, 2021 in-person

16    meeting, could we jump to Government's Exhibit 453D,

17    please?

18              MS. MILLER:  And may we publish and play?

19              THE COURT:  You may.

11:51:09 20              (Tape playing).

21    BY MS. MILLER:

22    Q.    What did you understand Mr. Spivak to mean by

23    "setting up a room"?

24    A.    Oftentimes in stock promotion they set up call

11:51:20 25    rooms, little boiler rooms of unregistered

```
 1    representatives that call people on the phone and

 2    pressure them into buying stock.

 3               So my interpretation of what he meant is he

 4    wanted to set up a call room offshore and particularly in

 5    Barcelona or somewhere like that to call investors.

 6    Q.   Is a call room something that can be used to

 7    promote stock on the front end?

 8    A.   Yes.

 9    Q.   Similar to what you and Bryan were contemplating?

10    A.   Yes.

11    Q.   Is that something you had discussed with

12    Mr. Spivak?

13    A.   I had not discussed a call room at that point.

14    Q.   So this was Mr. Spivak's own idea about a call

15    room?

16    A.   Yes.

17               MS. MILLER:  Could we please continue to

18    Government's Exhibit 453E also on this date?

19               And may we publish and play?

20               THE COURT:  You may.

21               (Tape playing).

22    BY MS. MILLER:

23    Q.   Mr. Spivak mentioned two things that he supposedly

24    learned from an SEC attorney.

25               What were those two things?
```

Dean - Direct

269

1    A.    The two things are that you don't want to have an

2    exact percentage tied as we discussed earlier, 25 percent

3    of six million shares would be 1.5 million shares

4    directly, so he wants to go with an odd number of shares.

11:54:10 5    Q.    Okay.  And there was also a reference to doing

6    things out of the country?

7    A.    Yes.

8    Q.    And that would include things like the Barcelona

9    call room?

11:54:18 10    A.    Yes, it would.

11    Q.    Mr. Spivak also says, "When they're looking at that

12    figure, they'll say what the hell is this."

13            What did you understand him to mean by

14    that?

11:54:27 15    A.    He said -- my understanding was that he meant what

16    the hell is this number, what does it -- what does it

17    mean; you know, what's it tied to.

18    Q.    Did you continue to discuss this arrangement with

19    Mr. Spivak via text message?

11:54:41 20    A.    Yes.

21    Q.    Could we pull up Government's Exhibit 907, please?

22            And, sir, what are we looking at here up at

23    the top?  Do you recognize this?

24            Is this a number that --

11:55:02 25    A.    Oh, yes, now that you underlined it.  I was looking

Dean - Direct                                    270

1    in the wrong spot.

2                    Yes, that's the number on the phone that I

3    was using from the FBI.

4    Q.    Okay.  And is this Mr. Spivak's number?

11:55:11  5    A.    Yes, it is.

6                    MS. MILLER:  May we publish this, please,

7    Your Honor?

8                    THE COURT:  You may.

9    BY MS. MILLER:

11:55:21 10   Q.    And so, sir, is Mr. Spivak here on the right side

11   and you're here on the left side?

12   A.    Yes.

13   Q.    Looking at that June 7, 2021 date, so about five

14   days after the in-person meeting we just listened to,

11:55:40 15   what does Mr. Spivak indicate to you?

16   A.    He wants me to call him before 3:00 o'clock, with a

17   bunch of exclamation points.

18   Q.    What do you say?

19   A.    I told him, "I'll get to you ASAP.  Let me cut out

11:55:54 20   of this meeting."

21   Q.    How does he respond?

22   A.    Just simply says "K," and then comes back with a

23   link to a news release.

24   Q.    How do you respond?

11:56:03 25   A.    I answer by saying, "Let me get the address."

Dean - Direct

271

1    Q.    What address are you referring to there?

2    A.    That would be the address of the Swiss corporation

3    that we had allegedly formed to -- for the contract

4    purposes.

11:56:17  5    Q.    How does Mr. Spivak respond?

6    A.    He uses a thumbs up.

7    Q.    Can we go to the next page, please?  Zooming in on

8    that, please.

9              And what do you indicate here, Mr. Dean?

11:56:31 10    A.    This is us responding or me responding with an

11    address in Zurich, Switzerland.

12    Q.    How does Mr. Spivak respond?

13    A.    Another thumbs up.

14    Q.    Please continue.

11:56:50 15              All right.  Sir, now, we've turned to the

16    second day or to the following day, is that right?

17    A.    Yes.

18    Q.    And, well, first, there's a holdover here at the

19    top, correct?

11:57:00 20    A.    Yes.

21    Q.    And that says, "Thanks"?

22    A.    Yes.

23    Q.    And now we're looking at June 8th, 2021, is that

24    right?

11:57:06 25    A.    Yes.

Dean - Direct                                    272

1    Q.   What do you indicate to Mr. Spivak?

2    A.   I told him, "I'll be on time.  I'll be there

3    shortly."

4    Q.   How does he respond?

11:57:12  5    A.   Another kissy face.

6    Q.   Did you, in fact, then meet with Mr. Spivak on June

7    8th, 2021?

8    A.   Yes.

9    Q.   Could we please go to Government's Exhibit 459A?

11:57:27 10              MS. MILLER:  And may we publish and play?

11              THE COURT:  You may.

12              (Tape playing).

13   BY MS. MILLER:

14   Q.   Stopping there for a moment at 28 seconds.

11:58:18 15              You start with, "Big day, my man.  Big

16   day."

17              Why was it a big day according to you?

18   A.   We were about to go meet with Matt Bianchi and we

19   were about to start, as far as Paul thought, our

11:58:31 20   promotional program.

21   Q.   Then you began discussing leaving your briefcase.

22              Mr. Spivak says trying -- a date today on

23   the back.

24              What were you doing at this point?

11:58:43 25   A.   We were signing the consulting agreements that we

          1    discussed before between USLG and my Swiss corporation.

          2    Q.    Could we please continue?

          3               (Tape playing).

          4    BY MS. MILLER:

12:00:22  5    Q.    The reference is to 6/2.

          6               What were those?

          7    A.    We backdated the contract to June 2nd, 6/2 of '21.

          8    Q.    And then Mr. Spivak indicates, "Don't let nobody

          9    see it"?

12:00:35 10    A.    Yes.

         11    Q.    Also a reference to the consulting agreement?

         12    A.    Yes.

         13    Q.    What happened to those consulting agreements?

         14    A.    One that was signed by both of us on the spot was

12:00:46 15    left on Paul's desk or in Paul's desk, his office in

         16    Euclid at USLG.

         17               The other one he handed me, signed up on

         18    his side, folded in half, and I took it with me to what

         19    he thought was our meeting.

12:01:01 20    Q.    Could we go to Government's Exhibit 211, please?

         21               Do you recognize this, sir?

         22    A.    Yes.

         23    Q.    What is it?

         24    A.    It's the consulting agreement we just discussed.

12:01:16 25               MS. MILLER:  Permission to publish, Your

1    Honor?

2                    THE COURT:  You may.

3    BY MS. MILLER:

4    Q.   Zooming in on the top half, please.

12:01:26   5         Sir, what's the effective date indicated

6    here?

7    A.   6/2 of 2021.

8    Q.   And you indicated that's not the actual date on

9    which it was signed?

12:01:35  10   A.   No, it was signed on the following week.

11   Q.   Who is the consulting agreement between?

12   A.   US Lighting Group, which is USLG, and Fidelity AG.

13   Q.   In this first paragraph under recitals, could you

14   read that for us?

12:01:52  15   A.   "Whereas the consultant has expertise in providing

16   services relating to company's European expansion but not

17   limited to manufacturing feasibility study per country,

18   manufacturing incentives, tax incentives, introduction to

19   European stock market, assistance with setting up

12:02:11  20   international locations and securing legal

21   representation, collectively the services and each a

22   service."

23   Q.   Those are the fake services that you and Mr. Spivak

24   had discussed for the consulting agreement?

12:02:23  25   A.   Yes.

Dean - Direct                                    275

1    Q.    Could we go down, please, to Paragraph 2?

2              And here, sir, do you see a list of

3    services?

4    A.    Yes.

12:02:37  5    Q.    And it generally says it shall include the services

6    set forth in the recital that you just read for us?

7    A.    Yes.

8    Q.    Page 5, please.  I'm sorry, Paragraph 5.

9              What does this paragraph state, sir?

12:02:54 10    A.    It says, "Consulting fee.  For the provision of

11   services hereunder, the company shall, subject to this

12   agreement, pay to consultant a base compensation of

13   1,585,000 shares of the company's common stock."

14   Q.    That 1,585,000 shares, what was that actually for?

12:03:14 15   A.    That was for arranging the purchase of the freely

16   tradeable stock by Matt Bianchi and our team, Bryan Kane,

17   from Mr. Scott and Mr. Church.

18   Q.    Paragraph 7, please.

19              And this paragraph -- or this paragraph is

12:03:36 20   entitled "Relationship of the parties."

21              Do you see that, sir?

22   A.    Yes.

23   Q.    And then beginning here at the bottom, could you

24   read that for us, please?

12:03:44 25   A.    Yes.

Dean - Direct

276

1        It says, "In no case may consultant act or

2    otherwise represent itself as an agent or representative

3    of the company without first complying with the laws of

4    the United States and several states or of any other

12:04:00   5    applicable" -- do you want me to continue reading?

6    Q.    Yes, please finish reading that.

7    A.    -- "applicable jurisdictions.  Furthermore, in no

8    case will consultant engage in activity that may be

9    deemed an offer or solicitation as those terms are

12:04:14  10    defined by law to invest in company securities unless the

11    consultant is a registered issuer-agent or FINRA

12    broker-dealer or is otherwise properly licensed in the

13    applicable jurisdiction."

14    Q.    So according to that last sentence that you read,

12:04:29  15    you were not to be offering or soliciting sales in USLG

16    stock?

17    A.    Yes.  Correct.

18    Q.    Unless you were a registered broker-dealer?

19    A.    Yes.  That's correct.

12:04:40  20    Q.    Could we go, please, to Page 6 of this document?

21            And looking at the bottom, sir, what is

22    that address for the consultant?

23    A.    It's the address of Fidelity AG in Zurich,

24    Switzerland.

12:04:58  25    Q.    The fictional address for the fictional company?

Dean - Direct                           277

1    A.    Yes.

2    Q.    Page 8, please.

3                MR. DeVILLERS:  Your Honor, I'm going to

4    just object.

12:05:05  5                I don't understand the relevance to this in

6    this case.

7                THE COURT:  Overruled.

8    BY MS. MILLER:

9    Q.    And, sir, please tell us how this consulting

12:05:16 10   agreement was signed.

11   A.    It was signed for US Lighting Group, a Florida

12   corporation, by Paul Spivak as CEO on 6/2 of '21 was the

13   date, and by the consultant it was signed by myself Jason

14   Dean for Fidelity AG as managing member.

12:05:35 15   Q.    Thank you.  And you may take that down,

16   Ms. Wojtasik.

17                Now, continuing on January -- I'm

18   sorry -- June 8th, 2021, could we pull up Government's

19   Exhibit 459B?

12:05:47 20                And this is the same day on which you

21   signed the consulting agreement at USLG with Mr. Spivak?

22   A.    Yes.

23   Q.    Did you then subsequently get in a vehicle with

24   him?

12:05:59 25   A.    Yes.

Dean - Direct                              278

1    Q.    Where were you headed?

2    A.    We were headed to Burke Lakefront Airport to meet

3    Matt Bianchi.

4    Q.    Could we please publish and play?

12:06:07  5              THE COURT:  You may.

6              (Tape playing).

7    BY MS. MILLER:

8    Q.    What are you discussing here with Mr. Spivak?

9    A.    When we got in the car, I just had folded the

12:07:00 10   consulting agreement in half.

11              I had a messenger bag and I was just

12   sliding it in the outside pocket, you know, right in the

13   front of the bag.

14              And Mr. Spivak got very alarmed and told me

12:07:12 15   not to put it there, Matt might see it; to open up -- to

16   open up the messenger bag and put it in the center of the

17   bag where it couldn't be as easily seen.

18   Q.    Could we please go to Government's Exhibit 459C,

19   please?

12:07:29 20              And also on this same date and in this same

21   vehicle, did you discuss with Mr. Spivak his expectations

22   about what your big day was going to look like?

23   A.    Yes.

24   Q.    Okay.  Could we please publish and play?

12:07:44 25              THE COURT:  You may.

```
 1                    (Tape playing).

 2      BY MS. MILLER:

 3      Q.    The discussion about getting the price up, tell us

 4      about that.

 5      A.    It's specifically in relation to getting the price

 6      of USLG stock up in the beginning of the promotion.

 7      Q.    And so 25, that's a reference to $0.25?

 8      A.    Yes.  That was the previous day's close before we

 9      were going to start the promotion that day.

10      Q.    What do you indicate on this first day of the

11      promotion that your team could get the stock up to?

12      A.    We -- I indicated that it would go to $0.35 or

13      $0.40 that day.

14      Q.    Mr. Spivak responds how?

15      A.    He seemed a little disappointed by that.

16      Q.    And he says specifically "That's it"?

17      A.    Yes.

18      Q.    How do you respond to that?

19      A.    I let him know that the plan was to start it a

20      little bit slower.

21                    Sometimes if stocks are being promoted and

22      they jump up too quickly, OTC Markets that I mentioned to

23      you earlier that tracks and puts essentially rating

24      systems on these stocks, if they're aware of a promotion

25      going on, they put an alert out similar to caveat emptor
```

Dean - Direct

280

1    before that I discussed.

2              They have a separate alert that's a

3    promotional red flag which kind of triggers the brokerage

4    firms to keep an eye on trading with it and sometimes

12:09:20  5    triggers them to not be able to buy the stock.

6    Q.    That's what you meant by promotion flags?

7    A.    Yeah, that's what I meant by promotion flag; that

8    we didn't want to trigger anything by setting alerts that

9    would have it go up too high too fast.

12:09:35 10    Q.    You can take that down, Ms. Wojtasik.

11              Thank you.  Now, sir, did you eventually

12    arrive at the airport with Mr. Spivak?

13    A.    Yes.

14    Q.    Tell us what happened when you arrived.

12:09:43 15    A.    We pulled into the airport, started to get out of

16    the car to walk in and meet Matt.  He wanted to get

17    pictures with Matt Bianchi in Matt's airplane, and, you

18    know, very excited about the promotion starting.

19              And when we got out of the car, we took a

12:09:59 20    few steps, we were immediately surrounded by a bunch of

21    SUVs, FBI SUVs, and we were subsequently arrested.

22    Q.    Did Mr. Spivak say anything to you when these SUVs

23    pulled up and the agents starting coming out?

24    A.    Yes.

12:10:13 25              As -- as we got out and as we were walking

Dean - Cross                              281

 1    and they all pulled up around us and the first agent

 2    jumped out and said "Mr. Spivak, Mr. Dean, hold it right

 3    there, Paul looked at me and said, "Oh, shit, we're in

 4    trouble."

12:10:33  5                    MS. MILLER:  One moment, Your Honor.

 6                         (Pause.)

 7                    MS. MILLER:  Nothing further.

 8                    Thank you.

 9                    THE COURT:  Any cross-examination?

12:10:43 10                    MR. DeVILLERS:  Yes, Your Honor.

11                    Do you want me to --

12                    THE COURT:  We'll at least get started.

13                    MR. DeVILLERS:  Sure.

14           CROSS-EXAMINATION OF JASON DEAN

12:11:02 15    BY MR. DeVILLERS:

16    Q.    Good afternoon, sir.

17                    How are you?

18    A.    I'm fine.

19                    How are you, sir?

12:11:08 20    Q.    I'm well.

21                    I represent Mr. Scott, and we've never

22    talked before, correct?

23    A.    Never.

24    Q.    Let me kind of start from the beginning.

12:11:22 25                    You indicated that -- and correct me if I'm

           1    wrong -- you had two incidents in the past:  One criminal

           2    and one SEC civil violation?

           3    A.    Pursuant to myself?

           4    Q.    Yes.

12:11:35   5    A.    Yes, sir.

           6    Q.    Okay.  And I kind of want to talk to you about when

           7    was the SEC civil violation?

           8    A.    1999.

           9    Q.    1999?

12:11:43  10    A.    Yes.

          11    Q.    And I think you said it was for

          12    recklessly -- reckless and not knowing there was fraud.

          13              Is that about right?

          14    A.    Yes.

12:11:51  15    Q.    Okay.  And you didn't go to prison for that,

          16    correct?

          17    A.    No, I did not.

          18    Q.    And it's not a federal felony conviction of any

          19    kind, correct?

12:11:59  20    A.    It is not.

          21    Q.    You just -- you lost your broker's license?

          22    A.    Yes, I was statutorily disqualified from being a

          23    broker as a result of that judgment.

          24    Q.    And later on you did get in trouble for some

12:12:10  25    securities fraud?

Dean - Cross                                    283

1    A.    Yes.

2    Q.    Okay.  Criminally, correct?

3    A.    Yes.

4    Q.    Do you get paid for all this we were talking about

5    as far as working as kind of a human source for the FBI?

6    A.    No.

7    Q.    So you just did it for fuzzies?

8    A.    No, I don't do anything for fuzzies, sir.

9    Q.    I'm not -- I'm truly curious.  Like, why are

10   you -- you spent a lot of time and energy on this,

11   correct?

12   A.    Yes.

13   Q.    So why?  Why are you doing it?

14   A.    As I indicated before, I made a big mistake in my

15   life, many mistakes but this particularly being a very

16   big one where I was incarcerated for the exact behavior

17   that you just heard on the tape where I took commissions

18   that weren't disclosed and disclosed to investors.

19              I spent time in jail because of that.

20              So I made a decision in jail that when I

21   got out, I wanted to do as much right as I possibly

22   could.  I wanted to balance karma out in life a little

23   bit and try and be able to walk down the street saying

24   I've done more good than harm in the world.

25   Q.    And to that end, you were introduced to Mr. Spivak?

1    A.    Yes.

2    Q.    Okay.  I want to talk about that a little bit.

3              I think, as I recall, in your testimony

4    your first really kind of interaction with Mr. Spivak was

5    through the purchase of stock, restricted stock?

6    A.    Yes.

7    Q.    Okay.  And I believe the purchase price was $0.15 a

8    share?

9    A.    Yes.

10   Q.    Correct?

11             And how much stock did you buy?

12   A.    166,666 shares, $25,000 worth.

13   Q.    Lots of sixes.

14   A.    Lots of sixes.

15   Q.    All right.  So and we talked, we heard about

16   Mr. Church and Mr. Scott also buying restricted stock at

17   that exact same price, 15, $0.15 a share, correct?

18   A.    In specific to what time frame?

19   Q.    Well, we heard you testify yesterday and today that

20   the plan was for Mr. Scott and Mr. Church to purchase

21   restricted stock for $0.15 a share.

22             Was I mistaken?

23   A.    Yeah, the plan was is once we bought the freely

24   tradeable shares off of them, they were going to buy

25   restricted stock from at one point the company, and at

1    the end of it, as you heard, directly from Paul Spivak's

2    personally owned shares at that price of $0.15 a share,

3    the same price.

4    Q.    Okay.  And that's what Mr. Spivak told you,

5    correct?

6    A.    Yes.

7    Q.    All right.  Mr. Scott never told you that he was

8    buying from Mr. Spivak, correct?

9    A.    Mr. Scott indicated in our previous meetings that

10   he was buying stock from Paul.

11               He didn't specify whether it was from the

12   company or from Paul personally.

13   Q.    Either way, in the end he literally purchased from

14   USLG, correct?

15               He didn't purchase it -- he did purchase

16   stock, correct, restricted stock?

17   A.    The transaction we're talking about, the three

18   million shares, the three million share, the $1.8 million

19   transaction for $900,000, that never happened.

20               We were arrested too quickly for it to be

21   completely consummated, so I don't believe that

22   transaction ever happened because Mr. Scott never got his

23   money.

