1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF OHIO
2           EASTERN DIVISION

3
     UNITED STATES OF AMERICA, )   Case No. 21-cr-491
4                              )
              Plaintiff,       )
5                              )   September 13, 2024
          vs.                  )   8:32 a.m.
6                              )
     CHARLES SCOTT,            )   **Phase 2, Day 3**
7                              )
              Defendant.)
8

9

10                  - - - - -

11        TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12     BEFORE THE HONORABLE J. PHILIP CALABRESE,

13          UNITED STATES DISTRICT JUDGE,

14               AND A JURY.

15                  - - - - -

16

17

18

19
     Official Court Reporter:  Susan Trischan,RMR,CRR,FCRR,CRC
20                             7-189 U.S. Court House
                               801 West Superior Avenue
21                             Cleveland, Ohio   44113
                               (216) 357-7087
22

23   Proceedings recorded by mechanical stenography.
     Transcript produced by computer-aided transcription.
24

25

1    APPEARANCES:

2    For the Government:          **Elliot D. Morrison, AUSA**
                                  **Megan R. Miller, AUSA**
3                                 **Stephanie Wojtasik, AUSA**
                                  Office of the U.S. Attorney
4                                 Northern District of Ohio
                                  801 West Superior Avenue
5                                 400 U.S. Court House
                                  Cleveland, Ohio   44113
6                                 (216) 622-3600

7

8
     For Defendant Scott:        **David M. DeVillers, Esq.**
9                                 **Blaique Brown, Esq.**
                                  Barnes & Thornburg
10                                Ste. 3300
                                  41 South High Street
11                                Columbus, OH 43215
                                  614-628-1446
12

13
                                  - - - - -
14

15

16

17

18

19

20

21

22

23

24

25

1                    FRIDAY, SEPTEMBER 13, 2024, 8:32 A.M.

2                         THE COURT:  Please be seated.

3                         Anything to take up before we bring the

4       jury in?

08:33:04  5                         MR. DeVILLERS:  Yeah, I just want to

6       introduce you to my associate Blaique Brown who will be

7       working as Ms. Pugh today.

8                         MS. BROWN:  Good morning, Your Honor.

9                         THE COURT:  All right.  Good morning.

08:33:14 10                         You have big shoes to fill.

11                         If there's nothing more, then we will bring

12       in the jury.

13                         (Jury in.)

14                         THE COURT:  Please be seated.

08:36:13 15                         Good morning, Ladies and Gentlemen.

16                         Good morning, counsel.

17                         The United States may call its next

18       witness.

19                         MR. MORRISON:  Thank you, Your Honor.

08:36:19 20                         The United States calls Special Agent

21       Anthony Fry.

22

23

24

25

1                   ANTHONY FRY,

2        of lawful age, a witness called by the Government,

3              being first duly sworn, was examined

4                  and testified as follows:

08:36:40  5                   THE COURT:  Please be seated.

6                   And if you would just state your name for

7       the record.

8                   THE WITNESS:  Anthony Fry.

9                   THE COURT:  Counsel, you may proceed when

08:36:49 10       ready.

11                   MR. MORRISON:  Thank you, Your Honor.

12           DIRECT EXAMINATION OF ANTHONY FRY

13       BY MR. MORRISON:

14       Q.   Now, Special Agent Fry, any major changes in your

08:36:55 15       background since the last time we spoke?

16       A.   No.

17       Q.   Good to know.

18                   Now, there is a change in what we're

19       allowed to discuss now, correct?

08:37:04 20       A.   Yes.

21       Q.   Okay.  So previously, we discussed how your

22       investigation got started.

23                   Do you recall that?

24       A.   Yes.

08:37:10 25       Q.   But we omitted some steps?

Fry - Direct                                              418

1    A.    Yes.

2    Q.    Obviously the jury has heard quite a bit about

3    those steps since then.

4    A.    Correct.

08:37:17 5    Q.    Now, we didn't -- we haven't quite gotten into all

6    of them.

7              Can you give the jury now kind of a full

8    sense of how the investigation began and what your

9    initial steps were?

08:37:28 10   A.    So when we opened this investigation, as I

11   previously stated, we had gotten a referral from the SEC.

12   We had previously just done some arrests on the GBEN case

13   with Tom Collins and Duwayne Graham, so we had a series

14   of information about USLG.

08:37:45 15             We elected to utilize an undercover

16   operation which was part of a bigger case we had to

17   investigate this case.

18             One of the main reasons of this is these

19   types of cases, there's a lot of this activity in these

08:38:03 20   schemes that, you know, is written on paper one way and

21   then discussed another.

22             So the undercover technique is effective in

23   these types of financial cases of, you know, getting

24   inside of what's actually happening and recording

08:38:17 25   statements so.

Fry - Direct                                    419

1    Q.    And so what did you ultimately decide to do?

2    A.    So we tasked the cooperator, Mr. Dean, to recount

3    to US Lighting Group and establish a relationship.

4              We had interviewed an investor on the GBEN

08:38:38  5    case, an elderly gentleman from California named Don

6    Brenholt, and when we were interviewing him about GBEN he

7    had said he was originally solicited by Don Howard to

8    invest in USLG.  He gave us a whole bunch of information.

9              So in order to add some credibility to the

08:38:56 10    source by reaching out to USLG, we had asked

11    Mr. Brenholt, "Would you be comfortable saying that you

12    referred a gentleman named Jason if anyone called."

13             So when Jason reached out to US Lighting

14    Group, he said, "Hey, I have a, you know, a family

08:39:11 15    associate named Don Brenholt who has invested in your

16    company, he referred me to just take a look at it," just

17    to kind of add a little bit of credibility and

18    backstopping to the source reaching out.

19    Q.    Okay.  Now, you used the term "backstopping."

08:39:25 20             That's a little bit of a term of art.

21             Can you explain to the jury what that

22    means?

23    A.    It's steps we take in undercover operations so that

24    if, you know, anyone tries to check up on your

08:39:39 25    background, your history or the story you're telling,

Fry - Direct                                    420

1    that there's something there.

2                   Because one of the challenges in these

3    cases is, you know, largely the undercovers and the

4    source in this case, by using an alias, was -- or an

08:39:55  5    identity we had given him, was there's not a lot of

6    history there, right?  Like, that person has not lived a

7    full life.

8                   So we take various steps in different ways

9    to kind of add some credibility if someone tries to check

08:40:06 10    up on these people.

11    Q.    Now, you referred to Mr. Dean as a cooperator.

12                   That isn't the actual official term he has,

13    is that right, at this time?

14    A.    Yes.  So in the FBI we call them confidential human

08:40:19 15    sources.

16    Q.    And what's the distinction between a cooperator and

17    a confidential human source?

18    A.    A cooperator is -- I mean, it doesn't really have

19    an official term in the FBI.  It's basically anyone who

08:40:30 20    is, you know, part of an investigation that, you know, is

21    assisting us in any way.

22                   That might be someone who you go and

23    interview and, you know, they talk openly with us, they

24    say, "Hey, I'm happy to, like, answer questions, happy to

08:40:43 25    send you information," whatever that is.

Fry - Direct                    421

1           A confidential human source or a CHS, as we

2    call them, is someone who is, you know, officially signed

3    up.  They've been, you know, given a list of rules of

4    things they can do, they can't do, and they're monitored

08:40:59 5    and instructed by us with whatever they're tasked to do.

6    Q.   Okay.  And at this stage, was Mr. Dean facing any

7    charges?

8    A.   No.

9    Q.   Okay.  Had he, in fact, completed a prison

08:41:13 10    sentence?

11    A.   Correct.

12           He was previously charged for securities

13    fraud, was sentenced, served his time, and then was

14    released from custody and then was -- you know, got back

08:41:26 15    into contact with the FBI and expressed a desire to help.

16    Q.   Okay.  Now, how do you choose -- you talked about

17    how to reach out and mentioning Mr. Brenholt as one step.

18           How do you choose the story that you're

19    going to have the confidential source provide?

08:41:44 20    A.   Part of our general, you know, pitch and scenario

21    in these cases, usually there's a time period from

22    initial contact where, you know, we have to just pose as

23    normal investors to kind of build a relationship and get,

24    you know, the subjects comfortable.  Right?

08:42:06 25           People don't tend to profess their personal

Fry - Direct                                    422

1    secrets to a random stranger or someone they have just

2    met.

3                    So the initial phase of us making the

4    restricted stock investment to show that we were serious

08:42:20  5    about a relationship and building that, you know,

6    relationship through discussion over a period of time,

7    you know, at that point Mr. Spivak started to loosen up

8    and started to share some of these things that he was

9    actually doing with the source.

08:42:33 10                    So it takes that, you know, rapport

11   building to -- in order to kind of get -- get Mr. Spivak

12   talking.

13                    At that point then we start to, as Mr. Dean

14   expressed yesterday, drop little hints here and there

08:42:48 15   that, you know, we may also engage in the shadier side of

16   the business, and kind of make that turn from just an

17   investor who might be more of a mark and just be taken

18   advantage of for their money to, hey, like, we're going

19   to be on the team and participate in this with you.

08:43:06 20   Q.   Now, okay, you mentioned dropping some of those

21   hints.

22                    Are those hints that Mr. Dean comes up

23   with?  Who, who comes up with the process of evolving

24   that story?

08:43:16 25   A.   The FBI.

Fry - Direct                              423

1          So myself and the other case agent had

2      always, you know, before every call or meeting, we would

3      sit down with Mr. Dean and discuss, you know, kind of

4      what we intend to -- you know, the big picture of what

08:43:31   5      we're going for here, but also, you know, where we're

6      going with this.

7      Q.    And so ultimately here you have Mr. Dean.

8              Do you come up with other personas that are

9      going to be presented here?

08:43:46  10      A.    Yes.  So one of the -- we used various undercovers

11      as you heard.

12              One of the -- I won't say challenges, but

13      things we run into in these penny stock cases is, as

14      you've obviously heard, it's very, you know, acronym

08:44:04  15      terminology based.  It's a whole different language that

16      is used in this space.

17              So, you know, for FBI agents who have a day

18      job also work undercover, you know, one day they might be

19      buying drugs, one day they might be acting as a hitman,

08:44:18  20      and one day they might put on a suit and now suddenly

21      they run a hedge fund.

22              So while they are, you know, very

23      knowledgeable, you know, experienced undercovers, you

24      know, they have not spent 25 years in the penny stock

08:44:30  25      space like Mr. Dean had.

Fry - Direct                                424

1          So we typically rely on the source as kind

2    of an intermediary to, you know, communicate between the

3    subjects and the undercovers.

4          So we created this scenario where, you

08:44:46  5    know, Matt Bianchi was -- ran a hedge fund and had

6    various business partners to insert, and it's putting out

7    there the allure of a, you know, rich investor who is,

8    you know, primarily invested in other things, but will

9    dabble in the penny stock space because there's, you

08:45:07 10    know, attractive returns on deals.

11          So those were some of the hints that kind

12    of we discussed that the source kind of dropped to

13    Mr. Spivak that, you know, this is -- this is a space

14    where the returns can be attractive, you know, given the

08:45:23 15    right thing.

16          And that basically our undercovers, while

17    being, you know, posing as legitimate hedge fund managers

18    will kind of cross into this territory just because the

19    money's good.

08:45:34 20    Q.    And so it's the FBI agents brainstorming and

21    working with the source on what that story is going to

22    be, is that right?

23    A.    Yes.

24    Q.    And then providing instruction to the source on how

08:45:46 25    to present things?

Fry - Direct                                    425

1    A.    Yes.

2                 And we -- so we discussed with the source

3    basically, you know, what our -- the story I just told

4    you about, you know, the undercovers and their background

08:45:58  5    that you're going to front to the subjects.

6                 The other, you know, part to us that is

7    important in these cases is we never tell, like, the

8    source any information that we actually know about the

9    case because that he wouldn't otherwise know from his

08:46:16 10    day-to-day interactions with Mr. Spivak just, one,

11    because if it were accidentally to be brought up, you

12    know, how would you know that information.

13                 But, two, it's to keep him, you know, a

14    clear distinction between the FBI and the source.

08:46:28 15                 You know, we task him to do things, and

16    what I always like to tell sources is that this

17    information flow is kind of one way.  Like, "You provide

18    information to us, and we can't really share the details

19    of our investigation."

08:46:41 20    Q.    Now, so you kind of parroted a question there, how

21    would you know that information.

22                 In that telling, who's asking that

23    question?  What's your concern about somebody asking that

24    question?

08:46:51 25    A.    Oh, yeah, so that, that would be in the sense of if

Fry - Direct                                           426

1    we started to share details about the case that we

2    learned through other investigative techniques, if we

3    shared those with the source, if he's meeting with

4    Mr. Spivak and inadvertently says, like, "You know, Paul,

08:47:06  5    I know X, you know, or Y," and, you know, Paul or any

6    other subject might say, "Well, how would you know that?

7    I've never told you that."  Right?

8                    So it's to -- we never want to set up the

9    source or the undercovers, for that matter, to be in a

08:47:19 10    position to, you know, walk into a situation like that.

11    Q.    Okay.  And so those other techniques, would that

12    include something as simple as obtaining financial

13    records for other parties?

14    A.    Yes.

08:47:29 15    Q.    Okay.  And as well as more complex techniques?

16    A.    Yes.

17    Q.    Okay.  Now, you've alluded to some of the

18    background of Matt Bianchi that was presented here by

19    someone who ran hedge funds and was a large investor,

08:47:46 20    right?

21    A.    Yes.

22    Q.    Can you explain to the jury any more about the

23    story of Mr. Bianchi and how and when this was sort of

24    developed in the investigation?

08:47:55 25    A.    Yes.

Fry - Direct                                                    427

1              So pretty early on when Mr. Dean was having

2      conversations with Mr. Spivak, he had mentioned that, you

3      know, he worked with other groups and partners who are

4      large investors.

08:48:07  5          And a lot of times if Mr. Dean were to make

6      an investment in a deal, that he would, you know, kind of

7      also pitch it to his partners and try to get them to make

8      an investment in it.

9              We ran through a series of meetings between

08:48:21 10     the introduction of Mr. Dean to Paul Spivak, and the

11     first time Mr. Bianchi actually met him, Mr. Spivak, was

12     on March 5th so it was a few months later.

13             Over that time period there was a series of

14     meetings between Mr. Dean where, you know, other

08:48:37 15    undercovers were introduced as business partners.  I

16     think you heard about a Peter who was viewed as Matt

17     Bianchi's right-hand man and gatekeeper or such.

18             There was a John Lawson, someone who ran

19     one of those hedge funds for Mr. Bianchi.

08:48:52 20          So some of that is to kind of build up the

21     credibility and the -- of Mr. Bianchi; that it's not just

22     him, right?  He has other people who do his work for him,

23     and if you want to get to the rich guy, you kind of have

24     to go through these various steps of meeting and

08:49:13 25    convincing his partners that this is something worth

Fry - Direct
428

1    their time.

2    Q.    Now, was there -- and you mentioned there being

3    multiple hedge funds; you said one fund run by

4    Mr. Lawson, is that right?

08:49:27 5    A.    Yes.  That was the story that was explained was

6    that, as I believe Mr. Dean said yesterday, that once a

7    fund, you know, a family office fund is the way it was

8    referred to, reaches above a hundred million, you know,

9    there are certain reporting and disclosure requirements

08:49:44 10   to the SEC.

11            So again, one of those hints to kind of

12   indicate that Mr. Bianchi isn't above, you know, you

13   know, crossing, you know, lines and gray areas was that,

14   you know, "Well, every time it gets close to a hundred

08:49:58 15   million, he just takes money out and spins off another

16   fund to intentionally stay below those SEC thresholds."

17            So Arrowwood was, you know, pitched as one

18   of these family office funds that Mr. Bianchi controlled.

19   Q.    Now, is there a difference between a hedge fund and

08:50:14 20   a family office fund?

21   A.    They are basically terms, hedge funds take money

22   from investors.  They also have their own money.  And

23   they, you know, whatever their investment criteria are,

24   but they will manage other people's money.

08:50:31 25            So family office funds are something where

Fry - Direct                                           429

1    it's not taking or managing outside parties' money; it's

2    usually just the people inside of the fund, it's their

3    own money.

4    Q.    Now, you mentioned Peter and John as kind of

08:50:45  5    gatekeepers or staff of Matt, Mr. Bianchi, right?

6    A.    Yes.

7    Q.    How was the sort of character of Bryan developed?

8    A.    So Bryan was introduced as basically a business

9    partner of Jason paired with he was a stock promoter, he

08:51:06  10    was based on the west coast, he, yeah, the term that was

11    repeatedly used is he's a magician, he can get almost any

12    stock, you know, trading with price and volume through

13    various promotional techniques.

14    Q.    Now, how -- what is the process?

08:51:25  15          You said that basically the CHS or the

16    confidential source is acting at your direction, is that

17    right?

18    A.    Yes.

19    Q.    How do you go about ensuring that he is following

08:51:37  20    your instructions?

21    A.    Well, every interaction that Mr. Dean had in this

22    case, you know, he would meet with us before and we would

23    get -- you know, turn on a recording device, you know,

24    hand it to him.

08:51:49  25          And then at the conclusion of it, it would

Fry - Direct                                    430

1    be, you know, directly handed to us at the conclusion of

2    the meeting.

3                Some of the other ways that we ensured that

4    was -- and it was kind of mentioned yesterday, was the

08:52:01  5    actual, you know, phone number and e-mail address that

6    Mr. Dean used to communicate within this case, he did not

7    have access or control to it unless he was with us.

8                It was a, you know, covert phone that we

9    had procured, and we -- we managed it.

08:52:15  10                So when we would meet with Mr. Dean, we

11    would, you know, hand it to him and allow him to read the

12    messages that had been sent and -- or received, and, you

13    know, even in his responses, you know, we would have

14    input on crafting that.

08:52:27  15                We would obviously allow him to, you know,

16    phrase it in a way that he would naturally say, so it's a

17    consistent message, but so everything that he did in this

18    case was, you know, kind of managed and organized by us.

19    Q.    Now, to be fair, you can't anticipate every

08:52:45  20    question or every statement he's going to encounter when

21    he's in a meeting like this, can you?

22    A.    No.

23    Q.    And so you can't give him instruction on how to

24    handle everything that he might hear, can you?

08:52:55  25    A.    No.

         1              What I mean, in that case we have to brief

         2      them on "Here's kind of our goals of what we're looking

         3      for," but we also brief sources on things not to do.

         4              And that includes, you know, the way I

08:53:13 5      always phrase it is basically never push the subject to

         6      open a door, but once they open a door, walk through it,

         7      right?

         8              So I think in the recordings and in -- you

         9      know, Mr. Dean explained dropping these hints to say,

08:53:28 10     "Hey, we might be kind of shady guys," and that will

        11      then -- you know, Mr. Spivak started to open doors.

        12              And at that point, you know, pursue things

        13      that are brought up.

        14      Q.   And so you mentioned using recorders and the timing

08:53:42 15     of when you turned things on.

        16              Can you just explain to the jury a little

        17      more about the technicalities about what the device is

        18      and how it works?

        19      A.   Yes.

08:53:51 20             So we primarily use two types of recording

        21      devices in this case.  We always had a primary and a

        22      backup for in-person recordings.

        23              They would be turned on by us at the

        24      beginning.  There's usually -- what was not played

08:54:09 25     because it's of no interest really is usually there's my

Fry - Direct                                         432

1    voice or another agent's stating at the start of it the

2    date, time, the place, this is going to be a recording

3    between whoever.

4                    Those recordings, once they're completed,

08:54:23  5    are turned off.  The recorders are turned off, and then

6    we take them to our evidence and they are turned in and

7    where they are downloaded and there's an original copy

8    made that, you know, has the date, time of everything.

9                    And the original evidence is maintained

08:54:38 10    there, and then we just get copies of that stuff for our

11    records for the case.

12   Q.    Now, can the recording be modified by the source

13   while he's using it, let's say?

14   A.    No.

08:54:51 15                    So the two types of devices we used in this

16   case, one of them requires a special software that the

17   FBI has in order to download it.

18                    Once it's, you know, if it's turned off and

19   on, basically the recording is on there and it cannot be

08:55:05 20   modified without the software.

21                    And then the other one, it's all encrypted

22   as well, so in the event that for some reason the phone

23   somehow got lost or taken by a subject, there's no trace

24   that, you know, that that recording is even on there, let

08:55:21 25   alone someone being able to access it.

Fry - Direct                                    433

1    Q.    And so that's -- you just explained the process for

2    meetings.

3                  Is it any different for phone calls?

4    A.    So in this case the way that we recorded the phone

08:55:31  5    calls was we were always with the source, either myself

6    or another agent, and we would be, you know, sitting

7    there and we would turn the -- we would turn the recorder

8    on and off.

9                  And the phone call would be placed on

08:55:43 10    speaker phone, which is probably why some of them, like

11    we listened to, the source's voice is very loud because

12    he's in the room with the recorder and, you know, the

13    subject's just being played over speaker phone.

14    Q.    Okay.  Now, you mentioned the control over the

08:55:58 15    devices to be used for the written communications, right?

16    A.    Yes.

17    Q.    Who has -- I mean, I guess who is ultimately in

18    charge of drafting those written communications?

19    A.    It was a collaborative process between us and the

08:56:13 20    source.

21                  Like I said, we wanted to have him put it

22    in his words as he would explain it so someone could not

23    pick up that this guy talks one way in person but

24    differently over text, or the text being inconsistent

08:56:27 25    with each other.

Fry - Direct                                                      434

```
          1              So everything that was sent was, you know,

          2    approved by us, but it was, you know, usually in his

          3    words.

          4    Q.   And similarly, does the source have, like, remote

08:56:41  5    access to the e-mail account, for example?

          6    A.   No.  We maintained control of that.

          7              He did not know the password to log in, and

          8    it was accessed on a -- only accessed on a computer that

          9    we controlled.

08:56:53 10    Q.   Okay.  So I just kind of want to, without going

         11    through all the recordings and things of that nature, I

         12    just want to review how you progressed through this

         13    investigation, what the stages were.

         14              You talked about making initial contact

08:57:06 15    through a purported referral, right?

         16    A.   Correct.

         17    Q.   And you explained that there was this initial

         18    restricted stock investment?

         19    A.   Yes.

08:57:17 20    Q.   And that was to be conducted after conversations

         21    with the main subject, right?

         22    A.   Yes.

         23              So Mr. Dean had original contact with the

         24    investor relations person at US Lighting Group Marie

08:57:30 25    Daniel, who then arranged a call with Paul Spivak.
```

Fry - Direct                          435

1          That call, Mr. Spivak invited the source to

2    come to the USLG's headquarters for a tour and to discuss

3    further.

4          That meeting happened a week or two later.

08:57:44  5          Coming out of that meeting, Mr. Dean

6    indicated he'd likely make an investment in restricted

7    stock at that time, which -- which happened probably

8    within the next couple weeks we actually sent that wire.

9    Q.   Now, this brings me to another point which is when

08:58:00 10   there's an in-person meeting like this happening like the

11   tour, where are you, where's the source?

12          What's the logistical setup?

13   A.   So I don't know if Mr. Dean said this yesterday.

14          One of the challenges of this case was of

08:58:15 15   him not using his, you know, real identity is we would

16   never want him to drive his own car to the office, so we

17   would always give him a vehicle to drive to the office.

18          So we would meet him before, turn the

19   recorder on, give him a vehicle to drive to the office so

08:58:31 20   that, you know, if someone, you know, had any way to

21   figure out who owned that car, it was not him.

22          And then he would be inside of USLG's

23   office -- or wherever the meeting was -- and we are

24   always somewhere in the vicinity with the ability to

08:58:46 25   respond in the event of something.

Fry - Direct                                              436

```
           1              And we're live monitoring it, listening to

           2      this as it's happening.

           3      Q.    And so here he's -- he does tours of the facility,

           4      you said, in those initial meetings?

08:59:01   5      A.    Yes.

           6      Q.    Okay.  Now, what's the time period that that's all

           7      happening?

           8      A.    So that original meeting, I believe, was on

           9      November 30th.

08:59:07  10              The restricted stock investment was made in

          11      the middle of December.  The holidays --

          12      Q.    November 30th of?

          13      A.    2020.

          14              Sorry.

08:59:18  15      Q.    Okay.

          16      A.    So November 30th of 2020 is the first in-person

          17      meeting when he gets the tour of US Lighting Group.  The

          18      restricted stock investment was done over the course of

          19      December.

08:59:28  20              The holidays passed, and then going into

          21      January there was a series of meetings with Mr. Dean,

          22      Mr. Spivak, where, as I said, Peter Harris was introduced

          23      and John Lawson.

          24              Mr. Harris also got a tour of USLG's

08:59:41  25      facility.  And then there was a meeting at another
```

Fry - Direct                                        437

1    location that we controlled with Mr. Spivak, John Lawson,

2    Peter and company.

3    Q.    Okay.  And what was that location?

4    A.    So as part of this case, this investigation, US

08:59:55   5    Lighting Group was one small piece of a much larger

6    undercover operation we had set up.

7            As part of that, we used a similar scenario

8    or playbook on numerous other stock transactions, so in

9    order to facilitate that, we actually set up an office

09:00:12  10    space that was this purported family office hedge fund to

11    meet with subjects, and it looked like a small

12    functioning office that we used to, you know, add more,

13    like I said, backstopping and credibility to the

14    undercovers.

09:00:29  15    Q.    And so how did this boat ride come about after this

16    process?

17    A.    So originally, Mr. Spivak had indicated that he was

18    going to south Florida for a boat show in February.

19            We, you know, used that opportunity to say,

09:00:48  20    "Hey, you know, Matt Bianchi spends a lot of time in

21    Florida in the winter, he has a boat, why don't we, you

22    know, do a meeting down there and you can get to meet him

23    in person?"

24            Through a series of, you know,

09:01:04  25    noncase-related things, Mr. Bianchi was not actually

Fry - Direct                                            438

1    available for that meeting when we set it so we had to

2    have, you know, Pete and other undercovers handle that

3    meeting.

4                So we arranged for this meeting to happen

09:01:18  5    on a yacht in Florida to, again, just add to that lure of

6    the undercover as a rich guy and, you know, I think as it

7    was phrased is you got to meet him, pitch him, convince

8    him on your deal, and then I think the money can start

9    flowing at that point.

09:01:38 10    Q.    Now, when did the actual meeting then with Matt

11   actually take place?

12   A.    So the first time Matt actually met Paul was a

13   little over two weeks after that, on March 5th.

14               That was an in-person meeting at USLG.

09:01:56 15   Q.    And we've obviously heard parts of those recordings

16   from that meeting.  Yes?

17   A.    Yes.

18   Q.    Okay.  And is that the recording with the mention

19   of the two trusted guys?

09:02:06 20   A.    Correct.

21   Q.    Now, during that meeting I guess you mentioned that

22   Mr. Brenholt had been kind of the introduction to all

23   this?

24   A.    Correct.

09:02:19 25   Q.    Now, the jury's already aware that ultimately you

Fry - Direct                                    439

1    did come to execute a search warrant at USLG?

2    A.    Yes.

3    Q.    And did you find any records related to

4    Mr. Brenholt's referral in that search warrant?

09:02:34  5    A.    Yes.

6    Q.    Okay.  Can we pull up Government's Exhibit 276?

7    276?  Yeah.

8                    Great.  And can we jump to Page 7?  Page 7.

9                    All right.  Is this a Notepad that was

09:02:59 10    recovered in the search warrant?

11    A.    Yes.

12    Q.    Okay.  And if we could zoom in on the middle

13    portion here.

14                    What did this note indicate?

09:03:11 15    A.    So it says -- indicates 3/5/21, "Call Don Brenholt,

16    more referrals."

17    Q.    And was this the meeting where Matt was pitched as

18    potentially making large investments?

19    A.    Yes.

09:03:25 20                    And if you zoom out, you can actually see

21    at the top of the page it says, "Kane Financial,

22    Jason & Matt," also 3/5/21.

23                    MR. MORRISON:  Can we publish this to the

24    jury, Your Honor?

09:03:41 25                    THE COURT:  You may.

Fry - Direct                                          440

1    BY MR. MORRISON:

2    Q.    All right.  So here in the middle, is that the

3    reference to calling Don Brenholt for more referrals?

4    A.    Yes.

09:03:46   5    Q.    And this is a meeting with Jason and Matt indicated

6    here?

7    A.    Yes.

8    Q.    Okay.  And --

9    A.    Going --

09:03:53 10    Q.    Go ahead.

11    A.    I was going to say, going back to your question on

12    not being able to anticipate every question that comes

13    up, one of the things that happened was the source

14    obviously indicated Don Brenholt was his connection to

09:04:04 15    the company to Maria Daniel and Paul, and at one point

16    Maria Daniel e-mailed and then said over the phone to the

17    source, "Didn't you say you were referred by Don

18    Brenholt," giving the implication that he had actually

19    called Don and he forgot to vouch for the source.

09:04:22 20              Luckily, the source was quick on his feet

21    and said, "Well, you know, Don's a fairly older gentleman

22    and his mind must just be going," because he was kind of

23    put in the situation where his backstopping had just been

24    ripped out from underneath him and had to, you know,

09:04:40 25    convince them that that's not the case so.

Fry - Direct

441

1    Q.    You mentioned Maria Daniel.

2              Who was Maria Daniel at USLG?

3    A.    So she was the investor relations person.

4              When we originally reached out and just

09:04:54  5    called the company's phone number and it gave a series of

6    options, you know, select whatever number for investor

7    relations, she had started just recently when I -- if I

8    remember correctly, only a few weeks prior to us reaching

9    out.

09:05:08 10    Q.    So what do we see here in the middle of these

11    notes?

12    A.    So that says "Shares, two-and-a-half million shares

13    left."

14    Q.    Now, after this meeting, were arrangements made for

09:05:23 15    any type of transaction?

16    A.    Yes.

17    Q.    Okay.  What were the arrangements made?

18    A.    So coming out of this meeting, this is where

19    Mr. Spivak indicated that there was two, three-million

09:05:38 20    share free trading blocks that were, you know, existed

21    and they were held by two trusted individuals.

22              Towards the end of that meeting, Mr. Spivak

23    basically agreed to put the source in contact with those

24    individuals.

09:05:56 25    Q.    Now, going back to your -- the initial restricted

1    stock purchase, was an agreement executed for that

2    purchase?

3    A.    Yes.

4    Q.    Okay.  And can we pull up Government's Exhibit 206,

09:06:15  5    please?  Go to the next page.

6              All right.  Did you find additional notes

7    about Mr. Dean when you executed the search warrant?

8    A.    Yes.

9              MR. MORRISON:  Permission to publish?

09:06:31 10              THE COURT:  You may.

11    BY MR. MORRISON:

12    Q.    And does this indicate some of the backstopping

13    story details that were provided?

14    A.    Yes.

09:06:39 15              That's the e-mail address, phone number

16    that we created for Mr. Dean to use in this case.

17              And you can see again it says, "Recommended

18    by Donald Brenholt."

19    Q.    Okay.  And if we go to the next page, and one more,

09:06:59 20    is this a subscription agreement here?

21    A.    Yes.

22    Q.    And if we go forward a few more pages to the

23    signature page, please.

24              Yeah.  Does this appear to be a copy of a

09:07:14 25    share agreement that would have been sent to Mr. Dean?

Fry - Direct                                                 443

```
          1    A.    Yeah, this looks like the draft or blank

          2    subscription agreement that was provided to us.

          3    Q.    And in any event, if we go to the first page, is

          4    this a copy of the folder as it was found at USLG?

09:07:35  5    A.    Yes.

          6    Q.    Following the same process you described in your

          7    earlier testimony?

          8    A.    Yes.

          9          Per the search warrant, files were seized

09:07:43 10    and they are sent to a facility to basically be digitized

         11    into these, these files or folders that we can view.

         12    Q.    Okay.  Now, you mentioned the $25,000 transaction.

         13          What's the idea behind the kind of initial

         14    transactions that are going to go on here after that

09:08:02 15    restricted share purchase, the March transactions?

         16    A.    The March transactions, so it's -- it's twofold in

         17    that, one, it was as Mr. Dean indicated yesterday, the

         18    idea of taking a small block of shares, a hundred

         19    thousand in this case, and trying to see whether they

09:08:23 20    could, you know, be deposited at a brokerage firm.

         21          So as has been alluded to over the past few

         22    weeks, the kind of increased regulatory environment has

         23    significantly impacted people's ability to take blocks of

         24    penny stocks and deposit them in their brokerage account

09:08:43 25    due to basically concerns about fraud.
```

Fry - Direct                                                    444

1          So, you know, in -- earlier we had

2     discussed, you know, Richard Mallion traded at a company

3     named Alpine.  Alpine went through a series of, you know,

4     regulatory scrutiny because of their practices in this

09:08:59 5     stuff.

6          Wilson Davis was another big one.  There's

7     a lot of -- over this time period of, you know, 2018,

8     2019 and 2020 it has become increasingly difficult to

9     take shares that are not already in the market and

09:09:13 10     deposit these blocks.

11          So as part of, you know, sounding real --

12     because no one's going to buy three million shares if

13     they can't actually do anything with them -- is, "Hey,

14     let's do a test transaction to see if we can take the

09:09:27 15     certificate and actually get it deposited into a

16     brokerage account."

17          The second part of that is, you know, we

18     are trying to reduce the amount that we as the FBI

19     actually have to pay as part of this, right?  We're not

09:09:41 20     going to spend, you know, hundreds of thousands of

21     dollars, like the subjects want us to, to buy a larger

22     transaction.

23          So it's a way for us to execute

24     transactions in a way to accomplish this with the story

09:09:52 25     also being tied back to, you know, it's a test to see

Fry - Direct                                        445

1    whether we can actually make this all work.

2    Q.    Now, do these transactions go through successfully?

3    A.    Yes.  We wired the funds to both Mr. Church and

4    Mr. Scott, and we executed the stock purchase agreements.

09:10:16  5    Q.    And again, he was doing all that at your direction?

6    A.    So Mr. Dean didn't actually, you know, send the

7    wires.

8              That's something that, you know, we had.

9    Q.    What's the process for that?  How are the wires

09:10:28 10    actually sent?

11    A.    Yeah, so as part of the undercover operation we had

12    undercover bank accounts set up and corporations that we

13    had formed.

14              So once these agreements were reached, we,

09:10:40 15    the agents, actually worked through the process of

16    initiating those wires and sending the money.

17              The Stock Purchase Agreements, the source

18    signed, but, you know, at our direction in completing

19    these transactions.

09:10:54 20    Q.    And physically where are you, where are the agents

21    when you're initiating these wires?

22    A.    In the Northern District of Ohio, in our office in

23    Cleveland.

24    Q.    Cleveland area, right over that way (indicating)?

09:11:06 25    A.    Yeah, on 1501 Lakeside.

Fry - Direct                                          446

1    Q.    Okay.  So without going through all the mechanics

2    again and without going through all the documents in

3    detail, have you reviewed a stack of exhibits that you

4    have there in front of you for the financial records

09:11:24  5    comprising those transactions?

6    A.    Yes.

7    Q.    Okay.  And so do you have in front of you, without

8    flashing everything up on the screen with lots of back

9    and forth on publishing, 20A and 20B?