24   Q.    Let me -- let me just kind of -- are you aware that

25   Mr. Scott purchased restricted stock from Mr. Spivak and

Dean - Cross                                    286

1    from USLG in 2021?

2    A.    Yes.  That's what he said he did.

3    Q.    Okay.  And that's what I'm talking about.  That was

4    from USLG.

5                 It wasn't from -- personally from

6    Mr. Spivak, was it?

7    A.    That was from -- there were multiple stories that

8    we were hit with on this.

9                 Paul Spivak said they got the stock for

10   free.  Mr. Scott said that he paid a significant amount

11   of money for it.

12   Q.    Maybe we're not -- I'm not being clear to you.

13                In 2021 Charles Scott bought restricted

14   stock from USLG, correct?

15   A.    In 2021, I don't believe that he actually did buy

16   stock from USLG because he never got the proceeds of the

17   sale of the restricted or -- excuse me -- the freely

18   tradeable shares that we were going to do.

19                So I don't think he bought any stock, I'm

20   unaware of any stock that he actually bought in 2021.

21                There was stock discussed that he allegedly

22   bought two-and-a-half years prior to 2021, and that's

23   where there's differences of what Mr. Scott told me he

24   paid for it versus what Mr. Spivak said he paid for it.

25                I'm just trying to be as clear as possible

Dean - Cross                                287

1    with you.  I don't think in 2021 he bought it.

2    Q.    Fair enough.  You're just not aware of him buying

3    restricted stock in 2021?

4    A.    I'm unaware of any stock being purchased in 2021 by

12:16:45 5    Mr. Scott.

6    Q.    All right.  Okay.  So you have every single second

7    of talking to Mr. Spivak was recorded, correct?

8    A.    Yes.

9    Q.    And that's either by phone or in person, correct?

12:17:00 10    A.    Yes.

11    Q.    And same with Mr. Church?

12    A.    Yes.

13    Q.    And also with Mr. Scott?

14    A.    Yes.

12:17:06 15    Q.    Correct?

16              There's no time, whether it's on Signal or

17    a phone or live in person, that you weren't recording it,

18    correct?

19    A.    Correct.

12:17:17 20    Q.    All right.  And was there ever a time during that

21    time period where you were on the same call with

22    Mr. Spivak and Mr. Scott?

23    A.    No.

24    Q.    Was there ever a time when you were in the same

12:17:30 25    state as Mr. Spivak and Mr. Scott?

Dean - Cross                                            288

```
        1    A.    No.

        2    Q.    Was there ever a time, same with Mr. Church, any

        3    time when the three of them or any of them, any possible

        4    combination, were together talking?

12:17:41 5    A.    I'm unaware of where their whereabouts were when we

        6    were talking, but not when I was present.

        7    Q.    You didn't see them in the room with you?

        8    A.    Never.

        9    Q.    Okay.  And you were asked a lot of questions about

12:17:53 10   what your understanding was.

       11              Do you recall that on cross --

       12    A.    Yes.

       13    Q.    I mean on direct.  I'm sorry.

       14              A lot, right?

12:17:59 15             You were asked what your understanding was,

       16    correct?

       17    A.    Yes.

       18    Q.    But we don't really need your understanding, do we?

       19              I mean, every single statement is recorded,

12:18:08 20   correct?

       21    A.    Yes.

       22    Q.    Okay.  Let's start with Mr. Spivak, and let me see

       23    if I got this right.

       24              Your plan with Mr. Spivak was that you were

12:18:24 25   going to get free-trading stock from Mr. Scott and
```

Dean - Cross                              289

1    Mr. Church, correct, through your -- through your

2    rich -- your rich fellow, right?

3    A.    Yes.  Yes.  The plan was for Matt Bianchi to buy

4    Mr. Scott and -- yeah, Mr. Scott and Mr. Church's freely

12:18:45 5    tradeable shares.

6    Q.    And there's nothing illegal about selling freely

7    tradeable shares, correct, in and of itself?

8    A.    In and of itself, it's --

9    Q.    Correct.

12:18:52 10   A.    -- it's fine.

11   Q.    And where it -- and then once you got the stock,

12   you were going to promote the stock, and then that

13   free-trading stock would be worth more and you'd make a

14   profit, correct?

12:19:05 15   A.    Yes.

16   Q.    Okay.  And so far, you know, all that's legal,

17   right?

18              Promoting stock is, in and of itself, is

19   not illegal, correct?

12:19:14 20   A.    Promoting the stock is legal as long as it's all

21   properly disclosed and done within the rules and

22   regulations of the industry.

23   Q.    Sure.  Sir, so but that's why you promote stock.

24              You promote stock to get more people to buy

12:19:27 25   it so the value goes up, is that fair to say?

Dean - Cross                           290

1      A.      Generally speaking, yes.

2      Q.      Okay.  Now, you talked about illegally promoting

3      stock, right, where it's a crime, you know, not just an

4      SEC violation but a crime, and that's when you're

12:19:41  5      promoting it through lies, correct?

6      A.      Yes.

7      Q.      You're lying to the general public about perhaps

8      the assets of the company, is that a common way?

9      A.      That would be a common way, yes.

12:19:52 10      Q.      You know, how long restricted shares would remain

11      restricted, that's also a common way?

12      A.      Common stock restrictions don't really have much to

13      do with the promotion itself.

14      Q.      So there's no situations where someone would tell

12:20:08 15      somebody, "Hey, this will only be restricted for six

16      months," when it's really for a few years?

17      A.      That would -- that would be fraud.

18      Q.      Okay.  Fraud.

19              And if you're promoting stock saying, "Hey,

12:20:18 20      this, this restricted stock is going to be free trading

21      in six months" when you know it's not true,

22      that's -- that's fraud, correct?

23      A.      Yes.

24      Q.      All right.  Lying about commissions, would that

12:20:33 25      also be fraud?

Dean - Cross                                              291

1          Would you agree with that?

2     A.    Yes, a hundred percent.

3     Q.    All right.  And I guess from what we heard -- and

4     again we only heard probably a relatively tiny portion of

12:20:48 5     your conversations with Mr. Church, Mr. Spivak, and

6     Mr. Scott, correct?

7     A.    Correct.

8     Q.    All right.  There's a lot more to it that the

9     Government didn't play, correct?

12:20:57 10    A.    Yes.  That's correct.

11    Q.    All right.  I guess I'm trying to figure out, like,

12    and it's talking about illegal promotion, right, the

13    crime of materially false statements, lies to the public

14    or would-be investors, I recall a conversation with you

12:21:19 15    and Mr. Spivak about, you know, Chris Farley meets Wolf

16    of Wall Street.

17          Do you recall that?

18    A.    Yes.

19    Q.    And I think the logical implication is, you know,

12:21:30 20    this is somebody that's doing something, something

21    illegal, correct?

22    A.    Yes.  I would assume that's the implication as

23    well.

24    Q.    All right.  My question to you, sir, is was there

12:21:41 25    ever a conversation, recorded or otherwise -- well,

Dean - Cross
292

```
         1    recorded, I guess they are all recorded -- with just

         2    Mr. Spivak talking about how you were going to illegally

         3    promote this stock?

         4    A.   For starters, the first illegal portion of it is

12:21:58 5    holding back news releases and timing them up

         6    specifically with a promotion.

         7    Q.   Well, sir, the Judge will instruct the jury on what

         8    the law is, correct?

         9         I guess I'm asking you --

12:22:11 10   A.   I guess so.

         11        You asked the question.  I answered.  I'm

         12   sorry.

         13   Q.   What's the lie that you planned to tell the public?

         14   A.   The lie that would be played would be that there

12:22:25 15   would be very little disclosure of the stock promotion,

         16   any compensation, any conflicts of interest, anything

         17   along that line.

         18   Q.   So that the lie would be not disclosing things and

         19   during your promotions, is that it?

12:22:40 20   A.   Yeah, that's part of it.

         21        If there was a promotion going, it would

         22   have to be disclosed if you're a shareholder and you're

         23   conflicted that way, among other things.

         24   Q.   Okay.  So what's the lie you're telling?

12:22:50 25        You're promoting to me, I'm the general
```

| | |
|---|---|
| 1 | public.  What's the lie that you planned with |
| 2 | Mr. Spivak -- and I know it wasn't you, you were playing |
| 3 | the FBI guy, right? |
| 4 | So what is the lie that you were going to |
| 12:23:04 5 | tell the public? |
| 6 | A.   The first of many lies would be that the news was |
| 7 | new news when what he would have been doing is sitting on |
| 8 | it for quite sometime. |
| 9 | Q.   The news of what? |
| 12:23:17 10 | A.   The press releases that Mr. Spivak was going to put |
| 11 | out. |
| 12 | If you recall the many conversations you've |
| 13 | heard, he talked about the press releases, he had said |
| 14 | they were sitting there collecting dust and he couldn't |
| 12:23:27 15 | sit on them forever, he wanted to put those press |
| 16 | releases out once we started the promotion, and timed in |
| 17 | concert with the promotion as though they were fresh news |
| 18 | and fresh events at the company. |
| 19 | Q.   Okay.  So the substance of those press releases |
| 12:23:40 20 | were lies? |
| 21 | A.   Define "substance." |
| 22 | Q.   Well, what's -- I don't -- I don't know.  That's |
| 23 | why I'm asking you. |
| 24 | What about the press release was a lie? |
| 12:23:51 25 | A.   If he puts a press release out on June 8th saying |

1    that he just signed a deal with XYZ Company to sell

2    products and it was really sometime two or three months

3    earlier, two weeks earlier, that would obviously be a

4    material misrepresentation.

12:24:06  5    Q.    Okay.  So that's the lie, right?  We're getting

6    somewhere.

7                 All right.  So the lie is, "I really did

8    something on this date when in reality I did it on

9    another date."

12:24:21  10   A.    Yes, especially for the purpose of furthering a

11   promotional effort.

12   Q.    Okay.  Got it.  Got it.

13                 I'd like to play for you Government's

14   Exhibit -- and, Ms. Wojtasik, can you help me out with

12:24:41  15   this? -- Government's Exhibit 435A.

16                 And I believe this is -- I hope this is

17   going to be a conversation with you and Mr. Kane and

18   Mr. Spivak.

19                 (Tape playing).

20   BY MR. DeVILLERS:

21   Q.    Okay.  Stop there for a second, Ms. Wojtasik.

22                 Thank you.

23                 So who is -- what is the role that Mr. Kane

24   is playing?

12:27:18  25   A.    Mr. Kane was going to be the promoter, the guy that

1    hires on the e-mail campaigns and different things to

2    promote the stock and get it in front of as many eyes as

3    possible.

4    Q.    Okay.  Does Mr. Kane ever talk about what exactly

12:27:33 5    he's going to do?

6              Like, when he's sending out these e-mails,

7    these false e-mails, like, how -- how is he going to lie

8    to investors in such a way to convince them to buy, buy

9    this stock?

12:27:48 10   A.    I don't think he -- I don't think he specifically

11   outlined that.

12   Q.    Okay.  All right.  I think I got it.

13             Bear with me a second.

14             (Pause.)

12:28:26 15            Okay.  And eventually you get ahold of

16   Charlie Scott regarding the purchase of some of his free

17   trading shares, correct?

18   A.    Yes.

19   Q.    And that was an introduction by Mr. Spivak via a

12:28:42 20   text or something along those lines?

21   A.    Yes.

22   Q.    And you called him and then he calls you back, is

23   that about right?

24   A.    Yes.  That's my recollection.

12:28:50 25   Q.    Okay.  And I'd like to play Government's Exhibit

1    437D, Ms. Wojtasik.  Thank you.

2                    (Tape playing).

3                    MR. DeVILLERS:  Can you stop there, please?

4    BY MR. DeVILLERS:

12:29:37 5    Q.    So this -- this is kind of the purpose of this

6    particular call is kind of the logistics of getting the

7    stock, is that -- is that accurate?

8    A.    Yes.

9    Q.    Okay.  And then you kind of throw out the line, I

12:29:53 10   think probably for the first time here, about investing

11   in SOLI/CareClix, correct?

12                    You start talking about that a little bit?

13   A.    Yes, I believe so.

14   Q.    Okay.  And that's -- you're not going to invest in

12:30:06 15   CareClix, right?

16                    I mean, there's no plan to really do that?

17   A.    At this point it was suggested that we talk about

18   it.

19                    I was taking the FBI's lead to ask about

12:30:18 20   SOLI, CareClix.

21   Q.    I get it, but this is the means to an end, right?

22                    The means is to say, "Hey, we really want

23   to invest in your company" and try to kind of get access,

24   right, to people, to find out more.

12:30:32 25                   Is that fair to say?

Dean - Cross                                297

1    A.    Yes, to find out more.

2    Q.    Okay.  And could you keep playing, please?

3                (Tape playing).

4                MR. DeVILLERS:  If you could stop there.

12:31:42 5    BY MR. DeVILLERS:

6    Q.    So you're telling Charlie, I believe, you say,

7    "Kind of how it comes into some of these stocks, so

8    there's little more thinly traded and we take a big

9    position -- big positions and then we bring in our guy to

12:32:00 10   make the market aware of what a good deal it is, and

11   everyone tends to be very happy when it's all said and

12   done."

13                Correct?

14                That's what you tell him, correct?

12:32:10 15   A.    Correct.  That's what I said.

16   Q.    And you're at this time kind of putting yourself

17   out there to as not only invest in his company, but

18   perhaps promote it?

19                Is that what you're trying to get him to

12:32:23 20   think about?

21   A.    Yes.

22   Q.    Okay.  And, yeah, let's keep going, please, ma'am.

23                Thanks.

24                (Tape playing).

12:33:00 25

1    BY MR. DeVILLERS:

2    Q.    Okay.  And is it fair to say this is you soliciting

3    him as being a promoter?

4                    He's not asking you about that, correct?

12:33:34 5    A.    That's fair.  That's us laying it out there.

6    That's one of the things we're offering.

7    Q.    Okay.  And on direct examination you specifically

8    said it was an offer to promote Scott's company in an

9    illegal way.

12:33:47 10                    Do you remember saying that on direct

11    examination?

12    A.    Yes.

13    Q.    Okay.  Where in this, this statement, do you even

14    come close to saying that you're doing it -- telling

12:33:59 15    Mr. Scott that you're doing it in an illegal way?

16    A.    There is nothing in this statement that says that.

17                    I was referring back to what we were doing

18    with Mr. Spivak, and saying we're going to do a similar

19    program.

12:34:09 20    Q.    Okay.  But it's not -- you didn't say, "Hey,

21    Charlie Scott, we're doing something illegal, promotions

22    with Mr. Spivak, and we want to do it with you"?

23                    You're just talking about asking him,

24    seeing if he'll allow your company to promote his

12:34:24 25    company?

Dean - Cross                                                    299

1   A.    In this conversation, that's accurate.

2   Q.    Okay.  Well, is there a conversation anywhere where

3   you say, "Hey, we would like to help you illegally

4   promote your company"?

12:34:34  5   A.    Not in those words.

6   Q.    All right.  Okay.  Is there -- tell me -- and I'm

7   not talking about what Mr. Spivak says; I'm not here to

8   defend Mr. Spivak -- but can you think of a time when you

9   told Mr. Scott or anybody in his company that, "Hey,

12:34:49  10  you're going to materially misrepresent to investors,

11  would-be investors through promotions"?

12  A.    Not -- not in that language.

13  Q.    Okay.  And later on, later in April, I believe, you

14  start talking a little bit more about investing in

12:35:21  15  CareClix, correct?

16  A.    Yes.

17  Q.    And to some extent, you know, you're going to kind

18  of hear them out about what CareClix is about, right?

19  A.    Yes.

12:35:31  20  Q.    And in April of 2021, there's a phone call between

21  yourself, Mr. Dean, Mr. Scott, and a Mr. Hipple.

22        Do you recall that?

23  A.    Yes.

24  Q.    All right.  I'd like to play for you Government's

12:35:50  25  Exhibit 439, starting at -- well, let me stop for a

 1    second.

 2                    Sorry.

 3                    This is a long conversation, correct?  This

 4    goes on for about an hour-45-minutes or something like

12:36:03  5    that?

 6    A.    Yes.  This is a long meeting in -- if it's the one

 7    I'm thinking of off my head, it's a long meeting in

 8    Alexandria, Virginia.

 9    Q.    Actually I'm not talking about -- that was in

12:36:16 10    person, correct?

11    A.    That was in person, yes.

12    Q.    But even before that, there was a conversation

13    about kind of generally about CareClix, do you recall

14    that?

12:36:25 15    A.    Yes, I do.

16    Q.    All right.  Let me see if I can help you out a

17    little bit then.

18                    I want to take you to Government's Exhibit

19    439 at minute 35.  And I'm going to play this for about

12:36:37 20    13 minutes.  Okay?

21                    (Tape playing).

22                    MR. DeVILLERS:  I'm sorry, can you start it

23    at minute 35?

24                    Can I stop you there for a second?

12:38:03 25

```
  1    BY MR. DeVILLERS:

  2    Q.   And is that Mr. Hipple's voice?

  3    A.   Yes.

  4    Q.   Okay.

  5              (Tape playing).

  6              MR. DeVILLERS:  If you could just stop for

  7    a quick second.

  8    BY MR. DeVILLERS:

  9    Q.   And this is, and I think you testified before, this

 10    is him kind of telling you about what CareClix is about

 11    and their services?

 12    A.   Yes.

 13              MR. DeVILLERS:  All right.  Continue.

 14              (Tape playing).

 15              MR. DeVILLERS:  If you could stop for a

 16    second.

 17    BY MR. DeVILLERS:

 18    Q.   And that voice is Mr. Scott, correct?

 19    A.   Yes.

 20              MR. DeVILLERS:  All right.  Please

 21    continue.

 22              (Tape playing).

 23              MR. DeVILLERS:  Ask you to stop there.

 24    BY MR. DeVILLERS:

 25    Q.   And he doesn't want this to get out, right?
```

1           I mean, you ask -- they ended up asking you

2    to sign an NDA on kind of their plan, correct?

3    A.    Correct.  Yes.

4               MR. DeVILLERS:  All right.

12:42:17  5          (Tape playing).

6               MR. DeVILLERS:  Stop there.

7    BY MR. DeVILLERS:

8    Q.    So this is a pitch, right, for you to invest, is

9    that fair to say?

12:45:13 10  A.    Yes.

11   Q.    Okay.  And you actually went to CareClix's

12   headquarter, correct, in Virginia?

13   A.    Yes.

14   Q.    And am I wrong in saying that you were impressed

12:45:22 15  with the building?

16   A.    It was a very professional building, yes.

17   Q.    Okay.  Now, at one point you start talking about

18   promoting the stock in CareClix, and this is a

19   conversation I think on April 30th, and Charlie kind of

12:45:42 20  stops you and says, "I don't think we need that, I don't

21   think we need to promote the stock."

22               Do you recall that?

23   A.    Yes, I do.

24   Q.    All right.  So he actually at one point told you,

12:45:53 25  "This stuff sells itself.  We don't need you to promote

Dean - Cross

303

1     stock."

2                    Is that fair to say?

3     A.    Yes, he did say that.

4     Q.    Okay.  And they do ask you, I think right after

12:46:07  5     this and before you go to Virginia, to sign an NDA,

6     correct?

7     A.    Yes.

8     Q.    And they ask you to download a WhatsApp so it's

9     encrypted, correct?

12:46:16  10     A.    I think it was Signal.

11     Q.    Signal.  Signal.  Okay.

12                    And just to be clear, everything they

13     talked to you about, whether it was on the phone, in

14     person or on Signal or anything, that was all recorded by

12:46:26  15     you, correct?

16     A.    Yes.

17     Q.    There was nothing not recorded, is that it?

18     A.    Yes.

19     Q.    Okay.

12:46:36  20                    THE COURT:  Counsel, if you're at or

21     approaching a good stopping point.

22                    MR. DeVILLERS:  I am, Your Honor.

23                    THE COURT:  All right.  This would be a

24     good time for a lunch break then.

12:46:44  25                    Ladies and Gentlemen, we will stand in

1    recess during lunch.