09:11:38  10   A.    Yes.

11   Q.    And 22A and 22B?

12   A.    Yes.

13   Q.    And 44A and B?

14   A.    Yes.

09:11:55  15   Q.    And 45A and B?

16   A.    Yes.

17   Q.    And 46A and B?

18   A.    Yes.

19   Q.    And 47A through C?

09:12:09  20   A.    Yes.

21   Q.    Okay.  And had you previously had a chance to

22   review all these documents?

23   A.    Yes.

24   Q.    Okay.  And are these all financial business records

09:12:27  25   concerning those, the $25,000 wires and then the

Fry - Direct                                    447

1    following $15,000 wires?

2    A.    Yes.

3    Q.    Okay.  Now, and have demonstrative exhibits been

4    prepared to illustrate the flow of funds in those

09:12:40  5    transactions?

6    A.    Yes.

7    Q.    Okay.

8              MR. MORRISON:  Permission to publish as a

9    demonstrative Government's Exhibit 701, Your Honor.

09:12:47 10              MR. DeVILLERS:  No objection.

11              THE COURT:  You may.

12              MR. MORRISON:  Can the jury see?  Yes?

13    BY MR. MORRISON:

14    Q.    Okay.  Special Agent Fry, can you just explain to

09:13:01 15    the jury what we see?

16              What was taking place in these transactions

17    concerning Mr. Scott?

18    A.    Yes.

19              So part of the agreement that was reached

09:13:10 20    was when the undercovers purchased the two blocks of a

21    hundred thousand shares for $25,000, that the agreement

22    was that $15,000 would be sent back to US Lighting Group

23    as the purchase of restricted shares so that Paul could

24    get money out of this deal.

09:13:28 25              So what you see here is on April 1st, 2021,

Fry - Direct                                    448

1    we initiated, the FBI, from a covert bank account $25,000

2    wire transfer to Charles Scott's Navy Federal Credit

3    Union account ending in 8616.

4                    Four days later Mr. Scott initiated a

09:13:49  5    second wire transfer to --

6    Q.    You're reading, huh?  Can w start again?

7    A.    The second wire transfer was from Mr. Scott to US

8    Lighting Group's Huntington account ending in 5187, and

9    that was for $15,000 on April 5th, 2021.

09:14:16 10    Q.    Okay.  Now, was there a parallel series of

11    transactions involving Mr. Church?

12    A.    Yes.

13                    MR. MORRISON:  Permission to publish

14    Government's Exhibit 702 as a demonstrative, Your Honor?

09:14:27 15                    MR. DeVILLERS:  No objection.

16                    THE COURT:  You may.

17    BY MR. MORRISON:

18    Q.    And is that what we see here is sort of equivalent

19    transactions from the time period at issue for

09:14:37 20    Mr. Church?

21    A.    Yes.

22    Q.    Okay.  And so do we see the $25,000 coming from the

23    FBI to Mr. Church's account?

24    A.    Yes.

09:14:45 25                    On March 26th, 2021, we again initiated a

Fry - Direct                                    449

1    wire transfer from a covert FBI account to Mr. Church,

2    who then several days later, you know, sent $15,000 back

3    to US Lighting Group as, you know, was the agreed upon

4    transaction.

09:15:03  5    Q.    Okay.  Now, these transactions are taking place.

6                Do you tell the source that when you obtain

7    records of, for example, that $15,000 payment?

8    A.    No.

9    Q.    And why is that?

09:15:20  10   A.    Again, he would have no way of knowing that

11   information unless he's told by one of the parties

12   involved that's not us.

13               So we obviously shared that we sent our

14   wire so that, you know, when he's communicating with

09:15:36  15   Mr. Spivak, Mr. Scott and Mr. Church that, you know, the

16   money from his business partners has left because he

17   would know that if Matt Bianchi had sent a wire transfer

18   or Bryan Kane, but then any of the other activity that we

19   then become aware of he would have no way of knowing, you

09:15:53  20   know, unless he was the FBI so.

21   Q.    And so you don't want to reveal that you

22   all -- he's working with somebody who's gathering these

23   records in the background?

24   A.    Correct.

09:16:03  25   Q.    Okay.  But he may well have in here and, in fact,

Fry - Direct                                   450

```
          1    was told about these transfers, told that this was the
          2    plan?
          3    A.    Yeah, he was told that this was the plan.
          4    Q.    Okay.  Now, we can take that down, Ms. Wojtasik.
09:16:15  5          Thank you.
          6          Now, at some point in this investigation,
          7    CareClix or SOLI arises.
          8          Do you recall that?
          9    A.    Yes.
09:16:25 10    Q.    And was that at the FBI's instruction?
         11    A.    No.
         12          So coming out of that March 5th meeting
         13    where the discussion of the two, three million share
         14    blocks came up with Paul's, you know, two trusted
09:16:41 15    individuals, there was, when Mr. Spivak had a phone call
         16    several days later with the source to basically make that
         17    introduction, he said -- that was the call we listened to
         18    yesterday where originally he said, "I got to call those
         19    guys and let them know, you know, you're on the team and
09:16:58 20    not some outsider."
         21          Shortly there later the same day there was
         22    another phone call with Mr. Spivak who indicated he had
         23    spoken with Mr. Scott and that he was expecting his call,
         24    and at the end of that call he said that Mr. Scott had a
09:17:10 25    publicly traded company SOLI and that Mr. Spivak had
```

Fry - Direct                                              451

1    given him that shell company, and that, you know, down

2    the road, after the source helped him make a bunch of

3    money on US Lighting Group, that he could or should help

4    Mr. Scott with SOLI.

09:17:30  5    Q.    Now, so that was from Mr. Spivak.

6                 Was then the instruction -- I think you

7    described earlier that your instruction generally to the

8    agents is if they open the door, you walk through it.

9                 Is that correct?

09:17:45 10    A.    Yes.

11    Q.    And so was that the process essentially followed

12    with respect to SOLI?

13    A.    Yes, which, which the source agreed to on that

14    call.

09:17:58 15                 It wasn't something that really was pushed

16    right away.  We wanted to get the US Lighting Group

17    transactions done.

18                 I think it was -- not sure of the specific

19    order, but a few calls in where the source had made the

09:18:13 20    comment to Mr. Scott about, "Paul mentioned you also

21    have, you know, a publicly traded company.  If that's

22    something you're looking for help for, let us know."

23    Q.    And how did Mr. Scott respond?

24    A.    I believe he said something along the lines of,

09:18:26 25    "It's always good to have options."

Fry - Direct                                    452

1    Q.    And then was that followed up on in later calls?

2    A.    Yes.

3          You know, at that point going forward there

4    was additional discussions about CareClix or SOLI, you

09:18:39  5    know, and eventually an in-person meeting with Mr. Scott

6    to discuss it.

7    Q.    And fair to say the Jury's heard a great deal about

8    that already?

9    A.    Yes.

09:18:49 10   Q.    Okay.  So you've mentioned now getting to that

11   in-person meeting with Mr. Scott, but before that, was

12   there another in-person meeting with Mr. Spivak?

13   A.    Yes.

14   Q.    Okay.  And is that the call -- the meeting that we

09:19:11 15   heard where the phones are left in the office and they

16   walk outside?

17   A.    Yes.  That was one of the in-person meetings kind

18   of in that timeframe that we skipped over.

19          Yeah, I believe that was on March 18th,

09:19:22 20   2021, the source was meeting with Mr. Spivak at USLG, and

21   was basically instructed to leave his phone inside.

22   Q.    Sorry, a quick interruption.

23          Did you say March?

24   A.    May, sorry.

09:19:38 25          May 18th, 2021.

Fry - Direct                                         453

```
            1              And, yeah, Mr. Spivak instructed the source
            2      to, you know, leave his phones inside and go on a walk,
            3      which obviously caused us as the agents great concern
            4      when all of a sudden the device that we had the ability
09:19:53    5      to hear in live time was not capturing.
            6              But yes, that meeting happened.
            7      Q.   Okay.  So explain that.
            8              So there's two devices, right?
            9      A.   Yes.
09:20:03   10      Q.   One of those devices you said you have the ability
           11      to hear in live time?
           12      A.   Yes.
           13      Q.   How does that work?
           14      A.   Basically it's streamed to us to be able to live
09:20:16   15      monitor the activity that's going on for, you know, for
           16      investigative purposes, but also primarily for safety
           17      purposes so we kind of know what's going on.
           18      Q.   And in that circumstance, you can hear that
           19      essentially it goes to silence?
09:20:30   20      A.   Correct.
           21      Q.   Okay.  And but are you aware that there's a backup
           22      recorder on the source?
           23      A.   Yes.
           24              Which is the reason we always use two is,
09:20:40   25      one, in the event that something like this happened, but
```

Fry - Direct                    454

1    primarily in case, you know, one of them fails or the

2    battery dies that, you know, we always have a chance of

3    success to capture the full duration of the meeting.

4    Q.    And is the goal to have that second recorder

09:20:57  5    perhaps a little more hidden or a little more covert?

6    A.    Yes, something that isn't going to be easily viewed

7    by the subject.

8                    Now, the downside to that is that the audio

9    quality tends to be, you know, inferior compared to the

09:21:12 10    primary device.

11    Q.    And we've heard a lot of them, I guess, whooshing

12    or swooshing, as I think it was described the other day.

13    A.    Yes.

14    Q.    Okay.  So again, without going over all the details

09:21:23 15    of these recordings, you made that recording and then you

16    proceed to arrange for an in-person meeting with

17    Mr. Scott?

18    A.    Yes.

19    Q.    And what was the goal of that meeting?

09:21:34 20    A.    You know, through the discussions about SOLI,

21    Mr. Scott had, you know, indicated that the CHS should

22    come and learn more about the company and the deal.

23                    So we arranged for the CHS to go to

24    Alexandria, Virginia to meet with Mr. Scott.

09:21:52 25                    Again similarly, you know, two agents went

Fry - Direct                                    455

1   with him, and the same process happened of turning the

2   recorder on, him going to the office, us monitoring it

3   nearby, and then, you know, him returning.

4   Q.   And we've heard those recordings at some length

09:22:06 5   already?

6   A.   Yes.

7   Q.   Okay.  Now, is there a reason why, there was a

8   concern that you weren't getting quite as much of a story

9   via phone calls?

09:22:19 10   A.   Yes.

11   Q.   And why was that?

12   A.   It was more just the observation that Mr. Scott was

13   more hesitant to discuss things on the phone.

14                Previous to that, there was the discussion

09:22:31 15   of "Would you download Signal," a text message along

16   those lines.

17                And in our experience doing these cases,

18   the best meetings tend to happen in person because people

19   tend to not like to discuss things over the phone in

09:22:48 20   general.  It's not -- you know, it's a common theme in

21   this space.

22   Q.   And so again, we're not going through all those

23   recordings again, but following -- now it's approximately

24   end of May that's taking place?

09:23:03 25   A.   Yes.  Approximately.

Fry - Direct                                    456

1    Q.    Okay.  And so after making those recordings and the

2    kind of walking and talking recording we'll call it with

3    Mr. Spivak, what was the investigative plan at that time?

4    A.    So over -- you know, this spanned a fair amount of

09:23:20  5    time.

6          Over that time, as you heard yesterday,

7    Mr. Spivak started to get very antsy about the lack of

8    activity and him wanting to kick this off, he wanted

9    money, he wanted the stock trading.

09:23:31 10          There was a call we heard yesterday where,

11   you know, actually a text message where it almost

12   appeared he was about to fire us and he had to go with

13   another group.

14          So we had done the two transactions, so

09:23:43 15   then we, you know, told Mr. Spivak that we were going to

16   kick things off in early June because we couldn't

17   basically hold him off any longer.

18          So given that point, by the end of May we

19   arranged that, hey, this kind of three-day, you know,

09:23:59 20   test program would start in early June.

21          And at that point we started making

22   arrangements to execute the search warrant at USLG's

23   office and arrest Mr. Spivak.

24   Q.    And so obviously -- bless you -- we've covered a

09:24:17 25   great deal about the search warrant already.  I'm not

Fry - Direct                                              457

1    going to retread old ground.

2                But fair to say there were some files that

3    were relevant specific to this 2021 time period?

4    A.    Yes.

09:24:27  5    Q.    Okay.  So can we show Government's Exhibit, to the

6    witness, Government's Exhibit -- I guess I've discussed

7    with Mr. DeVillers already permission to publish these

8    search warrant files straightaway?

9                THE COURT:  That's fine.

09:24:43 10                MR. MORRISON:  Okay.  Can we publish

11    Government's Exhibit 211?

12    BY MR. MORRISON:

13    Q.    And does this appear to be a copy of a

14    consulting -- oh, sorry.

09:24:53 15                Wait until it's actually shown to the jury.

16                Okay.  Now, what do we see here?

17    A.    This is a consulting agreement dated 6/2/2021

18    between US Lighting Group and Fidelity AG.

19                This was discussed yesterday at pretty

09:25:15 20    great length about how Mr. Spivak was going to give the

21    source a block of shares as payment for arranging this

22    transaction where Mr. Bianchi would buy the free-trading

23    shares from Mr. Scott and Mr. Church, and, you know,

24    Mr. Spivak and US Lighting Group were going to receive

09:25:34 25    approximately $900,000.

Fry - Direct                                    458

```
          1              And there was the whole discussion about

          2     not making the issuance of shares a, you know,

          3     mathematical calculation of six million, so that's, you

          4     know, I believe on the second or third page it's 1.85

09:25:47  5     million shares as opposed to 1.5 million shares.

          6     Q.   Okay.  Can we go up one page to Page 2 here?

          7              And is that where we see the 58 -- 1.585?

          8     A.   Yes.

          9     Q.   Okay.  And that's actually pretty close to the

09:26:03 10     number Mr. Spivak had been describing in that walking and

         11     talking call?

         12     A.   Yes.

         13     Q.   Or walking and talking meeting, I should say.

         14              Now, if we pull out of there, and again I

09:26:13 15     guess there's a description of the various services to be

         16     provided, is that right?

         17     A.   Correct.

         18     Q.   Had those been contemplated, in fact?

         19     A.   Yes.

09:26:24 20              As was played on the recording yesterday,

         21     there was the moment along that walk where it's like

         22     basically brainstorming and what are we going to put in

         23     this because we can't put what we're actually doing where

         24     Mr. Spivak asked the source, you know, if he was going to

09:26:39 25     be put on the stand and had to testify for what he does
```

Fry - Direct                                         459

```
         1   for a living, what would he say, and the brainstorming of

         2   RVs, boats, and such, and then eventually landing on

         3   European expansion consulting.

         4   Q.   And if we -- can we go to Page 7?

09:26:55 5             Okay.  One more page.  Sorry.

         6             So is this the fully executed version?

         7   A.   Yes.

         8   Q.   As found at the offices?

         9   A.   Yes.

09:27:07 10            This copy that was fully executed was found

        11   on Paul Spivak's desk when the search warrant was

        12   executed.

        13   Q.   Okay.  Can we actually jump to -- so were

        14   photographs taken of that process?

09:27:17 15  A.   Yes.

        16   Q.   Can we jump to Government's Exhibit 124A, please?

        17            Okay.  Is this a picture of the office as

        18   it was found during the search?

        19   A.   Yes.

09:27:28 20            MR. MORRISON:  Permission to publish, Your

        21   Honor?

        22            THE COURT:  You may.

        23   BY MR. MORRISON:

        24   Q.   And can we turn to Government's Exhibit 124B?

09:27:39 25            Okay.  And this is actually --
```

Fry - Direct                                    460

1          MR. MORRISON:  Permission to publish, Your

2     Honor?

3               THE COURT:  You may.

4     BY MR. MORRISON:

09:27:45  5     Q.    Is this actually a picture of that exact agreement

6     as it was found?

7     A.    Yes.

8     Q.    Okay.  Is that on Mr. Spivak's desk?

9     A.    Yes.

09:27:55 10          The first photo was, you know, kind of the

11    zoomed out context of the room, and then this was more

12    the close scale photo of the specific agreement that was

13    being taken.

14    Q.    Okay.  Now, if we go back to 211, and can we go to

09:28:06 15    Page 8, please?

16          And so this was the signed version, right,

17    the signature page there?

18          Can we go to the next page, Page 9?

19          Was there another version of this

09:28:19 20    consulting agreement found?

21    A.    Yes.

22          So there was a nonexecuted version, which

23    is this one is on the screen now, where it is a draft

24    consulting agreement between US Lighting Group and

09:28:35 25    Fidelity AG, but in the second paragraph where it says

Fry - Direct                                461

```
          1    the services that are provided, "market research" is

          2    scratched out and there's a handwritten series of

          3    statements of services related to expansion info -- into

          4    Europe, including but not limited to manufacturing

09:28:56  5    feasibility study per country, manufacturing incentives,

          6    tax incentives.

          7    Q.    I'm going to cut you off there.

          8               Fair to say the jury is going to be able to

          9    read that on their own later?

09:29:06 10    A.    Yes.

         11    Q.    Yeah.

         12

         13               And fair to say Sue doesn't want to hear

         14    you read anything any more?

         15    A.    No, that's fair.

         16    Q.    Now, I am -- I am going to test Ms. Wojtasik's

         17    abilities here.

         18               Is it possible -- I genuinely don't know

         19    the answer to this -- to compare the same document, two

09:29:24 20    different pages, and can we just show Page 1 and Page 9,

         21    if possible?

         22               Okay.  And would you agree that much of

         23    this text here that's handwritten makes it into this

         24    paragraph here, "Providing services related to the

09:29:41 25    company's European expansion," and such?
```

Fry - Direct                                         462

1    A.    Correct.

2    Q.    Okay.  Now, were the search warrant -- we can take

3    that down, but if we can stay published to the jury for

4    additional search warrant files.

09:29:54  5              Were additional files found related to

6    Mr. Scott?

7    A.    Yes.

8    Q.    Okay.  Can we show Government's Exhibit 239,

9    briefly?

09:30:01 10             Is this a folder of files related to

11    Mr. Scott that was located?

12    A.    Correct.

13    Q.    Okay.  If we go to Government's Exhibit 242A,

14    please.

09:30:11 15             Okay.  Is this another folder with

16    Mr. Scott's name on it?

17    A.    Correct.

18    Q.    Now, we reviewed a 242 earlier that had some pages

19    absent.

09:30:19 20             Do you recall that in your prior testimony?

21    A.    Yes.

22    Q.    Okay.  Can we go to the next page, please?

23              Now, does this concern the issuance of

24    shares in April, 2021?

09:30:33 25    A.    Yes.

Fry - Direct                                            463

1    Q.    Okay.  And so does that include a hundred thousand

2    shares being issued to Charles Scott here?

3    A.    Yes.

4    Q.    Okay.  And is that consistent with that $15,000

09:30:44 5    purchase of restricted stock by Mr. Scott?

6    A.    Yes, because you can also see Forrest Church is

7    also on the same document for a hundred thousand shares.

8              You know, that was the -- the agreement of

9    the undercovers would send the 25,000 to Mr. Scott and

09:31:01 10    Mr. Church.  They would send 15,000 back to US Lighting

11    Group.

12              And then they were each issued a hundred

13    thousand shares to replace the hundred thousand shares

14    they sold to the FBI.

09:31:10 15    Q.    And if we can go to the next page, please.

16              Are these also records related to the

17    actual issuance of those shares?

18    A.    Yeah.

19              This is the issuance instruction form

09:31:21 20    that's sent to VStock to actually have the transfer agent

21    issue those shares.

22    Q.    Okay.  And can we turn to the next page, please?

23              And is this, I guess, the private placement

24    memorandum or subscription agreement for those shares?

09:31:36 25    A.    Yes.

Fry - Direct                                                    464

1     Q.     Can we show briefly 251?

2                    Is this a file of documents related to

3     Mr. Church?

4     A.     Yes.

09:31:44 5     Q.     Do you understand that to include a large number of

6     subscription agreements and stock transfer records?

7     A.     Yes.

8     Q.     Okay.  Can we turn to Government's Exhibit 256,

9     please?

09:31:55 10                    Did you also find a file related to

11    Mr. Dean?

12    A.     Yes.

13    Q.     Okay.  Can we turn to the next page, please?

14                    Now, did this include the issuance of

09:32:08 15    shares for 166,600 -- I guess it would have been 166,666

16    shares, right?

17    A.     Yeah, correct, not dollars like this indicates.

18                    But that was the December restricted stock

19    purchase that we made for $25,000 that got us the 166,666

09:32:31 20    shares.

21    Q.     Okay.  That's up here, December 15th, 2020?

22    A.     Correct.

23    Q.     Can we go to the next page, please?

24                    And is this the share issuance that kind of

09:32:43 25    has correctly there it listed as that number of shares?

Fry - Direct                                                  465

```
         1    A.    Yes.

         2    Q.    Okay.  And again, those were issued to Kane

         3    Financial, is that right?

         4    A.    Yes.

09:32:53 5    Q.    Okay.  Can we go to the next page, please?

         6              Is this a subscription agreement related to

         7    that issuance?

         8    A.    Yes.

         9    Q.    Okay.  Scroll through to the signature page.

09:33:03 10              Now, is that again signed by Mr. Dean for

        11    Kane Financial?

        12    A.    Yes.

        13    Q.    And, sorry, just pull out of that zoom, please.

        14              And if we go forward, past the signature

09:33:28 15    page, is that a record of the wire transfer?

        16    A.    Yes.

        17    Q.    Now, if we go to the next page, please.

        18              And now, this is $15,000 here in this one,

        19    is that right?

09:33:48 20    A.    Yes.  That's what it says.

        21    Q.    Okay.  Can we go forward?

        22              And continue.

        23              So does it appear there's sort of a draft

        24    version here that had 15,000 on the front and 25,000 in

09:34:06 25    the details?
```

Fry - Direct

466

1   A.   Yes.

2   Q.   Okay.  And forward, please.

3   A.   There was originally the subscription agreement was

4   executed via it was e-mailed, and that was the first

5   version we saw that was hand typed out.

6        I think it was briefly covered yesterday

7   with Mr. Dean that there was a back and forth with us and

8   the company about them later wanting it to be DocuSigned.

9        So as you see here, this is a DocuSign

10  signature of a different version of it so.

11  Q.   So carrying forward, and continuing, please.

12       So is there also kind of an e-mail traffic

13  again about getting that DocuSign done?

14  A.   Correct.

15  Q.   Okay.  And to the last page, please.

16       And then sort of a record of the internal

17  accounting system for $25,000 coming in from Mr. Dean?

18  A.   Yes.

19  Q.   Okay.  Now, you mentioned conducting the search

20  warrant at USLG, and again we're not going to go back

21  through all the other aspects of it.

22  A.   Yep.

23  Q.   But you also mentioned plans to arrest Mr. Spivak,

24  do you recall that?

25  A.   Yes.

Fry - Direct                                          467

1    Q.    Okay.  What was the plan to arrest Mr. Spivak?

2    A.    So on the same day, actually prior to the execution

3    of the search warrant, we had obtained an arrest warrant

4    for Mr. Spivak.

09:35:34  5              And we -- the way we set up the arrest was

6    that it was supposed to be the day that the promotional

7    program to -- you know, by Mr. Kane was supposed to kick

8    off.

9              So the idea was that Mr. Dean would pick up

09:35:50 10   Mr. Spivak at his office and they would drive to our

11   hedge fund office and meet Mr. Bianchi and, basically,

12   you know, celebrate the start of the deal together.

13             The story was that Mr. Bianchi, who was in

14   Detroit, lived in Detroit, was going to fly in on his

09:36:07 15   personal jet that morning into Cleveland at Burke

16   Lakefront Airport.

17             So --

18   Q.    And where is Burke Lakefront Airport for any

19   members of the jury who don't know?

09:36:17 20   A.    Downtown Cleveland on the Lake.

21             So Mr. Dean picked up Mr. Spivak at his

22   office in Euclid.  They drove inside the parking lot of

23   Burke Lakefront.

24             We had teams of agents basically parked

09:36:33 25   spread out, and we had instructed Mr. Dean to kind -- a

Fry - Direct                                          468

 1    certain area to park in.

 2              Once they parked and got out to go inside

 3    because they had said they were going to, you know, go

 4    meet Mr. Bianchi on his plane and Paul wanted to, you

 5    know, get some pictures taken on a jet, so they

 6    start -- start walking towards the airport, at which time

 7    we executed the arrest of Mr. Spivak.

 8    Q.   Okay.  Is that basically consistent with how

 9    Mr. Dean described it as with swarming SUVs and the like?

10    A.   Yes.

11              So we -- you know, we nominally arrested

12    the source at that time, too, to make it look like they

13    were both in trouble, but once Mr. Spivak had been driven

14    away we took the handcuffs off him and let him go on his

15    way, but yeah.

16    Q.   And when you arrested Mr. Spivak, did you seize any

17    evidence from his person?

18    A.   Yes.

19              So on his -- his person, he had a cell

20    phone that we seized incident to arrest.

21    Q.   Okay.  Was that an iPhone?

22    A.   Yes.

23    Q.   Okay.  And did you ultimately obtain authority to

24    search that phone?

25    A.   Yes, we obtained a search warrant for the phone.

Fry - Direct                                    469

1    Q.    Okay.  Now, did you find text messages relevant to

2    this investigation on that phone?

3    A.    Yes, some.

4              MR. MORRISON:  Okay.  Now, can we -- and I

09:37:48 5   think I've covered this with Mr. DeVillers.  Permission

6    to publish Government's Exhibit 907, please?

7              MR. DeVILLERS:  No objection, Your Honor.

8              THE COURT:  You may.

9    BY MR. MORRISON:

09:37:58 10  Q.    Now, what do we see here, Special Agent Fry?

11   A.    This is a text message between Jason Dean and

12   Mr. Spivak.

13   Q.    And this is a string of a few messages, correct?

14   A.    Correct.

09:38:14 15  Q.    Okay.  Now, if we just kind of show the second page

16   briefly.

17              What date range does this cover?

18   A.    So the messages on this page --

19   Q.    The page there.

09:38:27 20  A.    -- are 6/7 or 6/8, but it starts at 6/7/2021, so

21   the day before the arrest.

22   Q.    Now, we had seen previously a much larger volume of

23   messages between the source and Mr. Spivak, is that

24   right?

09:38:41 25  A.    Correct.

Fry - Direct                                  470

1                    The previous messages were from the FBI

2         phone that the source used to communicate with

3         Mr. Spivak, which spanned the duration of the

4         investigation.

09:38:51  5                    On Mr. Spivak's phone we only located

6         messages between the two of them for these two days, June

7         7th and June 8th.

8         Q.    Did it appear that he had been deleting the rest of

9         the messages?

09:39:01  10       A.    Yes.

11        Q.    Okay.  And so here we just have the kind of

12        coordination for effectively the meeting on the 8th?

13        A.    Yes.

14        Q.    Okay.  Now, and so when you said moments ago that

09:39:15  15       you found some text messages on the phone of relevance,

16        is that kind of what you were referring to?

17        A.    Yes.

18        Q.    Okay.  Can we turn to Government's Exhibit 906?

19                    Now, is this a text message chain that also

09:39:31  20       loops in three-way with Bryan?

21        A.    Yes.

22        Q.    Okay.  Is that sent by Mr. Spivak there?

23        A.    Yes.

24        Q.    Okay.  Sharing some sort of press release?

09:39:42  25       A.    Yes.

1    Q.    Okay.  And finally, can we go to Government's

2    Exhibit 908?

3                    Okay.  And did you also locate messages

4    between Mr. Spivak and Mr. Scott?

09:39:55  5    A.    Yes.

6    Q.    Okay.  But again, did that span kind of the

7    lifetime of this phone?

8    A.    No.

9                    It starts here on May 13th, 2021.

09:40:04 10    Q.    So nothing before then located?

11    A.    Yes.

12    Q.    Okay.  And so does this appear to be a discussion

13    about a certificate agreement sort of thing?

14    A.    Yes.

09:40:14 15    Q.    Okay.  And so do we have Mr. Spivak on the right?

16    A.    Yes.

17    Q.    And Mr. Scott on the left?

18    A.    Yes.

19    Q.    Okay.  And we see a reference to asking Josh to

09:40:31 20    send things for him?

21    A.    Yes.

22    Q.    Okay.  If we go to the next page, please.

23                    And so does this include in that May

24    timeframe a message from Mr. Scott here saying, "FYI,

09:40:46 25    we've known each other around 10 years my BFAM"?

Fry - Cross                                    472

1    A.    Yes.

2    Q.    And what was Mr. Spivak's response?

3    A.    He sent an emoji which I believe is a face blowing

4    a kiss.

09:41:00  5    Q.    Okay.

6              MR. MORRISON:  No further questions, Your

7    Honor.

8              THE COURT:  Any cross-examination?

9              MR. DeVILLERS:  Yes, Your Honor, briefly.

09:41:13 10        CROSS-EXAMINATION OF ANTHONY FRY

11   BY MR. DeVILLERS:

12   Q.    So, Agent Fry, just a couple questions.

13             MR. DeVILLERS:  Could we, Ms. Wojtasik, can

14   I bother you to pull up Government Exhibit 10A on

09:41:31 15   Page 20, I think?

16             What was it?  Oh, Mr. Scott's file.

17             MR. MORRISON:  The search warrant?

18             MR. DeVILLERS:  Yeah.

19             (Discussion had off the record).

09:42:08 20             MR. DeVILLERS:  242A.

21   BY MR. DeVILLERS:

22   Q.    That's it, thank you.  Appreciate it.

23             Okay.  Agent Fry, can you take a look at

24   this is Government's Exhibit 242, Page 2.

09:43:14 25   A.    Okay.

Fry - Cross                                    473

1  Q.    And I think you talked about this on

2  cross -- direct examination, correct?

3  A.    Yes.

4  Q.    And this is April 15th of 2021?

09:43:24  5  A.    Yes.

6  Q.    And there's -- and this is a stock issuance,

7  correct?

8  A.    Yeah, basically it's a Board resolution to issue

9  the stock to these four individuals.

09:43:38  10  Q.    Okay.  And one is Mr. Church?

11  A.    Yes.

12  Q.    And one is Mr. Scott, correct?

13  A.    Yes.

14  Q.    And one is a Doris Fornat, is that right?

09:43:48  15  A.    Yes.

16  Q.    And who is that?

17  A.    I believe to be an investor.

18  Q.    Okay.  And how about Kenneth Miller, do you know

19  who that is?

09:43:55  20  A.    An investor.

21  Q.    Was Ms. Fornat or Mr. Miller indicted in this case?

22  A.    No.

23  Q.    Before, before indicting Mr. Scott, did you ever

24  even attempt to talk to him at all?

09:44:09  25  A.    No.

1    Q.    No interest?

2    A.    There was a discussion amongst us and the AUSAs,

3    and it's just the way the case evolved so.

4              MR. DeVILLERS:  No further questions, Your

09:44:23 5   Honor.

6              THE COURT:  Any redirect?

7              MR. MORRISON:  No, Your Honor.

8              THE COURT:  Ladies and Gentlemen, if you

9    have any questions for this witness, please write them

09:44:33 10  down, pass them forward at this time.

11             Are there any other questions?

12             (Proceedings at side-bar:)

13             THE COURT:  The first one's a good

14   question.

09:45:38 15            MR. DeVILLERS:  Yeah.

16             THE COURT:  So this first one is not a

17   question, but I'm happy to just make it a question by

18   saying "Why not."

19             I want to know who actually votes the

09:46:21 20  shares at the annual meeting.

21             MR. MORRISON:  Short meeting, I think.

22             THE COURT:  I think the answer depends on

23   your view of the executive.

24             MR. MORRISON:  Oh, interesting.

09:46:46 25            This is a great one.

Fry -                          475

```
          1              MS. MILLER:  I actually want to know.

          2              MR. MORRISON:  We actually had this

          3    conversation with him recently, what's the story with

          4    that?

09:46:57  5              Oh, okay.  Yes.

          6              THE COURT:  Yes, any issues on any of

          7    these?  I think the one is just to say why not.

          8              MR. MORRISON:  Yeah.

          9              No issues.

09:47:14 10              THE COURT:  I'm mark them all as Fry (Phase

         11    2) 1, 2, 3, 4.

         12              MR. MORRISON:  All right.

         13              THE COURT:  Oh, counsel, one last.

         14              I assume that this is your last witness.

09:47:31 15              MR. MORRISON:  Yes.

         16              We actually haven't really conferred on

         17    exhibits, but I don't think there's been any dispute on

         18    anything.

         19              THE COURT:  Yeah.  I mean, I think we can

09:47:40 20    get those, and you'll be resting subject to the exhibits.

         21              MR. MORRISON:  Right.

         22              THE COURT:  Which we don't need to do that

         23    in front of them, but we can get that done today or

         24    Monday or whatever.

09:47:49 25              So we should probably take a break at that
```

Fry -                      476

1    point, and then you're going to have one or two?

2                    MR. DeVILLERS:  Yeah.  Yeah.

3                    My Rule 29 will be brief.

4                    MR. MORRISON:  Have you made a decision on

09:48:00  5    one versus two?

6                    MR. DeVILLERS:  Two.

7                    Well, yeah, I think so.

8                    (End of side-bar conference.)

9                    THE COURT:  Special Agent, the Ladies and

09:48:52 10    Gentlemen of the Jury have a number of questions for you.

11                   The first is:  Is or was the FBI paying

12    for, waiving, reimbursing, forgiving any of Mr. Dean's

13    restitution or other financial sanctions as compensation

14    for his help in this case?

09:49:17 15                  THE WITNESS:  So we did not pay him

16    anything for his actual services or work provided, no

17    payments for restitution or anything of that.

18                   When he traveled to Florida for the meeting

19    on the boat or traveled to Virginia, basically he would

09:49:32 20    incur the travel expenses, and then we would reimburse

21    him for just the expenses he incurred.

22                   THE COURT:  In the text messages I believe

23    we were just looking at from the cell phone at the time

24    of Mr. Spivak's arrest, the identification of the

09:49:58 25    individuals on the threads lists "Other" for the text

1    messages from Paul Spivak.

2                    Why does it say "Other"?

3                    THE WITNESS:  Not to my knowledge, I don't

4    know why it says that.

09:50:11  5                    It was just his own phone so it wouldn't

6    obviously be a contact saved in his -- in his phone, but

7    various softwares where those text messages are exported

8    identify them different ways.

9                    Some of the previous text messages we've

09:50:25 10   looked at, the actual phone owner's messages are

11   identified as "User," but the way that export was done

12   I'm not sure explicitly why it said "Other" instead.

13                    THE COURT:  All right.  You gave some

14   testimony about date and time stamps and the various

09:50:44 15   recordings.

16                    In the transcripts of the audio files that

17   were shown here, there were not date or time stamps and

18   we didn't hear those audio files, and the question, the

19   jury was just wondering why, why not.

09:51:01 20                    THE WITNESS:  Why they're not in the

21   transcripts?

22                    THE COURT:  Right.

23                    THE WITNESS:  So in the transcripts, I

24   think because just clips were played, at the beginning of

09:51:10 25   each one, the call, myself or another agent would give a

Fry -                        478

1    preamble essentially saying, "You know, this is Special

2    Agent Anthony Fry, today's date is X, whatever time, the

3    location we're at, Cleveland, Ohio, this is a potentially

4    recorded call between CHS and, you know, Paul Spivak."