2              You know my instructions to you.  I won't

3    run through each of them, but please follow them, be

4    mindful of them, and we will resume when you have

12:46:57  5    completed lunch in about 45 minutes or so.

6                   THE CLERK:  All rise.

7                   (Jury out.)

8                   THE COURT:  We will stand in recess.

9                   (Proceedings recessed at 12:47 p.m.)

12:47:37 10                   -   -   -   -

11

12

13

14

14:09:56 15

16

17

18

19

20

21

22

23

24

25

Dean -                                          305

1              THURSDAY, SEPTEMBER 12, 2024, 2:09 P.M.

2                    THE COURT:  Please be seated.

3                    All right.  Before we bring the jury back

4        in, is there anything we should take up?

14:11:05  5                    MR. MORRISON:  Unfortunately, Your Honor,

6        as just before the jury was about to come out we got a

7        list of exhibits Mr. DeVillers will be asking

8        Ms. Wojtasik to play which include a number of additional

9        completeness -- at least two additional completeness

14:11:20 10       sections.

11                    I had thought he had said at side-bar that

12       it was just the one thing that he wanted to play for

13       completeness, and that was the end of it.

14                    But so I'm not in a position to say what's

14:11:31 15       in the content of these at all.  We just got this.  But I

16       guess from my perspective, what he did play before, it

17       was played based on his representation of what it was

18       being something that was countering something that was

19       stated in the recordings, and I don't think it did that

14:11:48 20       at all.

21                    And so I'm very hesitant to just go along

22       with whatever he proposes to play because what he ended

23       up playing was, "Hey, here's a bunch of good stuff about

24       our company," which nothing in the presentation that came

14:12:00 25       before was contrary to anything that was said there.

Dean -                        306

1           And so I don't think any of that was

2     actually required to correct any misimpressions under

3     106.

4                 MR. DeVILLERS:  Well, it was required

14:12:10  5     specifically and it was that very, very recording where

6     she said it was -- and Ms. Miller played something to the

7     effect of "You got to get in while it's good," as if it

8     was a pump and dump scheme.

9                 That was that very same exhibit, and I just

14:12:28 10     wanted -- I was pretty clear I wanted to establish, hey,

11     this is a real thing; this isn't some sort of shell

12     company.  And that's what I did.

13                 The other things, Your Honor, the two

14     exhibits that they've played before --

14:12:40 15                 THE COURT:  So on that point, unless

16     there's anything, I mean I assume we're done with the

17     completeness issues on that one.

18                 MR. DeVILLERS:  Yes, Your Honor.

19                 THE COURT:  Okay.

14:12:50 20                 MR. DeVILLERS:  And the other completeness

21     issue -- and I stopped objecting because, quite frankly,

22     our side-bars seemed to be, "Well, go on cross and we'll

23     see what happens."

24                 And 447 was played, parts of it, and it's

14:13:03 25     clear from 447 that there was a conversation -- this is

Dean -                    307

1    between Spivak and Mr. Dean -- and it's clear in this

2    that he actually isn't controlling, that

3    Mr. Dean -- Mr. Spivak is basically saying, "I can't

4    control their stock; I don't control their free-trading

14:13:16 5    stock."

6                He's saying something to the effect of, "I

7    can't control it because, you know, it's going to go high

8    and they're not going to sell it to you if it goes high,"

9    and it's the same thing in 449.

14:13:28 10                THE COURT:  But has that -- if that's

11    already been played, what is there to add that's

12    misleading or not complete?

13                MR. DeVILLERS:  Well, it isn't -- not all

14    that was played, so I want to play the portions where

14:13:42 15    they're talking about how Mr. Spivak really doesn't

16    control their stock.

17                They clearly played a bunch about him

18    controlling the stock, and now there's other

19    recordings -- and it's just between Mr. Dean and

14:13:55 20    Mr. Spivak -- about how he doesn't control their stock.

21                THE COURT:  So that leaves me, I suppose,

22    with two questions, one of which is why is that not

23    cumulative to what Mr. Scott had to say on one of the

24    clips about "I control my stock, it's my property," and

14:14:08 25    so forth?

Dean -                              308

1                    MR. DeVILLERS:  Well, it's not -- this

2        isn't with Mr. Scott.

3                    THE COURT:  No, I understand that.

4                    MR. DeVILLERS:  Yeah.

14:14:13  5                    THE COURT:  I understand that difference,

6        but why is this second clip that we're talking about

7        right now not cumulative to the earlier one with

8        Mr. Scott, which in some ways is more helpful for you in

9        the sense --

14:14:24 10                    MR. DeVILLERS:  I intend to play that, too,

11       Your Honor, frankly, but it's because it's coming from

12       Mr. Spivak where we've heard audio and audio how he

13       controls the stock, he controls the stock.

14                    Now he's specifically saying he doesn't

14:14:37 15       control the stock.

16                    MR. MORRISON:  Your Honor, I doubt he uses

17       those words "I don't control the stock," but I'm not in a

18       position, because this is a highly unorthodox procedure

19       where we are finding out about this, even though it was

14:14:51 20       stated at side-bar there was this one thing to be played,

21       these are all clips that were turned over previously

22       along with the Twitters, and we're finding out now a

23       moment before the witness is about to start, continuing

24       testifying.

14:15:04 25                    And I don't know what the excerpts are.

Dean -                              309

1              MR. DeVILLERS:  The Government is

2    recording.

3              MR. MORRISON:  Of course they are, but

4    there are hours of recording of what was said.

14:15:12 5              MR. DeVILLERS:  And we didn't know what you

6    were playing.

7              MR. MORRISON:  Except we provided the

8    excerpts with the transcripts.

9              THE COURT:  I guess my question is what are

14:15:23 10    you proposing to play in terms of substance and length?

11              MR. DeVILLERS:  Very short.  I think the

12    first one is a minute.

13              THE COURT:  Saying what?

14              MR. DeVILLERS:  This -- I would be happy to

14:15:32 15    read a little bit, this is Jason Mr. Dean.

16              "Okay.  That makes sense what I was going

17    to talk to you -- talk to them is you're know how

18    controllable they are.  Sounds like they're not, huh?"

19              "Mr. Spivak:  They're not that

14:15:49 20    controllable.  I mean, they invested in the company

21    awhile ago.  Can you call them up and trust with shit?

22    Yeah.  But when they see the stock prices goes up $3.00 a

23    share, you ain't getting it for $0.30."

24              And then it goes on like kind of two more

14:16:05 25    paragraphs, if that.

1          THE COURT:  And what's the length of it?

2          MR. DeVILLERS:  It is -- I'll do some math,

3     Judge -- less than a minute.

4          THE COURT:  If it's less than a minute, I

14:16:16  5     think that's fine.

6          I guess what I would say is because it's

7     Spivak himself, I think it's sufficiently probative of

8     what weight the jury wants to give what Spivak is saying.

9          MR. DeVILLERS:  And then I also wanted to

14:16:36 10    play 449 which gets into the same, same themes, and that

11    is -- and that is 1:15, that is a minute and 15 seconds.

12         MR. MORRISON:  Your Honor, the problem is

13    we're just hearing about this now.

14         We have not been able to even listen to

14:16:58 15    these.  We have no ability to respond to this in any way,

16    shape or form.

17         And I don't know why this couldn't have

18    been accomplished at a time when we could have either

19    negotiated a resolution or presented our views in a

14:17:12 20    reasonable way to the Court about this.

21         MR. DeVILLERS:  Your Honor, as I'm offering

22    it to the Court, I'm saying this is completely to explain

23    the misleading statements that Mr. Spivak -- they played

24    in audio earlier of Mr. Spivak saying he controlled the

14:17:30 25    stock.

1              That's all this is.

2              THE COURT:  So what is the length of the

3    second clip?

4              MR. DeVILLERS:  It's 1:15 to 2:30 so it

14:17:38  5    would be --

6              THE COURT:  A minute.

7              MR. DeVILLERS:  -- one minute and 15

8    seconds.

9              THE COURT:  And what is the substance of

14:17:43 10    it?

11              MR. DeVILLERS:  The substance is similar,

12    but in this case he's trying to coach kind of him on how

13    to get the -- get the stock from them.

14              And he says, same thing, he's not -- he's

14:18:00 15    really not in control of the stuff.  "Yeah, I mean, if

16    you're going to tell them, you know, you are, you're

17    going to buy it off him for $0.30 or whatever after

18    you're going to get it up to a dollar, that's -- that's

19    going to be a real short meeting.  Yeah, it was -- we

14:18:14 20    didn't take care of the dollar when he's with the 20 cent

21    stock that trades.  I know, but you, you know,

22    talking -- taking it to a dollar, got you, yeah.  We'll

23    play smooth.  We'll tell him we are going to run a

24    program."

14:18:31 25              And then Paul says, "You got to tell them,

Dean -                                    312

1    hey, you're helping the company to build, you know, you

2    tell them, hey, you're going to buy today and tomorrow,

3    and it's going to go to a dollar, you're going to make a

4    quick buck after Charlie waited, you know, five years

14:18:47  5    all, you're going to step on your own" -- that's it.

6                    That's all I'm going to say for that, but

7    yes.

8                    THE COURT:  All right.  It sounds like the

9    jury will enjoy that clip.

14:18:57 10                    I'm not sure; it might help the Government

11    more than it helps you, but if you want to play it, you

12    can play it.

13                    MR. DeVILLERS:  Okay.

14                    THE COURT:  I guess the last thing, since

14:19:07 15    we're wrapping this up, to close the loop on the Church

16    issues earlier, there were again the two issues.

17                    With respect to the first of those two

18    issues, namely communication with a testifying witness,

19    again my view remains.  I stated my view earlier on that,

14:19:29 20    and it remains that as soon as the witness comes off the

21    stand, I don't think it's any different if this had been

22    a single-phased trial if the Government had concluded the

23    testimony of Church and then decided to call him in

24    redirect, I don't think he's -- I don't think anybody

14:19:45 25    is -- rebuttal I should say, you know, after the

Dean -                                       313

1    defendants' cases, I don't think there's any expectation

2    that somehow talking with Church between the close of his

3    testimony and calling him as a rebuttal witness is in any

4    way improper or the like.

5                    The only thing I would add to everything I

6    had to say earlier on that first issue is that it's a

7    little bit less of an issue in a criminal case, and I

8    kind of include that in my order out of an abundance of

9    caution just so everybody knows my view.

10                   But in a criminal case, like, everyone is

11   going to ask anyway, like, tell me about all your

12   communications and so forth, and that becomes a little

13   bit more of an issue on the civil side.

14                   But I mean, I think that that examination,

15   that cross is coming in any event.  So I don't see an

16   issue on the front side of that.

17                   I've gone back and reviewed, you know, the

18   record and the issues and the like, and all I'll really

19   say is my -- I'm going to stand by my earlier statements

20   on that as well, which is I think everybody can put

21   whatever testimony they want on for Mr. Church.

22                   I don't think that, you know, I think

23   there's judgments about how far each side's lawyers want

24   to go and those are, you know, trial strategy questions,

25   but I don't think under the law there's anything that

Dean - Cross                                          314

```
        1    comes into play here that would properly allow me to

        2    limit or exclude Church's testimony at this point.

        3                    With that, we'll bring in the jury.

        4                    (Jury in.)

14:23:40 5              THE COURT:  Please be seated.

        6                    Ladies and Gentlemen, today is just not my

        7    day.  I had another proceeding that ran long due to no

        8    fault of anyone here.

        9                    I apologize for that.  Thank you for your

14:23:52 10   patience.

       11                    Like I said, it's just not my day.

       12                    So we will resume.

       13                    If you want to blame anyone for that, you

       14    can hold it against me, but with that, Mr. Dean, I will

14:24:04 15   remind you that you're under oath.

       16                    Mr. DeVillers, you may resume your

       17    cross-examination.

       18                    MR. DeVILLERS:  Thank you, sir.

       19          CROSS-EXAMINATION OF JASON DEAN (RESUMED)

14:24:12 20   BY MR. DeVILLERS:

       21    Q.    Getting back to what Mr. Spivak told you, I think

       22    particularly early on, Mr. Spivak assured you that he

       23    controlled Charlie Scott's free-trading stock, correct?

       24    A.    Yes.  Multiple times.

14:24:31 25   Q.    Okay.  But that evolved after awhile, correct,
```

Dean - Cross

```
          1    where he really wasn't necessarily in control of his

          2    stock; even he told you that, correct?

          3    A.    There were many changes in the story at different

          4    times.

14:24:45  5              There was one time when Mr. Scott said that

          6    he controlled the stock, and then at the end when we were

          7    contemplating a big transaction he clearly said, "At

          8    Mr. Spivak's request I'm doing this large block

          9    transaction."

14:24:59 10              So I'll leave it to you guys to interpret

         11    what that means.

         12    Q.    Let me stop you there.

         13              At a suggestion, he says, correct?

         14    A.    I think he said at his request.

14:25:09 15    Q.    You think he said at his request?

         16    A.    I think so.

         17              Semantics.

         18    Q.    Okay.  Well, let's go to Government's Exhibit 447,

         19    please, and start at 42:20, and I believe this is from

14:25:30 20    May 18th, a conversation with you and Mr. Spivak

         21    regarding the stock, I hope.

         22              (Tape playing).

         23              MR. DeVILLERS:  Stop.  Stop there, please.

         24    BY MR. DeVILLERS:

14:26:57 25    Q.    Okay.  So is it fair to say because if they know
```

Dean - Cross

316

1    the stock's going to go up, they're not going to want to

2    sell for $0.30 a share, correct?

3    A.    Based upon that comment, yes.

4    Q.    So and, in fact, he doesn't control their stock,

14:27:10 5    correct?

6    A.    In the context of the recording I just heard, he

7    just said, "If it's at $3.00 a share, they're not going

8    to sell it to you at $0.30 a share."

9    Q.    Doesn't he say they're not that controllable?

14:27:26 10   A.    He does say that as well.

11   Q.    Okay.  And the plan at this point is really

12   to -- you don't want Mr. Scott and Mr. Church to know or

13   think that the stock's going to go up because they won't

14   sell it to you, correct?

14:27:39 15             That's the concern here?

16   A.    In the broader context of that meeting, I believe

17   my takeaway was Paul was pressuring us to make the entire

18   purchase right then and there, and that was his way of

19   pressuring us to get it done, because he said, "If it

14:27:56 20   goes up, they're not going to want to sell it."

21   Q.    Fair enough.

22             The same exhibit, can you go to 49:45?

23             (Tape playing).

24             MR. DeVILLERS:  Okay.  Stop there.

14:28:33 25

Dean - Cross                    317

1     BY MR. DeVILLERS:

2     Q.    Again, this kind of confirms what you're saying,

3     he's pressuring you to get the stuff from Charlie and

4     Mr. Forrest, correct?

14:28:41  5     A.    Yes.

6     Q.    Okay.  Could we go to Government's Exhibit 449,

7     starting at 1:15?  And let me, before you start,

8     apologize.

9                   In a few days, on May 26th, you're actually

14:29:03 10     going to see Charlie in person, correct?

11     A.    Yes.

12     Q.    And that's when you go to his place of business,

13     right?

14     A.    Yes.

14:29:08 15     Q.    Okay.  And kind of before that, Mr. Spivak's

16     coaching you kind of on how to get that stock, is that

17     fair to say?

18     A.    Yes.

19     Q.    All right.  Could you please play 449, starting at

14:29:21 20     1:15?

21                   (Tape playing).

22                   MR. DeVILLERS:  If you can stop there.

23     BY MR. DeVILLERS:

24     Q.    Okay.  So fair to say, sir, Paul Spivak is kind of

14:30:53 25     coaching you on how to -- what to say to him?

Dean - Cross                                    318

1    A.    In this moment, yes.

2    Q.    Okay.  And he says, "Hey, tell them" -- he says,

3    "You got to tell them, hey, you're helping the company to

4    build, you know?  You got to tell them, hey, you're going

14:31:07  5    to buy today, and tomorrow is going to get a -- get to a

6    dollar."

7              Correct?

8    A.    That's what he said in the recording, yes.

9    Q.    Okay.  And then you have a conversation with

14:31:23  10   Mr. Scott, and he indicates it's his stock as well,

11   correct; that he controls his own stock?

12   A.    Which specific conversation?  It's flopped quite a

13   few times back and forth.

14   Q.    Okay.  Well, let's go to 445A.

14:32:40  15              (Tape playing).

16   BY MR. DeVILLERS:

17   Q.    Just a couple of quick questions, Mr. Dean.

18              Through all these conversations -- we've

19   heard maybe a small fraction of them, correct?

14:35:07  20   A.    Yes.

21   Q.    Through all these conversations with Mr. Scott, did

22   he ever tell you or did he have a conversation with you

23   about lying to investors through promoting stock?

24   A.    No.

14:35:21  25              MR. DeVILLERS:  No further questions.

           1                  THE COURT:  Any redirect?

           2                  MS. MILLER:  Yes, Your Honor.

           3                  Thank you.

           4          REDIRECT EXAMINATION OF JASON DEAN

14:35:32   5   BY MS. MILLER:

           6   Q.    Mr. Dean, I'd like to pick up where Mr. DeVillers

           7   left off with you.

           8                  You were listening to Government's Exhibit

           9   445A, and that was a conversation in which you and

14:36:01  10   Mr. Scott were talking, so that's the last conversation

          11   you just heard.

          12                  Would you like to hear that again, or is

          13   that fresh in your mind?

          14   A.    It's fresh.  I recall.

14:36:09  15   Q.    Okay.  And in that recording, Mr. Scott and you are

          16   discussing Mr. Scott's free trading shares in USLG, is

          17   that fair?

          18   A.    Yes.

          19   Q.    Mr. Scott indicates to you, "I don't think it's a

14:36:23  20   good idea for Paul to have anything to do with my

          21   shares."

          22                  What did you understand Mr. Scott to mean

          23   when he made that statement?

          24   A.    My understanding of it was is that he was trying

14:36:36  25   not to act as though all the conversations between

1    Mr. Spivak and myself and him had already happened, and

2    that he controlled his own shares despite all the other

3    conversations we had previously about it.

4    Q.    Why wouldn't it be a good idea for Mr. Spivak to be

14:36:52  5    involved with Mr. Scott's free trading shares?

6    A.    Because if Mr. Spivak's involved in arranging it,

7    if he's got a prior arrangement, if it appears in any

8    way, shape or form he's play -- he's the maestro of this

9    orchestra, the shares then become restricted again and

14:37:13 10   it's an improper transaction.

11   Q.    At the beginning of that same conversation, sir,

12   you talked with Mr. Scott about press releases and,

13   quote, firing up the engines in June.

14                  What were you referring to there?

14:37:30 15   A.    Specifically letting them know we were going to

16   start the promotion in June.

17   Q.    Promotion how?

18   A.    By Paul starting press releases, us promoting the

19   stock online and everywhere else to take the share price

14:37:45 20   higher.

21   Q.    Is that the first time you spoke with Mr. Scott

22   about press releases?

23   A.    No.

24   Q.    And in fact, Mr. DeVillers played for you a

14:37:52 25   conversation amongst yourself, Mr. Scott, and Bob.

1               Do you recall that?

2      A.    Yes.

3      Q.    And during that conversation, you

4      discussed -- well, the portion that you heard from

14:38:06  5    Mr. DeVillers, Bob was discussing basically the business

6      of CareClix.

7               Do you recall that?

8      A.    Yes.

9      Q.    Could we please pull up Government's Exhibit 439E?

14:38:19 10             And, sir, this is the beginning of that

11     conversation amongst the three of you, okay?

12             MS. MILLER:  And may we publish and play,

13     Your Honor?

14             THE COURT:  You may.

14:38:35 15             (Tape playing).

16             MS. MILLER:  Stopping there at 45 seconds.

17     BY MS. MILLER:

18     Q.    What did you understand when Mr. Scott told you

19     that Bob was like his consigliere?

14:39:31 20    A.    I would picture that as like a right-hand man,

21     somebody that he has involved in all of his transactions.

22             MS. MILLER:  Please continue.

23             (Tape playing).