09:51:29  5              So we would identify the date and time.

6              And then when the recording is actually

7    pulled off of the device, it has metadata that shows when

8    it was turned on and, you know, when it was shut off and

9    the duration of the call.

09:51:47 10              THE COURT:  In connection with this case,

11   was Mr. Church indicted as a co-defendant or

12   co-conspirator?

13              THE WITNESS:  Yes.

14              THE COURT:  Was Mr. Scott a target of this

09:52:04 15   investigation from the beginning?

16              THE WITNESS:  No.

17              THE COURT:  Was Mr. Scott's office ever

18   raided in connection with this investigation?

19              THE WITNESS:  No.

09:52:15 20              THE COURT:  And one question that not just

21   the Jury but I think all of us have is when the FBI buys

22   stock, where does it actually go?

23              THE WITNESS:  So in this case and other

24   cases, a lot of times it just stays at the transfer agent

09:52:36 25   in book entry form, but most of the time we get a

Fry - Redirect                                    479

1    physical stock certificate which is then placed into our

2    evidence room.

3                We, despite the representations about

4    selling stock and manipulating the market, that is not

09:52:52  5    anything that we actually ever undertake because we do

6    not want to be part of, you know, causing people to lose

7    money ourselves.

8                So that is why we, one of the reasons we do

9    the undercover technique with these types of cases is it

09:53:05 10    allows us to get involved, help set up a, you know, a

11    plan that someone was already going to do, but then take

12    it down before it happens to try to prevent losses from

13    happening before they would otherwise occur.

14                THE COURT:  Counsel, any follow-up on the

09:53:20 15    questions from the Ladies and Gentlemen of the Jury?

16                MR. MORRISON:  Very briefly.

17        REDIRECT EXAMINATION OF ANTHONY FRY

18    BY MR. MORRISON:

19    Q.    On the question about the transcripts, fair to say

09:53:26 20    that we could have all been more helpful to the jury by

21    putting time and dates in the transcripts?

22    A.    Yes.

23    Q.    Okay.  But is it your understanding that as we put

24    those together, we're supposed to only summarize the

09:53:38 25    exact words that are on -- that are being played in those

Fry - Redirect                                    480

1    clips?

2    A.    Yes.

3                   The transcripts just say, you know, the

4    person and what they said; not, you know, the time stamp

09:53:46  5    of each statement they made.

6                   MR. MORRISON:  Okay.

7                   All right.  That's all.

8                   THE COURT:  I think the Jury wants to go

9    back and hear each introductory clip.

09:53:55 10                   (Laughter.)

11                   MR. DeVILLERS:  Nothing, Your Honor.

12                   THE COURT:  All right.  Thank you.

13                   You may step down.

14                   (Witness excused).

09:54:01 15                   THE COURT:  Mr. Morrison.

16                   MR. MORRISON:  Yes, Your Honor.

17                   Subject to the admission of exhibits, at

18    this time the United States rests.

19                   THE COURT:  Ladies and Gentlemen, I have

09:54:11 20    some work to do with counsel.

21                   We will take a break for a short period of

22    time, perhaps a touch longer than normal, but not much,

23    hopefully.

24                   So while you are on the break, be mindful

09:54:30 25    of my instructions do not talk with anyone, do not talk

1    with each other about the case.  Keep an open mind until

2    the case is in and the case is formally submitted to you,

3    and do not do any outside research.

4                        We will stand in recess.

09:54:42  5                THE CLERK:  All rise.

6                (Jury out.)

7                THE COURT:  Please be seated.

8                And, Mr. DeVillers, did you wish to make a

9    motion?

09:55:16 10                MR. DeVILLERS:  Yes, Your Honor.

11                Thank you.  Briefly.

12                We would move again for a dismissal via

13    Rule 29.

14                You know, just I think, I think clearly the

09:55:27 15    Court is aware, but any sort of conspiracy can't be with

16    Mr. Dean.  It's got to be with Mr. Spivak and, I guess,

17    to some extent Mr. Church.

18                We didn't hear anything, clearly any

19    communications between Mr. Spivak and Mr. Scott, or

09:55:45 20    Mr. Church and Mr. Scott.

21                We heard, over many objections by me,

22    that -- their statements to Mr. Dean and what they said.

23    And I guess even just taking those, there's -- they'd

24    have to prove that Mr. Scott intended to defraud.  I

09:56:08 25    mean, that's the charge here.

1           And I believe what they're saying is, you

2      know, because he knew that Mr. Dean was going to promote

3      stock, somehow fraudulently, there's no conversation

4      clearly at all with Mr. Scott, Mr. Dean, talking about

09:56:24  5      fraudulently promoting the stock.

6           We do have Mr. Church at one point saying

7      that Mr. Scott knew -- kind of saying he knew that

8      Mr. Dean was going to promote, promote the stock and it

9      was going to inflate the price.

09:56:40 10           Well, that's -- that's profound.  I mean,

11      every time you promote stock, it's for the purpose of

12      making it higher.

13           Nothing Mr. Church or anyone else said,

14      even the conversations with Mr. Spivak, indicate that my

09:56:55 15      client knew they were going to fraudulently promote the

16      stock; that is, all the stuff we kind of learned about

17      the first trial, all the stuff I went over with Mr. Dean,

18      but there's no evidence of that.

19           And as such, no reasonable juror, in the

09:57:12 20      light most favorable to the Government, could convict

21      Mr. Scott.

22           THE COURT:  All right.

23           Thank you.

24           Bear with me one second.

09:57:18 25           (Pause.)

1        Any response from the United States?

2            MR. MORRISON:  Just briefly, Your Honor.

3            Obviously, we would kind of incorporate our

4    response from the previous motion by reference insofar as

09:57:35  5    this is effectively a continuation of the 2018 scheme.

6            You heard that described on the calls, that

7    this is following through on that effectively.  These

8    involve, at least as part of the conspiracy, some of

9    those very same shares.

09:57:51 10            Obviously, we don't have recordings of

11    calls between Mr. Scott and Mr. Spivak.  We don't think

12    that's necessary.

13            We think that there's a fair inference to

14    be drawn from the record from the very explicit

09:58:01 15    statements of Mr. Spivak and from the conversations that

16    are had between Mr. Scott and Mr. Dean as well as the

17    testimony of Mr. Church as to his conversations with both

18    those parties, that there was intent to defraud, that it

19    was in connection with the purchase and sale of

09:58:15 20    securities, and that they don't have to be causing one

21    particular investor to go into a transaction.

22            There could be a fraud perpetrated on the

23    market, and here one way that happens is by concealing

24    this arrangement and concealing the control that's being

09:58:30 25    exerted both by Mr. Spivak and by their agreement to

1    essentially pay these kickbacks to both the people who

2    are going to be fraudulently pumping up the price of the

3    stock, and in turn to the company.

4                 So we believe that taking the evidence in

09:58:47  5    the light most favorable to the Government, that a

6    rational Jury could convict.

7                 THE COURT:  All right.  Thank you.

8                 Let me preface this, I'm not going to go

9    through, in the interest of time, all the statements I

09:59:02 10   went through in addressing the Rule 29 motion in the

11   first trial.

12                Mr. Scott, you had the opportunity to hear

13   them then.  I'll simply say this is not my view of the

14   evidence.  That's not the standard at this point.  That's

09:59:16 15   not the Court's role.

16                The Court's role is to take the evidence,

17   construe it in the light most favorable to the United

18   States, and determine whether the case belongs with the

19   Jury or not.

09:59:29 20                In that regard, there's, I think, a couple

21   pieces of work I need to do.

22                First, I'll just close the door on it so

23   that we have some formal closure.

24                In terms of the conditional relevance and

09:59:48 25   Rule 106 issue, I do think that there is sufficient

1    evidence by a preponderance to believe that the

2    co-conspirator exception is in.

3                   I was paying particular attention to that

4    in this phase of the trial, as in the first, but in this

5    phase of the trial, I think -- I'd have to go back and

6    check my notes -- there was literally one -- I believe it

7    was a recording, not a text message -- that's arguably

8    not in furtherance of a conspiracy, but it was

9    sufficiently, in my view, informational by way of

10   background that I did not think there was any prejudice.

11                  It was just kind of normal background kind

12   of information and the like, so I didn't -- I didn't

13   think much of it.  But with that, I do think that the

14   evidence that's come in, to the best of my abilities, is

15   all within that exception.

16                  Then going through the counts that are

17   charged here, the conspiracy charge in Count 2, by my

18   brief review of the evidence in front of the Jury

19   construed in favor of the United States, a Jury could

20   fairly -- could fairly find each of the elements as to

21   Mr. Scott with respect to the Phase 2 evidence alone, to

22   say nothing of building on the Phase 1 evidence.

23                  There's evidence, including but not limited

24   to the testimony of Jason Dean and Forrest Church, that,

25   if believed, would satisfy the element that Mr. Scott

1    conspired or agreed to commit the crime of securities

2    fraud.

3                Of course, the Jury is free not to believe

4    that, but they could.

10:01:46  5                In terms of whether Mr. Scott knowingly and

6    voluntarily joined that conspiracy, there is a statement

7    from Mr. Scott that he owns his shares -- I'm

8    paraphrasing, of course -- he owns his shares, he

9    controls them, they're his property, the clear

10:02:05 10   implication being that his actions are his own and

11    they're knowing and voluntary.

12                And from that, the Jury could infer -- and,

13    of course, they might or they might not -- that he was a

14    willing participant in the conspiracy to commit

10:02:22 15   securities fraud.

16                And three, the overt acts, again in Count 2

17    we have a long list of overt acts.  I'm not going to go

18    through each of them, but at least one of them has

19    been -- and more than one of them, there's evidence to

10:02:35 20   allow proof of.

21                Jumping ahead and then I'll circle back,

22    the wire fraud counts, Counts 45 and 47, the elements,

23    first, that the defendant knowingly participated in a

24    scheme to defraud, again a lot of -- this one overlaps to

10:02:58 25   a significant degree with Count 2.

1          Regarding the second element, material

2    misrepresentation or concealment, there are different

3    potential material misrepresentations based on the record

4    at this stage.

10:03:14   5          For example, the Jury could find that the

6    misrepresentations included the use of investor funds,

7    meaning that, you know, roughly half, perhaps a little

8    bit more, were used to pay commissions; not to benefit

9    USLG and its operations and so forth.

10:03:29  10          Another might be a trading activity to

11   manipulate, inflate, prop up the price at which USLG

12   stock was trading.

13          Third, intent to defraud, this is, I think,

14   the crux of Mr. DeVillers' arguments.  Again, the Jury

10:03:48  15   heard testimony that Mr. Scott was careful in what he put

16   in writing, how he communicated with individuals and the

17   like, and we just had some testimony from Special Agent

18   Fry about the state of Mr. Spivak's cell phone.

19          From all of those facts, the Jury could

10:04:05  20   infer that there was an intent to defraud.

21          Of course, they're free not to find that.

22   That's up to the Jury.  Again, I'm not passing on the

23   evidence.  That's not my job, and it would not be proper

24   for me to do so.

10:04:19  25          In terms of interstate commerce, I don't

1    think there's any question that the wires involved

2    interstate commerce.

3                       So then circling back to Count 20, again I

4    think by this point I touched on the last two elements of

10:04:36  5    the securities fraud charge, interstate commerce and

6    intent to defraud.

7                       In terms of the first three elements, one

8    of which the United States must prove under 10b-5, I

9    think again for the reasons I've already said, I think

10:04:53  10    the record suffices, so I'll deny the motion for all of

11    those reasons.

12                       Anything else we should address before we

13    stand in recess?

14                       MR. DeVILLERS:  No, Your Honor.

10:05:04  15                       MR. MORRISON:  Not from the Government.

16                       THE COURT:  So why don't we take a short

17    break, and then we'll pick up with Mr. Scott's case when

18    we resume?

19                       MR. DeVILLERS:  Thank you.

10:05:14  20                       MR. MORRISON:  And who is first?

21                       THE COURT:  Mr. Hipple.

22                       THE CLERK:  All rise.

23                       (Recess taken.)

24                       THE COURT:  Please be seated.

10:30:05  25                       Before we bring the Jury in, I understand,

1    Mr. Scott, that you may testify?

2                    THE DEFENDANT:  Yes, Your Honor.

3                    THE COURT:  I -- we've been through this

4    once before, but I just want to make sure you understand

10:30:27  5    your rights.

6                    You have good and able counsel.  I trust

7    he's fully advised you and counseled you.

8                    You know your Fifth Amendment rights, is

9    that correct, sir?

10:30:39 10                    THE DEFENDANT:  Yes, sir.

11                    THE COURT:  And you know you have the right

12    to remain silent and not to testify?

13                    THE DEFENDANT:  Yes, sir.

14                    THE COURT:  You also know you can testify

10:30:47 15    if you want to?

16                    THE DEFENDANT:  Yes, sir.

17                    THE COURT:  And again, I think you've been

18    fully advised of all the risks and benefits of each

19    course of action available to you.

10:30:58 20                    So whatever decision you wish to make is

21    going to be your decision, correct?

22                    THE DEFENDANT:  Yes, sir.

23                    THE COURT:  All right.  If there's nothing

24    further, then let's bring in the Jury.

10:31:10 25                    (Jury in.)

```
 1                    THE COURT:  Please be seated.
 2                    Mr. DeVillers, you may call your first
 3          witness.
 4                    MR. DeVILLERS:  Thank you, Your Honor.
10:33:11  5          The defense calls Bob Hipple.
 6                    THE COURT:  Please raise your right hand.
 7                          ROBERT HIPPLE,
 8             of lawful age, a witness called by the Defendant,
 9                  being first duly sworn, was examined
10:33:43 10                 and testified as follows:
11                    THE COURT:  Thank you.
12                    Please be seated.
13                    THE WITNESS:  Good morning.
14                    THE COURT:  And if you will make sure to
10:33:54 15         speak directly into the microphone for the benefit of our
16          court reporter, and please begin by stating your name for
17          the record.
18                    Would you please state your name for the
19          record?
10:34:08 20                    THE WITNESS:  Robert Hipple.
21                    THE COURT:  And --
22                    THE WITNESS:  H-I-P-P-L-E.
23                    THE COURT:  All right.  Thank you.
24                    Mr. DeVillers, you may proceed when you are
10:34:15 25         ready.
```

1          DIRECT EXAMINATION OF ROBERT HIPPLE

2      BY MR. DeVILLERS:

3      Q.    Mr. Hipple, could you tell us where you're from?

4      A.    Where am I from?

5      Q.    Yes.

6      A.    I'm from Florida now.

7      Q.    Okay.  What do you do for a living?

8      A.    A lot of places.

9                 Washington, D.C.; Pennsylvania.  I was born

10     in Pennsylvania.  Lived in Ohio briefly; Utah;

11     California; and New York.

12                I think that's probably close to it.

13     Q.    What do you do for a job?  What do you do for a

14     living?

15                THE COURT:  Speak up a little bit.

16     BY MR. DeVILLERS:

17     Q.    What do you do for a living?

18                Can you hear me?

19     A.    Yeah.

20     Q.    All right.  What's your job?

21     A.    Officially I'm retired, but that lasted four days.

22     I retired 20 years ago.

23                I trained as a lawyer and been a lawyer

24     doing legal stuff for 50-plus years.

25     Q.    What's your education?  Your education, what is

Hipple - Direct                    492

1    your education?

2    A.    I got a Bachelor's Degree in economics and finance

3    at Wesleyan University in Connecticut, and went to law

4    school at Georgetown University in Washington, D.C.

10:35:36  5        Got a Doctor of Law in 1969, I think it

6    was.  Yeah.

7              I got a Master's Degree in tax law at

8    Georgetown in 1971.

9              I also completed an MBA program at Emory

10:35:58 10   University, although I didn't get a degree because I

11    never actually signed up.  I was a professor and took the

12    courses and started a program down there.

13    Q.    Tell us about your career after law school.

14              What did you do?

10:36:13 15   A.    In my last year of law school I started working 20

16    hours a week as an honor clerk at the U.S. Department of

17    Justice in a program that the department had, working in

18    the Tax Division, and got my admission to the Bar of

19    Virginia in my third year of law school.

10:36:37 20              I applied and was accepted as a full-time

21    attorney with the Department of Justice, and they found

22    out that I was coming back and I had my law degree, so I

23    had a full docket of cases before I graduated and spent

24    five years as an attorney with the Department of Justice

10:36:55 25   doing trial work mostly in the tax area nationwide.

1                  As I say, I got my Master's Degree in tax

2       while I was working at Justice.

3                  I started teaching in the graduate tax

4       program at Georgetown after I graduated from that degree,

10:37:17  5     and I did that for two or three years while I worked at

6       Justice.

7                  Then I became a full-time Professor of Law

8       at Emory University in Atlanta, Georgia.

9                  Was Director of the graduate tax program

10:37:30 10     and started a combined degree program in law and

11      business, J.D./MBA.

12      Q.   Where else -- did you teach anywhere else?

13      A.   Excuse me?

14      Q.   Did you teach law anywhere else?

10:37:42 15     A.   Yeah.  I've taught several other places.

16                 Let's see.  University of San Diego, I was

17      a visiting professor.  Florida A & M College of Law,

18      started their law program authorized by the State of

19      Florida in, I think, 1993 or '4.

10:38:07 20                I had retired, I had been retired for three

21      days, found out they were starting a law school, and the

22      new Dean of the law school was a friend of mine from my

23      teaching days, and I called him up and he said, "Can you

24      come over and teach?"

10:38:22 25                So I started teaching at Florida A & M as a

Hipple - Direct                                    494

1    visiting professor.

2    Q.    Besides that, the Justice Department and teaching

3    at law schools, did you have any other jobs in your

4    career?

10:38:35  5    A.    Well, I practiced law in Atlanta for 20-plus years.

6    That gradually evolved into a consulting program.  I

7    realized there was a need in the small business area for

8    advice on small public companies, and I started a

9    consulting program that provided consulting CFOs and

10:39:09 10   in-house general counsel for these smaller companies.

11                It allowed them to budget a lot better.

12   And I did that in Atlanta for about 10 years.

13                Then I went full-time as a general counsel

14   and CFO of a technology company in Atlanta.  Most of its

10:39:30 15   operations were in Asia or Europe, and I spent too much

16   time traveling.

17                Left that and joined a New York Stock

18   Exchange company in New York as their general counsel.

19   Did that for a few years.

10:39:46 20                Then I was CEO of a company for two years.

21   Sold that, and then retired.

22   Q.    All right.  Do you know Charles Scott?

23   A.    Yes.

24   Q.    Okay.  When did you meet Charles Scott?

10:39:57 25   A.    I'm not sure when I actually met him.

Hipple - Direct                           495

1          I was contacted by an individual named Josh

2    Flood after I moved to Florida, and he told me he was

3    working with a company in the Washington, D.C. area

4    called Soleil Systems, and he was acting as President and

10:40:27  5    CFO and a lot of other functions, and basically was over

6    his head.

7          The company had been talking to an

8    investment banking group out of Atlanta about helping to

9    fund the company, and apparently had said something about

10:40:44 10    he needed help, and that investment banking firm gave him

11    my name and number, and he called me and said, "Can you

12    help."

13          I started working as a part-time consultant

14    with that company 2019, early 2019.  And Charlie Scott

10:41:10 15    was the Chairman of the Board and the principal

16    shareholder of that company.

17          Sometime after I started working there I

18    met him.

19    Q.    Okay.  And when you started working there, and

10:41:21 20    actually what was your role?

21    A.    I re-created the role that I had done previously in

22    Atlanta.  I was basically contract CFO and general

23    counsel.

24    Q.    Okay.  And what's a CFO?

10:41:31 25    A.    Chief Financial Officer.

Hipple - Direct                                    496

1    Q.    And what's a Chief Financial Officer do?

2    A.    Handles all the money.

3    Q.    What's a general counsel?

4    A.    Advises on general legal issues involving the

5    corporation; determines when outside counsel might be

6    needed in a particular area; basically keeps the company

7    out of trouble and keeps them following the regulatory

8    requirements.

9              And in my case particularly, the Soleil

10   Systems was an SEC reporting company and had common

11   shares trading on the Over-The-Counter market, and

12   there's a lot of regulation that goes with that, and

13   that's what I had done for 30 years.

14   Q.    What is CareClix?

15   A.    CareClix is actually a trade name for a group of

16   companies that provide telemedicine service.

17             It was formed April of 2019 as a Virginia

18   corporation because the Soleil Group, Josh Flood,

19   Mr. Scott, were negotiating to acquire a software program

20   that had been designed by two doctors to go into the

21   telemedicine business.

22             Telemedicine basically is a system that --

23   it's more familiar now than it was then.  You, instead of

24   going to a doctor or emergency room or, you know, one of

25   the doc-in-the-box places when you don't feel good, you

Hipple - Direct                              497

1    can do the whole thing by telephone or on a computer.

2              The doctor answers, listens to your issues,

3    looks at your medical records and diagnoses sore throat,

4    colds, flu.  And if you've got something more serious,

10:43:42  5    tells you to go to the emergency room right away.

6    Q.    What's the relationship between CareClix and

7    SOLI?

8    A.    Soleil Systems entered into an agreement to acquire

9    this software that manages the interaction between the

10:44:00 10    patients and the doctors and coordinates -- and the

11    video, if you're doing it that way, coordinate the

12    telephones, the whole thing worked.

13              And the parent company, which was Soleil,

14    acquired that software -- not the company that owned it,

10:44:20 15    but the software itself -- and after it acquired it, it

16    put that software into a new company called CareClix

17    Inc.

18    Q.    Okay.  So is SOLI a public traded company --

19    publicly traded company?

10:44:35 20    A.    Yes, its common shares were traded on the -- it's

21    called the Over-The-Counter link market, generally known

22    as the Pink Sheets.

23    Q.    All right.  And was CareClix, before it was

24    acquired by SOLI, a publicly traded company?

10:44:50 25    A.    Was CareClix?  No, it was a private company.

Hipple - Direct                                498

```
         1    Q.    Okay.  Once, once they -- do you know what a
         2    reverse merger is?
         3    A.    No.
         4    Q.    Okay.  Once SOLI became -- acquired CareClix, did
10:45:03 5    CareClix then buy -- then become a publicly traded
         6    company?
         7    A.    No.
         8    Q.    So explain that.
         9          If SOLI owns CareClix, how come it's not a
10:45:15 10   publicly traded company?
        11    A.    It didn't have any shares that were traded on any
        12    public market.
        13          All of its shares were owned by the parent
        14    company, which was Soleil Systems, which was the public
10:45:28 15   company.
        16    Q.    Okay.  But SOLI could then sell shares, correct?
        17    A.    It could, yes.
        18    Q.    All right.  Who else was members of CareClix as far
        19    as their officers?
10:45:46 20   A.    Okay.  Well, there were seven Directors of the
        21    corporation.  Just for background, the corporation is
        22    managed by Directors, by state law.
        23          And Soleil was a Florida corporation and it
        24    had seven Directors.  Five of the seven were independent
10:46:09 25   Directors, which means they weren't major shareholders or
```

Hipple - Direct                    499

1    officers or insiders of the company.

2                    Charlie Scott was the Chairman of the

3    company, of the Board of Directors.

4                    Josh Flood at the time was, I believe, a

10:46:26 5    Director and was President and CFO of the company.

6                    Dr. John Korangy -- that's K-O-R-A-N-G-Y --

7    was one of the two medical doctors who had created the

8    software.

9                    He was President -- he was President/CEO.

10:46:51 10   Josh Flood was CFO.  He came over and was the operator of

11   the company.

12                   And there were probably twelve to 15

13   employees.

14   Q.    But by 2021, had CareClix expanded from 2019?

10:47:11 15   A.    Yes.  Quite a bit.

16   Q.    How so?  Was it a national market or international

17   market?

18   A.    Are you talking about the stock side or the

19   business side?

10:47:25 20   Q.    Business side.

21   A.    The business side.

22                   Well, I started as a part-time consultant

23   in early 2019.

24                   That expanded gradually as the work got

10:47:39 25   more and more, and ended up through my consulting company

1    assuming the roles of Chief Financial Officer and general

2    counsel.

3                    That was probably early 2020 when this

4    happened.

10:47:59  5                    At that point, Josh Flood kind of stepped

6    back.  Dr. Korangy was still there, and still is today.

7                    The company at that point was talking with

8    a number of investment banking firms about the direction

9    of the future of the company.

10:48:20 10                    The intent and desire was to expand the

11    business and eventually list the company for trading on

12    either the New York Stock Exchange or what's called the

13    NASDAQ market, the National Association of Securities

14    Dealers Automated Quotation System, that's NASDAQ, and

10:48:46 15    those are the two major markets for stock trading in the

16    U.S.

17                    And that was the plan.

18                    But there were a lot of requirements to get

19    there.  Independent Board of Directors.  You had to be a

10:48:55 20    reporting company.  You needed to be a trading company.

21    And at that point the Soleil shares had been removed from

22    public trading on the link markets, so it wasn't -- there

23    was a lot to be done.

24    Q.    And whose job was it to do that?

10:49:15 25    A.    Do what?

Hipple - Direct

501

1   Q.    To get -- get the Soleil/CareClix on the stock

2   market?

3   A.    Mr. Scott and Josh Flood had had that general plan

4   in mind from the time they acquired the company.

10:49:35 5         When I started working with the company in

6   early 2019, the public company Soleil had already been

7   acquired, and it was operating a different business, and

8   I had nothing to do with that.

9   Q.    All right.  In 2000 -- I'm going to take you to

10:49:52 10  kind of the spring of 2021.

11        At that time was CareClix still looking to

12  expand?

13  A.    Still?

14  Q.    Looking to expand?

10:50:01 15  A.    Oh, yeah.

16  Q.    And was that -- were you looking for people to

17  invest in CareClix?

18  A.    Yes.

19        The management and Directors were talking

10:50:15 20  with potential investors about investing in promissory

21  notes.

22        The company was not selling stock.  It had

23  had a glitch in its trading because of SEC activity in

24  August of '20, I think, April of '20, somewhere in there,

10:50:36 25  but in 2020.  And its shares were not readily tradeable

Hipple - Direct

502

1    at that period of time.

2                   They could be traded on what was called the

3    Grey Sheets, but it was a very cumbersome, difficult

4    process, and one that most investors couldn't do.

5                   So they were talking with investment banks

6    and potential investors, large investors who invest in

7    these kinds of companies with the goal of taking it

8    public, growing the business, and the telemedicine

9    operation itself, and going fully public.

10   Q.   So by spring of 2021, if I wanted to invest in

11   CareClix, I would do it through a promissory note?

12   A.   Well, that's -- that's all the company was

13   offering, you know.

14                  If someone with a large investment

15   portfolio came to the company and said, "I want to buy,

16   you know, 20 percent or 15 percent of your stock," I'm

17   sure they would have talked to them.

18   Q.   Do you know a person or did you come to know a

19   person by the name of Jason Dean?

20   A.   What?

21   Q.   Jason Dean.

22   A.   Jason.

23                  Do I recollect that now?  No.

24                  I know I had a conversation with an

25   individual named Jason Dean on the phone.

Hipple - Direct

503

```
 1    Q.    Okay.  And do you remember what that was about?
 2    A.    Yeah.
 3                Charlie Scott and Josh Flood had called me.
 4    They were in northern Virginia where the company office
 5    was.  I was in Florida.
 6                And they said they had had a couple of
 7    conversations about this individual; that he was
 8    supposedly affiliated with a number of wealthy families
 9    or wealthy investors and had, I think the number was,
10    $800 million to invest.
11                He had somehow gotten referred to CareClix
12    Group, and was interested in investing.
13                And they wanted me to talk to him because I
14    knew about the business operation, the finances, the
15    money and all that stuff.
16    Q.    Do you remember about how many times you talked to
17    him?
18    A.    I think just once.
19    Q.    Okay.  Was that via a phone call?
20    A.    Yes.
21    Q.    Was it a conference call?
22    A.    It was a conference call.  I think they, Mr. Scott
23    and Josh Flood, tied me into the call.
24    Q.    Did -- were you looking, was CareClix looking for
25    anyone to promote stock in 2021?
```

Hipple - Direct                                    504

1    A.    Not really.

2                There was nothing to promote.

3    Q.    Okay.  Did Mr. Dean talk to you at all about

4    promoting stock?

10:53:37  5    A.    Not specifically to me.

6                It may have gone from a conversation, but

7    the focus of the conversation was investing.

8    Q.    In your conversations with Mr. Dean, were you

9    basically explaining the company and how to invest?

10:53:54 10    A.    Not how to invest.

11                He seemed to know or at least professed

12    that he was an investor and knew all about the markets

13    and this kind of thing, and he had done this before.

14                So it was more about the potential of the

10:54:13 15    telemedicine industry, the telemedicine market, and

16    CareClix itself.

17    Q.    Did you have an impression of Mr. Dean when you

18    talked to him?

19    A.    Yes.

10:54:24 20    Q.    What was that impression?

21    A.    That he was like many others that I had talked to

22    on behalf of CareClix; that there's a lot of sharks in

23    those waters, and the promoters will call companies and

24    say, "I can do this, this, and this for you.  I can get

10:54:49 25    your stock up.  I can expand your shareholder base.  I

1    can get liquidity in your stock.  And I can raise you

2    money.  All you have to do is give me some stock or give

3    me money ahead of time, and I'll take care of you."

4                    And it's a lot of talk and nothing happens.

5                    And in fact, after this conversation, I

6    told Josh and Charlie Scott, I said "Just another one of

7    the stock promoters."

8    Q.    And after that conversation, after you talked to

9    Mr. Scott and Mr. Flood, did you ever talk to this guy

10   again?

11   A.    Not that I know of.

12   Q.    Do you know if Mr. Scott or Mr. Flood ever talked

13   to him again?

14   A.    I know they had several conversations.

15                   I don't know if those were before or after.

16   I kind of think they were before this one.

17                   MR. DeVILLERS:  No further questions, Your

18   Honor.

19                   THE COURT:  Any cross-examination?

20                   MS. MILLER:  Yes, Your Honor.

21                   Thank you.

22        CROSS-EXAMINATION OF ROBERT HIPPLE

23   BY MS. MILLER:

24   Q.    Good morning, Mr. Hipple.

25   A.    Good morning.

Hipple - Cross

506

1    Q.    I want to make sure I have the timeline correct of

2    when you became involved with SOLI and CareClix, okay?

3    A.    Okay.

4    Q.    Seems to me that you said January, 2019 or early

10:56:22  5    2019 you started working as a consultant with the

6    company.

7              Is that correct?

8    A.    Yeah.

9              It was sometime before the acquisition of

10:56:31 10    the software, which was in April of 2019.

11    Q.    All right.  So fair enough.

12              Early 2019, first involvement?

13    A.    It could have been late 2018, but, yeah, in that

14    period of time.

10:56:44 15    Q.    Okay.

16    A.    The focus was on the acquisition of that software.

17    Q.    Got it.

18              And then you were working on the

19    acquisition of the software, and it sounds like in around

10:56:55 20    August of 2020 you formally joined the company as the CFO

21    and the general counsel?

22    A.    Well, yes and no.

23              I never joined the company as an officer or

24    Director.

10:57:09 25    Q.    Right.

Hipple - Cross

507

1    A.    Okay.

2    Q.    You were serving in your independent --

3    A.    I -- I think that was probably before August of

4    2020.

10:57:16 5    Q.    Okay.

6    A.    We signed an agreement that I would undertake

7    those, those functions.

8    Q.    Okay.  And so as the general counsel, fair to

9    say -- and you testified that you do all the legal

10:57:30 10   issues, contracts compliance, those types of things?

11   A.    Yes.  Very much.

12   Q.    Okay.  And you also said you advised on legal

13   issues and regulatory compliance.

14                  Correct?

10:57:43 15   A.    Yes.

16   Q.    And in this particular space, we're talking about

17   compliance with SEC securities laws.

18                  Fair?

19   A.    Yes.

10:57:53 20   Q.    Okay.  And that's primarily your focus as the -- in

21   the general counsel role for SOLI/CareClix, correct?

22   A.    That, and general contracts.

23                  There were a lot of contracts being done

24   with customers.

10:58:11 25   Q.    Okay.  So contracts and securities law compliance?

Hipple - Cross

508

1    A.    Yeah.

2    Q.    Those were the two legal realms that you were

3    focusing on?

4    A.    Well, as general counsel, you're pretty much

10:58:24  5    involved in anything legal, but that was the major focus

6    of why I was there.

7    Q.    And that's what was going on at the company, right?

8          I mean, you said Josh Flood brought you in

9    because they were working with the investment banking,

10:58:36 10    they needed help?

11         Fair to say the hot button issues going on

12    for the company at the time was securities-type stuff?

13    A.    Yes.

14    Q.    All right.  You also said as CFO you handle all the

10:58:47 15    money, you're the Chief Financial Officer, right?

16    A.    Yes.

17    Q.    Okay.  And so when you walk in, you kind of need to

18    get up to speed, if you will, on the financial status of

19    the company that you're walking into, right?

10:58:59 20    A.    Yes.

21    Q.    And that would be something you needed to focus on

22    when you came in, correct?

23    A.    Oh, yeah, after I came in, that would be one of the

24    major focuses.

10:59:10 25    Q.    Right.

```
 1              And part of that is because that is, in

 2    fact, the reason you were brought in; you knew the

 3    company was having these financial issues, these legal

 4    troubles, Josh needed help, and they chose you to kind of

10:59:22  5    come in and help right the ship?

 6    A.    Yes.

 7    Q.    All right.  And when you came on board, and I guess

 8    during that process you would have worked with Mr. Scott

 9    and Mr. Flood trying to get up to speed and learn about

10:59:38 10    the company as much as possible so you could handle these

11    functions.

12                    Fair?

13    A.    Mostly Josh Flood.

14    Q.    Mostly Josh Flood?

10:59:47 15    A.    As I said, when I was asked that question before

16    when I met Charlie Scott, I'm not sure when it was.

17                    It was several months after I started doing

18    the consulting work on a part-time basis.

19    Q.    Got it.

11:00:00 20    A.    I had never -- I think I had talked to him on the

21    phone, and then at some point we had a conference call,

22    video call.

23                    I had been there, I think, at least three

24    or four months.

11:00:13 25    Q.    Okay.
```

Hipple - Cross

510

1    A.    Never been up there.

2    Q.    That was --

3    A.    That was the first time that I learned that Charlie

4    Scott was a black man.

11:00:20 5    Q.    Got it.

6    A.    Didn't even know it.

7    Q.    So fair to say then that Mr. Scott was relying on

8    you to handle these functions for him, trusting you to be

9    the CFO and the general counsel?

11:00:32 10    A.    I think I was second place after Josh Flood.

11              He relied primarily on Mr. Flood, and I

12    dealt with Josh Flood --

13    Q.    Got it.

14    A.    -- daily.

11:00:42 15    Q.    And so it wouldn't surprise you that Mr. Scott

16    described you as his consigliere, kind of his right-hand

17    man who takes care of him?