24             MS. MILLER:  Could we stop there at 1:30,

14:40:28 25    please?

BY MS. MILLER:

Q.   Sir, you mentioned some Grey Sheet deals.

         What is that?

A.   A Grey Sheet deal is one that has been downgraded
specifically on the OTC markets website that I discussed
with you guys previously, so it's a notch below Pink
Sheets, and it's reporting and it's investor information
available.

         They are usually very thinly traded just
due to the fact there's very, very little information
available on them.

Q.   Why did you reference Grey Sheet deals here in your
conversation with Mr. Scott and Bob?

A.   I wanted to give them the innuendo that we didn't
mind dealing in shady situations or less than transparent
situations, and see where they went with it.

Q.   Please continue.

         (Tape playing).

         MS. MILLER:  Can we stop there at 1:52?

BY MS. MILLER:

Q.   And, sir, you indicated, "Before" -- I'm sorry --
"Before the price goes up, we tend to like to take big
positions in the stock."

         Explain what you meant by that.

A.   Exactly like these transactions that we laid out

1    with Mr. Spivak and with Mr. Scott, before we start

2    promoting the stock, we wanted to invest, purchase,

3    gobble up huge positions in freely tradeable stock so

4    that we could sell them at higher prices later.

14:42:02  5    Q.    And I guess you kind of answered that at the end,

6    but what is the purpose of getting a large position in

7    the company before a stock price goes up?

8    A.    To -- to be ahead of the market move and be able to

9    make more money once it goes up, instead of chasing it up

14:42:19 10    as it goes.

11    Q.    Is that information that would be available to an

12    everyday investor in the marketplace?

13    A.    No.

14    Q.    Please continue.

14:42:26 15              (Tape playing)

16              MS. MILLER:  And stopping there at 3:30.

17    BY MS. MILLER:

18    Q.    What are you explaining here, Mr. Dean, about

19    Paul's deal?

14:44:07 20    A.    We're explaining that we've already made investment

21    in it, we're looking to do other investments in it, to

22    get everything in order, and be ready to promote the

23    stock, to take it to higher prices.

24    Q.    When you describe an investment, what is the

14:44:21 25    structure of that investment?

Dean - Redirect                    324

1    A.    The structure in the investment was for us to come

2    in and buy Mr. Scott and Mr. Church's freely tradeable

3    shares.

4    Q.    And is that the same layout in which you come in

14:44:34  5    and take a large position in a company before a stock

6    price goes up?

7    A.    Yes.

8    Q.    You also mentioned stock promotions and press

9    releases in this conversation?

14:44:47 10    A.    Yes.

11    Q.    Please continue.

12                (Tape playing).

13                MS. MILLER:  And stopping there at four

14    minutes.

14:45:16 15    BY MS. MILLER:

16    Q.    How did you hear Mr. -- well, Mr. Bob or Bob

17    respond to your information?

18    A.    After being presented with what we do and a loose

19    level of how we do it, he thinks that CareClix would be

14:45:31 20    an excellent target for us.

21    Q.    Mr. Scott was still on the phone at this point?

22    A.    Yes.

23                MS. MILLER:  You may take that down,

24    Ms. Wojtasik.

14:45:42 25                Thank you.

BY MS. MILLER:

Q.   Now, right after we came back from the break this

afternoon, Mr. DeVillers played a clip for you in which

you discussed whether Mr. Scott's shares were

controllable by Mr. Spivak.

Do you recall that?

A.   Yes.

Q.   Okay.  And Mr. DeVillers asked you a question to

which you responded, "Based upon that comment, no, they

were not controllable."

Do you have any clarification to that?

A.   Yes.

I was asked the specific question upon that

recording we listened to.  I gave a specific answer.  It

was truthful and honest about that particular clip.

But when presented with the facts that we

were about to run a promotion in USLG, he still decided

to sell us the stock anyway at Mr. Spivak's request.

Q.   You're talking about Mr. --

A.   Mr. Scott decided to anyways at Mr. Spivak's

request, which would tell me that Mr. Spivak actually did

control the situation.

Q.   And in that conversation, Mr. Spivak said, "Can I

call him and press him?  Sure, but if the stock goes up,

they're not going to want to sell to you for $0.30 a

1      share."

2                        Do you recall that?

3      A.    Yes.

4      Q.    What is your understanding of why that might not be

14:47:07 5    attractive?

6      A.    Well, if they could sell it on the open market

7      themselves at 50 or 60 or 70 cents a share, why would

8      they sell it to us at a cheaper price.

9      Q.    So basically they wouldn't make as much money?

14:47:19 10   A.    Exactly.

11                       They would make a lot more money that way.

12     Q.    When you were having these discussions with

13     Mr. Spivak, did he give you any indication that perhaps

14     you should not approach Mr. Scott or Mr. Church as a

14:47:33 15   result then?

16     A.    No.

17     Q.    When you approached Mr. Scott and Mr. Church, did

18     they give you any pushback?

19     A.    None.

14:47:40 20   Q.    Did they ultimately go through with accepting your

21     $25,000 apiece?

22     A.    Yes.

23     Q.    Now, as part of that, the clip that follows on that

24     same theme, Mr. DeVillers asked you, "Hey, make sure when

14:48:03 25   you talk to Mr. Scott it's about helping to build the

Dean - Redirect                                    327

1    company."

2                    Do you recall that?

3    A.    Yes.

4    Q.    Was that part of specific language that you used,

14:48:12  5    or can you tell us kind of how you communicated with

6    Mr. Scott?

7    A.    With -- with Mr. Scott, there were phone

8    conversations and, you know, per Mr. Spivak he wanted us

9    to make sure we conveyed that we were there to help the

14:48:27 10    company as well; not just ourselves.

11    Q.    When Mr. DeVillers asked you earlier this morning,

12    "Hey, did you get on the phone and call Mr. Scott and say

13    we're going to do something illegal now," do you recall

14    that?

14:48:41 15    A.    Yes.

16    Q.    And you said, "No, I didn't use that language."

17                    Fair?

18    A.    Fair.

19    Q.    Why wouldn't you use that language?

14:48:48 20    A.    I would think that in that situation he would think

21    he's being set up and hang up the phone right away.

22    Q.    Did you use different language to convey what you

23    were doing?

24    A.    Yes.

14:48:58 25                    We used different language, industry

1    language.

2                       We talked about promotions, we talked about

3    moving the share price up, we talked about investor

4    relations, things like that, you know, to kind of convey

14:49:10  5    what our intentions were on top of what Paul had conveyed

6    to him already about who we are and how we -- how we

7    handle things.

8    Q.    Did Mr. Spivak tell you that he conveyed that to

9    Mr. Scott?

14:49:20 10    A.    Yes.

11    Q.    And did Mr. Scott express any confusion or

12    hesitation to you?

13    A.    No.

14    Q.    Earlier on this morning, Mr. DeVillers asked you,

14:49:41 15    sir, what's the lie here.

16                       And I believe you responded that the first

17    of many lies is the timing of the press releases.

18                       So let's start with that first of many

19    lies.

14:49:55 20                       Tell us why the timing of a press release

21    is a lie.

22    A.    The timing of a press release is a lie because when

23    you put out a press release and you say, "Our business

24    just signed this contract" or "Our business just

14:50:08 25    accomplished this milestone, or brought on this new

1    customer," an investor would assume or feel that it just

2    happened.

3                He wouldn't assume that the company sat on

4    a whole stack of press releases collecting dust, as

14:50:23  5    Mr. Spivak put it once and, you know, you've heard it

6    talked about other ways with SOLI as well.

7                An investor wouldn't assume that this is

8    old news, this is old things.  He would think he's

9    getting new information, and the reason the company

14:50:41 10    wouldn't want to hold it back is they'd want to time it

11    with when we're sending out e-mail blasts and marketing

12    the stock profusely to get the biggest result in the

13    share price.

14    Q.    Did you discuss the timing of USLG press releases

14:50:54 15    with Mr. Spivak?

16    A.    Yes.

17    Q.    Did you discuss the timing of CareClix press

18    releases with Mr. Scott?

19    A.    Yes.

14:51:02 20    Q.    And what were the nature of those conversations?

21    A.    The nature of the conversations with Mr. Scott were

22    to wait until they had all of their financials, their

23    10Qs and 10Ks, as you heard played back earlier, filed so

24    the caveat emptor was off the stock, and then start

14:51:18 25    putting out press releases to make the stock more

Dean - Redirect

330

1   marketable and obviously the share price increase.

2   Q.   All right.  And so would that be an example of

3   sitting on old news, as you described?

4   A.   Yes.

14:51:29  5   Q.   You mentioned first of many lies.

6                Could you complete your sentence for us?

7                What are the other lies that you saw and

8   that you were pitching?

9   A.   The other lies I saw were that the company had

14:51:46 10   shares in USLG that Mr. Scott was holding that were

11   really the company shares that Paul was directing the

12   action on, and those shares were being made freely

13   available to us as outsiders as an added incentive for

14   the share price to go up and for Mr. Spivak and the

14:52:03 15   others to profit.

16   Q.   And what's the problem with Mr. Spivak kind of

17   directing or controlling or having an interest in those

18   free trading shares?

19   A.   As Mr. Spivak said directly in the recording you

14:52:18 20   heard earlier, the second he gets involved, the shares

21   are restricted and can't be used for this purpose

22   whatsoever.

23   Q.   You were also asked about promoting, and

24   Mr. DeVillers said there's nothing illegal about

14:52:32 25   promoting in and of itself.

1              Do you recall that?

2      A.    Yes.

3      Q.    And your response was something like, "Yes,

4      promoting if all properly disclosed."

14:52:42 5              Do you recall that?

6      A.    Yes.

7      Q.    What did you mean by, "If properly disclosed"?

8      A.    Promotion itself is not illegal if all the facts

9      are presented to the investors, as to any potential

14:52:57 10    conflicts.

11             Therefore, if I'm promoting the stock and

12     I'm a shareholder, I have to -- I have to put a

13     disclaimer in there saying that I'm a conflicted person;

14     that it might not be coming as a true fact or an accurate

14:53:13 15    fact; that I have an agenda that you need to know about

16     as an investor.

17             So that would be one.

18             Again, the timing of the press release is

19     another.

14:53:22 20             The -- I'm drawing a blank right now, but I

21     know --

22     Q.    And I want to stop you there on that conflict of

23     interest and ask you to flesh that out for us a little

24     bit more.

14:53:32 25             What is that conflict of interest between

Dean - Redirect                                   332

         1    someone with an interest in the company and a press

         2    release or a promotion?

         3              Can you explain that for us?

         4    A.    Yes.

14:53:40 5              If you're a shareholder and you stand to

         6    financially benefit, if you're a promoter who's a

         7    shareholder and stands to financially benefit, you need

         8    to disclose that publicly in the bottom of any e-mail,

         9    any type of circulation you put out.

14:53:57 10             If you go out on Twitter and you put out a

        11    blurb on a company, you're supposed to put a disclaimer

        12    in there that says, "I own shares of this.  I'm not

        13    coming from a neutral position" so to speak.

        14    Q.    Did you and Mr. Spivak agree that you and Bryan

14:54:12 15   would, in fact, put those disclaimers on press releases

        16    or promotional material?

        17    A.    No.

        18    Q.    How about you and Mr. Scott, did you discuss,

        19    "Let's make sure those disclosures are on this

14:54:24 20   promotional material"?

        21    A.    We didn't discuss disclosures at all.

        22    Q.    Would yourself and Bryan be folks that were getting

        23    compensated for doing press releases for USLG and

        24    CareClix?

14:54:35 25   A.    Yes, we would have a significant conflict of

Dean - Redirect                    333

1    interest.

2    Q.   And is that something that should have been

3    properly disclosed?

4    A.   Yes.

14:54:42  5    Q.   So under the plan as you were proposing it to

6    Mr. Scott and to Mr. Spivak, was the promotion proper or

7    improper?

8    A.   It would have been improper in that scenario.

9    Q.   You also, sir, mentioned about if you're a

14:55:03 10    shareholder, there could be a conflict of interest in

11    stock promotion.

12              Could you explain that to us?

13              MR. DeVILLERS:  Your Honor, I'd object as

14    to scope.

14:55:18 15              MS. MILLER:  This is something the witness

16    answered in direct response to --

17              MR. DeVILLERS:  Your Honor, if we need to

18    approach the Bench, that's fine, but I don't believe that

19    we should be --

14:55:35 20              THE COURT:  Overruled.

21    BY MS. MILLER:

22    Q.   Do you recall the question, or we can have it read

23    back?

24    A.   I got distracted by -- so if you could repeat it,

14:55:45 25    please.

1    Q.    Yes.

2              When Mr. DeVillers asked you what's the

3    lie, you also mentioned in addition to no disclosure of

4    stock promotion, there's also an issue if you're a

14:55:54 5    shareholder with stock promotion.

6              Could you explain that for us?

7    A.    Yeah.

8              If you're a shareholder and you're

9    contributing to outside promoters, that also needs to be

14:56:03 10   disclosed in any promotional marketing material at all

11   that they were paid by a third party shareholder or a

12   third party shareholder who might or likely would sell,

13   would have some influence on the promotional program and

14   the hiring of the promoter.

14:56:19 15   Q.    And what, to your understanding, is the purpose of

16   all this disclosure?

17   A.    It's so the average investor, if you get an e-mail

18   in your e-mail box or you see something on Twitter saying

19   this is the greatest company in the world, you need to

14:56:33 20   know --

21              MR. DeVILLERS:  Objection, Your Honor.

22              May we approach?

23              (Proceedings at side-bar:)

24              MR. DeVILLERS:  This is turning into

14:56:50 25   opinion testimony.

Dean - Redirect                                      335

                          I mean, they never put this person out to
          2    be an expert in the field.  He's a CI.
          3                 THE COURT:  I mean, look, I'll tell you,
          4    that -- the 701 issue here I thought about for a
14:57:03  5    day-and-a-half now.
          6                 I think he's well within where he can
          7    testify properly under 701.
          8                 So --
          9                 MR. DeVILLERS:  We weren't given
14:57:10 10    disclosures though, Your Honor.
         11                 THE COURT:  You don't get disclosures on
         12    701.  701 is a fact witness.
         13                 (End of side-bar conference.)
         14    BY MS. MILLER:
14:57:31 15    Q.    And, sir, I believe you were explaining, as you
         16    understand it, the purpose of these disclosure
         17    requirements.
         18    A.    Yeah.
         19                 The purpose, going back for the disclosure
14:57:41 20    or the requirements, is that an investor who opens up his
         21    e-mail and gets this stock tout or this profile page on a
         22    stock that says it's this great thing, something that
         23    might influence you to buy it, you as an investor need to
         24    know where the source is coming from; if it's somebody
14:58:00 25    who has a financial interest in getting you to buy the

1    stock or if it's somebody who's literally just saying

2    it's a good stock.

3                    So if I'm telling you to buy the stock, at

4    the same time I may be selling it, that's information

14:58:13  5    that the SEC and the FBI would want you to know so you

6    can actually make a decision on the origin of the

7    information and the origin of the outreach to you, so you

8    could actually make a little more clear decision on what

9    everyone's intent is.

14:58:29 10    Q.    In any of your discussions with Mr. Spivak, was

11    there any concern about proper disclosure and making sure

12    the full panoply of information is available to the

13    average investor in the marketplace?

14    A.    Not at all.

14:58:40 15    Q.    In any of your discussions with Mr. Scott, was

16    there any concern about making sure the full scope of

17    this information was available to an investor in the

18    marketplace?

19    A.    Not at all.

14:58:51 20                    MS. MILLER:  One moment, Your Honor.

21                    (Pause.)

22                    Nothing further.

23                    Thank you, Judge.

24                    THE COURT:  Ladies and Gentlemen, if you

14:58:59 25    have any questions for this witness, please write them

 1    down, pass them forward at this time.

 2                    Counsel and I will discuss them at

 3    side-bar.

 4                    As you're doing that, please remember my

14:59:12  5    instructions about questions to the witnesses.

 6                    (Proceedings at side-bar:)

 7                    MR. MORRISON:  Less crowded now.

 8                    THE COURT:  Okay.

 9                    MR. DeVILLERS:  Some of these --

15:00:29 10                    THE COURT:  There's more, don't worry.

11                    Interesting.

12                    Problem, anyone?

13                    Okay.  So I've labeled these Dean 1 through

14    5, which are separate sheets from the jurors.  Some have

15:02:37 15    multiple questions on them.

16                    Let me take them out of order.

17                    There was one question on Dean 5 which I

18    think thematically in each of your examinations comes

19    first, which is -- I'm paraphrasing -- talk to me about

15:02:59 20    your day job.  The question is:  "While working with the

21    FBI, did you continue to work in your regular job?"

22                    Any issue with that?

23                    MS. MILLER:  No.

24                    THE COURT:  Okay.  The other question on

15:03:22 25    Dean 5 was this question about you -- it was this issue

Dean -                                338

1       you guys were just going around about, "You said that

2       because Scott was willing to go forward with the sale, it

3       must mean that Paul controlled the stock.  Could it be

4       possible that Scott just wanted to make money on you

15:03:38  5     guys?"

6                       I mean, thoughts?

7                       There were no issues on that last question.

8                       So then there's three questions across two

9       different questions from the jurors about SOLI.

15:04:13 10                     MR. DeVILLERS:  I don't have a problem with

11      it.

12                      MS. MILLER:  No problem.

13                      THE COURT:  Okay.  So on Dean 1, the next

14      question is:  "The initial purchase between Matt and

15:04:28 15     Charlie, what was the market price at the time of the

16      purchase?"

17                      I think there was testimony on that, but, I

18      mean, I don't mind reasking it.

19                      MS. MILLER:  Right.

15:04:37 20                     THE COURT:  This is actually a really good

21      question, the time date stamp question.

22                      So --

23                      MR. MORRISON:  I think it's one of those

24      things where dates were given, but -- sorry, dates were

15:04:48 25     given, but I don't know that they are written down on the

Dean -                                          339

1    exhibits.

2                    I do think that the exhibit names do have

3    dates on them.  I don't think they have -- the excerpts

4    have times within the recordings, but the time of day of

15:05:03  5    the recording I don't think is recorded.

6                    THE COURT:  And --

7                    MR. MORRISON:  I don't think any of us have

8    a dispute about that.

9                    THE COURT:  I mean, I almost take the

15:05:13 10    question in some way as a digital technology matter.

11                    Is there, like, if you went to the

12    original --

13                    MR. MORRISON:  Yeah.

14                    THE COURT:  -- .wav file or whatever it is,

15:05:24 15    is there, like, a time and date stamp?

16                    I mean, just by way of analogy, I had one

17    civil case where the authenticity of this video recording

18    at a jail really was the dispositive motion -- issue for

19    purposes of summary judgment, and they were able to prove

15:05:41 20    up, the custodian was able to prove that up, like, with

21    that kind of organic, if you will -- that's not the

22    correct technical term -- information.

23                    I think that might be what they're asking

24    about.

15:05:54 25                    MR. MORRISON:  And that might be a better

Dean -                                340

1    question for Agent Fry, but it could be asked of him if

2    he knows.

3                THE COURT:  Why don't we save that one for

4    Fry perhaps?

15:06:06  5                MR. MORRISON:  Yes.

6                THE COURT:  And maybe whoever is examining

7    Fry, like, ask that question and get to that.

8                Then there's a bunch of questions about

9    press releases.  I don't know how much you all want to

15:06:20 10   get into that or not.

11               Many of this gets into your issue to some

12   degree from the last side-bar.  I'm not sure I have

13   strong feelings one way or another.

14               Dean 2, like, "How recent does a press

15:06:34 15   release have to be," and that's also in Dean 3, question

16   three, "What's the appropriate time period."

17               MS. MILLER:  I don't think we have a

18   problem one way or another.

19               THE COURT:  All right.  I'll probably not

15:06:52 20   ask those.

21               Dean 3 then gets into, "Did Scott know he

22   had been in trouble with the SEC before?"

23               I assume the answer to that is no, but

24   might as well ask him.