18    A.    Yes.

19              We've gotten much closer since Mr. Flood

11:00:55 20    left, and I work with him on a daily basis.

21    Q.    Yeah.

22              And about Mr. Flood, you indicated that he

23    was once the CFO and President.

24              Is that right?

11:01:06 25    A.    I think he was President, and he presented himself

Hipple - Cross                                    511

1    to me as the CFO.

2    Q.    Okay.  But then he stepped down as an officer of

3    the company?

4    A.    Yes.

5    Q.    Do you know why?

6                    MR. DeVILLERS:  Objection.

7                    May we approach, Your Honor?

8                    (Proceedings at side-bar:)

9                    MR. DeVILLERS:  They know why.

10                   This long conversation with Mr. Abreu of

11   many months ago, Mr. Flood is in prison for child

12   pornography, and I think the 403 objection is my

13   objection.

14                   I don't see how it's relevant, and it's

15   certainly inflammatory.

16                   MS. MILLER:  I think it goes to who has

17   been running this company and, you know, I think I could

18   lead him through it.

19                   I could just ask if there was a sentence,

20   without getting into the underlying charge.

21                   MR. DeVILLERS:  I don't see how that's

22   relevant.

23                   THE COURT:  I guess I agree with the 403

24   objection.

25                   I'm not sure we even need to go there at

Hipple - Cross

512

```
        1    this point.
        2                    MS. MILLER:  Okay.
        3                    (End of side-bar conference.)
        4    BY MS. MILLER:
11:02:43 5    Q.    So without telling us why Mr. Flood left, fair to
        6    say he kind of abruptly disappeared from the company?
        7    A.    The answer to your question is no, I don't know.
        8    Q.    You don't know why he left?
        9                    But he was gone at some point, right?
11:02:58 10   A.    No, he told me he was pulling back.  He wasn't
        11   gone.  Yeah, he was pulling back and had something to do
        12   with a personal matter.
        13                   He was in a nasty divorce.  He lived in
        14   California and was commuting back and forth.
11:03:13 15   Q.    Okay.
        16   A.    I assume from that that the travel was creating
        17   havoc with his other issues.
        18   Q.    All right.  So when you come in, you've kind of
        19   learned the background and history of the company from
11:03:28 20   Mr. Flood.
        21                   That's fair?
        22   A.    Mr. -- Mr. Flood, Dr. Korangy, some from Charlie
        23   Scott himself as he got more and more involved, yeah.
        24   Q.    Okay.
11:03:41 25   A.    Various people.
```

Hipple - Cross                                    513

1    Q.    Yes.

2                 And we talked about -- Mr. DeVillers asked

3    you about your conversation with Mr. Jason Dean, and you

4    said you don't really have a recollection of that

11:03:52  5    conversation, correct?

6    A.    Um-hmm.

7    Q.    But would -- do you recall giving Mr. Dean a

8    background overview of CareClix during your

9    conversation?

11:04:06  10   A.    I think I did.  I think that's the reason I was

11   there.

12   Q.    Okay.  And so your purpose of kind of getting on

13   this call was to explain, "Hey, this is what CareClix is

14   about," and you were presenting that to Mr. Dean on

11:04:18  15   behalf of the company and Mr. Scott.

16                 Right?

17   A.    Yes.

18   Q.    Okay.  And so during that conversation, you told

19   Mr. Dean, did you not, that the company was created

11:04:27  20   through a reverse merger?

21   A.    I'm sorry?

22   Q.    You told Mr. Dean that the company was created

23   through a reverse merger, correct?

24   A.    Yes.

11:04:37  25   Q.    Okay.  But you just testified you don't know what a

1    reverse merger is.

2    A.    That I don't know?

3    Q.    Yes.

4    A.    No, I know what a reverse merger is.

11:04:45 5    Q.    Oh, okay.

6    A.    This was not a reverse merger.

7    Q.    It was not a reverse merger?

8    A.    No.

9    Q.    So then why did you tell Mr. Dean that it was a

11:04:53 10    reverse merger?

11    A.    Because it was easier to explain that way.

12              It had been acquired originally as a

13    reverse merger by Charlie Scott and Mr. Flood.  They had

14    put another business in there.

11:05:06 15    Q.    Okay.

16    A.    This is just an acquisition of a software, and they

17    formed a subsidiary with it.

18    Q.    Okay.  And maybe we're talking about two different

19    time periods.

11:05:15 20              I'm going back to what you told Mr. Dean

21    about the origin of SOLI and CareClix itself.

22              And you told Mr. Dean that in 2016 and '17,

23    around that time period, that SOLI was formed by a

24    reverse merger.

11:05:30 25              Is that true or not?

Hipple - Cross                                        515

1   A.   That's, in fact, how it was formed.

2   Q.   Okay.

3   A.   But it wasn't with CareClix.

4   Q.   And you know that from information from Mr. Flood

11:05:40  5   or Mr. Scott, right?

6   A.   From the SEC filings and from the company files.

7   Q.   And you also know that Mr. Scott acquired the shell

8   for that reverse merger from Mr. Spivak, correct?

9   A.   That, I didn't know.

11:05:57 10   Q.   Oh, so that was something that you weren't privy to

11   as the CFO of the company?

12   A.   It wasn't relevant to anything I was doing.

13   Q.   Well, and nobody thought it was relevant to tell

14   you that fact, correct; Mr. Scott or Mr. Flood?

11:06:13 15   A.   It wasn't an issue.

16   Q.   Okay.

17   A.   I learned later that Mr. Spivak had been the party

18   that introduced it, but I had no idea what that relation

19   was or anything else.

11:06:24 20        I just knew that there was a company that

21   had been acquired two or three years earlier in a reverse

22   merger, and they put some company called Clinical and

23   Herbal in it.  I didn't know what that did.

24        That company was sold off shortly after the

11:06:43 25   CareClix companies came in, and it was history.

Hipple - Cross

1    Q.    So nobody bothered to tell you at the time that

2    Mr. Spivak is the one who gave that shell?

3    A.    No.

4    Q.    And did you know then that Mr. Spivak is a sizable

11:06:56 5    investor in SOLI?

6    A.    No.

7    Q.    Nobody told you that he holds a lot of shares in

8    that company?

9    A.    Mr. Scott owns by far the majority.  I think

11:07:10 10   Dr. Korangy was the next largest.

11   Q.    But that wasn't my question.

12              Nobody told you that Mr. Spivak also held

13   shares in the company?

14   A.    No.

11:07:18 15   Q.    That was again --

16   A.    Not particularly.

17   Q.    That was something that Mr. Flood or Mr. Scott

18   thought wasn't relevant financial background you would

19   need to know about the company?

11:07:31 20   A.    I guess not.  I guess not.

21   Q.    Okay.  And we talked about Mr. Flood a little bit,

22   but you knew that he had 11 million shares of SOLI,

23   right?

24   A.    I knew that he had shares.  I can't tell now how

11:07:43 25   many those shares were.

```
          1    Q.    Well, did you know if they were free trading or

          2    restricted?

          3    A.    Well, I had access to the shareholder list and I

          4    went through that, and part of the reporting is major

11:07:53  5    shareholders which is either more than five percent or

          6    more than ten percent of the total outstanding.

          7    Q.    And where was that percentage for Mr. Flood?

          8    A.    I think -- I think he had about more than five

          9    percent, and I don't remember if he had more than ten

11:08:07 10    percent of the outstanding shares.

         11    Q.    Okay.  You mentioned five and ten percent.

         12                What's -- why are you mentioning five and

         13    ten percent?

         14                Why not four and eight?  What's the

11:08:19 15    relevance to that?

         16    A.    Those are SEC reporting standards.

         17                If someone owns a certain percentage of the

         18    stock of a company, a public company, you have to

         19    disclose that.

11:08:27 20    Q.    Why do you have to disclose that?

         21    A.    When?

         22    Q.    Why?

         23    A.    So investing, people that are investing in the

         24    market know who controls it, they have access to that

11:08:39 25    information.
```

Hipple - Cross

1   Q.    Why is who controls the stock important to disclose

2   or could be important to the investing public?

3   A.    Well, if you're investing in a company as a private

4   individual, you want to know who, who's managing your

11:08:52  5   money.

6   Q.    Um-hmm.  And if -- well, about that disclosure, can

7   you tell us does it matter if they are free trading or

8   restricted?

9         Do you have to disclose if it's restricted,

11:09:05  10   or only free trading?

11         How does that work?

12   A.    Well, those, if you are an SEC reporting company,

13   all of those things are reported.

14         The individual who owns above a certain

11:09:17  15   percentage, five or ten percent, depending on the

16   circumstances, has to file a periodic report as an

17   individual disclosing their ownership.

18         Technically they are Forms 3, 4 and 5.  And

19   you file a Form 3 to show that you own that much.  A Form

11:09:40  20   4 is a change.  And a Form 5 is an annual report.

21   Anytime your ownership changes, you have to report it.

22   Q.    Got it.  And so the company itself can't hold

23   free-trading shares, fair?

24   A.    Yeah, but by late 2019, early 2020, the company was

11:09:57  25   no longer an SEC reporting company and technically didn't

1    have those reports any more.

2    Q.    And we'll get to that in a minute.

3              But part of that whole when a company needs

4    to disclose and what forms are being filled out, that's

11:10:11  5    all things that you were handling as the general counsel

6    during your tenure there, right?

7    A.    I was not handling the individual reports.

8    Those --

9    Q.    But you were advising on that in your capacity as

11:10:22 10    general counsel?

11   A.    I think I advised the Board of Directors generally

12   that they had that obligation as an insider.

13   Q.    Right.

14   A.    Directors and officers have to report regardless of

11:10:31 15    ownership.

16   Q.    And fair to say there was no one higher than you in

17   the company in terms of the legal authority?  I mean

18   that's the purpose of a general counsel.

19              All right.  Now, you said that there was a

11:10:47 20    glitch in the company's trading at some point, and you

21   also just mentioned that, you know, the company had some

22   issues that came about with respect to its trading.

23              So that glitch, sir, that was because the

24   SEC essentially suspended trading of SOLI, correct?

11:11:07 25    A.    Yes.  I believe that was in August of 2020.

Hipple - Cross

520

1    Q.    Yes.  Actually it's April 10th, 2020.

2              And that order of suspension of trading was

3    issued by the SEC because of questions regarding the

4    accuracy and adequacy of information in the marketplace

11:11:27  5    since at least March 16th, 2020.

6              Is that right?

7    A.    I think that's what it said, yeah.  That's pretty

8    standard for those kinds of orders.

9    Q.    Okay.  And it was the opinion of the Commission

11:11:40  10    that the public interest and the protection of investors

11    required that suspension of trading in SOLI securities,

12    did it not?

13    A.    Yeah.  That's what they're required to find if they

14    want to do a suspension.

11:11:52  15    Q.    Right.

16              But then when you spoke with Mr. Dean, you

17    told him that this -- well, and let me back up there.

18              The reason that there were questions

19    relating to SOLI's statements was about a press release

11:12:09  20    that the company issued on March 16th, 2020 and March

21    18th, 2020.

22              Correct?

23    A.    I believe so, yes.

24    Q.    And that was a press release on a national cable

11:12:20  25    news program interview with the Chief Executive Officer

1    of its wholly owned subsidiary CareClix about the ability

2    of CareClix to provide COVID-19 testing kits that would

3    allow a patient to submit a testing sample from home,

4    right?

11:12:38   5    A.    Yes.

6    Q.    And that was what the SEC found had questions of

7    accuracy and adequacy of information, right?

8    A.    Yeah.

9    Q.    You told Mr. Dean, when you spoke with him, that

11:12:53  10   that program had been vetted through FDA requirements,

11   did you not?

12   A.    I don't recall specifically but --

13   Q.    Well, how did you know?  How did you know the

14   program was vetted through FDA requirements?

11:13:05  15   A.    You know, I can explain that situation, if you'd

16   like.

17   Q.    Well, and we can talk about the situation, but I'm

18   asking specifically how you knew that it had been vetted

19   through FDA requirements as you told Mr. Dean.

11:13:17  20   A.    Well, because we had gone through -- we had gone

21   through the requirements before that press release was

22   issued of offering -- this is part of the COVID --

23   Q.    Yes.  This is the beginning of the pandemic, right?

24   A.    Yeah.  And the press release had indicated that the

11:13:43  25   company was going to be able to provide the COVID

1    vaccines through the telemedicine operation.

2                So you can either call up a doctor on the

3    phone, or do a videoconference, discuss the symptoms and

4    get the vaccine, and it would be sent to you by a

5    national farm -- registered pharmacy company.

6                That was the program that had been vetted

7    and approved by the company, and they did a press

8    release.

9    Q.   Well, and that's the same press release and program

10   that the SEC apparently disagreed.

11               Fair?

12   A.   Well, they didn't actually know when they did that,

13   that order.

14               That order was an order that affected, I

15   don't know, 20, 30, 40 companies, and they do these

16   periodically when it appears that there's a, like a

17   feeding frenzy going on in a particular area, they stop

18   all the trading to see are some of these companies really

19   doing this, or are they just fraudsters trying to sell

20   stuff.

21               It's going on right now with the diet

22   drugs.

23   Q.   Okay.

24   A.   I fully expect we're going to get an SEC order

25   stopping all the diet drugs because they really don't do

```
 1    it.
 2    Q.    Got it.
 3    A.    We got a letter later from the SEC and demanded it
 4    saying that the company was not under investigation.
11:15:13  5    Q.    So this order says, "In the matter of Soleil
 6    Systems Inc., file number 501," and there's no other
 7    entity listed on it.
 8              Would you like to see it?
 9    A.    No, that was a specific one because of that
11:15:27 10    announcement.
11              There were, if you look at the same period
12    of time, there's multiple other companies that were shut
13    down.
14    Q.    Oh, so it's your testimony --
11:15:36 15    A.    Exactly the same thing.
16    Q.    So it's your testimony then that the SEC was wrong
17    here?
18              It's your testimony that the SEC was wrong
19    here?  There was nothing inaccurate or inadequate about
11:15:46 20    your press release?
21    A.    No.  I think everything's fine.
22    Q.    All right.  Good to know.
23              Now, moving on, after this -- as you put
24    it -- glitch in the trading, the SEC suspension, the
11:15:59 25    company got put on the Grey Sheets, correct?
```

1    A.    On what?

2    Q.    The Grey Sheets, as you testified on direct.

3    A.    Yeah, well, that -- that's a national consequence

4    of that kind of a suspension order.

11:16:10  5    Q.    Right.

6    A.    The suspension order is designed so the SEC can

7    stop everything and take a look, and if there's nothing

8    wrong, then restart the trading.

9    Q.    And the Grey Sheets actually is called caveat

11:16:26  10    emptor, right?

11                    Caveat emptor, buyer beware?

12    A.    Yeah.

13    Q.    Yeah.

14                    And caveat emptor warns public investors

11:16:34  15    that the stock, SOLI, could be the subject of promotional

16    activity without adequate current information, or that

17    there is ongoing fraud investigation involving the

18    company?

19                    Isn't that what caveat emptor means?

11:16:47  20    A.    That's the standard that happens with these things.

21    Q.    Yeah.

22    A.    And that's really been kind of the problem with the

23    company since that.

24    Q.    Right.

11:16:56  25    A.    When the SEC issues an order like that and they

1    suspend trading, one of the consequences from the OTC

2    Market company is that they immediately remove you from

3    the regular trading markets.

4    Q.    Right.

5    A.    No questions asked, you're gone.

6              You cannot just get back on there.  You

7    have to go through a whole process to get relisted and

8    reestablished.

9              And the OTC Markets reporting thing which

10   is what you were just -- said you had four categories:

11   You're either in good standing, you're in a warning

12   status, you're at a severe warning status, or you're shut

13   down.

14   Q.    Right.

15   A.    And when you get a suspension, you get the worst

16   one which is the skull and crossbones and beware, beware.

17   Q.    Right.

18              Fair to say it's pretty darn hard to

19   attract investors in your company --

20   A.    Yeah.

21   Q.    -- with a big old skull and crossbones on your

22   ticker symbol, right?

23   A.    Yeah.

24              And that's why the company wasn't offering

25   stock or doing anything in the stock market for that

1    period of time.

2    Q.    In 2020 when you had the caveat emptor?

3    A.    No, from 2020 on through the end of 2021.

4    Q.    Right.

5          And during that same time, SOLI also had

6    issue with some delinquent filings, did it not?

7    A.    Well, yes.  We had an issue with the auditor.

8          When the audit firm that the company was

9    using at that time saw the suspension, they resigned as

10   the auditors.

11   Q.    Right.

12   A.    And --

13   Q.    Had to bring on new auditors, didn't you?

14   A.    We had to get new ones, but that's not an easy

15   thing to do, yeah.

16         And the auditor actually eventually, after

17   several months of conversation, agreed to come back in as

18   the auditor, and they started the audit, but it took them

19   a year or more to get the audit done.

20   Q.    Well, and specifically the auditor had issue with

21   the convertible notes, right; the valuation of one of the

22   convertible notes?

23   A.    They didn't have a problem with them.

24         They are just some very complicated

25   accounting rules that deal with how you report

1    convertible notes.

2    Q.    Oh, and so the auditors were wrong on the issue of

3    the convertible notes?

4    A.    No, they weren't wrong.

5              It's just it's a very complicated thing,

6    and they had to get that done.  We had to go to a third

7    party to get the valuation of the derivatives.

8    Q.    And so you hired that outside evaluation group to

9    essentially review the acquisition of these assets,

10   right?

11   A.    I think Josh Flood and I talked to the outside

12   group and hired them.

13   Q.    Right.

14             You just testified you brought in this

15   third party outside evaluation group in the process of

16   the audit, right?

17   A.    Yeah.

18   Q.    Okay.

19   A.    In talking with the auditor, because under the

20   accounting rules they can't do it, they can't make this

21   kind of calculation.

22             It's a very, very difficult calculation.  I

23   don't even -- I don't know how to do it.  So our auditors

24   couldn't do it.  We had to hire somebody else, another

25   accounting firm, and that's what this group was, a group

1    of accountants that specialized in doing this kind of

2    thing.

3    Q.    And so because of all of this, you've got the

4    suspended trading, the caveat emptor, the auditing

11:20:08  5    issues, that is what precipitated SOLI's delinquent

6    filings for the second and third quarters of 2020?

7    A.    I -- yeah.

8    Q.    Yeah.

9    A.    Basically, these are all the issues that Josh Flood

11:20:24 10    was concerned about when I came in.

11    Q.    That you inherited when you came in, right?

12    A.    Yeah.

13              And it took awhile to get it all fixed and

14    straightened out, and eventually it was done.

11:20:34 15    Q.    Right.

16              And so one of the things when you come in,

17    you're like how do we get money into the company now with

18    all of these things going on that we just talked about?

19    A.    There were conversations, and it made it a lot more

11:20:47 20    difficult because the traditional investment banking

21    firms look at this and say, "Well, you know, when you're

22    through with all that come back and we'll talk.  We like

23    the market, we like the telemedicine, we like the

24    company.  Get it all cleaned up."

11:21:02 25    Q.    Right.

Hipple - Cross

529

1          And so one of the things that you're

2     working toward is trying to get the stock ticker off of

3     caveat emptor?

4          You want to be able to trade again, fair?

11:21:11  5     You want to make investment money?

6     A.    Wanted to be in a position that the company stock

7     would be public and traded and fully reporting again with

8     the SEC and traded on a more sophisticated market like

9     the New York Stock Exchange or NASDAQ.

11:21:30 10    Q.    Right.

11          And you said that the traditional

12    investment banks, they really wouldn't take a look at

13    this.  They were -- they were kind of hands off?

14    A.    Not really.

11:21:41 15          Traditional kinds of stock market investors

16    don't do small public companies like this.  It's always

17    very difficult for small public companies to raise

18    capital.

19    Q.    Right.

11:21:55 20    A.    If you're a tech company, you can do an IPO and

21    everybody buys the stock thinking they're going to make a

22    fortune.

23          But an operating company with revenues, the

24    stock market is not an easy place to be.

11:22:09 25    Q.    Right.

Hipple - Cross

530

1          And so when Mr. Dean came in and said, "In

2     a perfect world, if I walked in with my whales and all my

3     big guys, what type of cash would you guys be looking to

4     put together and how soon," your response is, "Well,

11:22:23  5     yeah, but we want to do it in stages," right?

6     A.    Yeah.  We -- the company always needed money to

7     grow, and the one who is writing the check basically

8     decides how that investment is done.

9          And people come in and say, "I'll give you

11:22:40 10     X dollars, but I want 60 percent of the stock" or "I

11     want, you know, 30 percent interest," or -- yeah.

12          You have to find something that makes sense

13     with your company, your shareholders, and the growth of

14     the company.

11:22:56 15     Q.    And so from your point of view, your stock price

16     was way down, and you told Mr. Dean that you were looking

17     to get it up to about a dollar?

18     A.    That wasn't the focus.

19     Q.    But is that what you said to Mr. Dean?

11:23:10 20     A.    I may have, but the real focus was trying to raise

21     funds for operating the company.

22     Q.    Okay.  So Mr. Dean asked you what the capital

23     structure looks like, and you responded, "About 60 to

24     70" -- well, I'm sorry, he asked you how much of the

11:23:30 25     capital structure is insider held and how much is in the

Hipple - Cross

1    street, and you responded, "About 70-plus on the inside."

2                  Did you not?

3    A.    Probably.  That was about right.

4    Q.    And you're talking about -- you're talking about

11:23:44 5    shareholders, 70-plus percent of the shareholders are

6    insiders, right?

7                  I mean, that's --

8    A.    No, 75 percent of the holdings was held by

9    insiders.

11:23:57 10   Q.    Right.

11   A.    And there was, I think, three people.

12   Q.    Right.

13                  And you said a lot of the other stuff

14   that's out there is not on the street; it's still

11:24:05 15   restricted?

16   A.    Yes.

17   Q.    And a lot of people don't know how to get that

18   stock clear, restricted 144 stock for a company that's

19   caveat emptor, right?

11:24:13 20   A.    Yes.

21   Q.    And you told Mr. Dean, "That's tied a lot of it up,

22   fortunately," right?

23   A.    Yeah.

24   Q.    And it's fortunate because that means it's still

11:24:25 25   insider, as you explained it to Mr. Dean?

1    A.    Yeah.

2                I mean, that's the structure of the

3    company, they had three or four insiders who owned most

4    of the company, and there were some shareholders that

11:24:37  5    were inherited from the old shell days, and then there

6    were inside new investors that were brought in after it

7    became a telemedicine company.

8                They were brought in primarily as debtors.

9    Q.    Right.

11:24:53  10                And you were on the phone then when

11    Mr. Dean explained to you that he works with some groups,

12    right?

13    A.    Yes.

14    Q.    That have done Pink Sheet and Grey Sheet deals,

11:25:03  15    correct?

16    A.    I don't remember that specifically, but my

17    understanding was that he was representing a group with

18    $800 million to invest.

19    Q.    Right.

11:25:11  20                And he also told you that they take a big

21    position in the stock before the price goes up, right?

22    A.    I don't recall that.

23    Q.    Well, do you -- would it refresh your recollection

24    if I showed you a transcript of that call, or do you have

11:25:25  25    any reason to disbelieve me?

Hipple - Cross

533

1    A.    If it's there, then it's there, right?

2                It wouldn't refresh my recollection

3    probably.

4    Q.    Okay.  And in response to Mr. Dean saying that,

11:25:35 5    that his people take a big position in the stock price

6    before it goes up, you say, "Yeah, as a target, CareClix

7    is probably an excellent one."

8                Do you not?

9    A.    Yeah.

11:25:48 10               There's enormous potential of the company

11   once we got the shares trading again and we gave -- the

12   aim was to get it as a NASDAQ company, fully trading

13   public company, fully --

14   Q.    You're talking about shares here, sir.  You're not

11:26:04 15   talking about raising funds through convertible notes,

16   are you?

17   A.    No.

18   Q.    Right.

19               You're talking about shares?  You're

11:26:11 20   talking about a stock price?

21   A.    Well, the -- the idea was to do an initial public

22   offering of the company, which basically says, "Here's

23   this company, here's the business, this is where it's

24   going, and we're selling a part of this company through a

11:26:31 25   registered offering with the SEC."

1       You have to file a whole lot of information

2    and disclosures, and then people have the right to invest

3    in the stock.

4    Q.    Right.

5          And the words that you and Mr. Dean used

6    and the nature of your discussions was about getting the

7    stock trading again and getting the stock at a higher

8    price, as we just talked about, right?

9    A.    Sure.

10   Q.    Okay.  Now, I want to back up and talk a little bit

11   about the TeleMed structure that you discussed with

12   Mr. DeVillers.

13         Now, it's about 2021, fair, when

14   you're -- we're moving to the 2021 period.

15         You're still general counsel, you're still

16   CFO of this company?

17   A.    Yes.

18   Q.    And the company is still caveat emptor, still

19   hasn't been able to make its filings up-to-date for the

20   SEC, right?

21   A.    Yes.

22   Q.    And yet you told Mr. Dean that CareClix had

23   relationships with Pfizer?

24   A.    Yes.

25   Q.    Pepsi?

Hipple - Cross

1    A.    Yes.

2    Q.    American Express?

3    A.    Yes.

4    Q.    And was on track to do about ten million in

11:27:44  5    revenue?

6    A.    Yeah.  That would have been about that time, yes.

7    Q.    Okay.  Even though financial institutions and

8    traditional bankings wouldn't touch you?

9    A.    Say that -- I'm sorry.

11:27:56 10    Q.    Even though traditional financial institutions and

11    banks wouldn't touch the company.

12    A.    No, I wouldn't say it that way, but the company had

13    the issues with the public markets, and needed to fix all

14    those issues.

11:28:14 15           But that didn't affect the operating side,

16    the operating side of the business.

17    Q.    Okay.

18    A.    And it is on the operating side that American

19    Express, Pfizer and all those companies were customers of

11:28:28 20    the telemedicine.

21    Q.    Well, and on that operating side it was CareClix's

22    structure, proposed structure, if you will, that you

23    would have a subscription agreement for TeleMed services,

24    correct?

11:28:43 25           That's how you explained it; that

1    essentially people and companies would pay a fixed fee up

2    front every month to be able to see a doctor at will, or

3    however many times during the month that they wanted to?

4                    That's what you explained to Mr. Dean?

11:28:58  5    A.    Not really.

6                    It was not a subscription.  It was not

7    individuals at that time that were subscribing for it.

8    That's a current model that is being worked on.

9                    The customers of CareClix Inc. were

11:29:16 10    primarily associations, unions, corporations, people that

11    had a lot of members, employees and things like that.

12                    And the telemedicine was an add-on

13    employment or association benefit that the employer or

14    the association provided to its employees.

11:29:43 15    Q.    Fair enough.  Sir --

16    A.    The customers were the companies.

17    Q.    Right.

18                    So fair enough, you're offering this

19    subscription agreement to companies to offer on behalf of

11:29:54 20    their employees or members?

21    A.    Well --

22    Q.    I mean, you described it as a subscription

23    agreement?

24    A.    Well, it wasn't really a subscription.  That's kind

11:30:01 25    of like an individual is signing up to subscribe.

```
 1                 It was a contract between the CareClix Inc.
 2    and the companies, and the contract basically provided
 3    that CareClix will provide access to the telemedicine
 4    service to all of the employees, members, or other
 5    associates of this entity.
 6                 The entity would then pay X dollars per
 7    member per month.  That was the process.
 8    Q.    All right.  And so I guess we can agree to disagree
 9    on whether that's a subscription agreement or a contract,
10    but that's the arrangement, right?
11    A.    Yeah.
12    Q.    And that's the arrangement that you told Mr. Dean,
13    and you also discussed the margin for that arrangement
14    with Mr. Dean, right?
15    A.    Probably.  That would be part of the finances of
16    the company.
17    Q.    And that margin depends on utilization?
18    A.    Say again.
19    Q.    That margin would depend on utilization?
20                 So in other words, you get to keep the
21    upfront fee from the company or the union at very little
22    cost to you, and you make money by hoping that these
23    people don't actually use the services.
24                 Right?
25    A.    That's -- that's how the model is built, yes.
```

1    Q.    Right.

2              And so that's what you meant when you told

3    Mr. Dean, "The fewer people that use it, obviously the

4    better off we are"?

11:31:23    5    A.    I don't recall that.

6    Q.    And you also had salespeople that were going to

7    sell these agreements to these employer groups or these

8    unions, right?

9    A.    Yes.

11:31:36   10    Q.    And the salespeople do these through call centers?

11    A.    I don't know if there was a call center.

12              There were outside salespeople that were

13    selling the access to the system.

14    Q.    Well, you told Mr. Dean that you wanted to get the

11:31:49   15    call centers up and running, right?

16    A.    Well, we had a call center that handled the actual

17    processing.  When a person called in, they called the

18    call center so --

19    Q.    So Mr. Scott had call centers at his disposal?

11:32:06   20    A.    Yeah.  Those are call centers, too, and they are

21    still call centers today.

22              The call centers are to manage the patient

23    interaction with the doctor.  They call into the call

24    center, they provide their financial information, medical

11:32:22   25    history, they arrange for the appointments through the

Hipple - Cross

539

```
 1    call center, and then the appointment's scheduled with

 2    the doctor.

 3    Q.    Right.

 4                And then just moving to press releases, you

 5    also discussed those with Mr. Dean, did you not, in

 6    connection with this conversation you had?

 7                And you told him that the company was not

 8    doing press releases intentionally; that you were waiting

 9    to get the listing back up and current, and then you'll

10    start with press releases and the usual kind of stuff,

11    but, as you said, what's the point right now; why waste

12    it?

13    A.    I'll take your word for it.  I don't recall that.

14    Q.    And you weren't going to put out press releases

15    that were just going to sit there, right?

16                You were going to save those up and wait

17    until the stock price could get going?

18    A.    Well, the company was not a reporting company at

19    that point and it was not even a trading company at that

20    point, so --

21    Q.    So why waste your --

22    A.    There was no -- there was no legal requirement to

23    issue press releases, and they're expensive so --

24    Q.    Fair enough.

25    A.    -- there was no reason to do it.
```

Hipple - Cross

540

1    Q.    Now --

2    A.    There was no promotion going on.

3    Q.    Now, I want to go back to your history, and we

4    covered it for about ten minutes, your educational

11:33:39  5    background, your employment history, but I don't believe

6    we talked about in December of 20 -- or in December of

7    2004, that you formed a company called iWorld, right?

8    A.    I don't think I actually filed it, yes, but I was

9    involved with it down in Texas.

11:33:58  10   Q.    All right.  And in your involvement with iWorld, it

11   was formed by obtaining two public blank check shell

12   companies, correct?

13   A.    I would guess, yes.

14   Q.    And you caused those shells to merge together?

11:34:14  15   A.    Yeah, I don't remember the mechanics, but there

16   were --

17   Q.    By issuing preferred shares, meaning preferential

18   shares of one of the companies to nominee shareholders

19   that included your wife and a college-aged employee, did

11:34:29  20   you not?

21   A.    I -- yeah.

22   Q.    And that allowed your folks to obtain a controlling

23   interest in that company and approve iWorld's merger with

24   iWorld Florida, correct?

11:34:42  25   A.    Yeah.

1          The operating business was in the Florida

2     company.

3     Q.    Okay.  And then you filed an SEC Form 8-K, which is

4     basically a form you have to file notifying the public of

11:34:55 5     a big event in the life of a company, correct?

6     A.    Yes.

7     Q.    And you announced that merger and you said that the

8     transaction was valued at $10 million, right?

9     A.    I think that was based on the stock price at the

11:35:10 10    time.

11    Q.    But you didn't disclose in your Form 8-K filing

12    that you controlled both iWorld and iWorld Florida,

13    right?

14    A.    I don't -- I don't recall.

11:35:23 15    Q.    And that the merger was not arm's length and,

16    therefore, was a related party transaction?

17    A.    I think that was in the filings.  It was where it

18    came from.

19    Q.    And you also didn't disclose that because you

11:35:36 20    controlled both sides of the transaction, you could prop

21    up that $10 million figure with speculation, right?

22    A.    I don't think there was any speculation.

23          That was just the stock price of the

24    company and the number of shares that were outstanding,

11:35:54 25    and that was the value.

Hipple - Cross                                    542

1        Q.    The SEC found, did it not, sir, that that

2        $10 million figure was materially false and misleading

3        since they were wholly speculative and unsupported, did

4        it not?

11:36:08  5     A.    Yeah.

6                     When that whole thing came up, the issue

7        was there had been an acquisition of several different

8        assets by the company that I think the purchase price or

9        the way it was acquired supported the $10 million, but

11:36:29 10     when you have a situation like that, you have to review

11       those valuation figures annually when you do your annual

12       reports.

13                    And it probably would have been written

14       down on the December 31st -- what year was that -- 2003

11:36:46 15     or '4, as a nonoperating asset.

16                    And the real issue was whether it should

17       have been written down before that.

18       Q.    So do you disagree with the SEC that the

19       $10 million figure was "materially false and misleading

11:37:01 20     since they were wholly speculative and unsupported"?

21       A.    No.

22       Q.    And then with that $10 million figure, you then

23       filed three quarterly reports in which you continued to

24       maintain this $10 million valuation despite evidence that

11:37:16 25     the value was deflating, decreasing, all the way down to

1    pretty much nothing, right?

2    A.    No, it was just reported the same way until the

3    annual report was due for the end of the year.

4              We have to re -- have to review all the

11:37:33 5    things like that and make that determination.  That's the

6    standard process.

7    Q.    So you just filed the three quarterly reports using

8    the same information from the SK and didn't bother to see

9    whether it was accurate at the time?

11:37:46 10   A.    Yeah, from what I knew, I thought they were

11   accurate.

12              This was a construction project, I think,

13   in the Houston area.  I was in Florida at the time, so

14   yeah.

11:37:59 15   Q.    And then you lied and told iWorld's auditor that an

16   independent investment board had approved that

17   $10 million valuation?

18   A.    No, that's not true.

19   Q.    You didn't, okay.

11:38:08 20             So then did the SEC sue you, or not, on

21   July 9th, 2019 alleging that you willfully violated

22   Sections 10(b) and 13(b)(5) of the Securities Exchange

23   Act?

24   A.    That's what they alleged.

11:38:26 25             I didn't agree to it.

Hipple - Cross                    544

1    Q.    Okay.  Well, and they alleged that you did that by

2    fraudulently reporting the value of iWorld's investments,

3    failing to conduct a required asset valuation, failing to

4    make and keep requisite books and records, failing to

11:38:40  5    maintain a system of sufficient internal accounting

6    controls, and misleading iWorld's auditors.

7              You didn't do any of that?

8    A.    No.

9    Q.    Oh, okay.

11:38:48 10              And so when the SEC found on March 11th,

11    2010, issuing an order, that you willfully violated

12    Section 10(b) of the Securities Exchange Act and Rule

13    10b-5 prohibiting fraudulent conduct in connection with

14    the purchase or sale of securities, they were wrong

11:39:06 15    again, the SEC?

16    A.    No.  That was a consent order.

17    Q.    Okay.  And you know that's the same statute that's

18    at issue in this case here, right?