15:07:07 25               Okay.  I think the first question on Dean 3

```
         1    had been previously asked, but --
         2              MR. MORRISON:  What was that one?
         3              THE COURT:  "Did Scott seem hesitant at any
         4    point" --
15:07:24 5              MS. MILLER:  Sorry, I was trying to peek
         6    over Your Honor.
         7              THE COURT:  No, sorry.
         8              -- "to partake in the plan regarding USLG
         9    stock?"
15:07:3510              All right.  And then the last one on here
        11    is the specific question about this Government exhibit
        12    about "Take them F'ers out" in regard to Scott and
        13    Church.
        14              MS. MILLER:  Fine.
15:07:5215              THE COURT:  Okay.  I think that's all of
        16    them.
        17              MR. DeVILLERS:  Thank you.
        18              MS. MILLER:  Thank you.
        19              (End of side-bar conference.)
15:08:1320              THE COURT:  So the Ladies and Gentlemen of
        21    the Jury have a number of questions for you.
        22              Again, do not infer anything if I do or
        23    don't ask your questions or if I rephrase them.  Again, I
        24    was discussing with counsel what the Rules of Evidence
15:08:2825    allow us to ask and in what form.
```

Dean -                                        342

1              I will do my best to do this in a

2     reasonably orderly fashion, but I make no promises.

3                   So the first question that the jury had was

4     while working with the FBI on this case, did you continue

15:08:45  5     to work in your regular job?

6                   THE WITNESS:  Yes.

7                   THE COURT:  In the initial purchase between

8     Matt and Charlie, what was the market price at the time

9     of the purchase?

15:09:07 10                   THE WITNESS:  The market was fluctuating a

11    little bit at the time, and that's why we changed the

12    price on the contract.

13                   When we first initially talked to him about

14    doing the transaction between 25 and $0.30 a share, the

15:09:23 15    stock was at 30 to $0.35 a share, $0.35 a share it was

16    traded on the market.

17                   The stock came down a little bit to a price

18    just under 30, just under $0.30, and that's why we

19    lowered the price to $0.25 a share.

15:09:37 20                   If you recall my testimony earlier is we

21    did that so it wouldn't look shady if we went to deposit

22    the shares with a broker, the brokerage firm was doing

23    their diligence on it, because if we paid over the market

24    price on it on a small lot like that, it would have

15:09:52 25    looked like something's up.

 1          THE COURT:  Did Mr. Scott know that you had

 2     been in trouble with the SEC before?

 3          THE WITNESS:  No, because he knew me as

 4     Jason Dean; not as my true identity.

15:10:17  5          THE COURT:  Did Mr. Spivak own any shares

 6     of SOLI?

 7          Are there any five-percent-plus owners in

 8     SOLI?

 9          THE WITNESS:  I don't recall the exact

15:10:29 10     share structure of it, of who the other five percent

11     owners were.

12          I know there were insiders like Mr. Scott

13     that were in excess of that, and, yes, it was disclosed

14     to me by Mr. Spivak and by Mr. Scott that Paul Spivak

15:10:45 15     owned shares of SOLI as well.

16          THE COURT:  Did Mr. Scott seem hesitant at

17     any point to partake in the plan regarding USLG stock?

18          THE WITNESS:  No.

19          The only hesitation that was ever conveyed

15:11:03 20     to us was when we sent the share purchase agreement on

21     the first transaction and we lowered it to $0.25 a share,

22     and you heard the conversation back and forth that

23     resolved that issue.

24          THE COURT:  And what about in regard to

15:11:17 25     SOLI?

Dean -                              344

1          THE WITNESS:  No.

2          THE COURT:  There was a Government's

3    Exhibit about which there was testimony in which

4    Mr. Spivak said something to the effect of, "Take those

15:11:31  5    guys out" in regard to Mr. Scott and Mr. Church.

6              What was your understanding of what that

7    meant?

8          THE WITNESS:  He meant buy their entire

9    position right then and there, the entire three million

15:11:45 10    share block of freely tradeable stock for Mr. Scott and

11    the three million share block of freely tradeable stock

12    for Mr. Church.

13          THE COURT:  Was Mr. Spivak trying to hide

14    his actions from Mr. Scott and Mr. Church?

15:12:12 15          THE WITNESS:  No.

16          THE COURT:  Do you know how Mr. Spivak

17    portrayed the deal you've talked about to Mr. Scott and

18    Mr. Church?

19          THE WITNESS:  I don't know the specifics of

15:12:28 20    what he told, but I do know that he told them that we

21    were coming in to buy all the blocks of freely tradeable

22    stock, and then promote the stock higher.

23          THE COURT:  You said that because Mr. Scott

24    was willing to go forward, it must mean that Mr. Spivak

15:12:46 25    controlled the stock.

Dean -                          345

1                 Could it just be that Mr. Scott wanted to

2       make money on the deal?

3                 THE WITNESS:  Yes, I assume that's a

4       possibility as well.

15:12:59  5                 THE COURT:  Counsel, are there any

6       follow-up questions on these questions from the Ladies

7       and Gentlemen of the Jury?

8                 MS. MILLER:  No, Your Honor.

9                 Thank you.

15:13:08 10                 MR. DeVILLERS:  No, Your Honor.

11                 THE COURT:  You may step down.

12                 (Witness excused).

13                 THE COURT:  And the United States may call

14       its next witness.

15:13:29 15                 MR. MORRISON:  Thank you, Your Honor.

16                 The United States calls Forrest Church.

17                      FORREST CHURCH,

18       of lawful age, a witness called by the Government,

19                 being first duly sworn, was examined

15:14:23 20                   and testified as follows:

21                 THE COURT:  Thank you.

22                 Please be seated.

23                 And, Mr. Church, will you please just state

24       your name for the record?

15:14:33 25                 THE WITNESS:  Forrest Joseph Church.

```
 1              THE COURT:  Counsel, you may proceed when
 2      you are ready.
 3              MR. MORRISON:  Thank you.
 4          DIRECT EXAMINATION OF FORREST CHURCH
15:14:41  5  BY MR. MORRISON:
 6      Q.  Welcome back, Mr. Church.
 7              Jury's already pretty familiar with you
 8      from many hours of testimony in recent weeks so we're
 9      going to skip over all the background.
15:14:51 10             Are you still the same person you were back
11      then?
12      A.  Yes, sir.
13      Q.  Okay.  And are you still testifying here pursuant
14      to the same cooperation agreement that we discussed last
15:15:00 15  time?
16      A.  Yes, sir.
17      Q.  Now, I want to turn your attention to the end of
18      2020, early 2021.
19              Do you recall that time period?
15:15:09 20  A.  Yes, sir.
21      Q.  Do you recall being introduced to a man named Jason
22      Dean?
23      A.  Yes, sir.  I was told about him, and then at a
24      later date introduced.
15:15:20 25  Q.  Okay.  Now, who told you about him?
```

1          THE COURT:  You might just need to move the

2     microphone a touch closer.

3     A.    Paul Spivak.

4     Q.    What did he tell you about him?

15:15:30  5     A.    He told me that he would be, as he put it,

6     marketing US Lighting Group and would be basically taking

7     Richard's place.

8     Q.    Okay.  So there are two things.  Marketing US

9     Lighting Group and taking Richard's place.

15:15:48  10          By "marketing US Lighting Group," did you

11    understand that to mean marketing the products of US

12    Lighting Group like light bulbs or anything like that?

13    A.    No, sir.

14          It was marketing the stock and being able

15:16:02  15    to sell the stock.

16    Q.    Okay.  And when you say "taking Richard's place,"

17    is that Richard Mallion?

18    A.    Yes, sir.

19    Q.    Okay.  And what did you understand that to mean, to

15:16:11  20    take Richard Mallion's place?

21    A.    That Jason Dean would be stepping in with his group

22    of people who would set up phone banks, who would call,

23    cold call potential customers or potential stockholders

24    and build the base of stockholders for US Lighting Group.

15:16:37  25    Q.    Now, to be fair, have you come to learn since that

Church - Direct                    348

1    Mr. Dean was not who he said he was?

2    A.   Yes, sir.

3    Q.   And you understand that he was working with the FBI

4    as a part of this investigation?

15:16:46 5    A.   Yes, sir.

6    Q.   And that he was presenting a story of what was

7    planned in order to gather evidence against you,

8    Mr. Spivak, Mr. Scott and others?

9    A.   Yes, sir.

15:16:56 10    Q.   Okay.  But I want you to focus on what you

11    understood at the time when you were interacting with and

12    learning about Mr. Dean.

13                  Is that fair?

14    A.   Yes, sir.

15:17:05 15    Q.   Okay.  So what did you understand Dean -- let's put

16    it this way.

17                  Why did Mr. Spivak need to tell you about

18    Mr. Dean?

19    A.   Because I had a large share of free-trading stock.

15:17:24 20    Q.   And what was -- how was that relevant?

21    A.   Because it meant that there was stock available to

22    basically get to Mr. Dean and his people to give them an

23    incentive to raise the price of US Lighting Group.

24                  They could raise the price, get the

15:17:45 25    interest up, and then in turn purchase our shares and

1   turn around and sell them on the open market to make

2   their profits.

3   Q.   Okay.  Now, did he have a specific request of you?

4   A.   Originally it was that they were going to try a

15:18:08  5   limited run of a hundred thousand shares from myself and

6   from Mr. Scott.

7                    And assuming that worked out, they would

8   come back for additional shares.

9   Q.   Okay.  And so what was the plan for a limited run

15:18:27 10   of a hundred thousand shares?

11   A.   They would -- it was presented that they would pay

12   us $25,000, which is $0.25 a share for the hundred

13   thousand shares, and the deal with Mr. Spivak was we

14   would turn around and buy a hundred thousand shares back.

15:18:51 15   Q.   And so what's in it for you then?

16   A.   Well, I actually asked that question at one point

17   because I was selling some of my stock that I had

18   purchased for $0.25 a share, for $0.25 a share.

19                    And I was told, "Well, in the short run I

15:19:11 20   will sell you your hundred thousand shares for $0.15 a

21   share so that you at least have -- you're improving your

22   position.  And you have more than enough free trading

23   shares right now, you'll be able to convert these in six

24   months and then you'll have less expensive shares."

15:19:35 25   Q.   Okay.  So you mentioned that some of the shares you

1    were selling you had purchased for $0.25 with a promise

2    that -- I'm not going to make the jury go through all

3    those subscription agreements again.

4                         Fair to say that's referring back to your

15:19:49 5    earlier testimony?

6    A.    Restricted shares that I was able to finally get

7    unrestricted.

8    Q.    And because we're talking about now we're in early

9    2021, approximately?

15:19:59 10   A.    Yes, sir.

11   Q.    Okay.  And you had purchased those shares over the

12   course of 2016 to 2018?

13   A.    Yes, sir.

14   Q.    Is that fair?

15:20:09 15                   Okay.  And so by 2021, what was their

16   status?

17   A.    Their status, the majority of them, were already

18   converted to free trading shares.

19   Q.    And you had purchased some of those for $0.25 a

15:20:21 20   share?

21   A.    Yes, sir.

22   Q.    And so but the, I guess, the offer to you was that

23   you could purchase new shares at that point for $0.15 a

24   share?

15:20:31 25   A.    Yes, for that particular hundred thousand shares.

Church - Direct

351

1    Q.    And so was the pitch then that the effective profit

2    was the difference between $0.25 and $0.15 per share?

3    A.    Yes, sir.

4    Q.    Now, you mentioned that there was an initial run.

15:20:53 5              Why just initial?

6              What was the plan for after the initial

7    run?

8    A.    The pitch that was made to us was Mr. Dean and his

9    people would see if they were able to clear the stock, if

15:21:08 10   they were able to sell the stock readily, move the price

11   up on the stock.

12             And if that was the case, then they would

13   know that they would be able to make additional larger

14   purchases from Mr. Scott and I.

15:21:24 15  Q.    And you mentioned that your -- you'd be buying back

16   restricted shares, and that there was some expectation of

17   what would happen with those shares?

18   A.    Well, what Paul had always told us was as you

19   buy -- as you sell a hundred thousand shares, you buy

15:21:46 20  back a hundred thousand shares, and you always have

21   shares turning over.

22             And this can just go on and on forever.

23             And I said, well, nothing lasts forever,

24   but --

15:21:58 25  Q.    And you've referred a number of times to "us," that

Church - Direct

352

```
 1    this is -- that this would happen, that "we" would do
 2    this and this would benefit "us."
 3              Who is "we" and "us" in this description?
 4    A.    At this point it was Paul Spivak, Charles Scott and
 5    myself.
 6    Q.    And who did you understand -- you and Spivak have
 7    kind of different roles here, though, correct?
 8              You're sending money to Mr. Spivak --
 9    A.    Yes, sir.
10    Q.    -- for the restricted share purchase, right?
11    A.    Yes, sir.
12    Q.    Had you discussed with Mr. Spivak what Mr. Scott's
13    role was?
14    A.    Well, basically we were -- I was told that we would
15    be doing the same thing.
16    Q.    Okay.  Now, did you have an understanding that the
17    price on offer at this time initially was $0.25 per
18    share?
19    A.    Yes, sir.
20    Q.    Okay.  Did you have an understanding of whether
21    that price would change?
22    A.    Well, I was complaining because it wasn't exactly
23    good margins.
24              Now, granted it would get better when we
25    went to the $0.03 a share million-and-a-half shares that
```

1    Mr. Scott and I had.

2                    But overall, if you're buying something for

3    $0.25 and then you're getting -- selling it for $0.25 and

4    then turning around and buying more for $0.15, having to

15:23:26  5    sit on it for six months minimum, it wasn't overly

6    attractive.

7                    And I was just told in a generic this is

8    going to get so much better for all of us.

9    Q.    And did you -- was it told that the price would get

15:23:41 10    better?

11    A.    Yes.

12                    And as the price went up, we would be able

13    to charge more for Jason Dean and his people.

14    Q.    Okay.  And so when you refer to the price going up,

15:23:54 15    is that the open market price?

16    A.    Yes, sir.

17    Q.    And how did you understand the open market price

18    was going to go up?

19    A.    They were going to promote the stock with

15:24:05 20    information from Mr. Spivak, and as such with the hype

21    and the phone conversations and the phone banks and high

22    volume calls, they would find enough people wanting to

23    make the dream.

24    Q.    Now --

15:24:26 25    A.    And as such --

1    Q.   Go ahead.

2    A.   -- it would drive the price up.

3    Q.   You mentioned the $0.03 per share, shares that you

4    had?

15:24:36  5    A.   Yes, sir.

6    Q.   Right?

7               Is that a reference to the blocks of shares

8    that you received in 2018?

9    A.   Yes, sir, it was the million-and-a-half shares,

15:24:46  10   roughly million-and-a-half shares that I received, and

11   the roughly million-and-a-half shares that Mr. Scott

12   received.

13   Q.   Okay.  And that's, without going through all the

14   history again, is that related to the settlement of the

15:24:56  15   Mallion lawsuit?

16   A.   Yes, sir.

17   Q.   Now, at the time that you're engaged in this,

18   you're entering into this transaction, discussing it with

19   Mr. Spivak, do you recall roughly what the market price

15:25:08  20   was?

21   A.   I want to say it was in the 30-some-odd-cent range

22   at this point.

23   Q.   So then I have to ask, if the market price is $0.30

24   and these are freely trading shares, right?

15:25:24  25   A.   Yes, sir.

1    Q.    Why would you sell for $0.25 if you could sell on

2    the open market for $0.30?

3    A.    Because we were selling it to Mr. Dean under the

4    understanding that he would be able to drive the price up

15:25:35  5    and make the open market price much higher than it was at

6    that time.

7    Q.    Okay.  Did Mr. Spivak have any say in what happened

8    with your shares?

9    A.    Yes.

15:25:48 10   Q.    And why is that?

11   A.    Because it was constantly brought to my attention

12   that he allowed me into this deal, and it was always

13   supposed to be good for all of us.

14   Q.    And when you say "Into this deal," is that a

15:26:08 15   reference to those $0.03 shares?

16   A.    Yes, sir.

17   Q.    Now, what would happen, though, if you tried to

18   sell, to your understanding, three million shares on the

19   open market at that time at that, you know, roughly $0.30

15:26:21 20   price?

21   A.    It would have very quickly driven the price down.

22          At a hundred, 150,000 shares, it would

23   drive the price down to just pennies.  And if I went

24   beyond that, it would probably be a sub-penny stock.

15:26:38 25   Q.    So I guess fair to say it wasn't really an option

Church - Direct

356

1    to sell three million shares on the open market?

2    A.   No, sir, not even an option to sell one million

3    shares.

4    Q.   Now, you mentioned that Mr. Spivak kind of made

5    this introduction, is that right?

6    A.   Yes, sir.

7    Q.   Okay.  I'm going to show you what's been previously

8    marked as Government's Exhibit 1328.  1328.

9            Do you recognize this text message?

10    A.   Yes, sir.

11            MR. MORRISON:  Okay.  Permission to

12    publish.

13            MS. PUGH:  No objection.

14            THE COURT:  You may.

15    BY MR. MORRISON:

16    Q.   Now, do you recall receiving this text message?

17    A.   Yes, sir.

18    Q.   Who is it sent by?

19    A.   It was sent by Paul Spivak to let me know that

20    Jason Dean and that we all needed to meet.

21    Q.   Okay.

22    A.   Needed to talk.

23    Q.   Does this appear to be a message from Mr. Dean's

24    phone having messages with Mr. Spivak and yourself in a

25    sort of three-way message?

```
 1    A.    Yes, that, as it put, "You two need to talk."

 2    Q.    Okay.  And that's from Mr. Spivak?

 3    A.    Correct.

 4    Q.    And did you, in fact, make arrangements to speak

 5    with Mr. Dean?

 6    A.    Well, actually as I recall, Mr. Dean made

 7    arrangements to speak with me.

 8              But, yes, we did speak.

 9    Q.    You connected on the phone?

10    A.    Yes, sir.

11    Q.    Okay.

12              MR. MORRISON:  Permission to publish and

13    play Government's Exhibit 431B, please?

14              THE COURT:  You may.

15              (Tape playing).

16    BY MR. MORRISON:

17    Q.    At the end there, Mr. Church, what did you mean by

18    that it had worked out fairly well for him and had

19    totally sucked for you at moments?

20    A.    Well, to work with Paul, Paul always made sure Paul

21    got the first cut.

22              Paul got -- it -- it was all set up to take

23    care of Paul first, and then sometimes we were able to

24    have things our way if it was of no harm and Paul was

25    getting his piece.
```

15:28:06 (line 5)
15:28:15 (line 10)
15:28:26 (line 15)
15:29:43 (line 20)
15:30:07 (line 25)

Church - Direct                                             358

1    Q.    Okay.  And so would this conversation have taken

2    place sometime shortly after that March 10th text message

3    we saw a moment ago?

4    A.    Yes, sir, it would have been sometime in March.

15:30:18  5    Q.    Now, did you then start to make arrangements for

6    that 25,000 share sale?

7    A.    Slowly but surely, yes.

8    Q.    Or I guess $25,000 sale, I should say?

9    A.    $25,000; hundred thousand shares.

15:30:38  10                MR. MORRISON:  Okay.  Can we show and

11    publish Government's Exhibit 1325?

12                THE COURT:  You may.

13    BY MR. MORRISON:

14    Q.    Do you recognize this exchange of text messages?

15:30:51  15    A.    Yes, sir.

16    Q.    Okay.  And does this begin in approximately March

17    15th of 2021?

18    A.    Yes, sir.

19    Q.    Do you recognize this as a message from Jason Dean?

15:30:58  20    A.    Yes, sir, I do.

21    Q.    Okay.  And is he essentially looking for your

22    contact information?

23    A.    Yes, sir.

24    Q.    And do you then proceed to make arrangements

15:31:06  25    through these text messages about that $25,000, 100,000

1    share purchase?

2    A.   Yes, sir, I do.

3    Q.   If we could just go to the next page.

4            And in April, are you looking for some

15:31:21 5    details to complete that, the exchange?