19    A.    Yeah, you either do that or you go through the

11:39:17 20    whole process of litigation and expense, and this is an

21    easy way to resolve the issue.

22              If you'll read the beginning of that, it

23    says I didn't agree with any of it, but I wasn't arguing

24    with their -- what they were saying.

11:39:33 25              They could say it, and I would consent to

1    an order.

2    Q.    Okay.  And so you then agreed or you were ordered

3    to cease and desist from committing any future violations

4    of the Securities Exchange Act, right?

11:39:45 5    A.    Yes.

6    Q.    And you were barred from acting as an officer or

7    Director of any securities issuer for five years, right?

8    A.    Yeah.  That's what we -- that's what we consented

9    to.

11:39:53 10   Q.    Right.

11                And you were barred from associating with

12   any securities entity for five years, right?

13   A.    Yeah, that's what we agreed.  That was the

14   settlement.

11:40:03 15   Q.    What did Mr. Scott say when you told him about your

16   history?

17   A.    They had concerns about it, but, you know,

18   explained the circumstances.  And I was acting as a

19   consultant on regulatory compliance.

11:40:13 20   Q.    And so --

21   A.    Not an officer or Director of the company.

22   Q.    So your consulting job involved sending information

23   to auditors?

24   A.    Yes.

11:40:21 25   Q.    Finding independent evaluation companies to value

Hipple - Cross                                          546

1    the companies' figures?

2    A.    Yes.

3    Q.    Maintaining the company's books and records?

4    A.    Yes.

11:40:31  5    Q.    And providing legal advice about SEC compliance?

6    A.    Yes.

7    Q.    All right.  And so, too, I think when we were going

8    through your history, you didn't mention what you were

9    doing in 2013.

11:40:44  10             And so in March and April of 2013, you

11   still would have been under that five-year SEC

12   suspension, right?

13   A.    I'm not sure how long.

14   Q.    Okay.  We can do the math.

11:40:55  15             The order -- even I can do this math -- was

16   in August of 2010 and so March, April of 2013, that's

17   less than five years; you'd agree?

18   A.    Yes.

19   Q.    All right.  And despite that, in March and April of

11:41:08  20   2013, you were involved in marketing stock for SK3 Group

21   Inc. trading under the ticker symbol SKTO, right?

22   A.    I don't think I had anything to do with marketing a

23   stock.

24   Q.    Well, you had convertible notes in SKTO, right?

11:41:24  25   A.    Yeah.

1    Q.    Right.

2    A.    I was providing legal advice, the same kind of

3    stuff I've been doing for 30 years.

4    Q.    And SKTO, from July 2010 to March 2013, it had

11:41:36  5    barely been trading; minimal, di minimus trading

6    activity?

7    A.    Yeah.  It had very little trading.

8    Q.    Yeah, but then during that time, you were buying

9    and selling convertible notes in SKTO --

11:41:47 10   A.    I wasn't.

11   Q.    -- in conjunction with 17 promotional campaigns

12   between that same time?

13   A.    I don't recall that.

14   Q.    Including acquiring Medical Greens, a purported

11:42:00 15   medical marijuana company, and issuing 17 press releases

16   that were misleading?

17   A.    Yeah, I think that was the business they were going

18   into.

19   Q.    And causing the stock price to jump from below a

11:42:11 20   penny, from below a penny to trading value?

21   A.    No.  I wasn't running the company.  I was doing the

22   regulatory and legal stuff.

23   Q.    So this wouldn't apply to you being banned from

24   participating in the securities industry?

11:42:24 25   A.    No.

1    Q.    By selling and purchasing convertible notes to

2    inflate a stock ticker?

3    A.    I wasn't selling or buying the notes.  I wasn't

4    doing any of that.

11:42:33  5              I was doing the stuff that was discussed

6    and permitted in the consent order with the SEC.

7    Q.    So when Mr. Dean came to you and he explained the

8    proposal for taking a big position in the company and

9    boosting up the stock, using promotional campaigns of the

11:42:49  10   sort that you used for Grey Sheet deals, and you said,

11   "Yeah, I've seen this kind of thing before," that's the

12   kind of thing you were talking about, right, sir?

13   A.    Yes.

14   Q.    Okay.  And so we talked about sharks in the water,

11:43:00  15   but you, in fact, were one of those sharks, right?

16   A.    I didn't hear the last part of that.

17   Q.    You were one of the sharks in the water, were you

18   not?

19   A.    No.

11:43:11  20             MS. MILLER:  Nothing further.

21             THE COURT:  Any redirect?

22        REDIRECT EXAMINATION OF ROBERT HIPPLE

23   BY MR. DeVILLERS:

24   Q.    Just relatively briefly.

11:43:25  25             You indicated that the SEC at one point

1    suspended SOLI's trading, is that right?

2    A.    Yes.

3    Q.    How long was that suspension?

4    A.    Two weeks.

11:43:36  5    Q.    All right.  So during that time period, what was

6    going on with TeleMed nationally?

7    A.    Well, it was, I said before, a feeding frenzy.

8              This is the beginning of COVID-19, and the

9    Federal Government primarily through Medicare had

11:44:01 10    authorized reimbursement of telemedicine companies if

11    they participated in the treatment of or the promotion of

12    a vaccine for the COVID-19.

13              And all of a sudden like overnight when

14    this happened, telemedicine companies came out of the

11:44:23 15    woodwork and everybody on your street was in the

16    telemedicine business.

17              And they were promoting it, they were

18    advertising it, and a lot of them were really doing

19    nothing.  They were just saying they were in that

11:44:36 20    business.

21              And the SEC eventually catches onto that,

22    and they shut them all down until they figure out who's

23    real.

24              The same thing was done with the cannabis

11:44:51 25    industry when cannabis was first introduced into the

1    market as a legal substance, everybody was in cannabis

2    and that was the big thing that all the new public

3    companies are in.

4              "Oh, yeah, we're in the cannabis business."

11:45:06  5    So the investing public was all excited about these new

6    companies, so they were throwing money at them.

7              The current one I mentioned before is the

8    weight loss drugs.  Now everybody is in the weight loss.

9    If you want to buy weight loss drugs, "Oh, send -- call

11:45:22 10   me up, I'll send them to you," and a lot of those are in

11   public companies.

12             And I think it's going to happen again, you

13   know, the SEC will come out and shut down a whole bunch

14   of companies and suspend trading and clean up the market.

11:45:36 15   Q.    After that two-week suspension, did you get

16   anything from the SEC regarding stocks?

17   A.    Yes.

18             There is a process in the SEC that if you

19   believe there's been an action that was not justified,

11:45:49 20   you can demand a letter from the SEC basically saying,

21   "We're not doing an investigation."

22   Q.    And did you do that?

23   A.    We did that.  We demanded the letter and we got the

24   letter, and there is a letter from the SEC saying, "There

11:45:59 25   is no investigation going on of this company."

1    Q.    Ms. Miller kept asking you about call centers.

2          Do you recall that on cross-examination?

3    A.    Which one?

4    Q.    Do you remember being asked about call centers?

11:46:12  5    A.    Call center, yes.

6    Q.    All right.  Did those call centers have anything to

7    do with the sales of stock?

8    A.    No.  They were all part of the operation.

9          That was the group that was the first

11:46:25  10   contact with actual users of the telemedicine system.

11   You got to the call center, provided your information,

12   and they set up the appointment with the doctor and

13   managed that whole thing.

14   Q.    So did the call centers have anything to do with

11:46:38  15   sales at all?

16   A.    No.

17   Q.    Was it for the patients, the call centers?

18   A.    Yeah, it was the patient call centers.

19   Q.    And Ms. Miller asked you about sharks.

11:46:52  20         Do you recall being asked about that?

21   A.    About what?

22   Q.    Sharks, sharks in the water?

23   A.    Sharks in the water, yeah.

24   Q.    After the conference call with yourself, with

11:47:03  25   Mr. Scott, and with Mr. Dean when Mr. Dean went to

Hipple -                        552

1    Virginia, did you then tell Charlie not to deal with him?

2    A.    I don't think I used there were sharks in the

3    water, but basically there was nothing here to offer.

4              He was just one of many that we had talked

11:47:23 5    to, and talked to after that, about, "I got all this

6    money to invest and give me some money and, you know, pay

7    me a monthly fee or give me a big batch of stock and I'll

8    do all these things for you."

9              None of them ever panned out, so I told him

11:47:39 10    it was a waste of time.

11    Q.    Did you ever intend to have Mr. Dean or any of his

12    associates market stock for CareClix?

13    A.    I never did.  It was never even discussed.

14              MR. DeVILLERS:  No further questions, Your

11:47:52 15    Honor.

16              THE COURT:  Ladies and Gentlemen, if you

17    have any questions for this witness, please write them

18    down and pass them forward at this time.

19              Are there any questions for this witness?

11:48:06 20    Looks like there might be one.

21              All right.  Just a minute.

22              (Proceedings at side-bar:)

23              THE COURT:  Any issue?

24              MR. DeVILLERS:  Nope.

11:48:43 25              THE COURT:  All right.

Hipple -                        553

1          (End of side-bar conference.)

2          THE COURT:  Mr. Hipple, the Ladies and

3    Gentlemen of the Jury have one question they would like

4    you to address.

11:49:02  5          Did you ever have any conversations with

6    Mr. Scott about US Lighting Group?

7          Please speak into the microphone.

8          THE WITNESS:  I've had many conversations

9    with him about USLG in the last two months or since,

11:49:23 10   since he was involved in this case.

11          I had no knowledge of that company.  I had

12   no conversations with him before any of this started.

13          THE COURT:  Any follow-up on the question

14   from the Jury?

11:49:40 15          MR. DeVILLERS:  No, Your Honor.

16          MS. MILLER:  No, Your Honor.

17          THE COURT:  The witness may step down.

18          (Witness excused).

19          THE COURT:  Thank you.

11:49:47 20          THE WITNESS:  Thank you, sir.

21          THE COURT:  In light of the time, we will

22   take an early lunch, Ladies and Gentlemen, since it's

23   about ten minutes of 12:00.

24          We will stand in recess.  When you are all

11:50:12 25   back from lunch and assembled, we will resume with the

1     proceedings.

2                    THE CLERK:  All rise.

3                    (Jury out.)

4                    THE COURT:  We will stand in recess.

11:50:53  5          Thank you.

6                    (Proceedings recessed at 11:50 a.m.)

7                         -   -   -   -

555

                    FRIDAY, SEPTEMBER 13, 2024, 12:49 P.M.

 1

 2                      THE COURT:  You may be seated.

 3                      MR. MORRISON:  Your Honor, before we bring

 4    the Jury in, could we have just a very brief side-bar to

 5    alert you to something?

 6                      THE COURT:  Do we need to do it at

 7    side-bar?

 8                      MR. MORRISON:  Might be best.  I

 9    don't -- up to you.  I can explain, and then you can

10    decide if that works.

11                      THE COURT:  Why don't we go to side-bar?

12                      I had a couple questions before we bring in

13    the Jury as well.

14                      (Proceedings at side-bar:)

15                      THE COURT:  So I guess my question --

16    sorry, it's going to take precedence over yours.

17                      MR. MORRISON:  Fair enough.

18                      THE COURT:  So he's going to testify?

19                      MR. DeVILLERS:  Yes.

20                      THE COURT:  Okay.  How long do you think

21    he's going to go?

22                      MR. DeVILLERS:  Half hour.

23                      THE COURT:  Okay.  I will e-mail to you the

24    Jury instructions.  Exhibit B, the overt acts, Exhibit B

25    this time, not A, to keep it straight, and the verdict

1    forms.

2            So you'll have that in, like, probably the

3    next ten minutes or so.

4            So my question is just if he doesn't -- I

12:50:28  5    was guessing he was not going to testify for long.  I

6    mean, I suppose, like, one issue I have is we could

7    theoretically charge today.

8            I'm a little bit nervous about that just

9    because I don't want to force the Jury -- like, I feel

12:50:41 10    like they would decide today before they go home, and you

11    all might not be ready on closing anyway so.

12            MR. MORRISON:  Yeah, I think it would

13    be --

14            THE COURT:  There's a logistical issue with

12:50:56 15    exhibits.

16            MR. MORRISON:  There's a logistical with

17    exhibits, and the length of closing might be that they

18    won't get the case until after 5:00 anyway.

19            THE COURT:  Oh, we're not going home until

12:51:10 20    he's done anyway.

21            MR. MORRISON:  He said it would not be more

22    than two hours.

23            THE COURT:  So we'll get through.

24            I'll just say we have work to do and call

12:51:19 25    it an early day, and come back Monday morning and close.

1         Okay.

2              MR. MORRISON:  So this is, I don't think

3    anything that needs any intervention, but the agent was

4    telling us that as she got up to leave after the lunch

5    break or as we broke for lunch, that she saw, I guess,

6    the second alternate with the glasses on his head walking

7    out and then giving sort of like a fist raise and saying

8    something to Mr. Hipple as Mr. Hipple was leaving.

9              I don't know if there's any reason to think

10   there was anything inappropriate said, but I didn't want

11   to not raise it, then learn something subsequent and be

12   accused of having not said something at the right time.

13             And so we're not asking for anything to be

14   done, but we just wanted to put on the record that this

15   is something he saw.

16             MR. DeVILLERS:  We saw that, too.  Didn't

17   say anything, but saw him going like this.  (Indicating.)

18             THE COURT:  Okay.  I don't know what to

19   make of this at all.

20             MR. MORRISON:  I don't either.

21             THE COURT:  I mean, I tell them more than I

22   ever have, like, not to talk to anybody, including

23   themselves, so I don't know what that means.

24             So this is both by a little bit my longest

25   Jury trial, it's the longest Jury trial I've ever had

1    without an issue with a juror.

2              MR. DeVILLERS:  We have all the jurors, all

3    the alternates?

4              THE COURT:  I would not have guessed that,

12:52:43  5    I would not have foreseen that, so --

6              MR. DeVILLERS:  I don't know.  He saw them.

7              THE AGENT:  As we were standing there we

8    were turning away and he turned away -- sorry about that.

9              So it was as we were leaving, we both were

12:53:03  10   facing the window kind of turning away.  He turns back

11   toward the elevator to make sure that nobody is

12   interacting with any of the jurors, and that's when the

13   juror sees him and he goes like this.

14              And he looks at me, and, like, we both just

12:53:19  15   kind of don't know what to do because I've never seen

16   anything like that before.

17              MR. DeVILLERS:  The "he" being that was

18   Hipple?

19              THE AGENT:  Hipple, yes.

12:53:28  20              And we didn't know what to think.

21              MR. MORRISON:  It just struck me as very

22   strange.  I'm glad to hear there was a consistent and

23   similarly inexplicable view from that angle.

24              THE COURT:  As I said, this is the longest

12:53:42  25   I've spent with any Jury where I've not had to deal with

559

1        any issues involving jurors.

2                    MR. MORRISON:  So I think it may never be

3        an issue because, as you said, we have all of our regular

4        jurors plus another alternate before him, so it probably

12:53:56   5        is never going to matter so --

6                    THE COURT:  So this is the coach?

7                    MR. MORRISON:  Yes.  Yes.

8                    THE COURT:  The guy --

9                    MR. MORRISON:  Yes.

12:54:03  10                    THE COURT:  Okay.

11                    MR. DeVILLERS:  He's 14?

12                    MR. MORRISON:  Yes.  14.

13                    I mean, there's other issues with him.

14                    THE COURT:  I have other issues with him,

12:54:12  15        none of which -- my understanding is it's like an ADD

16        type issue; it's not a -- because, like, after the first

17        day I just kind of sent a note back to him like, "Hey,

18        look, like, have some coffee or something," and he was a

19        bit better after that.

12:54:30  20                    But he did tell my courtroom deputy just,

21        like, he has a hard time, like, sitting still.  So I

22        think he just has ADD or ADHD or something like that.

23                    And my response to that is, like, "Well,

24        you're a teacher, you must go to faculty meetings that

12:54:47  25        are far -- they are bad, they are, you know, maybe not

560

1    this, but they're not great."

2              So I mean, I have those same kind of issues

3    with him, but to me none of those issues have risen to a

4    level where I've even felt the need to raise anything or

12:55:05    5    do anything about it.

6              MR. MORRISON:  No.

7              THE COURT:  I suppose if push really comes

8    to shove and we don't have a juror next week, we can

9    figure out if we want him deliberating, but I'm inclined

12:55:17   10    just to kind of get through closing and see where we

11    stand.

12              MR. MORRISON:  Yeah.  Agreed.

13              THE COURT:  Okay.  Thanks.

14              (End of side-bar conference.)

15                        - - - - -

16

17

18

19

20

21

22

23

24

25

1                 THE COURT:  All right.  Let's bring in the

2      Jury.

3                     (Jury in.)

4                 THE COURT:  Please be seated.

12:57:49  5                 Mr. DeVillers, you may call your next

6      witness.

7                 MR. DeVILLERS:  Defense calls Charles

8      Scott.

9                 THE COURT:  Please raise your right hand.

10                    CHARLES SCOTT,

11              of lawful age, a Defendant herein,

12              being first duly sworn, was examined

13                and testified as follows: is

14                 THE COURT:  Thank you.

12:58:15 15                 Please be seated.

16                 And if you would --

17                 THE WITNESS:  Testing, testing.

18                 THE COURT:  If you would please state your

19      name for the record.

12:58:32 20                 THE WITNESS:  Charles Overton Scott.

21                 THE COURT:  Counsel, you may proceed when

22      you're ready.

23                 THE WITNESS:  Scott is spelled S-C-O-T-T.

24

25

Scott - Direct                                562

1          DIRECT EXAMINATION OF CHARLES SCOTT

2     BY MR. DeVILLERS:

3     Q.    Mr. Scott, tell us a little bit about yourself.

4                Where are you from?

12:58:43  5     A.    I'm from a little mountain town in Virginia called

6     Shipman.  I was born and raised there.

7                I went to Nelson County High School.  We

8     were fairly poor people.  My biological father wasn't

9     with us but, oh, by the way, he was a deputy sheriff.

12:59:07 10                I ended up graduating from the University

11     of Virginia; pretty much went into the insurance business

12     and failed for the first seven, eight years, nine years

13     maybe.

14                By the time I was 30 I was pretty

12:59:21 15     successful.  By the time I was 35 I had -- pretty much

16     all of the dreams that I had as a child had been

17     accomplished.

18                Not much has changed since then.

19     Q.    What did you do in the insurance business when you

12:59:32 20     first got started?

21     A.    I was a salesman.  Life insurance.

22     Q.    And eventually, did you start to get into other

23     businesses as well?

24     A.    Yes.

12:59:43 25                I thought -- I've worked with a lot of

Scott - Direct                                        563

```
          1    people and so not everyone is good at life insurance, and

          2    so I was always looking for ways that I could help, you

          3    know, the people that I mentored and that I teach.

          4              And entrepreneurism for me was a way for

13:00:04  5    upward mobility, if you would.  And I sought the same for

          6    so many other poor kids, poor young men and women, but I

          7    just didn't -- I don't work for just poor.  Just anybody

          8    that needs -- needs a mentor.

          9              So there were several businesses that I

13:00:21 10    became involved in over the years.

         11    Q.   Tell us about your family.

         12    A.   My what?

         13    Q.   Your family, your current family.

         14    A.   Oh, my -- my wife and my dear son Hudson, Hudson's

13:00:35 15    22, Penn State.

         16              I live with them on a 26 acre farm, horse

         17    farm in central Virginia, and I love my family.

         18    Q.   How old are you?

         19              You're under oath.

13:01:01 20    A.   Let me put it this way:  I've been on Earth 70

         21    years and two months.

         22    Q.   Okay.  All right.  Paul Spivak, when did you meet

         23    Paul Spivak?

         24    A.   I think I met Paul Spivak in 2011.

13:01:19 25    Q.   Tell us about, yeah, the circumstances.
```

1     A.    Yeah, I was -- I was introduced to an opportunity

2     to buy territories for an LED company, and turned -- by

3     friend that I had known for many years.  Trusted friend,

4     by the way.

13:01:36   5              Turns out that Paul Spivak was the man that

6     had come up with that.

7                   I was -- I was contacted by a man by the

8     name of Tim Niedel, and I purchased the territories, I

9     think 20,000, $30,000, and was invited to the USLG office

13:02:00  10    for training.

11    Q.    Let's stop for a second there.

12                   Territories; what's that mean, purchasing

13    territories?

14    A.    Well, the model that USLG had -- I'm a fan of that

13:02:08  15    model, by the way -- is that they sell these

16    distributorships based on the per capita population, the

17    size of the population, and I -- so I bought into that,

18    those territories, and they were exclusive territories.

19    Q.    What do you mean "exclusive"?

13:02:27  20    A.    Well, no one else could come into my territory.

21                   My plan was to grow the territory, and to

22    flip it one day, you know, sell it at a profit.

23    Q.    So I guess when you say no one's coming into your

24    territory, to do what?

13:02:41  25                   Were you selling something?

1    A.    LED bulbs, what I thought was an awesome bulb.

2              Based on what I had seen and when I went to

3    training, I thought that the bulb was incredible.

4              Paul Spivak was a Midwestern entrepreneur

13:03:02  5    engineer.  I thought he was brilliant.  I thought the

6    product was really good.

7              He still had some, what do you call it,

8    patents and all he needed to get done, and then the

9    business was not -- he had three or four engineers when I

13:03:22 10    got over there and he took us around and all that, but I

11    thought he was just brilliant, but he had caught the

12    wave, the LED.  He was out in front of it.

13              And I thought it was an incredible

14    opportunity, and I was very pleased to be a territory

13:03:35 15    owner.

16    Q.    When you say "brilliant," what do you mean as far

17    as Paul Spivak?

18              What's your -- what's your perception of

19    him as brilliant?

13:03:42 20    A.    Engineering.  Engineering and creative ideas.

21    Q.    How about businessman?

22    A.    No.  He's not a very good businessman.

23              I don't think he is anyway.

24    Q.    I'm going to bring it to the spring of 2021, what

13:04:00 25    this case is about.

Scott - Direct                                    566

1        At that time, the spring of 2021, how many

2   times do you think you've been in the same room as Paul

3   Spivak?

4   A.    Maybe three, four.

13:04:13  5   Q.    Did you talk to him on the phone or zoom or

6   anything like that over the years?

7   A.    Well, many of the conversations would have been

8   about, you know, the bulbs because they were having

9   troubles with the supplies and all that.

13:04:28 10        The COVID pretty much crashed, crushed that

11   company because the supply line, the supply chain got cut

12   off.

13        Most of those calls were about when am I

14   going to get my product; can you satisfy this huge

13:04:44 15   customer that I have that they just -- so mostly that's

16   what that was about.

17   Q.    In the spring of 2021, was USLG selling other

18   products besides light bulbs, or developing other

19   products?

13:04:59 20   A.    In the spring of 2021, I didn't know -- you know, I

21   hadn't really been talking to them or paying attention to

22   USLG for the last, I guess, two or three years.

23        I -- I did know that he was looking into

24   going into these RVs, and the boats, and some other

13:05:20 25   stuff.

Scott - Direct                                    567

```
          1              I thought those were good ideas, especially

          2      the one where he had this, this Martian-looking little

          3      house, right, from the '50s, retro, and he was looking to

          4      manufacture those.  I thought that was a good idea.

13:05:36  5              So, yeah, he was moving into other

          6      businesses.

          7      Q.   Okay.  Since this trial started, since it's

          8      finishing, did you come to learn more about Paul Spivak?

          9      A.   A lot more.

13:05:51 10      Q.   Okay.

         11      A.   Yeah, I -- yeah, a lot more.

         12      Q.   All right.  Well, let's -- let's kind of get you

         13      back in the spring of 2021.

         14              What were you doing?

13:06:06 15              What was on your mind?  What were you

         16      working on in the spring of 2021?

         17      A.   I just had gotten into the telemedicine business.

         18              We had a little bit of a rocky, rocky road

         19      and so I was -- I think I was at the transition of going

13:06:24 20      almost entirely into the business on a day-to-day basis

         21      so I was extremely busy.

         22              And I also -- I've been in the insurance

         23      business for 46 years, and so I don't have to run that

         24      because I've got guys that are pretty strong.

13:06:43 25              You know, I have other interests.  I'm also
```

1    a farmer.

2                    So with all that was going on, I was

3    extremely busy.

4    Q.    What was your goal?

13:06:51  5              In 2021, what did you want to do with

6    CareClix?

7    A.    Well, what I wanted to do was to grow the business.

8                    We were in 37 countries.  We were -- we had

9    the hottest software on the market, and we had had some

13:07:07 10   issues with the, you know, with the company.

11                   And raising money was probably the number

12   one thing we needed to do.

13                   In terms of the product and services, what

14   I wanted to do was to be competitive in the marketplace

13:07:22 15   and wanted to -- I thought we could be -- I thought we

16   could be number one, number two or three behind Teladoc

17   and Amwell, and so I was still pushing.

18                   We thought we could do that.

19   Q.    In the spring of 2021, did you have USLG stock?

13:07:41 20   A.    Yes.

21   Q.    How much stock did you have?

22   A.    I think about 2.7 million or something like that.

23   Q.    All right.  And since the end of our last trial

24   until the spring of 2021, did you sell any of that stock?

13:07:56 25   A.    Since when?

Scott - Direct                                    569

1    Q.    Since 2019 to 2021, did you sell any of the USLG

2    stock you have?

3    A.    Did I sell any?

4    Q.    Sell any, yeah.

13:08:08  5    A.    In 2021?

6    Q.    In 2019, 2020, and spring of 2021, have you sold

7    any stock?

8    A.    In 2021, I sold some to Jason Dean.

9    Q.    Okay.  Other than that, did you sell any?

13:08:21 10   A.    I don't believe so.

11   Q.    Okay.  In the spring of 2021, did you get a call

12   from Paul Spivak?

13   A.    Yeah, more than one call from Paul Spivak in 2021.

14   Q.    All right.  Since the first call you got in 2021

13:08:35 15   from Paul Spivak, how long do you think before that had

16   you heard from him?

17   A.    I don't know.

18             Where he called me?

19   Q.    Yeah.

13:08:48 20   A.    Probably had to be at least a year or so.

21   Q.    All right.  When he called you, what did he -- what

22   did he tell you?

23             What did he want to talk about?

24   A.    "Buddy, buddy, I miss you, I miss you.  I got

13:09:03 25   something for you.  You aren't going to believe this.

Scott - Direct

1    You -- look, you're just not going to believe it.  I

2    think I have someone that's going to buy all of your

3    stock, all of your stock.  I'm checking them out now.

4    I'm checking them out now.  It's -- it's -- it's -- it's

13:09:15  5    incredible, it's incredible.  And guess what?  They know

6    how to do it.  They do it right."

7    Q.    Okay.

8    A.    "They do it right.  I know how you are.  I know how

9    you are.

13:09:24  10              "Look, it's not time right yet, but I'll

11    get back with you.  I'll get back with you.

12              "There's this guy named Jason I'm going to

13    have call you."

14              You know how he is.  Well, maybe you guys

13:09:35  15    don't know how he is.

16    Q.    All right.  He was excited?

17    A.    Oh, yeah, he was very excited.

18    Q.    What did he want you to do?

19    A.    He said he had someone that would buy all my stock.

13:09:44  20              He also said, "They may even help you with

21    CareClix.  I know you need money for CareClix."

22    Q.    Okay.  What did you take from his information and

23    that call?

24              What was going through your mind?

13:09:58  25    A.    Yeah, right.

Scott - Direct                          571

1          Maybe.

2     Q.    Okay.

3     A.    But.

4     Q.    Okay.

13:10:06  5     A.    I mean, I -- I was -- I was more concerned with

6     CareClix than anything, so when he said I might -- he

7     might be able to get me funded, get some funds for

8     CareClix, now that really got me; sparked my -- got my

9     interest.

13:10:21 10     Q.    And did you talk to -- did Jason Dean call you?

11     A.    Well, Paul called me again and asked me to either

12     call Jason Dean or have Jason -- or Jason Dean was going

13     to call me.

14          And so even though I had the interest, it

13:10:37 15     wasn't, you know, it wasn't -- I was busy so I didn't

16     call right away.

17          So I guess in a couple days -- I don't know

18     how many days it was -- he called back and said -- no.

19     Whoa, whoa, whoa, whoa.  Wait a minute.

13:10:51 20          He -- yeah.  Yeah.

21          I think I've gotten a little lost here.

22     Q.    Okay.  Well, did he talk to you about you selling

23     him your free shares of USLG stock?

24     A.    Well, the first time he called, he said he had this

13:11:06 25     guy or he had something.

1          Then he called and said that he had a guy

2     who was going to buy all of my stock.  I could also

3     probably get him to do something with CareClix.  And that

4     I needed to call him, you know, or he was going to call

13:11:19  5     me.

6          "Jason Dean, you need to call him."  He

7     said --

8     Q.   Now, who is the "he" saying this?

9          You're talking about --

13:11:26 10    A.   This is Paul Spivak.

11    Q.   Okay.

12    A.   He's saying that, "I've checked them out.  They are

13    the real deal.  I know how you are.  They do it right.

14    Buddy, they do it right.  I been" --

13:11:36 15         MR. MORRISON:  Objection, Your Honor.

16         Could we have a brief side-bar?

17         (Proceedings at side-bar:)

18         MR. MORRISON:  So he's introducing hearsay

19    statements of Mr. Spivak, and when it's going to setting

13:11:52 20    up the transactions, that's one thing, but once he's

21    getting into he's representing that Mr. Spivak

22    represented that everything was done above board and

23    everything is being done right, now we're in hearsay

24    territory.

13:12:04 25         And he can't offer his co-conspirator's

Scott - Direct                                          573

1    statements himself.

2                      MR. DeVILLERS:  Fine.  I'll move on.

3                      MR. MORRISON:  Okay.

4                      (End of side-bar conference.)

13:12:22  5    BY MR. DeVILLERS:

6    Q.   Okay.  As a result of what Mr. Spivak told you and

7    as a result of your phone calls, your conversations with

8    Mr. Dean, did you come up with a plan?

9                      Like, what did you want to do?

13:12:34 10    A.   Well, after, after talking to them, my number one

11   thing was maybe I can get some money for CareClix.

12                      I mean, that would be a big deal for me.

13                      Number two, I wanted to maintain my

14   position, my largest position with USLG to help grow the

13:12:57 15   company.

16                      And I wanted to make some money now and

17   perhaps in the future if they were able to grow the

18   company.

19   Q.   Let's talk about that a little bit.

13:13:06 20                      You said maintain your position in USLG.

21                      What's that -- we've heard that before.

22                      What's that mean?

23   A.   Well, I don't know -- I don't know what the

24   percentage was, but I had 2.7 million shares, okay.  So

13:13:19 25   if, if -- I don't want to have less than that, if you

Scott - Direct                                    574

1    would.

2                    Yeah, so if -- if they're going to be

3    growing the company, then I want to keep the same

4    position as I -- as I could.

13:13:32  5                    So, so, so when Paul was talking to me, he

6    said -- or he suggested -- and I was fine with it -- "You

7    know, the way to keep your position is to buy restricted

8    shares," and so I was -- I was 100 percent with that.

9    Q.    So you -- you agreed to sell free-trading shares

13:13:52 10    and buy restricted shares?

11    A.    Yes.

12    Q.    Okay.  And was that of your own free will?

13    A.    Yes.  Of course.

14    Q.    Were you compelled to do that by Mr. Spivak in any

13:14:01 15    way?

16    A.    Nobody, no.

17    Q.    The shares that you owned you talked about, were

18    they your shares?

19    A.    I bought them.  They're my property.  They're

13:14:15 20    absolutely my shares.

21                    And, I mean, I've been listening.  Nobody

22    tells me what to do with my stuff.

23    Q.    Okay.  All right.  So you indicated that you were

24    going to buy restricted shares to maintain your position?

13:14:31 25    A.    Yes.

Scott - Direct                              575

1   Q.    What was your understanding of where, when you

2   bought restricted shares, where that money went to?

3   A.    To grow the company.  That's -- if it's not to grow

4   the company, what would it be for?  And that's -- that's

13:14:44  5   what I'd be interested in.

6              And, frankly, if it wasn't to grow the

7   company, I may not have been so interested.

8              But that's exactly what I expected it to

9   be.

13:14:54  10   Q.    Okay.  So as you sold -- the jury's aware you did

11   sell some free-trading shares to Mr. Dean, correct?

12   A.    Yes.

13   Q.    And about how many shares did you sell to him?

14   A.    100,000.

13:15:10  15   Q.    And was your -- was your plan to sell more to him?

16   A.    Yes.

17   Q.    Okay.  And then what were you going to do with the

18   proceeds of that sale?

19   A.    Well, I was going to buy more USLG restricted

13:15:30  20   shares and put a little money in my pocket, put some

21   money in my pocket.

22   Q.    Okay.  From your conversations with -- with

23   Mr. Spivak and with Mr. Dean, were you aware that

24   Mr. Dean was saying that he was going to promote USLG

13:15:50  25   stock?

Scott - Direct                    576

1    A.    Yes.

2    Q.    And were you aware, or did anybody ever tell you or

3    talk to you about how he was going to promote USLG stock?

4    A.    No.

13:16:02  5    Q.    Did Mr. Dean talk to you about promoting

6    CareClix?

7    A.    I think he tried to slip that in some kind of way,

8    but we didn't need him to promote CareClix.

9    Q.    And did you tell him that?

13:16:21 10    A.    Yes.

11              I told him, "We don't need you to promote

12    CareClix."

13    Q.    All right.  What was the purpose -- we've heard

14    testimony about some calls with him, some conference

13:16:34 15    calls, and there was -- apparently there was -- was there

16    a meeting in Virginia?

17    A.    Say that again.

18    Q.    Was there a meeting with Mr. Dean in Virginia in

19    person?

13:16:44 20    A.    Yes.  At the office, yes.

21    Q.    What was the purpose of that meeting?

22    A.    My purpose was to get some of that $800 million

23    that they said they had.

24    Q.    All right.  Explain that.  Explain that.

13:16:56 25              What do you mean?

Scott - Cross                              577

1    A.    Mr. Dean represented himself as someone that was

2    representing very successful people, and that he said

3    that he had talked to his people about CareClix and

4    they were more interested in CareClix than they were in

13:17:16  5    USLG.

6              I'm like "Okay."

7    Q.    Okay.  Did Mr. Dean or anybody else ever talk to

8    you about fraudulently promoting USLG stock?

9    A.    No.

13:17:39  10              Hell no.

11              MR. DeVILLERS:  I have no further

12    questions, Your Honor.

13              THE COURT:  Any cross-examination?

14              MR. MORRISON:  Yes, Your Honor.

13:17:50  15              Thank you.

16         CROSS-EXAMINATION OF CHARLES SCOTT

17    BY MR. MORRISON:

18    Q.    Mr. Scott, how are you doing?

19    A.    I'm doing fine, sir.

13:18:15  20    Q.    Good.

21    A.    Thank you.

22    Q.    First things first.  We got to clear one thing up,

23    all right?

24              Who was it who first said, "You're my

13:18:23  25    brother from another mother"?