6    A.   Yes, sir.

7    Q.   Okay.  And still then continuing on, if we go to

8    the next page, are you talking still by mid April about

9    VStock forms?

15:31:38 10   A.   Yes, sir.

11   Q.   Okay.  So is that approximately a timeframe when

12   that transaction was taking place between March and

13   April?

14   A.   Yes, sir, it was.

15:31:49 15   Q.   Now, do you recall exchanging e-mails to actually

16   complete the documents necessary to effectuate that

17   transaction?

18   A.   Yes, sir.

19            MR. MORRISON:  Permission to republish

15:31:59 20   Government's Exhibit 183, please.

21            THE COURT:  You may.

22            MS. PUGH:  No objection.

23   BY MR. MORRISON:

24   Q.   Now, we're going to go from the bottom here.  Can

15:32:10 25   we start at Page 12, please?

1          Now, do you recognize this as Mr. Dean

2    sending a share purchase agreement to you?

3    A.    Yes.

4    Q.    Or a Stock Purchase Agreement?

15:32:27 5    A.    Yes, sir, I do.

6    Q.    Okay.  Now, can we move on to Page 8?

7              THE COURT:  I think you might need to be

8    closer to the microphone.

9              MR. MORRISON:  Oh.  Thank you.  I'll slide

15:32:41 10   a little over.

11   BY MR. MORRISON:

12   Q.    Do you recognize this now as your response to

13   Mr. -- response to Mr. Dean attaching the Stock Purchase

14   Agreement?

15:32:50 15   A.    Yes, sir.

16   Q.    Okay.  And if we move up to Page 6, did you then

17   indicate you were providing wire instructions on March

18   26th?

19   A.    Yes, sir, I did.

15:33:04 20   Q.    Okay.  And then on to Page 1, please, this final

21   e-mail is Mr. Dean indicating that the wire should go out

22   shortly?

23   A.    Yes, sir.

24   Q.    And that's also on March 26th?

15:33:23 25   A.    Yes, sir.

Church - Direct                          361

1    Q.    Okay.  Now, do you recall speaking with Mr. Dean on

2    the phone around the time of these, these communications?

3    A.    Yes, sir, I do.

4              MR. MORRISON:  Okay.  Can we -- permission

15:33:34 5   to show and publish Government's Exhibit 434A, please?

6              THE COURT:  You may.

7              MR. MORRISON:  Can we play this when it's

8    up for the jury?

9              (Tape playing).

15:34:01 10  BY MR. MORRISON:

11   Q.    Okay.  Do you recall talking to Mr. Dean in

12   approximately March 24th?

13   A.    Yes, sir.

14   Q.    2021?

15:34:06 15  A.    Yes, sir.

16   Q.    Okay.  And he indicates that, "You aren't talking

17   to Jason, and Jason needs to send money so you can send

18   me money."

19              Can you explain what you understood or what

15:34:22 20  you were explaining to Mr. Dean there?

21   A.    Paul had contacted me insisting that I get with

22   Jason and get the wire for the 25,000 so that I could

23   immediately turn around and wire Paul his 15,000.

24   Q.    Can we move on to 434B, please?

15:34:49 25            MR. MORRISON:  And publish to the jury,

```
 1    please?
 2                  THE COURT:  You may.
 3                  (Tape playing).
 4    BY MR. MORRISON:
 5    Q.    Now, at the start of that call you were kind of
 6    relating some concerns about the numbers, is that right?
 7    A.    Yes, sir.
 8    Q.    And is that kind of what we talked about before
 9    about how much profit you would or wouldn't make on the
10    particulars of this $25,000 arrangement?
11    A.    Yes, sir.  There really wasn't much there.
12    Q.    But to the extent it concerned those $0.03 shares,
13    would that be a much more profitable deal?
14    A.    Yes, obviously that would be roughly an eight-fold
15    gain.
16    Q.    Okay.  Now, towards the end you mentioned or in the
17    middle, I suppose it was, a description of a test run on
18    a certificate.
19                  Do you recall that language?
20    A.    Yes, sir.
21    Q.    Okay.  What did you understand that to mean when
22    you were having that discussion with Mr. Dean?
23    A.    That meant that we were providing stock
24    certificates to Mr. Dean and his people, who were then
25    going to have to get those stock certificates put into a
```

1    brokerage and be able to sell those stocks.

2    Q.    And did you understand was there any particular way

3    that they were going to be selling this stock?

4    A.    On the open market as they had drummed up interest.

15:37:14 5    Q.    Now, he also mentioned it being, I think, teed up

6    for three million shares.

7                 Do you recall that language?

8    A.    Yes, sir.

9    Q.    What did you understand him to mean by teed up for

15:37:28 10   the three million shares?

11   A.    The million-and-a-half shares that I possessed from

12   the $0.03 shares, and the million-and-a-half that

13   Mr. Scott possessed from the $0.03 shares.

14   Q.    Now, did you also own more than just the

15:37:44 15   million-and-a-half that you had from the -- from the

16   $0.03 shares?

17   A.    Yes, sir.

18                 What now?  I'm sorry, I just --

19   Q.    Yeah, you had the million-and-a-half shares, right,

15:37:55 20   from the $0.03 shares, as you were calling them?

21   A.    Yes, sir.

22   Q.    You also had made reference to those restricted

23   shares that you purchased with the -- one-time restricted

24   shares that you purchased between 2016 and 2018?

15:38:07 25   A.    Yes, sir.  I had a little over two million shares

1    at the time, I believe.

2    Q.    Okay.  And had you had discussions with Mr. Spivak

3    about selling some, all, part?

4              How much of your shares did you anticipate

15:38:20 5    selling to Mr. Dean?

6    A.    Well, Paul was ideally wanting all our shares sold

7    so that we could buy more restricted shares, get them

8    cleared and free trading, sell those and just basically

9    create a revolving door situation.

15:38:40 10    Q.    Okay.  So he wanted them all sold, and then more

11    bought, and then those sold again?

12    A.    Yes, sir.

13              MR. MORRISON:  Could we turn to 434C and

14    publish to the jury, please?

15:38:53 15              THE COURT:  You may.

16              (Tape playing).

17    BY MR. MORRISON:

18    Q.    Okay.  Early on in that there's a few references to

19    50 grand.

15:40:28 20              Do you recall that?

21    A.    Yes, sir.

22    Q.    What's -- what's that a reference to?

23    A.    That's a reference to the 50 grand that I put up

24    and the 50 grand that Charles Scott put up for the

15:40:39 25    million-and-a-half shares each, the little over three

1    million total back in 2018.

2    Q.    Okay.  And that was -- those are the same shares

3    that were subject to the kind of unwritten arrangement

4    you had with Mr. Spivak back then?

5    A.    Yes, sir.

6    Q.    Now, you mentioned having 300,000 in this play.

7              What did you mean by that?

8    A.    That meant roughly, over the course of this, I had

9    invested basically $300,000 worth of money over the

10   course of the -- at this point I guess it would be five

11   years.

12   Q.    And does that account for any money you'd received?

13   A.    No, sir.

14   Q.    So that's just the gross?

15   A.    That was just a gross number --

16   Q.    Okay.

17   A.    -- of what I had put into this.

18   Q.    Okay.  So did you, in fact, receive the $25,000 for

19   the sale of these shares?

20   A.    Yes, sir.

21   Q.    Okay.  And can -- did you then -- what did you do

22   after receiving the $25,000?

23   A.    I turned around and wired 15,000 to Paul Spivak.

24             MR. MORRISON:  And, Your Honor, I don't

25   think there's going to be any objection to 44A or 46A,

Church - Direct                                    366

1    the financial documents here.

2                  MS. PUGH:  No objection.

3                  MR. MORRISON:  Permission to publish 44A.

4                  THE COURT:  You may.

15:42:02  5      MR. MORRISON:  Could we go to Page 3,

6    please?

7    BY MR. MORRISON:

8    Q.   Now, do you recognize this document here?

9    A.   Yes, sir.

15:42:08 10  Q.   Okay.  Is that the $25,000 coming in from Kane

11   Financial?

12   A.   Yes, sir.

13   Q.   And again, this is your March 19th to April 19th

14   Bank of America statement?

15:42:22 15  A.   Yes, sirs.

16   Q.   And so does that $25,000 come in on March 26th?

17   A.   Yes, sir, it did.

18   Q.   Okay.  And then actually just looking down, do you

19   send out $15,000 to US Lighting Group on April 2nd of

15:42:38 20  2021?

21   A.   Yes, sir.

22   Q.   And if we could just momentarily show Government's

23   Exhibit 46A.

24                  And if we could go to Page 3, is that in

15:42:53 25  effect the same bank statement there?

1    A.    Yes, sir.

2    Q.    Now, did you execute a subscription agreement to

3    buy those shares from USLG for the $15,000?

4    A.    Yes, sir, after the fact, I believe so.

15:43:08  5    Q.    Now, can we go to Government's Exhibit 251, Page 4,

6    or start with 251?

7                   And can we go to Page 4, please?

8                   MR. MORRISON:  Permission to publish, Your

9    Honor?

15:43:26 10                   THE COURT:  You may.

11   BY MR. MORRISON:

12   Q.    Okay.  Now, do you recognize this as a subscription

13   agreement with US Lighting Group?

14   A.    Yes, sir, I do.

15:43:35 15   Q.    Now, could we go down to Page 11, please?

16                   And is that your signature there on the

17   same date of that wire?

18   A.    Yes, sir.

19   Q.    That wire?

15:43:51 20   A.    Yes, sir.

21   Q.    On the 2nd?

22                   All right.  And if we go up to Page 10 of

23   this exhibit, does that indicate that $0.15 per share, a

24   hundred thousand shares?

15:44:03 25   A.    Yes, sir.

Church - Direct

368

1    Q.   At the cost of $15,000?

2    A.   Yes, sir.

3    Q.   Okay.  Now, if we go up to Page 3 of this exhibit,

4    do you recognize that as a stock issuance form for

5    VStock?

6    A.   Yes, sir.

7    Q.   And is that the sort of same hundred thousand

8    shares being issued shortly thereafter on or about April

9    15th of 2021?

10   A.   Yes, sir, it is.

11   Q.   Did you then exchange those -- we saw those text

12   messages earlier, but did you exchange messages with

13   Mr. Dean about the logistics of getting him the shares

14   that we saw?

15   A.   Yes, sir.

16   Q.   And that's kind of the other side of this

17   transaction, right?

18   A.   Yes, sir.

19   Q.   Now, could we show the witness Government's Exhibit

20   44B, please?

21        Do you recognize this as a VStock record of

22   the transfer of those hundred thousand shares to Kane

23   Financial?

24   A.   Yes, sir, I do.

25        MR. MORRISON:  Okay.  Permission to

1    publish, Your Honor?

2              THE COURT:  You may.

3    BY MR. MORRISON:

4    Q.    Now, when you received the $25,000 from your

15:45:30  5    conversations with Mr. Spivak, what was your

6    understanding of what Mr. Dean was doing at that time?

7    A.    He was working to deposit the certificate for the

8    hundred thousand dollars -- hundred thousand shares that

9    I gave and the hundred thousand shares that Charlie

15:45:51 10    provided into a brokerage account.

11              He was setting up phone banks to be able to

12    drive the prices up on the open market, and then in turn

13    be able to sell those shares for a profit.

14    Q.    Did you understand, was it told to you that

15:46:19 15    Mr. Dean and his people would be disclosing to potential

16    investors that they were, indeed, selling off USLG stock

17    at the same time they were promoting it?

18              MS. PUGH:  Objection.

19              Leading.

15:46:31 20              THE COURT:  Yeah, if you could rephrase.

21              MR. MORRISON:  Okay.

22    BY MR. MORRISON:

23    Q.    Did you understand -- so you understood that

24    Mr. Dean and his team were receiving your stock and

15:46:39 25    Mr. Scott's stock, is that right?

1    A.    Yes, sir.  That is correct.

2    Q.    Okay.  And did you understand then that they would

3    then be selling that stock as they promoted it?

4    A.    Yes, sir, I did.

15:46:48  5    Q.    Did you -- had you been told at any time that they

6    would disclose the fact that they were selling stock as

7    they were promoting it?

8    A.    No, sir.

9               MS. PUGH:  Objection.

15:46:56 10               Leading.

11               THE COURT:  Overruled.

12   Q.    You can answer.

13   A.    No, sir.

14   Q.    Did you understand that they -- what was your

15:47:06 15  understanding of what they would be telling investors

16   about that?

17   A.    Paul was providing information as to all the

18   wonderful things that US Lighting Group had coming up so

19   that they would in turn be able to promote the stock.

15:47:25 20   Q.    Was there any sense that they would disclose their

21   interest in the stock?

22   A.    No, sir.

23   Q.    Now, did you discuss this arrangement with

24   Mr. Scott?

15:47:37 25   A.    We discussed a lot of these arrangements over this

Church - Direct                                    371

1    period of time.

2    Q.   And did you understand -- had you talked to

3    Mr. Spivak about him having also talked to Mr. Scott

4    about this?

15:47:54  5    A.   Yes, sir.

6    Q.   And did you understand, did you also -- what was

7    your understanding, based on those conversations, of what

8    Mr. Scott understood about this arrangement?

9                    MS. PUGH:  Objection.

15:48:07 10                    Speculation.

11                    THE COURT:  Overruled.

12    Q.   You may answer.

13    A.   It was my understanding that Mr. Scott understood

14    the same information as to how this deal was being

15:48:29 15    handled that I did.

16    Q.   And that's as you've described it already here?

17    A.   Yes, sir.

18    Q.   Now, had you and Mr. Scott discussed using call

19    rooms or phone banks before to market USLG stock?

15:48:52 20    A.   Yes, sir, we did.

21    Q.   And without going into all the same detail that we

22    went into last time, I'm going to show you Scott Exhibit

23    Number 16 now.

24                    Do you recall an e-mail exchange that you

15:49:10 25    and Mr. Scott and Mr. Spivak had with an attorney Morgan

1      Petitti?

2      A.    Yes, sir, I do.

3      Q.    Okay.  And do you recognize this and remember

4      reviewing this while you were on the stand during your

15:49:22 5      prior testimony?

6      A.    Yes, sir.

7      Q.    Okay.  If we can go to the bottom of Page 2,

8      please.

9                   MR. MORRISON:  Okay.  Now, sorry.

15:49:36 10                   Permission to publish, Your Honor?

11                   MS. PUGH:  No objection.

12                   THE COURT:  You may.

13      BY MR. MORRISON:

14      Q.    Now, when you testified before, you'll recall that

15:49:46 15      we discussed some of the terms in this e-mail.

16                   Do you recall that?

17      A.    Yes, sir.

18      Q.    But we didn't discuss any conversations that you

19      had with Ms. Petitti around the time of this e-mail.

15:49:54 20                   Do you recall that?

21      A.    Yes, sir.

22      Q.    Okay.  Now, had you had conversations with Petitti

23      before writing this e-mail?

24      A.    Yes, sir.

15:50:04 25      Q.    Okay.  Now, had you -- who had participated in

1    those conversations with Ms. Petitti?

2    A.    That would have been me personally.

3    Q.    Okay.  And did you relate those conversations to

4    Mr. Scott or Mr. Spivak?

15:50:21  5    A.    Well, the conversations before I went to Morgan

6    Petitti were with Mr. Scott and Mr. Spivak.

7    Q.    Okay.  And what did you discuss with them?

8    A.    Basically we discussed that Charlie Scott had the

9    ability to put together phone rooms, and he had access to

15:50:47 10    autodialers and all kinds of things that I didn't quite

11    understand, but I think it was so that you could quickly

12    do a lot of cold calling.

13              And that evidently, in the area where he

14    lived, it would not be real difficult to put together a

15:51:04 15    phone room.

16              And so we needed to figure out if we could

17    set up a phone room that would make us money, and at what

18    level we could actually make money doing this.

19    Q.    And now, you recall -- we won't walk through the

15:51:24 20    whole spreadsheet again; I won't even put it up, but do

21    you recall going through a spreadsheet where you were

22    doing calculations about what the profits might be?

23    A.    Yes, sir, because that's kind of what I do is

24    crunch numbers.

15:51:34 25    Q.    And is that part of what lead into these questions?

1    A.    Yes, sir.

2    Q.    Okay.  And so in other words, you had discussed

3    with Mr. Scott and Mr. Spivak potential efforts to set up

4    a phone room or a call room?

15:51:46 5    A.    Yes, sir.

6    Q.    Okay.  And then who set you up with Ms. Petitti?

7              How did you get in contact with

8    Ms. Petitti?

9    A.    It was recommended by Paul that I contact Morgan

15:51:56 10    Petitti, who was USLG's SEC attorney.

11    Q.    And were you speaking with her on behalf of not

12    just yourself, but also Mr. Spivak and Mr. Scott?

13    A.    Yes.

14              In fact, the original phone call was -- to

15:52:12 15    her was to explain that Paul and Charlie and I had

16    discussed setting up a marketing phone room to sit and

17    get -- get the word out on US Lighting Group, and get an

18    interest going.

19    Q.    Okay.  And did you have a conversation with her

15:52:35 20    about that goal?

21    A.    Yes.  Yes, sir.

22    Q.    Okay.  And what did she tell you?

23    A.    She told me that there were potential issues, and

24    so to come up with a list of questions that were the most

15:52:53 25    significant that we -- and how we were trying to set it

1     up.

2     Q.    Okay.  Now, as to the question of whether or not

3     you could directly operate a call room to promote USLG

4     stock, did you ask her that?

15:53:13  5     A.    I don't understand what you're asking because it,

6     to some extent, is addressed on the -- the e-mail that

7     you're looking at there.

8     Q.    Right.

9           I guess these conversations took place

15:53:24 10     before this e-mail, is that right?

11     A.    Yes, sir.

12     Q.    Okay.  So before we get to this e-mail, what

13     would -- did you ask her, generally speaking, whether you

14     could set up a call room to solicit sales of USLG stock?

15:53:36 15     A.    Yes.

16           We -- I was told that potentially we could

17     if it was basically a promotion.  You know, a company can

18     come and promote a stock for a business or for a publicly

19     held company.

15:53:54 20     Q.    So I just want to break up the companies that we

21     have here.

22           You were told that it was possibly going to

23     be okay under what circumstances?

24     A.    Well, the problem -- the problem was she kept

15:54:07 25     bringing up limitations.

Church - Direct

376

1    Q.    Um-hmm.

2    A.    Which was what brought me back to trying to come up

3    with more detail.

4    Q.    So what were some limitations that she came up

5    with?

6    A.    The limitations were we had discussed at one point

7    possibly putting restricted shares together with open

8    market shares in marketing them, and that became very

9    problematic.

10              We talked about potentially doing some kind

11   of warrant system where if they buy so many on the open

12   market, we could give them, in there, some kind of

13   warrant subscription agreement that would allow them to

14   buy additional shares from the company at a later date,

15   and would that violate the situation.

16   Q.    Now, it sounds like you're looking for ways around

17   a problem.

18              Is that --

19   A.    Yes, sir.

20   Q.    -- a fair statement?

21              But I guess I haven't understood exactly

22   what the problem was.

23              Were -- did you ask her point blank whether

24   you could have a call room to, you know, you guys as

25   independent people supposedly, to promote -- not just to

Church - Direct

377

1    promote, but to solicit purchases of USLG stock?

2                    MS. PUGH:  Objection.

3                    Leading.

4                    THE COURT:  Why don't you -- I don't think

15:55:40  5    it's leading, but I do think you should rephrase the

6    question.

7                    MR. MORRISON:  Happy to.

8    BY MR. MORRISON:

9    Q.    Did you ask Ms. Petitti, before you get into the

15:55:47 10    things you just discussed, before you get into those

11    details, did you ask Ms. Petitti whether you could set up

12    a call room to promote or to solicit, I should say, to

13    solicit investors to purchase USLG stock?

14    A.    It was not put in that terminology, but --

15:56:06 15    Q.    What was the terminology you used?

16    A.    It was discussed a marketing phone room.

17                    It wasn't to promote and sell the stock

18    or -- it was more in generic terms.