Scott - Cross

578

1           I just got to know.  I have to know.

2                Who said it first?

3    A.    I'm the brother.

4    Q.    So who said it?

13:18:32  5    A.    Spivak said it.

6    Q.    Oh, okay.  All right.  I thought maybe.

7                Okay.  You used the term sometimes as well

8    with him?

9    A.    Yes.

13:18:43 10    Q.    Okay.  Now, I want to understand your role in US

11   Lighting Group.

12                As I am hearing it here, you were a

13   distributor and an investor.

14                Is that fair?

13:18:57 15    A.    Yeah.

16                I'd say an investor, and my first

17   investment was in the territories, and then I invested in

18   the company.

19   Q.    Okay.  And so you're buying -- would it be fair to

13:19:11 20   say that your investment in the territories was buying

21   effectively a distributorship, distributorship rights, is

22   that correct?

23   A.    Distributorship rights.

24   Q.    Okay.  So you had exclusive rights to distribute

13:19:24 25   these light bulbs in certain territories?

Scott - Cross

579

1    A.    Yes.

2    Q.    Okay.  And as you indicated, it sounds like you

3    invested in the territory.

4                You weren't personally going door-to-door

13:19:36 5   selling light bulbs or anything, right?

6    A.    Yes.  Kind of.

7    Q.    Okay.  Tell us about that.

8    A.    I was -- yeah, I was -- I had friends that have

9    businesses, and, sure, I'd go and meet them and talk to

13:19:52 10  them about the bulb, yeah.

11               I did some of that myself.

12   Q.    Okay.  You sound like you're a pretty busy guy,

13   though, right?

14   A.    Yeah, but if you got a friend that's got -- you

13:20:02 15  know, that can buy 10,000 bulbs, you could probably, you

16   know, cut out a few minutes to go see them.

17   Q.    You can spare some time for that, yeah.

18               And so about how much money did you make

19   selling light bulbs for Mr. Spivak?

13:20:16 20  A.    When he paid me, a few thousand, maybe.

21   Q.    All -- wait.

22               You're saying from -- when did you start

23   with him?  I'm sorry, was it 2012?

24   A.    2011.

13:20:29 25  Q.    2011 is when you met him.

Scott - Cross

580

```
 1              Did you buy the distributorship right away,
 2      or the rights to the territory?
 3      A.    Yes.
 4      Q.    Okay.  And so from 2011 through 2021, over those 10
 5      years --
 6      A.    2019, 2020.
 7      Q.    Okay.
 8                  -- you made about a few thousand dollars?
 9      A.    Maybe 20 or 30,000.
10      Q.    Okay.  Over that whole time?
11      A.    Um-hmm.
12                  That's -- that's my recollection.
13      Q.    Okay.  How much did you pay for the
14      distributorships?
15      A.    Twenty -- between 20 and 30,000.
16      Q.    Okay.  Was that net then that you made the 20,000
17      or so, or is that gross?
18      A.    No.  That would not be net.
19                  And I spent more money for offices and all
20      that kind of stuff.
21      Q.    So not -- not a profitable --
22      A.    Salespeople.
23      Q.    Sorry, I don't mean to cut you off.
24                  Go ahead.
25      A.    That's all right.
```

Scott - Cross

581

```
         1    Q.    You also hired salespeople, you said?

         2    A.    Um-hmm.

         3    Q.    Okay.  All right.  Now, so I guess you have this

         4    very limited role for USLG then is what I'm hearing, is

13:21:34 5    that right?

         6    A.    What do you mean by "limited role"?

         7    Q.    Well, I asked were you a distributor and an

         8    investor, and you said, "Really just an investor because

         9    I invested in distributorships and I invested in stock."

13:21:47 10   A.    Yeah.  Just clearing up that I'm an investor.

        11              I -- I pushed the bulbs pretty hard for a

        12    while.

        13    Q.    Okay.

        14    A.    So that's why it consumed a little bit of -- quite

13:22:02 15   a bit of my time for the first few years.

        16    Q.    Starting in 2011 or so?

        17    A.    Yeah.

        18    Q.    Okay.  So for those few years you were pretty

        19    involved in sales?

13:22:10 20   A.    Um-hmm.

        21    Q.    Okay.  So but then outside of your work in sales,

        22    owning the territory, and being an investor, I just want

        23    to make sure, as I understand it you weren't really

        24    involved in the management of USLG, right?

13:22:23 25   A.    No.
```

Scott - Cross                                           582

```
        1    Q.    You didn't -- you weren't an employee of USLG?

        2    A.    No.

        3    Q.    You weren't an independent contractor for USLG?

        4    A.    Well, the distributorship was an independent

13:22:35 5   contractor.

        6    Q.    Okay.  So you were a contractor for; not a vendor

        7    for as a distributor?

        8    A.    Would you say that again?

        9    Q.    So do you understand the difference I'm getting at

13:22:44 10  with an independent contractor and a vendor?

        11                Right?

        12                Were you providing services as a

        13   distributor and being paid for that, or were you buying

        14   product and selling it?

13:22:59 15  A.    I was buying product and selling it.

        16   Q.    Okay.  So you weren't being paid for services

        17   rendered as a distributor, right?

        18   A.    No.  No.

        19   Q.    Okay.  So is there anything -- I feel like -- I'm

13:23:11 20  not trying to make you nervous here.

        21                Is there anything you talked about on

        22   direct that you feel like you want to clarify, that you

        23   just, you know, you feel like you haven't had an

        24   opportunity to explain fully?

13:23:21 25  A.    Not that I can think of.
```

Scott - Cross                                            583

```
         1    Q.    Okay.  Just want to make sure.

         2                 Okay.  And so you weren't employed, didn't

         3    have any role in the management of USLG, right?

         4    A.    Right.

13:23:30 5    Q.    Just a distributor and an investor, right?

         6    A.    Pretty much.

         7    Q.    Pretty much a yes or --

         8    A.    Pretty much yes.  I mean, those are my official

         9    roles, yes.

13:23:45 10   Q.    Okay.  Did you have some unofficial roles?

        11    A.    No.

        12    Q.    So then it's pretty much a yes?

        13    A.    Yes.

        14    Q.    All right.  Okay.

13:23:55 15                  All right.  So turning to this 2021 time

        16    period -- actually before we get there, the light bulbs,

        17    I think I want to understand the flow of the business a

        18    little bit because you mentioned during direct that the

        19    light bulb business was really killed by COVID.

13:24:15 20                  Is that right?

        21    A.    I think it was.

        22    Q.    Okay.  So in other words, all the testimony that we

        23    heard in the first trial about how it was destined for

        24    bankruptcy as of the fourth quarter of 2016, that wasn't

13:24:29 25   true?
```

1    A.    Well, you know, I don't know.  I mean, I wasn't in

2    on the -- I don't know.

3              I -- I'm thinking of my own accord that if,

4    if the company was not able to compete, it would have

13:24:53 5    meant that they weren't able to buy enough supplies or

6    parts.

7    Q.    Right.

8    A.    And so they'd have to pay more for them.  And when

9    the supplies -- and when the supply chain kind of got

13:25:08 10    stifled, only the big companies were able to do that.

11              So it's just an opinion of mine, I think.

12    Q.    Okay.  But you're aware they basically were pretty

13    much done with light bulbs by the early 2019, right?

14              You were sitting here during this trial;

13:25:23 15    you saw that, didn't you?

16    A.    Yeah.  They were pretty much finished.

17              I had a couple of salespeople that just

18    believed in the company and all of that, but I think in

19    terms of USLG, I think they switched gears, yeah.

13:25:39 20    Q.    Okay.  So then it wasn't really COVID that did it

21    to them on the light bulbs then, right?

22    A.    I'm not an expert.

23              That's just my -- that was just my opinion

24    frankly.

13:25:50 25    Q.    So you just offered that even though you didn't

Scott - Cross                                    585

1    know if it was true before?

2    A.    Don't know if it was true, no.

3    Q.    Okay.  Anything else you said before on direct that

4    you didn't know was true that you want to clear up now?

13:26:02  5    A.    No.

6    Q.    That's the one thing?

7    A.    Not that I can think of.

8    Q.    Okay.  Now, you were pretty busy in 2021, right?

9          I think I saw you said that, right, on

13:26:16 10    direct?

11          Is that correct?

12    A.    Yes.

13    Q.    Okay.  I didn't mean for that to be a tough one.

14          So because you're in telemedicine in the

13:26:25 15    middle of COVID, right?  Busy times?

16    A.    Is that a question?

17    Q.    It was busy times, was it not?

18    A.    Yes, sir.

19    Q.    Okay.  Thank you for clarifying.

13:26:34 20          And in fact, you had a company that was

21    going to make the world's best software for telemedicine

22    or the world's best telemedicine company?

23          What was it going to be number one, two or

24    three in in the world ?

13:26:45 25    A.    There's virtually no difference between the

Scott - Cross                                    586

1    software and the telemedicine.

2                    It's -- it's actually the clinic.

3                    The software is the clinic.  And we believe

4    it was the best.

13:26:56  5    Q.    So the software treats the patients?

6    A.    Well, the software makes -- makes the -- is

7    the -- well, the software is like the doctor's office to

8    the doctor.

9    Q.    Okay.

13:27:09 10    A.    So the doctor's office don't treat you.  The doctor

11    treats you.  But the software and the brick and mortar

12    clinic are pretty much needed.

13    Q.    Okay.  So the software takes the place of a

14    building where doctors work?

13:27:27 15    A.    Is that a question?

16    Q.    Yes.  Sorry, I'll try and make more clear.

17                    Is that -- was that your understanding?  Is

18    that your testimony today?

19    A.    I think that's the general understanding.

13:27:38 20    Q.    Okay.  And about how many doctors were providing

21    health care through CareClix software at that time?

22    A.    I actually don't know how many doctors.

23    Q.    Do you have a ballpark for us?

24    A.    In 2021?

13:27:54 25    Q.    2021.  Let's call it specifically March 1st of

Scott - Cross                                    587

1    2021.

2    A.    Well, you know, part of the reason why I --

3    Q.    Do you have a ballpark for us, was the question.

4    A.    I actually don't know how many doctors were

13:28:14  5    providing services in 2021.

6    Q.    More than 20?

7    A.    I'm pretty sure it was more than 20.

8    Q.    Okay.  How about more than a hundred?

9    A.    Could be.

13:28:27  10          You'd have to -- I'd have to ask Dr. K.

11    Q.    Okay.  So that's a close call at a hundred?

12    A.    Well, I know that we had a few million potential

13    users of the service.

14    Q.    Okay.  What's a potential user?

13:28:44  15    A.    Yeah.

16    Q.    Was I a potential user, do you know?  Is everyone a

17    potential user?

18    A.    Well, you know, at the -- at the -- let's say over

19    at Pfizer -- I think we had Pfizer at the time and

13:28:59  20    Workday and I think there were a couple unions -- each

21    one of those people could use the service.

22          So when a company bought a contract,

23    everybody in that company generally was a potential user.

24    Q.    I see.

13:29:15  25          So it's people who had the, through an

Scott - Cross                    588

1    employer or some other plan, the right to use the

2    service, even if they didn't choose to?

3    A.    Yeah.  Like your Government insurance and stuff

4    like that, yeah.

13:29:29  5    Q.    So everyone on Government insurance was a potential

6    user?

7    A.    No.

8                I mean, I know that most of you men and

9    women who work for the Government, you may use the

13:29:42 10    service, you may not.

11                I'm just saying everyone that works for the

12    Government probably has health insurance, and they could

13    use it or they may not use it.

14    Q.    So then everyone who worked for the Government was

13:29:53 15    a potential user?

16    A.    No.  That's not what I'm saying.

17    Q.    Well, we'll move on from this.

18                So these salespeople, you had a lot of

19    salespeople working at the time, right?

13:30:08 20    A.    In 2021?

21    Q.    Yeah.

22    A.    Yeah.  We called them account executives, yeah.

23    Q.    Okay.  Account executives.

24                About how many account executives did you

13:30:19 25    have working?

Scott - Cross                    589

1    A.    In 2021?  Between 200 and 900.

2              I think maybe around 200 around that time.

3    Q.    Okay.  And were those all, like, W-2 employees?

4    A.    They were all 1099.

13:30:33  5    Q.    Okay.  So were they paid commissions?

6    A.    Well, they were on commission.

7    Q.    All right.  That's a yes?

8    A.    They were on commission.  They were

9    commission -- they were commission workers.

13:30:49  10   Q.    Okay.  They're getting a share of the money paid

11   for the access to the service?

12   A.    They should be getting some, yeah.

13   Q.    Okay.  And I'm not trying to trip you up.

14             I'm not asking about stock or anything.

13:31:05  15   Just those employees, okay, or those account executives.

16   A.    Yeah.

17   Q.    Now, you heard your attorney's opening statement,

18   right?

19   A.    I did.

13:31:13  20   Q.    And you kind of made a sort of a vague reference to

21   it during your testimony of you've learned a lot about

22   Mr. Spivak in the past few weeks.

23             Right?

24   A.    Mostly the last few days, yeah.

13:31:28  25   Q.    Okay.  And so I guess do you agree with what he

Scott - Cross

590

1    said that you agree that Mr. Spivak was engaged in a

2    securities fraud?

3    A.    You know, even to this day I don't know.  But I

4    did -- I was listening.

13:31:47 5    Q.    Okay.  Well, I guess, do you think Mr. Spivak was

6    trying to defraud people?

7                    And let me make that a little more clear

8    because I don't mean that he was trying to cause them to

9    lose money.

13:31:56 10                    Do you think that he was trying to get

11    people's money by being dishonest with them?

12    A.    Well, apparently the Jury thought that.  That's --

13    Q.    I didn't ask what the Jury thought.  I'm not

14    allowed to, unfortunately.

13:32:14 15                    I'm asking what you thought.

16    A.    Even to this day I can only go by what I've seen

17    and heard here.

18                    And sure looked like it.

19    Q.    And in fact, as I understand it, would you agree

13:32:38 20    that, from what I take from your testimony on direct,

21    your position is Mr. Spivak was falsely describing you

22    when he was talking to Jason Dean?

23    A.    I didn't get that.

24    Q.    So you thought everything Mr. Spivak said about you

13:32:54 25    on the recordings you've been listening to was accurate?

Scott - Cross

591

```
            1   A.    What did he say?

            2   Q.    You want -- how much time do you have?

            3             Let's start with the big one, right?

            4             "They'll do what I say."

13:33:13    5   A.    Oh, hell no.

            6   Q.    Okay.  So that was inaccurate, right?

            7   A.    That was inaccurate.

            8   Q.    Okay.  But Paul was -- I'll borrow one of

            9   Mr. DeVillers' terms -- he was bloviating a bit, right?

13:33:24   10   A.    Yeah, big time.

           11   Q.    Okay.  He was spouting off and he wasn't speaking

           12   truthfully about you?

           13   A.    No, he wasn't.

           14   Q.    And in fact, that's kind of what you understood

13:33:38   15   about him from the beginning, right?

           16             He's a big talker?

           17   A.    I wouldn't say that.

           18   Q.    No?

           19             So this is just a new thing you learned

13:33:51   20   just sitting here in this trial?

           21   A.    That he's a big talker?

           22   Q.    Well, that he was out there lying to people on a

           23   semiregular basis, let's put it that way.

           24   A.    I had no idea if Paul was out there lying to people

13:34:09   25   on a semiregular basis about stock.
```

Scott - Cross                                    592

```
         1    Q.    Okay.  Did you think he was out there lying to

         2    people about other things?

         3    A.    I don't know what he was out talking about.

         4              I mean, I -- I probably -- I'm in Virginia.

13:34:27 5    I don't -- I don't -- I don't know what he's doing.

         6    Q.    Okay.  That's right.  And in fact, you'd only been

         7    in the same room as him three or four times?

         8    A.    That's what I believe.

         9              In the same room with him?  I think so.

13:34:43 10   Q.    That's from 2011 to 2021?

        11    A.    That's my recollection.

        12    Q.    Now, when Mr. Dean appeared -- this is the other

        13    thing I thought I heard.

        14              When Mr. Dean appeared, you were looking

13:34:59 15   for investment in CareClix?

        16    A.    That was my primary motivation, that's for sure.

        17    Q.    Yeah.  I think you said you had three, right?

        18              You were going to, number one, you were

        19    going to get money for CareClix, right?

13:35:14 20              Number two, you were going to maintain your

        21    position, right?

        22    A.    Um-hmm.

        23    Q.    And number three was, I think, make some money, is

        24    that right?

13:35:24 25   A.    Yes.
```

Scott - Cross

593

1    Q.    Okay.  But number one is get money for CareClix,

2    right?

3    A.    Yes.

4    Q.    Okay.  And you wanted to sell all your shares to

13:35:39  5    Mr. Dean, right?

6    A.    I'll say I wanted to make some money.

7               I would have sold all my shares to anyone

8    that would buy them.

9    Q.    Right.

13:36:00  10              And but you were willing to sell them at a

11   discount to Mr. Dean, right?

12   A.    I wouldn't exactly say that.

13   Q.    Well, when you sold them at $0.25 a share, wasn't

14   the market price higher than that?

13:36:21  15              That's what I call a discount, to be clear.

16   A.    Well, the market price, the price for whatever

17   you're selling is what a willing buyer will give to a

18   willing seller.

19              So I know what you're -- I don't know what

13:36:39  20   the market price was when -- I think it -- I think they

21   said it was a little higher than that.

22   Q.    Okay.  And so you could have sold on the open

23   market for more than $0.25, right?

24   A.    Well, I don't know.  Never tried.

13:37:05  25   Q.    Never tried to sell on the open market?

1    A.    Not in 2021.

2    Q.    Not in 2021.

3                 Okay.  You did earlier, though, right?

4    A.    What do you mean?

13:37:14   5    Q.    As in you know how it works to sell on the open

6    market; you had sold stock on the open market?

7    A.    I have sold stock on the open market.

8    Q.    Back in 2018, right?

9    A.    I've sold stock on the open market.

13:37:26  10    Q.    Okay.  And did you do it in 2018, or no?

11    A.    Yes, I did sell stock on the open market in 2018,

12    yes.

13    Q.    Okay.  And that was around the time that lawsuit

14    with Mr. Mallion settled, right?

13:37:42  15                 MR. DeVILLERS:  Your Honor, I'm going to

16    object to scope.

17                 THE COURT:  He can answer the question.

18    A.    Say -- would you repeat the question?

19    BY MR. MORRISON:

13:37:58  20    Q.    When you were selling the stock in 2018 as you've

21    testified on the open market, was that around the time

22    the lawsuit with Mr. Mallion settles?

23    A.    "Around the time" meaning within a few months or

24    something like that?

13:38:17  25    Q.    Let's say within two months.

Scott - Cross                                                       595

1    A.    I think so.

2    Q.    Okay.  And, indeed, you said you had how many

3    shares at the time Mr. Dean approached you?

4    A.    I believe I had about 2.7, maybe 1. -- 2.7, I

13:38:42  5    think.

6    Q.    Okay.  And of that 2.7 --

7    A.    2.7 million.

8    Q.    Okay.  And of those 2.7 million shares you

9    testified to on direct, how many of those shares came

13:38:53 10    from the arrangement with Mr. Spivak and the LXRT

11    shareholders?

12    A.    In terms of the entire block?

13    Q.    Yeah.

14          About how much of that 2.7 was from that

13:39:06 15    2018 purchase?

16    A.    I think it was 1.5 million.

17    Q.    Okay.  Fair to say the majority of your holdings

18    came from that 2018 deal?

19    A.    Yeah.

13:39:19 20          At that time, yeah.

21    Q.    Was there a time when that wasn't the case?

22    A.    Pretty -- I mean, it's pretty even, you know what I

23    mean?

24          It's like if I have 1.5, 1.5 out of 2.7,

13:39:35 25    you know what I mean?  I have 2.7.

Scott - Cross                                      596

1    Q.   I don't know what you mean, no.

2    A.   1.5 is almost half of 2.7.

3    Q.   You'd agree that it's more than half, right?

4    A.   A little bit more than half.

13:39:47  5    Q.   Okay.  And the entire time you had the 1.5 million

6    shares, it was more than half; i.e. most of your holdings

7    in USLG, right?

8    A.   In 2021?

9    Q.   I'm talking about the entire time because you said

13:40:01  10   "At that time," and I just want -- I just want to

11   understand was there a time when that wasn't true?

12   A.   I think you're confusing me a little bit now.

13               Just -- could you just explain what you're

14   saying?

13:40:16  15   Q.   Sure.

16               In 2018 you acquire 1.5 million

17   free-trading shares from the LXRT owners, right?

18   A.   Right.

19   Q.   Okay.  From that time until the end of 2021, let's

13:40:28  20   say, or the end of June, 2021, was there any time when

21   that 1.5 million shares wasn't the majority of your USLG

22   holdings?

23   A.   I don't think so.  I believe it was not.

24   Q.   Okay.  And you don't have your records up there

13:40:44  25   with you.  I'm not asking you to swear to every VStock

1      piece of paper that's ever come across your desk, right?

2                  So one of the things also about those

3      free-trading shares you saw was that you understood that

4      Paul couldn't be involved in the sale of free-trading

13:41:07  5    shares in USLG, right?

6      A.    I wouldn't say that.

7      Q.    Did you not say that to Mr. Dean on recording?

8      A.    I don't recall saying that.

9      Q.    Okay.  What do you recall saying to Mr. Dean on

13:41:20 10    recording about Paul being involved in the sale of

11     free-trading shares?

12     A.    I don't recall, but you want to play it?

13     Q.    Be happy to.  We'll come back to that.

14                 But so do you have a memory -- I guess

13:41:32 15    what's your understanding, leaving aside what you told

16     Mr. Dean, what's your understanding of whether Mr. Spivak

17     could be involved in the sale of free-trading shares of

18     USLG?

19     A.    Did I say that to Mr. Dean?

13:41:47 20    Q.    I'm just asking your understanding now.

21                 We can move past what you said to Mr. Dean.

22     A.    My understanding would be if it -- I wouldn't

23     engage in that conversation, I don't think.

24     Q.    In other words, if you were him, you don't think it

13:42:02 25    would be wise to engage, is that what you mean?

Scott - Cross                    598

```
          1    A.    No.
          2                What I'm saying is I don't see why I would
          3    have a conversation with Mr. Dean about Paul's or anybody
          4    else's free-trading shares.
13:42:17  5    Q.    Okay.  Let's refocus.
          6                I'm asking whether you had an understanding
          7    of whether Mr. Spivak could be involved in the sale of
          8    free-trading shares, period, full stop.
          9    A.    It's just not something I would have thought about.
13:42:34 10    I, you know --
         11    Q.    Would have never thought of that?
         12    A.    As an officer in a company, I know that there are
         13    certain rules, but in terms of what Paul Spivak might
         14    have been doing with free-trading shares, I don't see
13:42:51 15    where that came up anywhere.
         16    Q.    And I guess I'm not asking you to speak to
         17    everything he did or didn't do.
         18                I get it, right?  Only three times, four
         19    times in the same room, a lot of text messages and phone
13:43:03 20    calls maybe, but you can't be monitoring his every move,
         21    right?
         22                You can't, right?
         23                Is that a yes or a no?
         24    A.    Let me see if I can get some clarity on the
13:43:17 25    question.
```

Scott - Cross                                        599

1            You're asking me whether I can monitor Paul

2      Spivak's every move.

3      Q.    I'm trying to throw you a softball here.

4            Yeah.

13:43:31  5            You need to think about that one?

6      A.    Can I monitor every move -- no, of course not.

7      Q.    That's a no, of course not, you can't monitor every

8      move, right?

9      A.    I can't monitor every move of anybody.

13:43:46  10   Q.    Okay.  But as to whether he could be involved in

11     free trading -- in the sale of free-trading shares of

12     USLG, leaving aside what conversations you would or

13     wouldn't have had, what's your understanding of whether

14     he could or could not be involved?

13:43:59  15   A.    Oh, my understanding is that -- my understanding is

16     that as an officer of a company?

17     Q.    Yes.

18     A.    Or a CEO?

19            I don't think he can be.

13:44:08  20   Q.    Okay.  And I'll represent to you that you made a

21     statement along those lines to Mr. Dean, right?

22     A.    I don't recall that.

23     Q.    Okay.  Well, your attorney pointed that out

24     multiple times.

13:44:19  25            You don't recall seeing that?

Scott - Cross

600

1    A.    If I don't recall, I don't recall, sir.

2    Q.    We can move on from that.  That's fine.

3                Now, I haven't been succeeding at this, but

4    I'm really going to try, okay?

13:44:38  5                I'm going to try and keep these questions

6    pretty simple, and you understand that I'm probably going

7    to ask you a lot of questions that are just going to be

8    yes or no.  Right?

9    A.    Yes.

13:44:47 10   Q.    And you understand that if you want to explain

11   more, you're going to have a chance, when your attorney

12   comes back up here, to explain whatever he thinks you

13   need to explain.

14                You understand that?

13:44:54 15   A.    Yes.

16   Q.    Okay.  And we've been going a little slow and I had

17   really hoped to match Mr. DeVillers for speed here and

18   I'm failing, but I can catch up a little bit if you'll

19   answer those yes or no questions "yes" or "no" or "I

13:45:08 20   can't answer that."

21                Does that make sense?

22   A.    That does make sense.

23   Q.    Okay.  You saw Mr. Hipple testify earlier today,

24   right?

13:45:14 25   A.    I'm sorry?

Scott - Cross

601

```
         1    Q.    You saw Mr. Hipple testify earlier today, right?

         2    A.    I saw him, yes.

         3    Q.    And he was your general counsel for your publicly

         4    traded company, right?

13:45:26 5    A.    Yes.

         6    Q.    Okay.  And you knew about his SEC problems, right?

         7    A.    I knew of them.

         8    Q.    Okay.  And so you knew that the SEC had barred him

         9    from serving -- being involved in the securities industry

13:45:44 10   for a period of five years.

         11                Right?

         12   A.    Yes.

         13   Q.    Okay.  And you knew that he had agreed to a consent

         14   order on the basis of his having willfully violated the

13:45:59 15   securities laws.

         16                Right?

         17   A.    No.

         18   Q.    So you did not know the contents of that order, is

         19   that right?

13:46:08 20   A.    I didn't know that, um-hmm.

         21   Q.    Sorry, you did not know that?

         22   A.    I did not know that.

         23   Q.    Okay.  Do you have Google?  Is that a thing you

         24   have access to?

13:46:18 25   A.    Yes.
```

Scott - Cross

602

1    Q.    Okay.  And so are you aware that if you Google

2    Robert J. Hipple, the very first result is that SEC

3    order?

4    A.    No.

13:46:30  5    Q.    No?  Never Googled -- this is your general counsel?

6    A.    No.

7    Q.    I'm talking about Robert Hipple, he's not your

8    general counsel?

9    A.    No, I did not Google Robert Hipple.

13:46:38 10    Q.    Okay.  And I just want to be clear.  He's your

11   general counsel, right?

12   A.    Yes.

13   Q.    And he's your CFO, right?

14   A.    Yes.

13:46:43 15    Q.    He is advising you on securities issues, right?

16   A.    Yes.

17   Q.    And you know that he's had trouble with the SEC

18   that led to his being barred from participation in the

19   securities industry, right?

13:46:59 20    A.    I knew he had trouble with the securities industry,

21   with the SEC.

22   Q.    But you didn't bother to even Google him?

23   A.    I asked to see his law licenses.

24   Q.    So you determined that he had a law license, that's

13:47:15 25   all you needed to know?

Scott - Cross                                                  603

1    A.    Sometimes you make decisions, yes.

2                Other than that, it would have been who

3    referred him.

4    Q.    Okay.  But again, you, the extent of your due

13:47:32  5    diligence on Mr. Hipple, after he tells you that he's had

6    trouble with the SEC, is not even to look at what the

7    nature of that trouble was?

8    A.    That's why I have people like Josh and some of

9    the -- Josh did that.

13:47:50 10    Q.    So you felt Josh was pretty reliable, huh?

11    A.    Well, I did.

12    Q.    You did.

13                You don't feel that way any more, do you?

14    A.    Yes, I think he's reliable.

13:48:01 15    Q.    You do think he's reliable.

16                When was the last time you talked to Josh?

17    A.    I don't recall the last time I talked to him.

18    Q.    And in fact, you asked him to step away from the

19    company, as we heard earlier, right?

13:48:13 20    A.    Yes.  I think I did.

21    Q.    Okay.  And that was after an incident that occurred

22    at the company, right?

23    A.    Well, I think the way it went was he felt he needed

24    to step away from the company.  I said "Okay."

13:48:29 25    Q.    He felt he needed to step away from the company

Scott - Cross

604

1    after an incident that occurred at the company

2    facilities, right?

3    A.    Say that once more, please.

4    Q.    He felt he needed to step away from the company

13:48:42 5    after an incident occurred at the company facilities,

6    correct?

7    A.    No.

8    Q.    So when did he feel he needed to step away?

9              Do you understand the incident I'm

13:48:54 10   referring to?

11   A.    No.

12   Q.    Do you recall him being arrested at the company

13   facilities?

14   A.    Yes.

13:48:59 15   Q.    Ah, okay, that's the incident.

16              Now, before he was arrested at the company

17   facilities, is that when he decided to step away?

18   A.    No.

19              He decided to step away -- no, no, no, no.

13:49:12 20              You're right, it was after that, yes.

21   Q.    Okay.  So he gets arrested at CareClix, and then he

22   decides to step away?

23   A.    Yes.

24   Q.    So you actually were fine with him continuing to

13:49:26 25   work then?

Scott - Cross

605

1    A.    I wouldn't say that.

2    Q.    Okay.  So it was -- or whose decision was it

3    because last I checked you're the boss, right?

4    A.    You know, many times when people are let go --

13:49:41 5    Q.    Are you the boss or not?

6    A.    -- they're given the opportunity --

7    Q.    Now, you understand, as I said, we agreed earlier

8    your attorney is going to give you the chance to clarify

9    and expound on all the things he wants you to expound

13:49:51 10   upon, right?

11                And I didn't ask for the whole history of

12   hiring and firing.  I asked whether you're the boss.

13                Are you the boss at that company or not?

14   A.    I'm the Chairman.  I'm the CEO.  I do have the

13:50:08 15   authority, especially now, yeah, and then I did, too.

16   Q.    CEO is Chief Executive Officer, right?

17   A.    Um-hmm.

18   Q.    Okay.  And Chairman, Chairman of the Board of

19   Directors, right?

13:50:18 20   A.    Right.

21   Q.    Okay.  Now, the Chairman leads the Board of

22   Directors, which in turn controls the company, right?

23   A.    The Board controls the company, yes.

24   Q.    Yes.

13:50:28 25                And the company's day-to-day operations, in

Scott - Cross                                  606

1    the absence of the Board's instruction, is determined at

2    the top by the CEO, right?

3    A.    Well, say that one more time.

4    Q.    Okay.  Absent some contrary direction by the Board

13:50:48 5    of Directors, isn't the CEO in charge of the decisions of

6    the company?

7              Yes or no?

8    A.    I --

9    Q.    Either yes or no, or you can't answer it.  If it's

13:50:59 10    too complicated, you can say that.

11    A.    Okay.  I think at that time we had a management

12    team, and we -- we had people that we'd get together and

13    make decisions pretty much in a vote.

14              So I understand what you're saying.

13:51:17 15              Josh Flood decided to move out of the

16    company.  Well, he volunteered, so it made it easy to say

17    okay.

18    Q.    So you were planning to ask him to leave then, in

19    other words?

13:51:33 20    A.    Probably.

21    Q.    And to be clear, when he left the company

22    facilities that day, it was in handcuffs and not a

23    decision, right?

24    A.    Well, he came -- it was in handcuffs that day.

13:51:50 25    Q.    And so it was not a decision, right?

Scott - Cross

607

A.     Not that day.

Q.     Okay.  And he eventually was convicted of a serious
crime, right?

A.     He was convicted of a crime, and I -- yes.

Q.     Between his arrest and his conviction, you
continued to have him involved in the company, right?

A.     Yes.

Q.     Okay.  And so, for example, the recordings we heard
were Josh speaking with you and Mr. Dean, that's after
his arrest, right?

A.     Yes.

Q.     So you know about Mr. Hipple's history with the
SEC, but you chose to close your eyes to the details,
right?

A.     I wouldn't characterize it that way.

Q.     Okay.  The details, would you agree they're freely
available on Google?

A.     I imagine they are.

Q.     Okay.  And you could have gone and read them
anytime you wanted in the past six years, however long
it's been?

A.     It's been at least six years.

Q.     Okay.  But you chose not to go see them, right?

A.     I haven't Googled it.

Q.     Okay.  And then Mr. Flood as well, you chose to

1    keep him involved even after he's taken away in handcuffs

2    from your company?

3    A.    Well, he didn't work for the company per se but,

4    yes, I kept him involved.

13:53:28  5    Q.    Okay.  And so then if he doesn't work there, that's

6    really affirmatively your choice.

7                You've got no obligation to have him

8    involved at all, right?

9    A.    I have no obligation to have him involved, no.

13:53:37 10    Q.    You chose to have him stay involved?

11    A.    I chose to have him stay involved.

12    Q.    Now, your company was operated in some ways that

13    were very similar to USLG, would you agree?

14    A.    No.

13:53:51 15    Q.    Okay.  But you also, like USLG, found a shell for

16    your company, right?

17    A.    I don't know the founding of USLG.

18    Q.    You -- wait.  You're saying you don't know that

19    there was a shell company used for USLG?

13:54:10 20    A.    I don't know if it was a shell company.

21                I know they did -- I don't know if it was a

22    shell company.

23    Q.    Okay.  Let's put it this way.

24                Was there a reverse merger to form -- to

13:54:21 25    take USLG public?

Scott - Cross

609

1    A.    I -- I believe so.

2    Q.    Okay.  Reverse merger into LXRT, right?

3    A.    I've come to learn that, yes.

4    Q.    Okay.  Now, your company, you engaged in a reverse

13:54:37 5    merger with SOLI, right?

6    A.    Yes.  Absolutely.

7    Q.    Okay.  And SOLI, actually that came from

8    Mr. Spivak, right?

9    A.    That, that, he sold me that company, yes.

13:54:47 10    Q.    Okay.  And that was a Grey Sheet company when you

11    received it, right?

12    A.    You know, I didn't know enough about it.

13    Q.    It didn't have any real operations, did it?

14    A.    No, it didn't have any real operations.

13:55:00 15    Q.    So that was a shell company then, right?

16    A.    Hmm?

17    Q.    That was a shell company for sure then, right?

18    A.    That's why we have people like Bob and these other

19    guys.

13:55:11 20              I really don't know enough about this

21    stuff.

22    Q.    You rely on Bob for your legal advice, right?

23    A.    I rely on Bob for legal advice, and I have other

24    attorneys as well.

13:55:21 25    Q.    Right.