19    Q.    Okay.  And what was her response as to the generic

15:56:26 20    terms?

21    A.    Her response was it would depend on the specifics,

22    and that we needed to come up with specific questions.

23    Q.    And so did you discuss -- and when you say "we,"

24    who is "we" there?

15:56:43 25    A.    Mr. Scott, Mr. Spivak and myself.

1    Q.    And did you then try to formulate questions based

2    on what you understood?

3    A.    Yes, sir.

4    Q.    And was that in part based on what she told you you

5    could and couldn't do?

6    A.    That was partially on that, and it was partially on

7    the questions that Mr. Scott and Mr. Spivak brought to

8    the table of what if we tried to do it this way.

9    Q.    Okay.  And so is that what these questions are here

10   we see in one through three?

11   A.    Yes, sir.

12   Q.    Okay.  And so specifically, is number one here your

13   attempt to describe a potentially acceptable situation

14   for cold calling investors?

15   A.    Yes.

16              We had discussed possibly one of us

17   becoming a Director so that we could act on behalf of the

18   company, because that was one of the allowable items that

19   Ms. Petitti had mentioned.

20   Q.    And just if you can explain that, is that that the

21   company itself can solicit investors to invest in the

22   company?

23   A.    Yes.

24   Q.    And so the proposal was what if you or Mr. Scott

25   became officially a Director of USLG?

1    A.    Yes, sir.

2    Q.    But if you weren't a Director of USLG, what was

3    your understanding of whether that would be a problem?

4    A.    The problem then would just be selling the stock

15:58:17 5    itself.

6    Q.    And you couldn't do that in that situation?

7    A.    Correct.

8    Q.    Okay.  And so was this then drafted essentially to

9    try and summarize what you thought would get a yes from

15:58:37 10    Ms. Petitti?

11    A.    What I thought could get a yes.

12    Q.    Okay.  Now, how about number two?

13              What did that concern?

14    A.    Basically we're looking at other aspects of can

15:58:54 15    they pay our promotional phone company; can USLG pay to

16    compensate its Directors with salary, bonuses and perhaps

17    stock.

18    Q.    And so in this situation, its Directors, is that in

19    the hypothetical where you or Mr. Scott become a Director

15:59:21 20    of USLG?

21    A.    Yes.

22    Q.    Okay.

23    A.    And where we would be the promotional company.

24    Q.    So you're trying to find a way for USLG to pay you

15:59:31 25    to run a call room?

          1    A.    Yes, sir, so that we could basically, for lack of a

          2    better term, get rid of Rich and the other pirates.

          3    Q.    And now, ultimately, what did you conclude about

          4    the feasibility of doing that?

15:59:51  5    A.    There were too many red flags that were popping up,

          6    and there was no good way to do this without blatantly

          7    breaking the law.

          8    Q.    And is that why, I think you said in your testimony

          9    last time, that one of you made the comment that, "We

16:00:10 10    don't look good in orange jumpsuits"?

         11    A.    Yes, sir.

         12    Q.    Okay.  And so how did this background affect your

         13    thinking about the arrangement with Mr. Dean when it came

         14    up?

16:00:22 15                We can take this down now.

         16    A.    Well, basically it was taking us out of the direct

         17    line of sight, and putting Mr. Dean and his people as the

         18    blatant disregard for the law individuals where we were

         19    kind of in the background.

16:00:57 20    Q.    And so do you understand, though, that you were

         21    still supporting that process?

         22    A.    Yes, sir.

         23    Q.    And in fact helping to pay for it?

         24    A.    Yes, sir.

16:01:07 25    Q.    But better for them to be getting their hands

```
         1    dirty?

         2    A.    Yes, sir.

         3    Q.    Now, after that $25,000 transaction, what was your

         4    expectation at that point of what would happen next?

16:01:23 5    A.    We were told that after they had had a successful

         6    track run, they would contact us and start getting larger

         7    and larger quantities of shares.

         8    Q.    Okay.  Now, around this time, were you also on some

         9    text messages with Mr. Spivak, Mr. Scott, and Mr. Dean?

16:01:50 10   A.    Yes, sir.

         11   Q.    Okay.  Can we show you Government's Exhibit 1326,

         12   please?

         13                 So here we are at the end of March, 2021?

         14                 MR. MORRISON:  Permission to publish, Your

16:02:07 15   Honor?

         16                 THE COURT:  You may.

         17   BY MR. MORRISON:

         18   Q.    Do you recognize this?

         19   A.    Yes, sir.

16:02:13 20   Q.    Okay.  Are these the messages we just described?

         21   A.    Yes, sir.

         22   Q.    Does it begin with Mr. Spivak reaching out about

         23   the audit with a wide range of emojis, let's call it?

         24   A.    Yes, sir.

16:02:26 25   Q.    And if we'd go to the next page.
```

Church - Direct                                           382

1                Does he continue with some sort of links to

2    OTC markets?

3    A.    Yes, sir.  That was to actually show the filings.

4    Q.    Okay.  And is Mr. Scott's response "Super"?

16:02:41  5    A.    Yes, sir.

6    Q.    Now, at the end of this, were you planning to sell

7    much more shares to Mr. Dean?

8    A.    Yes, sir.

9    Q.    And were you taking any steps to try and prepare to

16:03:09 10    have those shares available to sell?

11    A.    Yes, sir.

12    Q.    And what were you doing?

13    A.    Well, I had explained to Mr. Dean where the shares

14    currently were, and that we could quickly be able to

16:03:20 15    transfer him, as I recall, it was seven or 800,000 that

16    was at the transfer agent, but the other shares that I

17    had available were with brokerage, different brokerage

18    accounts.

19    Q.    Now, ultimately you didn't transfer any more

16:03:38 20    shares, is that right?

21    A.    No, sir.

22    Q.    And why is that?

23    A.    Because by the time it got around to that point, I

24    received a phone call from Mr. Scott telling me that

16:03:53 25    Mr. Spivak had been arrested.

Church - Direct                                    383

1    Q.    And at that point did you understand that Mr. Dean

2    had been working with law enforcement?

3    A.    No, sir, I did not at that point.

4    Q.    When did you come to learn that?

16:04:03  5    A.    Probably sometime closer to August of that year.

6                    MR. MORRISON:  Just a moment, Your Honor.

7                    (Pause.)

8                    MR. MORRISON:  Nothing further, Your Honor.

9                    THE COURT:  Any cross-examination?

16:04:35 10                    MS. PUGH:  Yes, Your Honor.

11                    May we approach briefly, first?

12                    THE COURT:  Yes.

13                    (Proceedings at side-bar:)

14                    MS. PUGH:  Could we have a restroom break?

16:04:45 15                    THE COURT:  Yes, I was going to.

16                    MS. PUGH:  Okay.

17                    THE COURT:  That's fine.

18                    MS. PUGH:  Yes.

19                    THE COURT:  And I assume -- we'll wait,

16:04:52 20    we'll wait for them.

21                    So, like, the question I have is I assume

22    we can get done with him today.

23                    MS. PUGH:  Yes.

24                    THE COURT:  And get him off, and we'll call

16:05:01 25    it a day.

1          So why don't we take a short break and do

2     that and then --

3          MS. PUGH:  I should say, Your Honor, I

4     won't be here tomorrow.  I'll have someone else with

16:05:12  5     Mr. DeVillers because I will be closing on a house.

6          THE COURT:  It's a great market for it so.

7          MS. PUGH:  I've already pushed it off once

8     so I'm in a bit of a tight position, so to the extent

9     that redirect goes into tomorrow --

16:05:21  10          THE COURT:  I'd like to get it done today

11     to the greatest extent.

12          MR. MORRISON:  I don't expect a long

13     redirect.

14          THE COURT:  Okay.  I'm going to tell the

16:05:30  15     jury that we will take a short break, but you tell me I

16     don't anticipate us staying late.

17          MS. PUGH:  No.

18          THE COURT:  Okay.  Very good.

19          (End of side-bar conference.)

16:05:41  20          THE COURT:  Ladies and Gentlemen, let me

21     tell you two logistical things.

22          So, first, we're going to take a short

23     break.

24          Our goal is going to be allow Mr. Church to

16:05:53  25     leave this evening.  That is not going to require, I

1     don't think, that we stay here until all hours tonight,

2     but I do think it warrants taking a short break.

3                   So it's five minutes after 4:00.

4                   We'll try to make it as short as possible,

16:06:08  5     we'll plan ten minutes, 15 tops, and then come back and

6     get done as promptly as we can today.

7                   So we'll stand in recess.

8                   THE CLERK:  All rise.

9                   (Jury out.)

16:06:51 10                   THE COURT:  And we will stand in recess.

11                   Thank you.

12                   (Recess taken.)

13                   THE COURT:  Please be seated.

14                   Let's bring in the jury.

16:22:24 15                   (Jury in.)

16                   THE COURT:  Please be seated.

17                   I will remind the witness that you are

18     under oath.

19                   Ms. Pugh, you may proceed with your

16:24:14 20     cross-examination when you are ready.

21                   MS. PUGH:  Thank you, Your Honor.

22           CROSS-EXAMINATION OF FORREST CHURCH

23     BY MS. PUGH:

24     Q.    Good afternoon, Mr. Church.

16:24:24 25                   How are you?

1    A.    Fine, I guess.

2    Q.    So I know you were here a couple weeks ago; feels

3    like many, many weeks ago now at this point I'm sure.

4              And you did speak with my colleague, but

16:24:36  5  you and I have never met, is that fair to say?

6    A.    Yes, ma'am.

7    Q.    Okay.  Now, I'm going to try to make this quick

8    because, as I mentioned, I know we spoke to you a few

9    weeks ago so we already know a lot about you, as

16:24:51 10  Mr. Morrison noted, so hopefully this won't be too

11   difficult for you.

12             Now, I want to start at this conversation

13   that you discussed with Mr. Morrison about the

14   conversation that you had with an attorney named Morgan

16:25:03 15  Petitti.

16             Okay.  Do you recall?

17   A.    Yes, ma'am.

18   Q.    Okay.  And there was an e-mail exchange between you

19   and Morgan Petitti where you were asking for advice on

16:25:12 20  how to set up this marketing arm for USLG?

21   A.    Yes, ma'am.

22   Q.    Okay.  And you and Charlie had discussed together

23   the possibility of setting up a marketing arm for USLG to

24   promote stock.

16:25:25 25             Is that an accurate depiction?

1    A.    Yes, ma'am.

2    Q.    Okay.  And prior to doing that, you reached out to

3    an attorney for legal advice on how to do that, correct?

4    A.    To clarify, are you asking prior to us doing it, or

16:25:42  5    prior to us having the discussions?

6    Q.    Well, you didn't actually do it, correct?

7    A.    Correct.

8    Q.    Because you received legal advice from Morgan

9    Petitti that complicated matters a little too much for

16:25:55  10    you and Charlie, correct?

11    A.    Correct.

12    Q.    Okay.  Now, you're suggesting today -- and correct

13    me if I'm wrong -- that that e-mail that we reviewed,

14    Exhibit 16, was simply an attempt to get a yes from

16:26:15  15    Ms. Petitti.

16              Is that a fair characterization of how you

17    testified?

18    A.    Yes, ma'am.

19    Q.    Okay.  And so you're suggesting now that the

16:26:24  20    questions in that e-mail weren't genuine?

21    A.    No, ma'am, that is not what I'm suggesting.

22    Q.    Okay.  So when you say you structured those

23    questions to get a yes from Ms. Petitti, you're not

24    saying that you were being disingenuous with those

16:26:42  25    questions?

1    A.    No, ma'am.

2    Q.    Okay.  So you were legitimately wondering how you

3    could market USLG stock legally?

4    A.    Yes, ma'am.

16:26:49 5    Q.    Okay.  And you and Mr. Scott reached out to legal

6    counsel so you could figure out how to do that?

7    A.    Yes, ma'am.

8    Q.    Okay.  And she actually explained to you that it's

9    perfectly legal for a company to come and promote stock.

16:27:06 10            Fair?

11   A.    Yes, ma'am.

12   Q.    Okay.  And eventually -- well, part of this

13   conversation surrounded the possibility of purchasing

14   leads through a lead company, is that correct?

16:27:26 15   A.    Well, we did discuss that.  It wasn't included in

16   the e-mail itself, I don't believe, but --

17   Q.    But it was part of the conversation that you had

18   with Mr. Scott?

19   A.    Yes.

16:27:36 20   Q.    Okay.  And that is also something that Ms. Petitti

21   said is perfectly legal, soliciting leads?

22   A.    Yes.

23   Q.    Okay.  Now, ultimately you and Mr. Scott decided

24   not to go forward with this marketing arm of USLG, is

16:28:10 25   that correct?

1    A.    Yes, ma'am.  That is correct.

2    Q.    Okay.  And I believe you testified that's because

3    there were too many red flags?

4    A.    Yes, ma'am.

16:28:16  5    Q.    Okay.  And would you agree with me that you always

6    knew Mr. Scott to be a very busy man?

7    A.    Yes, he always appeared to be quite busy.

8    Q.    And would I be correct in saying that there were

9    also discussions about the time restraint that this

16:28:33 10   endeavor would have on Mr. Scott and his inability to

11   devote his time to that?

12   A.    I can believe that there were discussions in that

13   realm as well.

14   Q.    Okay.  Now, I want to transition to this

16:28:54 15   arrangement with Mr. Dean.  Okay?

16              So you testified --

17   A.    Pardon me, can you restate that?  I missed part of

18   it.

19   Q.    I'm sorry?

16:29:03 20              THE COURT:  That was my fault.

21              I'm sorry.

22   BY MS. PUGH:

23   Q.    I'm going to transition and talk about this

24   arrangement in 2021 with Mr. Dean.

16:29:09 25              Before I get into that, though, this 2018

1    conversation between you and Mrs. Petitti has nothing to

2    do with the 2021 arrangement with Mr. Dean, is that fair

3    to say?

4    A.    It -- we knew nothing of Jason Dean at that time.

16:29:25  5    Q.    Okay.  So the answer to my question is yes, it had

6    nothing to do with --

7    A.    Yes.

8    Q.    -- the arrangement with Mr. Dean?

9    A.    We did not know Mr. Dean.

16:29:38  10    Q.    Okay.  So you didn't make any plans with Mr. Scott

11    and Mr. Dean to set up a marketing arm of USLG?

12    A.    No, ma'am.

13    Q.    He was not involved in that?

14    A.    No, ma'am.

16:29:47  15    Q.    Okay.  Now, you testified it was your understanding

16    that Jason Dean was to be a replacement for Richard

17    Mallion, is that correct?

18    A.    Yes, ma'am.

19    Q.    Okay.  And would you agree with me that during the

16:30:06  20    time Richard Mallion was working with USLG, and you were

21    engaging with Richard Mallion, you didn't at that point

22    realize that you were doing anything illegal?

23          Is that fair to say?

24    A.    I don't know that that is a totally accurate

16:30:22  25    statement.

1    Q.   Okay.  Would it be totally accurate if you

2    testified a couple weeks ago that it wasn't until after

3    being indicted and looking into the securities laws that

4    you determined that you had done things that were wrong?

16:30:39  5    A.   Specifically as to some of the items, that would be

6    correct.

7    Q.   Okay.  And so would it be accurate to say that it

8    was not in your mind to defraud anyone during that time

9    period?

16:30:55 10    A.   That was not on my mind.

11    Q.   Okay.  And in fact, it wasn't until after you were

12    being indicted and you looked at those securities laws

13    that you realized you were actually defrauding people?

14    A.   That did bring it to a point.

16:31:11 15    Q.   Okay.  And so you were not indicted until after

16    your interactions with Jason Dean, is that fair to say?

17    A.   Yes, ma'am.

18    Q.   Okay.  And you, all of your discussions with

19    Mr. Dean, the ones that we've heard recordings of -- and

16:31:30 20    were there others that we did not hear recordings of?

21    A.   Not that I'm aware of.

22    Q.   Okay.  So all of the conversations that you had

23    with Mr. Dean, that happened before you were indicted?

24    A.   Yes, ma'am.

16:31:40 25    Q.   Okay.  And so is it fair to say that at that point

1    you had no intention to defraud anyone?

2    A.    At that point we were trying to sell stock for as

3    much money as we could.

4    Q.    And --

16:31:55 5    A.    Was I looking at the term "Defraud"?  No, ma'am.

6    Q.    Okay.  So you are testifying -- strike that.

7                    Is it fair to say that you weren't trying

8    to rip anyone off?

9    A.    No, ma'am, that was not at the forefront of my

16:32:12 10    mind.

11    Q.    Okay.  Now, you testified that you were told that

12    Mr. Scott would be doing the same thing as you were with

13    Mr. Dean, is that correct?

14    A.    Yes, ma'am.

16:32:31 15    Q.    And Mr. Spivak told you that?

16    A.    Yes, ma'am.

17    Q.    Okay.  And --

18    A.    Also, I spoke with Mr. Scott on multiple occasions

19    as to whether he had sent Mr. Dean his stock and how he

16:32:49 20    felt that it was going to be, but --

21    Q.    Okay.  And if Mr. Scott owned stock, selling that

22    stock is not illegal, would you agree?

23    A.    On its face, no, ma'am.

24    Q.    Okay.  So you mentioned that you had these

16:33:08 25    conversations with Mr. Scott about this scheme or

1    whatever.

2                    Have we seen any of those conversations?

3    A.    Have you seen --

4    Q.    Have we seen phone records of calls between you and

16:33:23  5    Mr. Scott?

6    A.    No, ma'am.

7    Q.    Have we seen text messages exchanged between you

8    and Mr. Scott to that effect?

9    A.    Not that I'm aware of.

16:33:29  10   Q.    E-mails?

11   A.    Not that I'm aware of.

12   Q.    Okay.  Do you and Mr. Scott live in the same state?

13   A.    No, ma'am.

14   Q.    Okay.  Now, again, you mentioned that your

16:33:46  15   understanding of Mr. Dean's role in this promotion of

16   USLG was that he had contacts with phone banks and people

17   that could cold call, and he could build a base of

18   stockholders for USLG, correct?

19   A.    Correct.

16:34:03  20   Q.    Okay.  Now, we didn't hear you talk about any of

21   that specifically in the recorded conversations we heard

22   today, did we?

23   A.    No, ma'am.

24   Q.    Okay.  And you are aware now that Mr. Dean was

16:34:15  25   actually working for the FBI?

1    A.    Yes, ma'am, I am aware at this point.

2    Q.    And that he was recording all of your calls or all

3    of your conversations?

4    A.    Well, I have heard the recordings, yes, ma'am.

16:34:25  5    Q.    Okay.  And so there are no recordings of you and

6    Mr. Dean talking about lying to potential investors or

7    the general public?

8    A.    No, ma'am.

9    Q.    Okay.  There are no conversations about lying about

16:34:45 10    commissions?

11    A.    No, ma'am.

12    Q.    No conversations about lying on holding periods on

13    restricted stock?

14    A.    No, ma'am.

16:34:55 15    Q.    No conversations about misleading press releases

16    from USLG?

17    A.    No, ma'am.

18    Q.    Okay.  And we heard calls between you and Mr. Dean,

19    but we did not hear any calls between you, Mr. Dean and

16:35:16 20    Mr. Scott, is that correct?

21    A.    Correct.

22    Q.    Because those calls did not happen?

23    A.    Correct.

24    Q.    Okay.  And we didn't hear any calls between you,

16:35:22 25    Mr. Dean and Mr. Spivak, correct?

1    A.    Correct.

2    Q.    Because those calls didn't happen?

3    A.    Correct.

4    Q.    Okay.  So would you agree with me that you really

16:35:33 5    can't say what Mr. Dean and Mr. Spivak were discussing in

6    their calls behind the scenes of this whole plan?

7    A.    Only to the extent that Mr. Spivak would have

8    shared -- what he actually shared with me in phone calls.

9    Q.    Okay.  And you're not sure what the conversation

16:35:53 10   between Mr. Dean and Mr. Scott was either, is that fair?

11   A.    Only to the extent of knowing what Mr. Scott told

12   me about their interactions.