Scott - Cross

610

```
         1              And you rely on Josh for operational
         2   issues, right, or you relied, you used to rely?
         3   A.    There was a time.  That was back then, yeah.
         4   Q.    Okay.  Now, you had Mr. Flood as your primary
13:55:37 5   business partner back then, right?
         6   A.    He worked for me.
         7   Q.    Was there someone who was more important than
         8   Mr. Flood as in the operations of the company in, say,
         9   2018?
13:55:56 10  A.    2018?
         11  Q.    Yeah.
         12  A.    Which company are you talking about?
         13  Q.    I'm talking about CareClix.
         14  A.    I think John Korangy was probably more important
13:56:12 15  than any of us.
         16  Q.    Okay.  So would it be fair to say it was the three
         17  of you then; Mr. Flood, you and John?
         18  A.    And the IT guys who we can't do anything without,
         19  and the call center people that we can't do anything
13:56:28 20  without.
         21  Q.    Everybody is essential?
         22  A.    Dr. John Korangy was the CEO and the President of
         23  the company during that time up until, I think, 2021.
         24  Q.    And Dr. John, he's the one who made the statements
13:56:39 25  that caused the SEC to suspend trading, right?
```

Scott - Cross                                          611

```
         1    A.    I don't know if that's the case.

         2    Q.    Was he the CEO of CareClix, the subsidiary at that

         3    time?

         4    A.    Um-hmm.

13:56:50 5    Q.    So if I represent to you that what the SEC said was

         6    that those were false and misleading statements made by

         7    the then CEO of CareClix, that would be him, right?

         8    A.    Well, you know, the SEC sent us a letter saying

         9    that --

13:57:09 10   Q.    I asked you, sir -- sir, I asked you not about what

        11    letters you got later from the SEC, right?

        12                You can agree I didn't ask about any legal

        13    letters, correct?

        14    A.    Yes.  Yes.

13:57:18 15   Q.    And you understand, you had a chance to talk about

        16    the letters?

        17    A.    That's right.

        18    Q.    I'm not trying to prolong this here.

        19                And Mr. Hipple was your consigliere.

13:57:27 20                Is that the term you used for him, right?

        21    A.    I think that's the term I used in that piece that I

        22    saw.

        23    Q.    Okay.  And he had been barred by the SEC, right?

        24    A.    Yes.  I'm sorry, say that again.

13:57:41 25   Q.    He had been barred by the SEC?
```

Scott - Cross

612

1          MR. DeVILLERS:  Your Honor, I'm going to

2    object as to asked and answered.

3                THE COURT:  Overruled.

4    A.    He has, yeah.  Yes.

13:57:52  5    Q.    Okay.  And similarly, Mr. Mallion had been barred

6    by the SEC, right?

7    A.    I'm not aware of that.

8    Q.    You're not aware that Mr. Mallion was given a

9    lifetime ban by the SEC?

13:58:00 10    A.    Oh, yes, I've heard that.

11    Q.    Okay.

12    A.    But I haven't --

13    Q.    Had you heard it in 2018?

14    A.    No, I don't believe I had.

13:58:08 15    Q.    So you didn't know that in 2018, even though it was

16    in the lawsuit filed by USLG?

17                So your close friend Mr. Spivak is saying

18    how he's defrauded the company, right?

19                You got to say verbally because --

20    A.    Yes.

21    Q.    -- she can't take down --

22    A.    Yes.

23    Q.    -- when you nod.

24                And he talks about how Mr. Mallion is

13:58:40 25    barred by the SEC for life and still engaged in the

Scott - Cross

613

```
 1   securities industry, right?

 2   A.    Yes, I saw that, too.

 3   Q.    And that's the lawsuit that you participated in

 4   settling, right?

 5   A.    I participated in what?

 6   Q.    Settling that lawsuit.

 7   A.    Yes.

 8              Well, I don't -- I wouldn't say I settled

 9   the lawsuit, but, yeah, I participated in it.

10   Q.    You were part of the deal to settle the lawsuit,

11   right?

12   A.    I wouldn't say it like that.

13   Q.    So you got 1.5 million shares at $0.03 a share as

14   part of the deal to settle that lawsuit, right?

15   A.    You know what?  I think that had something to do

16   with it.

17   Q.    Sorry, I just want to get this straight.

18              You think that the 1.5 million shares had

19   something to do with the lawsuit?

20   A.    I think that I helped them in one instance, and it

21   may have had something to do with that 1.5 million

22   shares.

23   Q.    You helped who in one instance?

24              You helped Mr. Spivak?

25   A.    I would say that.
```

Scott - Cross

```
          1    Q.    Okay.  That's the one instance in which you helped
          2    Mr. Spivak?
          3                 There's only one instance you've ever
          4    helped Mr. Spivak?
14:00:06  5    A.    I gave him $100,000 in 2012.
          6                 I sold territory -- sold products for
          7    years.  So I think I helped him in those, in that
          8    respect.
          9    Q.    Okay.  But so then in 2018, you agreed to help him
14:00:23 10    again, right?
         11    A.    I'd say yeah.
         12    Q.    And that was in settling that lawsuit with Richard
         13    Mallion and the LXRT folks?
         14    A.    That probably had something -- I mean, that might
14:00:34 15    have been something with that matter.
         16    Q.    It might.  You're not sure, though?
         17    A.    You know, I can't think for him.
         18    Q.    Can't think for who?
         19                 Let me be clear.  I'm asking you to think
14:00:49 20    for yourself.
         21    A.    I can't -- I can't -- oh, okay.
         22    Q.    I'm asking you to think for yourself.
         23                 Did you know that the lawsuit was related
         24    to the 1.5 million shares that you got for $0.03 a share?
14:00:59 25    A.    I think the 1.5 million was a culmination of all of
```

Scott - Cross

615

1    the assistance that I'd given USLG.

2    Q.    A second ago it was just one instance of you

3    helping, but now there's, oh, we're culminating lots of

4    instances, right?

14:01:16  5              I could do bigger hand gestures.  My

6    shoulder's not working.

7              At the end of the day, there's lots and

8    lots of assistance you've given USLG, right?

9    A.    I sold bulbs.  I did my best to help these people.

14:01:33 10   Q.    Okay.

11   A.    Yes.

12   Q.    Okay.  So you did know you were involved in the

13   settlement of that lawsuit with Mr. Mallion, right?

14   A.    I think I was helpful.

14:01:50 15   Q.    Okay.  And you helped by getting shares at $0.03

16   apiece, right?

17   A.    I don't understand what you're saying.

18   Q.    You helped by paying $50,000 for 1.5, roughly,

19   million shares of USLG.

14:02:06 20              Is that how you helped?

21   A.    Well, that's not what I was -- no.

22              That's -- maybe that was helpful, but

23   that's not what I was thinking.

24   Q.    You were thinking about the selling of the bulbs?

14:02:22 25   A.    I was thinking about the selling of the bulbs and,

Scott - Cross                                              616

1    yes, I was thinking about the selling of the bulbs.

2    Q.    Okay.  So you weren't helping to settle the lawsuit

3    then?

4    A.    I did help settle the lawsuit.

14:02:39 5    Q.    Ah, here we go.

6                    Okay.  Good.

7    A.    But what I did that I thought was helpful was wire

8    that money to -- from USLG to Mallion.

9                    I thought that was helpful.

14:02:56 10   Q.    Right.  Because they didn't want to wire it

11   directly, right?

12   A.    Because there was a conflict of interest, they

13   said.

14   Q.    And that conflict of interest wouldn't be apparent

14:03:11 15   if the money went through you, right?

16   A.    That's probably the case, yes.

17   Q.    Okay.  So you know, you understand at that time

18   that there's a conflict of interest between USLG and

19   Mr. Mallion, right?

14:03:28 20   A.    Um-hmm.

21   Q.    Okay.  But they need to pay Mr. Mallion, right?

22   A.    They need to get money to Mr. Mallion.

23   Q.    Is there a difference between needing to pay him

24   and needing to get him money?

14:03:48 25                   Is there a difference?

Scott - Cross

617

1      A.    He apparently owed him money, and he wanted to give

2      it to him.

3      Q.    So they wanted to pay him?

4      A.    I suppose.

14:03:58  5      Q.    I don't want to put you out on a limb here.

6      A.    I'm not out on a limb.

7      Q.    All right.  And so you agreed to be helpful, right?

8      A.    Here's what happened.

9            They said that they needed to get some

14:04:27 10      money wired to Richard for whatever, and I said okay.

11      Q.    Was their bank account not working?

12      A.    They said it had to do with the conflict of

13      interest at the -- at the lawsuit.

14      Q.    Okay.  So they were not allowed --

14:04:47 15      A.    "They" being Paul Spivak.

16      Q.    Okay.  So Paul said, "Because there's a conflict of

17      interest I can't send the money directly to Richard

18      Mallion."

19            Is that right?

14:04:59 20      A.    Yes.

21      Q.    Okay.  "So I need you to send the money to Richard

22      Mallion"?

23      A.    He asked me to do it.

24      Q.    Okay.  And so as a result, he said, "I'm going to

14:05:14 25      send you sums of money, and I need you to forward those

Scott - Cross

618

```
 1    sums of money to Richard Mallion."

 2                  Right?

 3    A.    I sent exactly what he sent.

 4    Q.    Okay.  Now, when you did that, you knew it was

 5    wrong, right?

 6    A.    No.

 7    Q.    You thought it was totally above board to be doing

 8    this?

 9    A.    I didn't think it was smart, you know, in

10    retrospect.

11    Q.    No, I don't really want retrospect.

12                  What did you think at the time?

13    A.    I didn't think it was wrong.

14    Q.    Thought it was totally fine, right?

15                  You were just helping a friend, right?

16    A.    Pretty much.

17    Q.    And so help me understand this.

18                  You think it's totally fine, just helping a

19    friend, right?

20    A.    Yes.

21    Q.    And you're helping a friend to get money to Richard

22    Mallion, right?

23    A.    Yes.

24    Q.    Why would you describe it as sending money to

25    Richard Bernstein then?
```

Scott - Cross                    619

1    A.    I don't recall doing that.

2    Q.    Let me help you recall.

3              MR. MORRISON:  Can we show, please,

4    Government's Exhibit 1401, please?

14:06:39  5              Can we show it just to the witness at

6    first?

7              Okay.  And if we'd zoom in on the top half,

8    just one, just a one-pager here.

9    BY MR. MORRISON:

14:06:55 10    Q.    Okay.  So do you recognize this as a record of a

11   wire?

12   A.    Yeah.  Um-hmm.

13   Q.    Okay.  And this was part of how you helped

14   Mr. Spivak with his conflict of interest problem, right?

14:07:16 15   A.    Um-hmm.

16   Q.    Okay.

17              MR. MORRISON:  Permission to publish, Your

18   Honor?

19              MR. DeVILLERS:  No objection.

14:07:23 20              THE COURT:  You may.

21   BY MR. MORRISON:

22   Q.    Okay.  So you see this is a $29,000 wire, right?

23   A.    Yes.

24   Q.    Okay.  And the date on this is -- well, no, sorry,

14:07:34 25   that's a run date.  Don't look at that.

Scott - Cross                                    620

 1              Sorry.

 2              The date on the transfer is -- let's see if

 3    we can find the actual transfer date.  Looks like it's

 4    2018, April, 2009.

14:07:49  5              No.

 6              2018, April 9th, right?

 7              18/04/09, would you agree with me that

 8    04/09 is April 9th?

 9    A.    Yes.

14:08:02 10    Q.    Does that sound about like when you would have sent

 11    $29,000 to Mr. Mallion?

 12    A.    Say that again.

 13    Q.    Is that approximately when you might have sent this

 14    money to Mr. Mallion?

14:08:13 15    A.    Yes.

 16    Q.    Okay.  Now, of course you didn't call him

 17    Mr. Mallion, right?

 18              Did you call him Mr. Mallion or not?

 19              I mean, it says right there Bernstein?

14:08:28 20    A.    He was Richard Bernstein at one point.  He was

 21    Richard Mallion at another point.  I, you know --

 22    Q.    Okay.  At this point, I'm asking at this point, at

 23    this point he'd been sued as Richard Mallion, right?

 24    A.    I don't -- I don't recall this.

14:08:40 25    Q.    Okay.  At this point you understood that he had

Scott - Cross

621

1    been sued in his real name Richard Mallion, right?

2    A.   I understood he was sued as Richard Mallion.

3    Q.   Okay.  And you also understood that part of that

4    lawsuit was that he was using fake names and shell

14:09:04 5    companies to hide who he really was, right?

6    A.   No.

7    Q.   Didn't know that part?

8    A.   How would I know?

9    Q.   You were the second-largest shareholder in USLG at

14:09:18 10    that time, right?

11                   And you helped to settle the lawsuit,

12    right?

13    A.   I think that helped.

14    Q.   Well, this may well have helped.  I have no doubt

14:09:33 15    that this helped.

16                   I guess my point is you also paid $50,000

17    to get that lawsuit settled, right?

18    A.   I paid $50,000 for the stock.

19    Q.   Okay.  And you didn't have any understanding that

14:09:44 20    that had any relationship to the lawsuit?  Is this the

21    first you're hearing about that?

22    A.   Of course I knew that the 50 -- the stock

23    settlement was a part of the lawsuit.

24    Q.   So then you could just answer my question with a

14:10:01 25    yes next time.

1    A.    Yes.

2    Q.    And not try to avoid it.  Okay.

3                So at the end of the day you did pay

4    $50,000 to help settle that lawsuit, right?

14:10:09  5    A.    At the end of the day I paid $50,000 for the stock.

6    Q.    Okay.  And you knew that was helping to settle the

7    lawsuit?

8    A.    I suppose it was helping to settle the lawsuit.

9    Q.    Just a second ago you said it definitely did, but

14:10:21 10    now you're only supposing?

11                MR. DeVILLERS:  Objection.

12                Argumentative.

13                THE COURT:  Sustained.

14    BY MR. MORRISON:

14:10:26 15    Q.    Mr. Scott, at the end of the day, you knew that he

16    was Mr. Mallion at this time?

17                The lawsuit was in 2017, right?

18    A.    I --

19                MR. DeVILLERS:  Objection.

14:10:38 20                Asked and answered, Your Honor.

21                THE COURT:  Overruled.

22    A.    Say that again.

23    Q.    The lawsuit was in 2017, right?

24    A.    I think so, yes.

14:10:43 25    Q.    Okay.  And you knew that he was Richard Mallion?

Scott - Cross                                    623

1          You knew that was his real name, right?

2    A.    Look, man --

3    Q.    Did you or did you not know that was his real name?

4    I just -- I'm trying to get this over with.

14:10:58 5    A.    I really don't -- I still don't know what his real

6    name is.

7    Q.    Ah, okay, so now you're not sure?

8    A.    I know the lawsuit said Richard Mallion.

9    Q.    Okay.

14:11:07 10   A.    And I know that you guys are talking about him as

11   Richard Mallion.

12          Richard Bernstein, that's -- when I met

13   him, that's who he was.

14          I don't recall putting his name on this

14:11:18 15   deal at all.

16   Q.    Okay.  So you understand this is a record of the

17   wire transfer from your bank account to Legacy Global

18   Investments?

19   A.    And I wrote that?

14:11:35 20   Q.    You understand that wire transfers, when they have

21   notes, it's a note made by the person sending the wire?

22          Do you understand that?

23   A.    Yeah, I understand that.

24   Q.    Okay.  So did you let other people send wires for

14:11:45 25   you out of your personal account for $29,000?

Scott - Cross                                      624

1    A.    Yes.

2    Q.    Who did you let do that?

3    A.    Josh did it sometimes.

4    Q.    Oh, so Josh, arrested, convicted of serious crime,

14:12:07  5    maybe this is him?

6    A.    You know what?  All I'm saying is I don't recall

7    putting "Richard Bernstein" on the invoice, and if I did

8    put "Richard Bernstein" on the invoice it was probably a

9    mistake or I just -- it -- I'm not trying to deceive

14:12:26  10    anybody as I do this.

11              Why would I?

12    Q.    You want me to answer that seriously?

13    A.    Yes, sure, go ahead.

14    Q.    I don't think you do.

14:12:36  15              I think you were trying to deceive people

16    because you said it was to cover management consulting,

17    didn't you?

18    A.    Who am I deceiving?

19    Q.    Well, the Ladies and Gentlemen of this Jury for

14:12:50  20    starters, the bank for seconds, investors in USLG for

21    thirds; would you agree with that?

22              MR. DeVILLERS:  Objection.

23              Argumentative, and I'm not sure he should

24    be answering his questions.

14:12:59  25              THE COURT:  Yes.  Sustained.

Scott - Cross                                    625

1          MR. MORRISON:  I tried to avoid it.

2     BY MR. MORRISON:

3     Q.   At the end of the day, Richard Bernstein, did he

4     strike you as a management consultant?

14:13:06  5     A.   I don't recall putting Richard Bernstein on there.

6     I may have.

7     Q.   Did Mr. Richard Mallion or Bernstein, whatever you

8     want to call him, did he strike you as a management

9     consultant?

14:13:19 10     A.   Actually, yes.

11     Q.   That's the way he came off to you?

12     A.   That's the way he was presented to me.

13     Q.   Okay.  Did you believe that he was in truth and in

14     fact a management consultant?

14:13:32 15     A.   I believe that he was a management consultant to

16     USLG, yeah.

17     Q.   Okay.  And so you believed that this payment for

18     $29,000 in April of 2018 was a payment for management

19     consulting services, is that right?

14:13:51 20     A.   Yes, actually.

21     Q.   Okay.  And that's even though at that time there

22     was a pending lawsuit claiming that he was a crook and

23     using a false identity, right?

24     A.   There was a pending lawsuit saying that, yes.

14:14:06 25     Q.   Okay.  But you thought USLG still wanted to pay him

Scott - Cross

626

1    for management consulting services?

2    A.    Yes.

3    Q.    And you just accidentally wrote a fake name on this

4    invoice?

14:14:23  5    A.    I don't recall writing his name, but whether it was

6    Richard Bernstein or Richard Mallion, if I wrote it, I

7    wrote it, but I don't recall writing that.

8    Q.    Okay.  And did Mr. Spivak tell you that this was

9    for management consulting?

14:14:46 10    A.    I think Mr. Spivak said, "Can you send this to

11    Richard?"

12    Q.    So then you made up the part about management

13    consulting?

14    A.    Hmm.  I think I may have put that on there.

14:15:06 15    Q.    Okay.  Even though all you knew was that it was,

16    "Please just send this to Mr. Mallion, to Richard"?

17    A.    Even though it was just, "Send this to Richard,"

18    yep.

19    Q.    We can take that down now.

14:15:22 20            So you know he's got two names, right, at

21    the time of that wire, right?

22    A.    I know he's got two names.

23    Q.    Okay.  And let's just -- I'm not going to ask you

24    to go through all the various warning signs that you had

14:15:49 25    about Mr. Mallion before then, but after that lawsuit,

Scott - Cross

```
 1    after that wire record, fair to say that he ripped you

 2    off, right?

 3    A.    That's fair to say.

 4    Q.    Okay.  A hundred thousand shares and you never got

 5    paid, right?

 6    A.    Never got paid.

 7    Q.    Okay.  And Mr. Collins also ripped you off, right?

 8    A.    Never paid me.

 9    Q.    Sent him a hundred thousand shares; never got paid?

10    A.    Yes.

11    Q.    Okay.  Now, other issues with Mr. Spivak that you

12    had, you knew that he had all these pirates running

13    around, right?

14    A.    No.

15    Q.    You didn't know about him using the term "pirates"

16    all the time?

17    A.    No.

18    Q.    Okay.  Could you --

19    A.    I --

20    Q.    Go ahead.  Sorry.

21    A.    I think I heard him use "pirates" one time.

22    Q.    Was it in reference to, like, a Johnny Depp movie,

23    or what?

24    A.    Was it in reference to what?

25    Q.    A movie, or was it in reference to people who were
```

Scott - Cross

628

1    selling stock for commissions?

2    A.   I think he was referring to the people that were

3    selling or investing.

4             The people that he was working with, he

14:17:08 5   called them pirates.  I didn't know who they were.

6    Q.   Okay.  Didn't know who they were.

7             Did you know that they had been sued by the

8    SEC?

9    A.   Who?

14:17:17 10  Q.   The pirates, the people he was working with to sell

11   stock.

12   A.   Who were the pirates?

13   Q.   I'll give you some names.

14             Did you know that Christopher Bongiorno was

14:17:29 15  sued by the SEC?

16   A.   No.

17   Q.   Did you know that Hughe Duwayne Graham was sued by

18   the SEC?

19   A.   No.

14:17:36 20  Q.   Did you know that Jason Arthur was sued by the SEC?

21   A.   No.

22   Q.   Did you know of anyone who worked for USLG who was

23   sued by the SEC?

24             And by "worked for," let me clarify?

14:17:51 25            Did -- provided services to in exchange for

Scott - Cross

629

1   some compensation, right?  So I'll include Mr. Mallion in

2   that bucket.

3   A.    I think I found out about Mallion being sued by the

4   SEC.

14:18:06  5   Q.    Okay.  He's the only one, though?

6   A.    I didn't know the other guys.

7   Q.    Okay.  But you also didn't know about them being

8   sued by the SEC?

9   A.    No, I didn't.

14:18:16  10   Q.    And did you know that USLG was investigated by the

11   SEC?

12   A.    I did.

13   Q.    Okay.  After all that, still in 2021 you're full

14   steam ahead with USLG, right?

14:18:31  15   A.    I'm full steam ahead with my plans with USLG, yeah.

16   Q.    Your plans are to make money by selling your stock,

17   right?

18   A.    My plans, if I can sell my stock, yes.

19   Q.    Okay.  Now, we agreed earlier that it was your

14:18:55  20   understanding that Paul could not be involved in the sale

21   of free-trading stock for USLG, right?

22         I know it's been an hour or so so --

23   A.    I'm fine.  I just -- it's -- I am not interested in

24   that.  I wasn't interested.  I didn't talk about that

14:19:18  25   stuff.  I don't know about that.

Scott - Cross

630

1    Q.    Okay.  You understand that the way this works --

2    A.    I understand it now.

3    Q.    -- is I ask you questions, and whether or not you

4    want to talk about them or not, unfortunately, you do

14:19:29   5    have to answer them, okay?

6    A.    That's fine.

7    Q.    Okay.  My question earlier was what was your

8    understanding about whether he could be involved selling

9    free-trading stock, and your answer -- tell me if you

14:19:38  10    disagree -- was you understood that he could not be

11    involved in selling free-trading stock?

12    A.    I understood that CEOs and officers of companies,

13    directors cannot be involved in free-trading stock.  I've

14    come to know that.

14:19:51  15    Q.    Okay.  Did you -- maybe I'm skipping a step.

16          Did you understand that Mr. Spivak was such

17    a person, that he was the CEO of USLG?

18    A.    I knew he was the CEO, but, look --

19    Q.    Hold on.  Let me just --

20    A.    Yes.

21    Q.    You knew he was a CEO, right?

22          Did you know he was an officer and a

23    director?

24    A.    I knew he was the officer and a director, yeah.

14:20:14  25    Q.    Okay.  So just so we're clear, you knew he --

Scott - Cross

631

1    basically he checked all those boxes, right?

2    A.    Officer and Director, yeah.

3    Q.    And so he should not be involved in selling USLG

4    stock, right?

14:20:26  5    A.    Officers and directors are the only people that can

6    sell USLG stock.

7    Q.    Sorry.  That's a good point.

8                   They are involved in selling restricted

9    shares, officers and directors, right?

14:20:36 10    A.    Yeah.  I've come to understand that, yes.

11    Q.    All right.  But they should not be involved in

12    selling other people's free-trading shares of stock,

13    right?

14    A.    Selling their free-trading shares?

14:20:46 15    Q.    No.  Other people's.

16                   They should not be involved in selling

17    other people's free-trading shares of stock?

18    A.    I don't -- I don't understand what you're saying.

19    Q.    Okay.  Earlier when you said you understood that

14:20:58 20    officers and directors should not be involved in selling

21    free-trading shares of stock, what did you mean by that?

22    A.    That's a rule, I believe.

23    Q.    Okay.  And the rule is against what?

24    A.    What do you mean "against what"?

14:21:13 25    Q.    I'm just trying to understand what you understood

Scott - Cross                                    632

```
          1    about the rule because you've said a couple different

          2    things.

          3                    Can Mr. Spivak, as an officer and director,

          4    be involved in selling free-trading shares of USLG stock?

14:21:32  5    A.    Whether it's him or anybody else, I think they can

          6    sell a certain amount per quarter or something like that.

          7    Q.    Okay.  You understand there's a separate rule when

          8    it concerns Mr. Spivak selling his own personal stock,

          9    right?

14:21:44 10                    And there's limitations on how much he can

         11    sell, right?

         12                    That's what you're referring to there,

         13    right?

         14    A.    Yes.  I think so.

14:21:53 15    Q.    Okay.  Now, separate and apart from that, there's a

         16    different rule, right?

         17                    All right.  And you talked about it

         18    earlier, I think you stated it a couple times, that they

         19    cannot be involved in selling free-trading shares of

14:22:08 20    stock by other people, right?

         21    A.    You know, I've -- I don't know enough about this

         22    stuff to be talking too much about it.  That's why I have

         23    Bob Hipple and these other lawyers.

         24                    It is my understanding that if you're an

14:22:24 25    officer in a public company, you should -- you can sell
```

Scott - Cross

633

1     free-trading stock, so much per quarter of your stock.

2     Q.    Yep.

3     A.    You can sell every dime of your restricted stock

4     anytime to anybody you want to.

14:22:39 5              In terms of being involved in someone

6     else's free-trading stock, I don't even know where that

7     would come up with a legitimate officer.

8     Q.    Okay.  Well, let's imagine an illegitimate officer

9     who is trying to arrange for his buddy to sell

14:22:53 10    free-trading shares.  Right?

11              So I take your point, and agree with it,

12    that a legitimate officer would not be involved in

13    someone else selling free-trading shares of stock?

14    A.    Right.

14:23:03 15    Q.    Right?

16              But that's because they're not allowed to

17    be involved in other people's sales of free-trading

18    stock, right?

19    A.    Right.

14:23:10 20    Q.    Okay.  But Mr. Spivak was, in fact, involved in you

21    selling your free-trading shares of stock, right?

22    A.    No.

23    Q.    So Mr. Spivak had no hand?

24    A.    Not a bit.  How could he have a hand in me selling

14:23:24 25    my free-trading stock?

Scott - Cross

634

```
        1    Q.    Okay.  Did he or did he not set you up with
        2    Mr. Dean for the explicit purpose of Mr. Dean buying
        3    $25,000 of free-trading stock from you?
        4    A.    He introduced me, yeah.
14:23:38 5    Q.    Okay.  And did he introduce you for that explicit
        6    purpose?
        7    A.    He introduced me to Mr. Dean for that purpose, and
        8    hopefully for Mr. Dean to invest in our company.
        9    Q.    Right.
14:23:58 10              So one of the purposes of introducing
       11    Mr. Dean was for him to buy free-trading stock from you?
       12    A.    Yes.
       13    Q.    Okay.  Even though he's not supposed to be involved
       14    in such sales?
14:24:09 15   A.    Who?
       16    Q.    Mr. Spivak.
       17    A.    I'm -- I mean, I don't know anything about that.
       18    Q.    I won't make you say all the things you said before
       19    again.
14:24:21 20              At the end of the day, you also knew
       21    Mr. Spivak had a plan to flee the country if something
       22    came up, right?
       23    A.    No.
       24    Q.    No?
14:24:27 25              So were you lying to Mr. Dean when you said
```

Scott - Cross

635

```
         1    that he had a whole plan to fly to France when the

         2    sheriff showed up at your house?

         3    A.    That was a joke.

         4    Q.    Okay.  Not a lie, but a joke, right?

14:24:41 5    A.    I think -- I think it was a joke.

         6    Q.    Did the sheriff actually show up at your house?

         7    A.    No.  No.  No.  No.  Not at my house.

         8    Q.    Where did the sheriff show up?

         9    A.    I think he came by the office but I wasn't there,

14:24:59 10   and he didn't come back.

        11    Q.    Was that to arrest Mr. Flood?

        12    A.    Hmm?

        13    Q.    Was that to arrest Mr. Flood?

        14    A.    No.

14:25:08 15   Q.    Something else?

        16    A.    Something else.

        17    Q.    Okay.

        18    A.    But it wasn't for me.

        19    Q.    Didn't know that at the time, though, did you?

14:25:17 20   A.    No.

        21    Q.    So your top priority in getting money from Mr. Dean

        22    was to get money to CareClix, right?

        23    A.    That, that was at the top of my list, yeah.

        24    Q.    Okay.  That was number one I think is what you

14:25:44 25   said, right?
```

Scott - Cross                                          636

1    A.    Yeah, that was -- I mean, yeah.

2    Q.    Okay.  What did you do with the money you got from

3    Mr. Dean?

4    A.    What did I do with it?

14:25:50  5    Q.    Yeah.

6    A.    I subsequently purchased 100,000 of restricted USLG

7    shares.

8    Q.    Okay.  How much money was that?

9    A.    It was $15,000.

14:26:04 10    Q.    How much did you have left of the money from

11   Mr. Dean?

12   A.    $10,000.

13   Q.    Well, did that go to your CareClix?

14   A.    Hmm.  I'm not sure.

14:26:21 15    Q.    Okay.  Number one priority was money for CareClix,

16   right?

17   A.    Um-hmm.

18   Q.    But would you believe that actually none of it went

19   to CareClix?

14:26:33 20    A.    I could believe that.

21   Q.    Okay.  Would you believe that all of it went to

22   Coinbase in structured transfers?

23   A.    Yes.  I could believe that.

24   Q.    That does sound familiar?

14:26:44 25                Did you do a thousand dollars at a time

Scott - Cross

637

1    repeatedly over and over again in the course of a few

2    days?

3    A.    Well, yes, with the Coinbase.

4    Q.    Okay.  So took that money that you got from this

14:27:00  5    deal with Mr. Dean, paid the 15,000 to Mr. Spivak, and

6    the rest over to Coinbase, right?

7    A.    Correct.

8    Q.    Coinbase is for crypto currencies, right?

9    A.    Yes.

14:27:16 10    Q.    So you would agree that getting money to CareClix

11    wasn't really your number one priority, was it?

12    A.    Yes, it was my number one priority.

13    Q.    Just not the one you took care of first or second?

14              Did you take care of it?

14:27:30 15    A.    Second?  Second?

16    Q.    First or second?

17              So I think we just went over, first thing

18    you did with the money, right, is send money to

19    Mr. Spivak, right?

14:27:40 20              Second thing you did, put it in crypto,

21    right?

22    A.    The 25,000?

23    Q.    Yeah.

24    A.    Yes.

14:27:46 25    Q.    And you put all of the rest of it there?

Scott - Cross                                    638

1    A.    Say that once more.

2    Q.    You put all of that $10,000 into crypto, right?

3    A.    Yes.

4    Q.    Okay.  And none of it went to CareClix?

14:27:58  5    A.    No.

6    Q.    Now, you've testified at some length that you had

7    no idea what the purpose was of Mr. Dean getting involved

8    with USLG, right?

9                 And I'm summarizing, so you can clarify if

14:28:35 10    you'd like.

11    A.    Paul Spivak calls me out of the blue and tells me

12    to call, or telling me that Dean is going to call.

13                 What are you asking me.

14    Q.    I'm asking you you're saying you didn't really know

14:28:55 15    what he was going to be doing, right?

16    A.    Yes.  I knew what he was going to be doing.

17    Q.    Okay.  What was he going to be doing?

18    A.    Promoting USLG stock, I believe.

19    Q.    Okay.  And he was going to be being paid for that

14:29:09 20    how?

21    A.    I didn't know that.

22    Q.    So what was the relevance of you selling your stock

23    to him?

24    A.    From my perspective, it was to sell my stock.

14:29:21 25    Q.    Okay.

Scott - Cross                           639

```
            1    A.    And next thing I wanted to do is to help the

            2    company --

            3    Q.    Okay.  So you didn't --

            4    A.    -- of course.

14:29:27    5    Q.    Sorry.

            6                So you didn't understand the sale of your

            7    stock to have any connection at all to him promoting the

            8    stock?

            9    A.    I -- I -- I believe that he was going to promote

14:29:40   10    the stock.

           11    Q.    Okay.  And did you understand that there was any

           12    connection between his promoting the stock and your

           13    selling him your stock?

           14    A.    There had to be, there was some connection.

14:29:54   15    Q.    So that's a yes, there was a connection?

           16    A.    Hmm?

           17    Q.    There was a connection then?

           18    A.    Yeah, he said -- they said they wanted to see

           19    whether or not the thing would work or something, so I

14:30:06   20    guess there was a connection, yeah.

           21    Q.    Okay.  And again, he was going to be making his

           22    money by selling that stock at higher prices, right?

           23    A.    I don't know about that.

           24    Q.    Well, let me just make sure I understand.

14:30:22   25                If I buy stock for $25,000, and I don't
```

Scott - Cross

640

1    sell it for more than $25,000, have I made any money?

2    A.    No.

3    Q.    Okay.  So the only way he's going to make money is

4    by selling it for more than $25,000, right?

14:30:41  5    A.    I thought that they were going to do a much bigger

6    deal.  I -- yeah, I guess that's right.

7    Q.    Right.  And --

8    A.    Yes, I do believe that they were going to promote

9    the stock, and I do believe they wanted to make that

14:30:56 10    stock go as high as it could go.

11    Q.    Right.  They wanted to push that price up?

12    A.    High as it will go.

13    Q.    Right.

14              And they were going to do that in

14:31:06 15    conjunction with not only buying $25,000 of stock from

16    you, but buying all of the stock that you owned, right?

17    A.    That's what Paul Spivak said, that they would buy

18    all my stock.

19    Q.    Right.  And, in fact, you discussed that with

14:31:24 20    Mr. Dean, right?

21    A.    I think I did.

22    Q.    And you understood that the description of how that

23    would happen was through a man who was described as a

24    magician who could make things trade, right?

14:31:40 25    A.    I didn't understand -- I don't know if I understood

Scott - Cross                                      641

1     that.

2                   MR. MORRISON:  Okay.  Can we play

3     Government's Exhibit 445A?

4                   Permission to publish?

14:32:11  5                   THE COURT:  You may.

6                   (Tape playing).

7                   MR. MORRISON:  Can we stop there?  Can we

8     stop there, please?

9     BY MR. MORRISON:

14:32:45 10    Q.   So does that refresh your recollection,

11    Mr. Scott --

12    A.   Yeah.

13    Q.   -- that the way that they were going to get the

14    price up was through Bryan who's a magician?

14:33:00 15    A.   I -- he's -- he's responding to me, and yeah,

16    that's what he's saying, but I'm not really -- yeah.

17    Yeah.  Yes, I see that.

18                   Bryan is a magician and he makes these

19    things trade and he's going to -- yeah.

14:33:16 20    Q.   All right.  And they are going to fire up the

21    engines, right, first or second week of June?

22    A.   Yeah.

23    Q.   Okay.  So you were told that, right?

24    A.   Yeah, I was told that the -- "Well, yeah, I would

14:33:28 25    probably look at it as each of them separate press

Scott - Cross

642

1    releases and have somebody like my guy Bryan, you know,

2    working away on it and, you know, I -- I -- I -- I've

3    told Paul he's a magician that makes these things trade."

4              Yeah, he said that.

14:33:47  5  Q.   I didn't -- you don't have to read any more.