13   Q.    Okay.  And now, this entire arrangement with Jason

14   Dean, I think you described it -- and correct me if I'm

16:36:23 15   wrong -- but as a plan to promote USLG stock, is that

16   fair?

17   A.    Well, that's what he was supposed to be doing is

18   promoting the stock.

19   Q.    Okay.  And just to make sure I understand, you were

16:36:36 20   to sell him $25,000, a hundred shares -- a hundred

21   thousand shares for $25,000, correct?

22   A.    Correct.

23   Q.    Okay.  So that's $0.25 a share?

24   A.    Yes, ma'am.

16:36:45 25   Q.    And that's free-trading stock?

1    A.    Yes, ma'am.

2    Q.    Okay.  And then he was going to promote that stock

3    to hopefully make it more profitable?

4    A.    Yes, ma'am.

16:36:57  5    Q.    Okay.  And you then had the option to buy

6    restricted stock at $0.15 a share, correct?

7    A.    Well, it wasn't an option.

8              It was a, basically, direct request that I

9    do it by way of Paul Spivak.

16:37:16 10    Q.    Mr. Spivak forced you to do it?

11    A.    Well, he insisted.

12              Did he force me?  No.  No one showed up

13    with a gun.

14    Q.    Okay.  And so my question again was you had the

16:37:31 15    opportunity to buy a hundred thousand shares back at

16    $0.15 per share?

17    A.    Yes, ma'am.

18    Q.    Of restricted stock?

19    A.    Yes, ma'am.

16:37:39 20    Q.    Okay.  And the hope in that was that Mr. Dean,

21    through these promotional efforts, would make the stock

22    more profitable and then you've got restricted stock

23    that's going to be more profitable, is that fair?

24    A.    Hopefully the price of the shares would go up.

16:38:01 25    Q.    Um-hmm.

          1    A.    Making all shares that we possessed more

          2    profitable.

          3    Q.    Okay.  And so would you agree with me if I called

          4    that a smart business decision?

16:38:13  5    A.    On its face, yes, ma'am.

          6    Q.    Now, you mentioned that you only did this because

          7    Paul insisted.

          8               And I think you testified -- and again

          9    correct me if I'm mischaracterizing this -- but that Paul

16:38:32 10    controlled your shares in the USLG stock?

         11    A.    Yes, ma'am.

         12    Q.    Okay.  And he constantly brought it to your

         13    attention that he allowed you into this deal, is that

         14    fair?

16:38:43 15    A.    Yes, ma'am.

         16    Q.    Okay.  But would you agree with me that you really

         17    are not privy to Mr. Scott's trading activity, is that

         18    fair to say?

         19    A.    I have no idea what Mr. Scott traded or did not

16:38:57 20    trade, other than the couple of times that we -- we

         21    discussed a couple of isolated transactions.

         22    Q.    Okay.  So this assertion that Mr. Spivak was

         23    controlling these USLG shares, you don't know what

         24    Mr. Scott was doing with his USLG shares, correct?

16:39:21 25    A.    No, ma'am.

1    Q.   Okay.  Correct, you don't know?

2    A.   I do not know.

3    Q.   Okay.  Thank you.

4         Now, I won't belabor this point, but you

16:39:39 5   are here today based on your obligation to the United

6    States Government, is that fair?

7    A.   I was asked to testify, yes, ma'am, for the U.S.

8    Government.

9    Q.   Okay.  In exchange for a potential reduction in

16:39:53 10  your sentence?

11   A.   For a potential, I believe it was three points, but

12   yes, ma'am.

13   Q.   Okay.  And being here today substantially increases

14   your chances of getting probation, is that fair to say?

16:40:05 15  A.   I'm hopeful.

16   Q.   Okay.  And obviously that's a very valuable

17   proposition to you because you have ten children at home,

18   is that fair?

19   A.   Yes, ma'am.

16:40:15 20  Q.   Okay.  Now, I know you've touched on some

21   conversations that you claim you had with Mr. Scott, but

22   would it be fair for me to say that during the time you

23   knew Mr. Scott and the time that you interacted with him,

24   you knew him as somebody who was always trying to do the

16:40:40 25  right thing?

1    A.    For the majority of the time, yes.  Yes, ma'am.

2              MS. PUGH:  Okay.  And, okay, if I could

3    have one second, Your Honor?

4              (Pause.)

16:41:07  5              MS. PUGH:  No further questions.

6              THE COURT:  Any redirect?

7              MR. MORRISON:  Yes, Your Honor.

8         REDIRECT EXAMINATION OF FORREST CHURCH

9    BY MR. MORRISON:

16:41:27 10   Q.    Can we show Scott's Exhibit 16, please?

11             MR. MORRISON:  May I publish to the jury?

12             THE COURT:  You may.

13   BY MR. MORRISON:

14   Q.    If you go down to that Page 2 to 3 range there.

16:41:45 15             And do you recall some questions about

16   whether it was, quote, perfectly legal to solicit

17   investors?

18             Do you recall that?

19   A.    Yes, sir.

16:41:54 20   Q.    Do you recall that that was specifically if it was

21   done by a USLG Director?

22   A.    Yes, sir.

23   Q.    Who will do the selling lawfully?

24   A.    Yes, sir.

16:42:02 25   Q.    Okay.  But in this arrangement that you were

1    contemplating, it would be necessary for you or Mr. Scott

2    to actually become a Director of USLG, is that right?

3    A.    Yes, sir, under that example.

4    Q.    And that never happened, did it?

16:42:15 5    A.    No, sir.

6    Q.    And instead, did you have Mr. Mallion continue to

7    promote the stock?

8    A.    Yes, sir.

9    Q.    Was he a USLG Director?

16:42:22 10    A.    No, sir, I do not believe so.

11    Q.    Was Jason Dean a USLG Director?

12    A.    No, sir, I do not believe so.

13    Q.    Anyone on Jason Dean's team a USLG Director?

14    A.    No, sir, not to my knowledge.

16:42:33 15    Q.    Okay.  So in other words, the requirement for it to

16    be "perfectly legal" was missing in all of those

17    circumstances following this exchange with Ms. Petitti,

18    isn't that right?

19    A.    Yes, sir.

16:42:47 20    Q.    And was it your understanding that Mr. Dean was

21    just soliciting leads and handing them to USLG?

22    A.    No, sir.

23    Q.    So he also wouldn't have been following this advice

24    that you and Mr. Scott and Mr. Spivak solicited from

16:43:02 25    Ms. Petitti, is that right?

1    A.    No, sir.

2    Q.    Now, we can take that down.

3            You were asked a number of questions about

4    whether you were trying to defraud people in that, in the

16:43:20  5    time period, and I think we kind of allied at something,

6    but your earlier testimony was about 2017, 2018.

7            Do you recall that?

8    A.    Yes, sir.

9    Q.    Okay.  Now, in this time period you said it wasn't

16:43:32 10    at the forefront of your mind to try to defraud anyone,

11    was it?

12    A.    At the point we had gotten this far in, all I was

13    looking at was the money and trying to recoup investments

14    and make money for my family.

16:43:50 15    Q.    And at that point in time, what did you

16    understand -- I guess did you understand that Mr. Dean

17    was going to be inflating the price of the stock?

18    A.    Yes, sir.

19    Q.    Okay.  And did you understand that he was doing so

16:44:07 20    at the direction of and in coordination with Mr. Spivak?

21    A.    Yes, sir.

22    Q.    And did you understand that you and Mr. Scott were

23    helping provide the shares for Mr. Dean and his team to

24    profit?

16:44:23 25    A.    Yes, sir.

1    Q.    And that was also at the direction of Mr. Spivak,

2    right?

3    A.    Yes, sir.

4    Q.    So those people that he was promoting the stock to,

16:44:32 5    they would be buying it at an inflated price?

6    A.    Yes, sir.

7    Q.    And they would be buying shares in part that you

8    and Mr. Scott had provided to Mr. Dean?

9    A.    Yes, sir.

16:44:43 10    Q.    Now, you were asked some questions about whether

11    you knew exactly what Mr. Spivak and Mr. Scott had

12    discussed or whether you knew exactly what Mr. Dean and

13    Mr. Spivak had discussed.

14              Do you recall those questions?

16:45:05 15    A.    Yes, sir, I do.

16    Q.    What did Mr. Scott tell you about this arrangement?

17    A.    That we'd finally be able to make some decent

18    money.

19    Q.    Based on Mr. Dean's promotion of the stock?

16:45:18 20              MS. PUGH:  Objection.

21              Leading.

22              THE COURT:  Sustained.

23    BY MR. MORRISON:

24    Q.    How would you be able to make some decent money?

16:45:26 25    A.    Because if Mr. Dean was successful in his promotion

1    of the stock, and being able to turn around and as he

2    built a list of buyers, could sell it, we would be able

3    to sell more and more of our stock to Mr. Dean for a

4    profit, which would allow us to finally make a decent

5    return.

6    Q.    And is that part of that same arrangement where

7    he'd be selling to those investors at inflated prices?

8    A.    Yes, sir.

9    Q.    Now, there was a question then also of you not

10   knowing exactly what Mr. Spivak's conversations were with

11   those people.

12            What did Mr. Spivak tell you his

13   conversations were with Mr. Scott and Mr. Dean?

14   A.    Well, first of all, with Mr. Dean he explained that

15   he had gone through how we were going to be able to do

16   this over and over again, and that we would be able to

17   make good money, and that Mr. Dean had the connections

18   and the structure to be able to put together what we'd

19   been trying to do for a while.

20            As far as with Mr. Scott, the conversations

21   were a little more simplistic of we can finally start to

22   make money, and a lot of the conversations were actually

23   of a personal nature with Mr. Scott because, to be

24   honest, he was the only person in the deal that I

25   actually would have any desire to have ever hung out

1    with.

2    Q.    Fair to say you and Mr. Scott were in a similar

3    position in this arrangement?

4    A.    Yes, sir.

16:47:11  5    Q.    Both in 2018 and again in 2021?

6    A.    Yes, sir.

7    Q.    And you're both trying to salvage a bad position?

8    A.    Yes, sir.

9    Q.    And you both chose, as far as you know, to work

16:47:23 10    with Mr. Dean and Mr. Spivak to do so?

11    A.    Yes, sir.

12    Q.    Now, you were asked about whether or not if selling

13    stock was illegal, and I believe your answer was on its

14    face not illegal, right?

16:47:38 15    A.    Correct.

16    Q.    Okay.  And you were also asked whether selling

17    stock when the price goes up, whether that could be

18    considered just a smart business decision.

19          Do you recall that?

16:47:47 20    A.    Well, if it is not artificially increasing, yes,

21    it's a smart business decision.

22    Q.    And so it's a smart business decision in the sense

23    that it's profitable, right?

24    A.    Yes.

16:47:56 25    Q.    Okay.  But in the sense that it's based on

1   artificially inflated prices --

2              MS. PUGH:  Objection.

3              THE COURT:  Why don't you rephrase,

4   counsel?

16:48:09 5              MR. MORRISON:  Yes.

6   BY MR. MORRISON:

7   Q.   You were asked about the intelligence or smartness

8   of certain business decisions.

9              Can people make profits illegally?

16:48:18 10  A.   Can they make profits illegally?

11  Q.   Yes.

12  A.   Yes, they can.

13  Q.   And is the reason why it would be a smart decision

14  to sell stock at a profit a good business decision on its

16:48:28 15  face basically because it's profitable?

16  A.   From a profitability standpoint, it's a good

17  decision.

18  Q.   Has it turned out to you in the long run to be a

19  smart business decision to engage --

16:48:41 20  A.   It was one of the most costly business decisions

21  that I have ever done.

22  Q.   Now, you were asked at the end there, because of

23  your testimony in the original time, about how Mr. Scott

24  had generally been trying to do the right thing.

16:49:01 25             Do you recall that testimony?

1     A.    Yes, sir.

2     Q.    The first time around?

3                 When you were asked this time, last time it

4     was about the earlier time period.

16:49:08  5             Do you recall that?

6     A.    Yes, sir.

7     Q.    When you were asked this time your answer was --

8     was he trying to do the right thing, and I believe your

9     answer was, "For the majority of the time."

16:49:16  10  A.    Yes, sir.

11    Q.    What was the minority?

12    A.    The decisions that were being made further down the

13    line were more to keep us from being blatantly illegal in

14    our activities.

16:49:37  15             It was to allow ourselves to pretend that

16    everything was going to be okay.

17    Q.    Were you allowing others to do your dirty work?

18    A.    Yes, sir.

19    Q.    And did you go along in order to profit?

16:49:50  20  A.    Yes, sir.

21                MR. MORRISON:  Nothing further, Your Honor.

22                THE COURT:  Ladies and Gentlemen, if you

23    have any questions for this witness, this is your

24    opportunity to write them down, pass them forward.

16:50:02  25             I'll discuss them with counsel at the

1    side-bar.

2                       Are there any other questions?  One more.

3                       (Proceedings at side-bar:)

4                       MR. MORRISON:  I keep expecting it to be

16:50:43 5    more crowded.

6                       About the timeline on that one.

7                       THE COURT:  So on these questions, any

8    issues, concerns?

9                       MR. MORRISON:  No.

16:52:42 10                       MR. DeVILLERS:  No.

11                       THE COURT:  All right.  I will, I think,

12    mark them all Church (Phase 2) 1, 2, something to that

13    effect.

14                       MR. MORRISON:  Yes.  Hadn't thought of

16:52:58 15    that.

16                       THE COURT:  The only thing I'll say is on

17    the -- I haven't marked them yet, but on the last one --

18    I'll try to keep them in order -- but there's one

19    question that has a substantial number of other

16:53:10 20    questions, all of which have been scratched out and none

21    of which I will ask.

22                       And so I'll try to focus on the one

23    question that's not been scratched out.

24                       All right.

16:53:20 25                       (End of side-bar conference.)

1          THE COURT:  All right.  Mr. Church, the

2    Ladies and Gentlemen of the Jury have a number of

3    questions for you.

4          First, before your introduction to the

16:53:38  5    Jason Dean group, what was your position in USLG?

6          How many shares did you own?  Do you know

7    what percentage of the company it was?

8          THE WITNESS:  It was less than five

9    percent, probably a couple of percent.

16:53:56 10          It was between two and three million

11    shares.

12          THE COURT:  When you spoke with Mr. Spivak

13    about the Jason Dean USLG deal over the phone, did

14    Mr. Spivak use language to hide what he was doing?

16:54:57 15          In other words, was he saying something in

16    language that might appear to be not suspicious or the

17    like, but you understood what he really meant?

18          THE WITNESS:  No, sir.

19          He wasn't particularly trying to hide

16:55:18 20    anything.

21          He was just telling us that we were finally

22    going to be able to make profits and achieve what he had

23    originally planned with the three million shares that we

24    acquired back in 2018 and move forward.

16:55:37 25          THE COURT:  Did Mr. Dean ever directly tell

1    you that he was doing something which you knew to be

2    illegal, or did he ever just say that he and his group

3    were going to be promoting stock?

4             THE WITNESS:  He said that some of his

16:56:02 5    group would be taking the stock that they had purchased

6    and getting it into brokerage accounts and see if they

7    can clear the stock certificates.

8             And the -- he had phone groups already set

9    up to be able to get out and market and promote the stock

16:56:24 10   to get the prices up, and if they could successfully sell

11   those shares that they had bought, then they would be

12   able to come back, get more shares, and continue to sell

13   them to the people that they were promoting to.

14            THE COURT:  Did you tell Mr. Scott concerns

16:56:48 15   about the lawfulness of that arrangement, of the Dean

16   group?

17            THE WITNESS:  No, sir, I did not, because

18   we were just happy to be making money finally.

19            THE COURT:  When Mr. Spivak talked with you

16:57:22 20   about Jason Dean in 2021, had you already been in

21   communication with the FBI or law enforcement with

22   respect to USLG?

23            THE WITNESS:  No, sir.

24            THE COURT:  What year were you charged in?

16:57:43 25            THE WITNESS:  I believe I found out that I

1    was being charged in October of 2021.

2                 THE COURT:  And did the FBI ever seize your

3    cell phone, your computer, records, anything like that?

4                 THE WITNESS:  No, sir.

16:58:00  5          THE COURT:  Counsel, any follow-up

6    questions on the questions that the Ladies and Gentlemen

7    of the Jury submitted?

8                 MR. MORRISON:  Not from the Government,

9    Your Honor.

16:58:10 10          MS. PUGH:  No, Your Honor.

11                Thank you.

12                THE COURT:  Mr. Church, you may step down.

13                (Witness excused).

14                THE COURT:  Ladies and Gentlemen, it's

16:58:43 15   nearly 5:00 o'clock so we will stand in recess for the

16    day.

17                We will begin at the usual time tomorrow as

18    soon as you are all assembled.

19                Please report here to the 16th floor at

16:58:58 20   8:15.

21                Between now and then, as you well know, you

22    should not discuss the case with anyone, including your

23    fellow jurors.  You should not do any outside research.

24    You should not form any opinions or conclusions until all

16:59:11 25   the evidence in this phase of the trial is in and the

411

1       case is finally submitted to you.

2                   I probably already said it, but I'll say it

3       again.  Don't do any outside research.  You know all

4       this.

16:59:24  5             And I will see you in the morning.

6                   We will stand in recess until then.

7                   THE CLERK:  All rise.

8                   (Jury out.)

9                   THE COURT:  Please be seated.

16:59:59 10             A couple last housekeeping items then.

11                  From my perspective I think, I'll just

12      confirm, tomorrow we have the United States with Special

13      Agent Fry, is that correct?

14                  MR. MORRISON:  That's correct, Your Honor.

17:00:10 15             THE COURT:  And then any other witnesses?

16                  MR. MORRISON:  No, Your Honor.

17                  THE COURT:  Any -- I think you have at

18      least one defense witness?

19                  MR. DeVILLERS:  Yes, Your Honor.  Probably

17:00:18 20      two.

21                  THE COURT:  Probably two?

22                  Okay.  Fair enough.  So I'm working on jury

23      instructions in my spare time such as it is.

24                  I don't have them to give to you yet, but

17:00:28 25      I'm not sure that there's that much to do, but I'll get

412

1    them to you as promptly as I can.

2                    And it sounds like we'll be on track to

3    close on Monday.

4                    Anything else we should talk about?

17:00:42  5                    MR. MORRISON:  Not for the Government, Your

6    Honor.

7                    MR. DeVILLERS:  Not from Mr. Scott, Your

8    Honor.

9                    THE COURT:  All right.  Well, then, we will

17:00:48 10    stand in recess until tomorrow.

11                    And I will see you then.

12                    Thank you very much.

13                    MR. MORRISON:  Thank you.

14                    (Proceedings concluded at 5:00 p.m.)

17:00:56 15                        -   -   -   -

16                    C E R T I F I C A T E

17                    I certify that the foregoing is a correct

18    transcript from the record of proceedings in the

19    above-entitled matter.

20

21    **/s/Susan Trischan**
      /S/ Susan Trischan, Official Court Reporter
22    Certified Realtime Reporter

23    7-189 U.S. Court House
      801 West Superior Avenue
24    Cleveland, Ohio 44113
      (216) 357-7087
17:02:50 25

1                            **I N D E X**

2

3    <u>**WITNESSES**</u>:                                          <u>**PAGE**</u>

4     DIRECT EXAMINATION OF JASON DEAN (RESUMED)          207

5     BY MS. MILLER

6     CROSS-EXAMINATION OF JASON DEAN                     281

7     BY MR. DeVILLERS

8     CROSS-EXAMINATION OF JASON DEAN (RESUMED)           314

9     BY MR. DeVILLERS

10    REDIRECT EXAMINATION OF JASON DEAN                  319

11    BY MS. MILLER

12    DIRECT EXAMINATION OF FORREST CHURCH                346

13    BY MR. MORRISON

14    CROSS-EXAMINATION OF FORREST CHURCH                 385

15    BY MS. PUGH

16    REDIRECT EXAMINATION OF FORREST CHURCH              399

17    BY MR. MORRISON

18

19                            * * * * *

20

21

22

23

24

25