6              The jury's heard enough reading.

7    A.   Well, it helps me to do that.

8    Q.   Yeah, okay.  Well, so that's good.

9              We can go ahead and take that down then.

14:33:59 10            And, in fact, after that, when you met in

11   person with Mr. Dean, you said, "I see what you're trying

12   to accomplish and I know I'm going to get my money out of

13   it and I'm super cool with it."

14             Do you recall saying that?

14:34:12 15  A.   Yes.

16   Q.   Okay.  And you said specifically, "I know what's

17   going on."

18             Do you recall saying that?

19   A.   Yes.  I recall saying that.

14:34:24 20  Q.   Now, one thing, you did not like to talk about

21   free-trading shares on the telephone, would you agree?

22   A.   No.

23   Q.   You don't agree with that?

24             Okay.  Can we pull up 451F and go to the --

14:34:46 25  sort of halfway through?  A little further.

Scott - Cross                                    643

1              MR. MORRISON:  Permission to publish, Your

2     Honor.

3              THE COURT:  I'm sorry, what was the exhibit

4     number?

14:35:02  5              MR. MORRISON:  I'm sorry, it is 451F.

6              THE COURT:  You may.

7              MR. DeVILLERS:  Where are you playing from?

8     Can you show me where?

9              MR. MORRISON:  We are playing from

14:35:13 10     approximately 40 seconds.

11              MR. DeVILLERS:  Yes.

12              MR. MORRISON:  Thank you for keeping the

13     record clear.

14              Go ahead and hit "Play."

14:35:20 15              (Tape playing).

16              MR. MORRISON:  Can we pull up -- I forgot

17     we were having a technical issue with this one.

18              Can we go to 451 Proper, please?

19              And -- what's that?

14:36:07 20              Okay.  Now, this is just the excerpt.

21              Oh, I see.  Right.  Okay, if you want to go

22     to the end of that.

23              Go further because we've already just

24     listened to that.  Yeah.

14:36:21 25              Okay.  We're going to start from 51 seconds

Scott - Cross                                   644

1    there.

2                    MR. DeVILLERS:  And this is 451 Proper?

3                    MR. MORRISON:  This is 451F now, just to

4    complete this excerpt.

14:36:31 5                    MR. DeVILLERS:  This is 451F?

6                    MR. MORRISON:  Yes.  This is 451F.  We are

7    just going to the audio-only file.

8                    (Tape playing).

9    BY MR. MORRISON:

14:36:46 10   Q.   So did you hear yourself, Mr. Scott, interrupting

11   as soon as Mr. Dean said he tends to like a blend of

12   freely tradeable shares, before he could even finish what

13   they were going to be blended with, you said "You know

14   we're on the phone"?

14:37:01 15                   Did you hear that?

16   A.   I think someone walked into the office.

17   Q.   Oh, okay.  So you were interrupted by somebody?

18   A.   I believe so.

19   Q.   Okay.  So Mr. Dean was lying.  He didn't mention

14:37:10 20   that, right?  He said that you didn't want him to talk

21   about that.

22                   Do you recall Mr. Dean testifying?

23   A.   I don't talk -- I normally talk -- I wouldn't care

24   if we are talking on the phone about free-trading stock.

14:37:31 25   Q.   That wouldn't be a problem for you, right?

Scott - Cross

645

1    A.    It is not a problem for me.

2    Q.    And it wouldn't be the type of thing you would hide

3    from Mr. Hipple, right?

4    A.    Why would I hide it?

14:37:43  5    Q.    I ask questions.  You answer questions.

6    A.    Oh.  Oh, okay.

7    Q.    I think we've established, as much as I would love

8    to answer your questions, I don't think I'm supposed to.

9    A.    Well --

14:37:57 10    Q.    Is it the type of thing you would hide from

11    Mr. Hipple?

12               Apparently -- is the answer no?

13    A.    What?  The talking about free-trading shares?

14    Q.    Yes.

14:38:08 15    A.    To hide from Mr. Hipple?

16    Q.    I -- if it's such a ludicrous question, you can

17    just say no.

18    A.    No, I can't imagine hiding that from Mr. Hipple.  I

19    can't imagine hiding that from Mr. Hipple.

14:38:18 20    Q.    You would not hide that from Mr. Hipple, right?

21    A.    I can't imagine hiding that from Mr. Hipple.

22    Q.    Okay.  Now, can we turn to 451 Proper?  And we're

23    going to go to one hour 55 minutes and 29 seconds.  One

24    hour 55 minutes and 29 seconds, I believe.

14:38:46 25               This is Government's Exhibit 451, no

Scott - Cross                    646

1    suffix.

2                    (Tape playing).

3                    MR. MORRISON:  Can we pause that now for a

4    second?  We're at 1:55 now.

5    BY MR. MORRISON:

6    Q.    Would you agree that that's Mr. Hipple on the phone

7    there?

8    A.    Sounds like it.

9    Q.    Okay.

14:39:16 10                    (Tape playing).

11    BY MR. MORRISON:

12    Q.    Pause it.

13                    Okay.  So are we saying goodbye to

14    Mr. Hipple now?  He's off the phone?

14:39:35 15    A.    Yes.

16    Q.    Okay.  And that was the person you were on the

17    phone with when, during that last click, you said, "You

18    know we're on the phone"?

19    A.    Sounds like it.

14:39:45 20    Q.    Okay.  All right.  Now, your version is somebody

21    walked into the room, right?

22    A.    That's what I think.

23    Q.    Okay.  All right.  But you certainly wouldn't have

24    any problem talking on the phone about freely trading

14:39:56 25    shares, right?

Scott - Cross                                    647

1    A.    I have a problem talking on a regular phone,

2    period.

3              But no.

4    Q.    Okay.  But you would agree that you probably just

14:40:06 5    spoke to Mr. Hipple on the phone there for quite awhile,

6    right?

7              That was a pretty long call with

8    Mr. Hipple?

9    A.    Yeah, that was in a meeting at the office, I

14:40:15 10   believe.

11   Q.    Yes.

12             And then as, you know, your attorney played

13   earlier, that there was a long phone call with Mr. Hipple

14   so you could talk about -- all about the business, right?

14:40:23 15  A.    Yes.

16             MR. MORRISON:  Okay.  Now, if we could keep

17   playing now as soon as Mr. Hipple is off.

18             (Tape playing).

19             MR. MORRISON:  Let's stop here.

14:41:33 20  BY MR. MORRISON:

21   Q.    So you would agree that as soon as Mr. Hipple gets

22   off the phone, that you bring up these 11 million shares

23   of free -- that are going to be free trading at various

24   times, right?

25             (Pause.)

Scott - Cross                                     648

1           I take it you want to point out that's just

2      a coincidence?

3      A.    Would you say that again?

4      Q.    My question was you bring up the control of 11

14:41:53  5      million shares, much of which is free trading, you bring

6      up control of all of those shares as soon as Mr. Hipple

7      gets off the phone, don't you?

8      A.    And as soon as this conversation's over, I called

9      Mr. Hipple and asked him his advice on this stuff.

14:42:08 10      Q.    Okay.  You've had a chance to talk about that

11      already, right?

12           You've had a chance.  You understand your

13      attorney asked you questions and you get to answer and go

14      on and on?

14:42:19 15      A.    Okay.  Yes.

16      Q.    Okay.  You understand I didn't ask you about the

17      calls that came after this, right?

18      A.    You did not.

19      Q.    Okay.  And I think everybody is ready for this to

14:42:27 20      be done, you and me included, right?

21      A.    I'm getting used to this process as we speak.  I'll

22      try to do better, sir.

23      Q.    Just in time.

24           Okay.  So I'm glad you're getting used to

14:42:37 25      it, but I want to wrap up here.

Scott - Cross                                        649

1              So you would agree that --

2    A.    Feel free.

3    Q.    If you'll let me.

4    A.    Yes, sir.

14:42:46  5    Q.    You would agree --

6    A.    Yes, sir.

7    Q.    -- that it's right after Mr. Hipple gets off the

8    phone that you get into those 11 million shares, right?

9    A.    Yeah, I talk about that.

14:42:56  10    Q.    Okay.  And you would agree that what you said is

11    that Josh, Mr. Flood, controls 11 million shares, right?

12    A.    Yeah.  That's -- that's --

13    Q.    Did you say that --

14    A.    Yes.  Yes.

14:43:10  15    Q.    -- just then or not?

16    A.    Yes, I said it.

17    Q.    In fact, you said it a couple times, right?

18    A.    I -- I said it.

19              I don't know how many times.

14:43:18  20    Q.    All right.  I can get you a transcript to count if

21    you want, but would you agree you said it at least a

22    couple?

23    A.    Sounded like it, yeah.

24    Q.    Okay.  And Mr. Flood corrected you and said

14:43:30  25    actually he only owns one million, right?

Scott - Cross

650

```
           1    A.    Yeah, I think so.  I think that's what he said.

           2    Q.    And he explained that what he has is a

           3    "relationship" with ten million, right?

           4    A.    That's what he said.

14:43:46   5    Q.    Okay.  So you wait until you get off the phone with

           6    your general counsel, who's been barred by the SEC, to

           7    talk about these shares, right?

           8    A.    No.

           9    Q.    You didn't wait?

14:44:04  10    A.    No.

          11    Q.    Okay.  You got -- you started talking about these

          12    shares as soon as he got off the phone.

          13          We can agree on that, can we not?

          14    A.    Yes.  Yes.

14:44:11  15    Q.    Okay.  And you then explain there's a situation

          16    where Josh controls shares that he doesn't own, right?

          17    A.    Yes.

          18    Q.    Okay.  In the same way that Mr. Spivak controlled

          19    the shares that you owned, right?

14:44:28  20    A.    No.  Not at all.

          21          MR. MORRISON:  Nothing further, Your Honor.

          22          MR. DeVILLERS:  I won't be long, if you

          23    want.

          24          THE COURT:  Okay.  Let's do redirect then.

14:44:40  25          MR. DeVILLERS:  Thank you.
```

1          REDIRECT EXAMINATION OF CHARLES SCOTT

2     BY MR. DeVILLERS:

3     Q.    Okay.  Mr. Scott, let's talk about a few things.

4                On cross, you were kind of -- it was

14:44:54 5     brought up kind of your three interests in doing this.

6                To get Mr. Dean to invest in CareClix.

7                Is that accurate?

8     A.    Yes, sir.

9     Q.    To maintain your amount of stock in USLG.

14:45:14 10                Is that accurate?

11    A.    Um-hmm.

12    Q.    And to --

13    A.    Yes.

14    Q.    And put some money in your pocket, right?  To make

14:45:21 15    some money?

16    A.    Yes.

17    Q.    Okay.  Keeping that in mind, when Mr. -- there was

18    some argument back and forth during the case regarding

19    initially Mr. Dean going to purchase your stock for $0.30

14:45:38 20    a share, but then it went down to $0.25 a share, correct?

21                Is that about right?

22    A.    Yes.

23    Q.    All right.  And that, that would have been on cross

24    you were asked if that was below market.

14:45:51 25                Do you remember being asked that on cross?

Scott - Redirect                652

1    A.    Yes.

2    Q.    What was your number one goal in all this stuff?

3    A.    To sell all of my shares, a big chunk, and to, as I

4    said, I wanted to retain the position.

14:46:11  5          I believe those guys were going to grow the

6    stock, and so I wanted to help the company, and I wanted

7    to make some money.

8    Q.    Okay.  By "the company," do you mean CareClix?

9    A.    CareClix.

14:46:27 10   Q.    Okay.

11   A.    Well, I wanted to help CareClix for sure.

12          But I also wanted to help USLG.

13   Q.    Okay.

14   A.    Because the restricted shares should be going to

14:46:38 15  building the company.

16   Q.    Okay.  My -- I guess -- your number one goal, I

17   think you testified about, was to get Dean to invest in

18   CareClix?

19   A.    That -- that was my number one goal.

14:46:51 20   Q.    And if that meant selling your initial stock for

21   less than $0.30 a share, were you willing to do that?

22   A.    I would have given it to him.

23   Q.    You would have what?

24   A.    I would have given it to him.

14:47:03 25   Q.    All right.  We talked a little bit about Josh

Scott - Redirect                              653

1    Flood, and Josh Flood was arrested some years ago, is

2    that right?

3    A.    Yes.

4    Q.    All right.  Did that incident, arrest, have

14:47:14  5    anything to do with white collar or fraud or anything

6    like that?

7    A.    No.

8    Q.    You were asked if you -- if you Googled Mr. Hipple.

9              Do you remember that?

14:47:27 10    A.    Yes.

11    Q.    All right.  How long have I been your attorney for?

12    A.    About three years.

13    Q.    When did you first Google me?

14              MR. MORRISON:  Objection, Your Honor.

14:47:42 15              Scope.

16              THE COURT:  Overruled.

17    A.    About a month ago.

18    BY MR. DeVILLERS:

19    Q.    So almost three years until you Googled me?

14:47:50 20    A.    Yes, sir.

21    Q.    Should I be offended about that?

22    A.    I hope you're not.

23    Q.    Okay.

24              THE COURT:  Don't Google any of these

14:47:59 25    people.

Scott - Redirect                                    654

1          (Laughter.)

2    BY MR. DeVILLERS:

3    Q.    And you talked a little bit about -- and Mr. Hipple

4    talked about it a little bit, too -- there was some point

14:48:09 5    where the ticker SOLI was suspended by the SEC, is that

6    right?

7              You couldn't, you couldn't sell stock?

8    A.    They halted the stock, yes.

9    Q.    But for how long?

14:48:20 10    A.    Ten days, I think.

11    Q.    Okay.  And then you were talking about a letter

12    that you got from the SEC after that.

13              What was that letter?

14              MR. MORRISON:  Scope, Your Honor.

14:48:39 15              THE COURT:  Sustained.

16    BY MR. DeVILLERS:

17    Q.    Okay.  You did get into the money that you wired to

18    Mallion from Spivak, right; from USLG to you to Mallion.

19              In your own words, what was that about?

14:48:58 20    What was your understanding of what that was about?

21    A.    Well, Paul asked me to do him a favor.

22              I asked him what was it all about.  And he

23    said he had a conflict of interest, and if I could just

24    do this this one, two times I think.

14:49:13 25    Q.    Did you make any money off that?

Scott - Redirect                          655

1    A.    No.

2                    MR. DeVILLERS:  Okay.  Could we please

3    play -- sorry, Steph, could I bug you again -- 445A?

4                    And this was played on cross-examination.

14:49:51  5                    (Tape playing).

6                    MR. DeVILLERS:  Stop there, please.

7    BY MR. DeVILLERS:

8    Q.    So far this conversation when you were talking

9    about press releases, are you talking about CareClix or

14:50:27 10   USLG?  If you remember.

11   A.    Pretty sure I'm talking about CareClix.

12   Q.    Okay.  And then Mr. Dean changes it to USLG, is

13   that right?

14                    Let's keep playing, please, Steph.

14:50:46 15                    (Tape playing).

16                    MR. DeVILLERS:  Okay.  You can stop there.

17   BY MR. DeVILLERS:

18   Q.    All right.  Is there -- and they're talking

19   about -- are they talking about promoting USLG stock at

14:51:07 20   this point?

21   A.    Is who talking about promoting USLG stock?

22   Q.    Well, they are talking about -- well, they are

23   talking about USLG, right?

24   A.    Well, it changed to USLG.

14:51:16 25   Q.    Okay.  But now, now are they talking about USLG?

1    A.    Yes.  But this is -- this is just imagine, I mean

2    he's like imagine, I mean it's just --

3    Q.    I understand that.  And my question is are they now

4    talking about USLG?

14:51:30  5    A.    Yes, they are now talking about USLG.

6    Q.    All right.  And they are talking about promoting

7    USLG stock?

8    A.    Okay.  Yes.

9          Okay.  Yes.

14:51:37 10    Q.    All right.  Is there anything in here about

11    fraudulently promoting USLG stock?

12    A.    No.

13    Q.    Have, in any of these tapes that you have heard or

14    in any of your independent recollection, has anyone ever

14:51:51 15    talked to you about fraudulently promoting USLG stock?

16    A.    No.

17          MR. DeVILLERS:  Okay.  Let's go to I

18    believe, yeah, please, Stephanie, 551F.

19          And I think it was at 50 seconds.

14:52:19 20          MS. MILLER:  451F.

21          MR. DeVILLERS:  451?  451F.

22          And, yeah, go ahead and press "Play."

23          (Tape playing).

24    BY MR. DeVILLERS:

14:52:51 25    Q.    Okay.  Did you hear you say something in there, in

Scott - Redirect                    657

1    the middle there?  Was that your voice?

2    A.    Yeah, I think so.

3    Q.    Do you remember where this was?

4          Where were you located at this time when

14:53:07  5    this was going on?

6    A.    I think I was at the office.

7    Q.    Okay.  Were there people walking in and out of the

8    office?

9    A.    Yeah.

14:53:15 10    Q.    Okay.  When people -- if you're on the phone and

11    someone walks in the office, do you ever say, "We're on

12    the phone"?

13    A.    Yes.

14    Q.    I believe on cross-examination you indicated that's

14:53:30 15    what you thought happened.

16          Is that your recollection?

17    A.    That's what I thought.

18    Q.    Mr. Scott, during this entire time period, have you

19    ever thought or desired to defraud anybody?

14:53:50 20    A.    Absolutely not.

21                MR. MORRISON:  Scope, Your Honor.

22                THE COURT:  Overruled.

23                MR. DeVILLERS:  No further questions, Your

24    Honor.

14:53:56 25                THE COURT:  Ladies and Gentlemen, if you

Scott -                    658

1    have any questions for this witness, please write them

2    down, pass them forward.

3                    I will discuss them with counsel at

4    side-bar.

14:54:13  5              Looks like there might be a couple

6    questions.

7                    (Proceedings at side-bar:)

8                    THE COURT:  So the first question, any

9    issues?

14:55:50 10              MR. DeVILLERS:  Not from the defense.

11                   MR. MORRISON:  No issues.

12                   THE COURT:  Second one had a series of

13   about four questions, and any issues with any of these?

14                   MR. MORRISON:  No.  We're good.

14:56:01 15              THE COURT:  So ask them all?

16                   MR. MORRISON:  Yes.

17                   THE COURT:  All right.  We'll see what

18   happens.

19                   (End of side-bar conference.)

14:56:11 20              THE COURT:  Mr. Scott, the Ladies and

21   Gentlemen of the Jury have a number of questions that I

22   will put to you now.

23                   First, when you sold your shares to Jason

24   Dean, did you still believe in USLG?

14:56:27 25              THE WITNESS:  Yes.

Scott -                                 659

1          THE COURT:  Did your company CareClix run a

2     background check on Robert Hipple, before you hired him

3     presumably?

4          THE WITNESS:  I think Josh did a background

14:56:48  5     check on him.

6          THE COURT:  How many shares of CareClix

7     does Mr. Spivak own?

8          THE WITNESS:  I think at this

9     point -- clarification.  How much --

14:57:02 10          THE COURT:  Either in absolute numbers or

11     relative terms.

12          THE WITNESS:  Like now or when?

13          THE COURT:  I mean, maybe in 2021.

14          First half of 2021.

14:57:17 15          THE WITNESS:  Well, I'm not sure because

16     what happened is, as we started talking to attorneys

17     about -- SEC attorneys and these other guys going through

18     the NASDAQ, that company had too many issues with it,

19     what they call warrants.

14:57:40 20          So I don't think he has any now.

21          And that company never came back.  SOLI is

22     defunct; it's gone.  We couldn't do anything with it.

23     It's the worst deal ever.

24          And so in 2021, originally he had three

14:58:06 25     million shares, I believe, and a promissory note.

Scott -                    660

```
 1              It took me 877 days to get that thing
 2    straight.  877 days, lawsuits, tens of thousands of
 3    dollars to get SOLI to the point where we could get it on
 4    the market, so it was a bad deal.
 5              THE COURT:  You talked about the
 6    distributorship for USLG and indicated that there were
 7    some sales and the like for which you were not
 8    compensated.
 9              What was the amount of money you feel you
10    were owed and not paid?
11              Again just roughly.  I don't think anyone's
12    looking for an exact dollar amount to the penny or
13    anything like that.
14              THE WITNESS:  Probably about a hundred
15    thousand, 150,000.
16              THE COURT:  And finally, why did you use
17    encrypted text messaging services?
18              THE WITNESS:  Elon Musk uses it.
19              And when you're -- when you're -- when
20    you're public, you don't -- you don't want people to be
21    able to listen in because you may have a customer like,
22    like Pfizer -- or maybe I shouldn't say Pfizer -- that
23    just don't want that information out.
24              Even though you may have a contract with
25    them, they don't want anybody to know that, and so it's
```

Scott - Redirect                                        661

```
          1    just better to have -- to speak at all times on an

          2    encrypted line.

          3                    We, you know, we started using it years

          4    ago.

14:59:54  5                    THE COURT:  Counsel, any follow-up on the

          6    questions from the Ladies and Gentlemen of the Jury?

          7                    MR. DeVILLERS:  Briefly.

          8        FURTHER REDIRECT EXAMINATION OF CHARLES SCOTT

          9    BY MR. DeVILLERS:

15:00:01 10    Q.    There's some testimony about your question was

         11    about SOLI and how much stock Mr. Spivak owned.

         12                    You acquired SOLI from -- did you acquire

         13    SOLI from Mr. Spivak?

         14    A.    Um-hmm.

15:00:15 15    Q.    And was that, when you acquired that, did

         16    Mr. Spivak have interests of stock in SOLI?

         17    A.    Yes.

         18    Q.    All right.  Did he ever have any interest in

         19    CareClix?

15:00:30 20    A.    He had no management interest, but I -- I think it

         21    took us awhile to get him out.

         22    Q.    Is that because of buying the shell SOLI that he

         23    had stock in?

         24    A.    Yes.

15:00:41 25    Q.    Okay.  I guess my question is before, before that
```

1    happened, before the merger between -- the reverse merger

2    between CareClix and SOLI, did he have any interest

3    before that happened in CareClix itself?

4    A.    No.  No.

15:00:54    5            MR. DeVILLERS:  No questions, Your Honor.

6            THE COURT:  Any follow-up from the United

7    States?

8            MR. MORRISON:  Briefly, Your Honor.

9        RECROSS-EXAMINATION OF CHARLES SCOTT

15:01:00 10   BY MR. MORRISON:

11   Q.    So you were asked about encrypted text messaging

12   systems, and you said because Elon Musk uses it, is that

13   right?

14   A.    That's what I said.

15:01:07 15   Q.    Okay.  He's an idol of yours?

16   A.    Hmm?

17   Q.    He's an idol of yours?

18   A.    Oh, yeah, he's an idol of mine.

19   Q.    Okay.  But and you're worried about people being

15:01:18 20   able to listen in or to read your messages as they are

21   sent, is that the idea?

22   A.    I think it's a -- it's a practice that is just

23   smart, you know, kind of like brushing your teeth in the

24   morning, just something you ought to do.

15:01:29 25   Q.    So using Signal is like brushing your teeth for

Scott - Recross                                663

1    you?

2    A.    What?

3    Q.    Using Signal is like brushing your teeth?

4    A.    I'm sorry, I'm really having a little trouble

15:01:38  5    understanding what you're saying.

6    Q.    Using Signal is like brushing your teeth for you?

7    A.    Yeah.

8              I hope I never forget to use it.

9    Q.    Okay.  Now, you would agree there's one time you

15:01:49  10   did forget to use it when you were having a whole

11   discussion of your business, right?

12              That was with Mr. Hipple on the phone with

13   Mr. Dean; that was a regular phone call, right?

14   A.    There are always exceptions, sir.

15:02:02  15   Q.    Of course.  But that was one, the whole purpose of

16   which was to discuss the private details of the company,

17   right?

18   A.    No.

19   Q.    You had a whole -- the Jury's heard it -- a whole

15:02:12  20   extended discussion of everything about the company's

21   operations, right?

22   A.    A lot of people had to go.

23   Q.    What's that?

24   A.    A lot of people had to go, I imagine.

15:02:21  25              There was no attempt to not talk about it

1    in front of Bob Hipple.

2                  Is that what you're saying?

3    Q.    No.  No.  No.

4                  Separately, I know you're remembering our

15:02:29  5    earlier exchange.

6                  I'm talking about the use of Signal or

7    encrypted apps versus the regular telephone.

8                  When you spoke to Mr. Hipple on the phone

9    with Mr. Dean, you spoke on the regular telephone, right?

15:02:40 10                  That's what you said when somebody

11    purportedly walked in?

12    A.    I reckon.

13    Q.    What's that?

14    A.    I don't know, man.

15:02:47 15                  Was it a regular phone?  Okay.  Yes.  I

16    guess.

17    Q.    Okay.  And so you would agree then the reason why

18    you use Signal is not for business confidentiality, but

19    to hide the illegal things you're doing, right?

15:03:00 20    A.    I don't do anything illegal.

21    Q.    Nothing illegal, right?

22                  Okay.  You just hire people barred by the

23    SEC and people arrested for serious crimes that are not

24    white collar in nature.

25    A.    That's illegal?

Scott - Recross                                665

1    Q.    Okay.

2    A.    Is that illegal?

3    Q.    No, I'm just asking.

4          That's what you do, right?

15:03:17 5   A.    Say it one more time, please.

6    Q.    We can move on.

7          So the distributorship, you say you're owed

8    $100,000 or so on that, is that right?

9    A.    That's a ballpark.

15:03:27 10  Q.    Okay.  But you've only made about 20 or so grand,

11   you said?

12   A.    That's just from my recollection, I think so.

13   Q.    Okay.  So over 10 years, you made about 20 grand

14   and you're owed another hundred thousand?

15:03:38 15  A.    Well, we sold territories and we never got paid for

16   them.

17          And sometimes we -- when the company that

18   is struggling, you can't -- sometimes they can't pay

19   their bills.

15:03:49 20  Q.    Okay.  But even being ripped off for $100,000, you

21   continued to follow Mr. Spivak's instructions, right?

22   A.    I don't follow anybody's instructions.

23   Q.    Did you follow his suggestions?

24   A.    It takes some companies 10 years just to be able to

15:04:04 25  survive.

1    Q.    Okay.

2    A.    These are small companies.

3    Q.    Okay.  Did you still follow his suggestions?

4    A.    I don't -- did I still follow his suggestions?

15:04:14  5    Q.    Even after he owed you another hundred thousand

6    dollars.

7    A.    Suggestions as to what?

8    Q.    Selling free-trading shares to Jason Dean, for

9    example?

15:04:24  10    A.    Oh, yeah.  Yeah.  Yeah.

11              MR. MORRISON:  Okay.  Nothing further, Your

12    Honor.

13              THE COURT:  You may step down.

14              (Witness excused).

15                   - - - - -

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Ladies and Gentlemen, counsel

2     and I have some work to do, so rather than keep you for

3     the rest of the day, we will stand in recess early.

4          As soon as you come on Monday morning, we

15:04:57 5     will resume and proceed to closing arguments, I believe,

6     but we have a few issues we need to work out first, so we

7     will attend to that.

8          Let me just ask counsel one question, and

9     then I'll give you some further instructions.

15:05:11 10          (Proceedings at side-bar:)

11          THE COURT:  I forgot to ask when we were

12     over here before, let me ask you the unfair question,

13     although it's less unfair than under other circumstances.

14          So getting the -- I'll be in a position to

15:05:29 15     send you the Jury instructions like probably in the next

16     10-ish minutes.

17          MR. DeVILLERS:  Okay.

18          THE COURT:  How much time do you think we

19     need?  I just need to know what time to tell them to

15:05:39 20     come.

21          MR. MORRISON:  How much time for closings?

22          MR. DeVILLERS:  For --

23          THE COURT:  On Monday morning.  Like, I

24     mean --

15:05:47 25          MR. MORRISON:  You're saying go over them,

668

1    we'll go over them on the weekend and then meet with you

2    Monday morning?

3                    THE COURT:  Correct.

4                    MR. DeVILLERS:  I don't see -- I mean, I

15:05:53  5    see one.

6                    We will probably object to the willful

7    blindness sort of thing.

8                    MR. MORRISON:  I almost got him to say

9    literally close his eyes to it.

15:06:02 10                    THE COURT:  Yes, I know we almost have the

11    exact instruction so.

12                    MR. DeVILLERS:  Your Honor, I guess I don't

13    see any -- I don't foresee any issue with instructions

14    that would objectionable.

15:06:15 15                    MR. MORRISON:  I think we have a few small

16    things, so I think if we have an hour, that would be more

17    than enough.

18                    THE COURT:  Yeah, I'll ask them to come by

19    maybe 9:00, and we'll start at, like, 8:30 or so.

15:06:26 20                    MR. DeVILLERS:  The only issue I perceive,

21    in the overt acts there's a quote from Mr. Spivak in

22    there or Mr. Scott, but it's not accurate.

23                    I mean, it's -- and so I think I'm going to

24    object to that quote going in.  It's not even -- it's not

15:06:43 25    even accurate according to their transcript, so yeah.

1          MR. MORRISON:  We will take a look at it,

2    and maybe we might agree to do a summary instead or take

3    it out.

4          MR. DeVILLERS:  Take it out would be my

15:06:54 5    preference.

6          THE COURT:  If you decide you want to take

7    it out, the sooner you let me know.

8          MR. MORRISON:  Yeah.

9          THE COURT:  I mean, if Adobe cooperates, it

15:07:06 10   will take a minute.  It doesn't always cooperate, as you

11   saw yesterday.

12          I'll have them come by 9:00, and if we

13   start at 8:30ish we should get that in.  I'm going to do

14   an abbreviated charge, but we can talk about what that

15:07:20 15   looks like as well.

16          MR. MORRISON:  Okay.

17          THE COURT:  I haven't completely worked

18   that out, but we should be good to go on Monday morning.

19          MR. DeVILLERS:  And, Judge, you know as far

15:07:28 20   as reading of the Jury instructions, I think probably the

21   verdict forms because they are different might be

22   something to read but --

23          THE COURT:  And this time there's only four

24   verdict forms, so I do anticipate going through each of

15:07:38 25   them because they are a little bit different and there's

1      only four.

2                     I was not going to read whatever the number

3      was on Phase 1, I was just not going to do it, I'm sorry.

4                     MR. MORRISON:  Again, there was no problem

15:07:49  5      with that from our perspective.

6                     THE COURT:  All right.  Thank you.

7                     MR. DeVILLERS:  Thank you.

8                     (End of side-bar conference.)

9                     THE COURT:  All right.  So Ladies and

15:07:56 10      Gentlemen, as I indicated, counsel and I have some work

11      to do so we will stand in recess.

12                     On Monday morning, if you are here at

13      9:00 a.m., by the time you assemble, we should be able to

14      conclude the work that we need to do to be in a position

15:08:11 15      to move to closing arguments.

16                     Over the weekend, as you know, do not

17      discuss the case with anyone, including each other.

18                     Do not do any outside research.  There was

19      a lot of talk about Googling certain people and the like.

15:08:31 20      Please do not do that, do not Google anyone or anything

21      that relates to or touches on this case in any way.

22                     You'll be able to do that soon enough; just

23      not this weekend.

24                     And please keep an open mind until the case

15:08:46 25      is finally submitted to you after closing arguments next

1   week.

2                    And with that, we will stand in recess.

3                    THE CLERK:  All rise.

4                    (Jury out.)

15:09:25  5          THE COURT:  All right.  Please be seated.

6                    So I think we talked about all the issues

7   we need to discuss at side-bar, but just wanted to see if

8   there was anything else we should discuss before we

9   adjourn for the weekend.

15:09:36 10          MR. DeVILLERS:  No.

11                   We have the two, the two audio files we'll

12  give to you to take a look at and see if they are

13  accurate.

14                   MR. MORRISON:  And we will do likewise.  We

15:09:44 15  just played a little extra piece of -- right before, I

16  think it was something F, 451F.

17                   MR. DeVILLERS:  Okay.

18                   MR. MORRISON:  We had a little bit just

19  then.

15:09:52 20          THE COURT:  I think the other two

21  logistical issues are, one, I think everyone appreciates

22  this, but we'll just be explicit about it rather than

23  implicit.

24                   One, the Jury will get the case on Monday,

15:10:04 25  so please have all the exhibits and everything ready to

672

1    send back to them.

2                   I think Mr. Morrison indicated earlier

3    there's far fewer of them, so that should be a little

4    easier of a process.

15:10:16   5                   And, two, if you could send my courtroom

6    deputy, by Monday morning at the latest, kind of what you

7    think the agreed exhibits are and the like, we'll match

8    it up to our records and so forth.

9                   And we could be in a position on Monday to

15:10:30  10    deal with that.

11                   MR. MORRISON:  And I guess a lot of it's

12    not particularly relevant, but my understanding was we

13    were not going over old ground here because everything

14    that was admitted before remains admitted now.

15:10:41  15                   THE COURT:  Correct.

16                   I'm just talking about, like, an additional

17    or supplemental, the Phase 2, if you will --

18                   MR. MORRISON:  Yes.

19                   THE COURT:  -- exhibit list.

15:10:49  20                   MR. MORRISON:  Okay.

21                   THE COURT:  With that, I will see you on

22    Monday morning.

23                   We should convene by 8:30.

24                   We'll get through whatever we need to get

15:10:58  25    through, and then proceed to closing.

673

1              Thank you.

2              MR. MORRISON:  Thank you.

3              THE CLERK:  All rise.

4              (Proceedings concluded at 3:11 p.m.)

15:11:02  5                    -   -   -   -

6                   C E R T I F I C A T E

7              I certify that the foregoing is a correct

8      transcript from the record of proceedings in the

9      above-entitled matter.

10

11

12

13     **/s/Susan Trischan**
       /S/ Susan Trischan, Official Court Reporter
14     Certified Realtime Reporter

15     7-189 U.S. Court House
       801 West Superior Avenue
16     Cleveland, Ohio 44113
       (216) 357-7087
17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2      **WITNESSES:**                                          **PAGE**

3       DIRECT EXAMINATION OF ANTHONY FRY                      417

4       BY MR. MORRISON

5       CROSS-EXAMINATION OF ANTHONY FRY                       472

6       BY MR. DeVILLERS

7       REDIRECT EXAMINATION OF ANTHONY FRY                    479

8       BY MR. MORRISON

9       DIRECT EXAMINATION OF ROBERT HIPPLE                    491

10      BY MR. DeVILLERS

11      CROSS-EXAMINATION OF ROBERT HIPPLE                     505

12      BY MS. MILLER

13      REDIRECT EXAMINATION OF ROBERT HIPPLE                  548

14      BY MR. DeVILLERS

15      DIRECT EXAMINATION OF CHARLES SCOTT                    562

16      BY MR. DeVILLERS

17      CROSS-EXAMINATION OF CHARLES SCOTT                     577

18      BY MR. MORRISON

19      REDIRECT EXAMINATION OF CHARLES SCOTT                  651

20      BY MR. DeVILLERS

21      FURTHER REDIRECT EXAMINATION OF CHARLES SCOTT          661

22      BY MR. DeVILLERS

23      RECROSS-EXAMINATION OF CHARLES SCOTT                   662

24      BY MR. MORRISON

25                           * * * * *