1                 UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3

UNITED STATES OF AMERICA, )   Case No. 21-cr-491
4                      )

           Plaintiff,   )
5                      )   September 16, 2024
       vs.            )   8:41 a.m.
6                      )

CHARLES SCOTT,          )   **Phase 2, Day 4**
7                      )

           Defendant.    )
8

9

10                      - - - - -

11         TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12       BEFORE THE HONORABLE J. PHILIP CALABRESE,

13          UNITED STATES DISTRICT JUDGE,

14               AND A JURY.

15                      - - - - -

16

17

18

19

20 Official Court Reporter:   Susan Trischan,RMR,CRR,FCRR,CRC
                           7-189 U.S. Court House
21                            801 West Superior Avenue
                           Cleveland, Ohio    44113
22                            (216) 357-7087

23 Proceedings recorded by mechanical stenography.
    Transcript produced by computer-aided transcription.
24

25

676

```
 1    APPEARANCES:

 2    For the Government:        Elliot D. Morrison, AUSA
                                 Megan R. Miller, AUSA
 3                               Stephanie Wojtasik, AUSA
                                 Office of the U.S. Attorney
 4                               Northern District of Ohio
                                 801 West Superior Avenue
 5                               400 U.S. Court House
                                 Cleveland, Ohio   44113
 6                               (216) 622-3600

 7


 8
      For Defendant Scott:      David M. DeVillers, Esq.
 9                              Samantha Pugh, Esq.
                                Barnes & Thornburg
10                              Ste. 3300
                                41 South High Street
11                              Columbus, OH 43215
                                614-628-1446
12

13                                - - - - -

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>MONDAY, SEPTEMBER 16, 2024, 8:41 A.M.</u>

1

2          THE COURT:  Please be seated.

3          Other than jury instructions, are there

4    issues to take up this morning?

08:42:26 5          MR. DeVILLERS:  I don't think so, Your

6    Honor.

7          MR. MORRISON:  Not from the Government,

8    Your Honor.

9          Oh, I mean, we do have that list of

08:42:32 10    exhibits.  I think we're agreed on it.

11          We're just trying to finalize the clips

12    because, you know, as we had some prepared clips and then

13    because of completeness issues we added some, because the

14    originals should be kind of the full, we want to make

08:42:47 15    sure we mark the parts that were played as -- I'm

16    sorry -- as new clips, and then give those distinct kind

17    of exhibit numbers so there's no confusion about which is

18    which.

19          But I don't think there's any dispute about

08:43:03 20    what is admitted.

21          MR. DeVILLERS:  Correct, Your Honor.

22          THE COURT:  All right.  In terms of jury

23    instructions and the like, let me work backward.

24          Any issues on the verdict forms?

08:43:14 25          MR. MORRISON:  No.  Not from the

1    Government, Your Honor.

2                     MS. PUGH:  And not from defense.

3                     THE COURT:  All right.  Easy enough.

4                     The overt acts exhibit, Exhibit B, I saw

08:43:24  5    that there was a revised version that you sent this

6    morning which I did review, so as long as you're all fine

7    with that, I think we're good on Exhibit B.

8                     So any issues on Exhibit B?

9                     MS. PUGH:  No, Your Honor.

08:43:40 10                     MR. MORRISON:  Yep, it's all good.

11                     THE COURT:  All right.  So that takes us to

12    the instructions themselves.

13                     There were a few edits, some that I found,

14    some that you found in terms of just going from multiple

08:43:54 15    defendants to one defendant.

16                     So most of those are just, you know, making

17    it "The defendant" or "A defendant," but other than that,

18    I don't think there was anything too material on that.

19                     As I indicated, I don't intend to read

08:44:09 20    everything to the jury.  I'm going to just try to

21    highlight presumption of innocence and the elements of

22    the offenses, but not get into the subinstructions by and

23    large.

24                     But there's some special evidentiary

08:44:22 25    matters that are different, obviously, that I'll get to.

1          Mr. Scott's testimony, so there's a special

2    instruction on that.

3          The instruction about the video clips and

4    the like.

08:44:35  5          So it should be pared down substantially,

6    but they will have, the Jury will have the full

7    complement of all the instructions.

8          So with that, any other issues to take up?

9          MR. MORRISON:  We'd sent a proposed revised

08:44:49 10   version of deliberate ignorance just because phase one,

11   the version of deliberate ignorance was a little bit

12   different given the nature of the conspiracy there.

13          And so I don't think there's anything

14   material on those changes, but I'm sure they will let us

08:45:04 15   know if they disagree.

16          MS. PUGH:  Your Honor, we don't have any

17   issues with the materiality of the changes, but we would

18   renew our objection to deliberate ignorance.

19          I'm happy to remake the argument for the

08:45:13 20   sake of phase two, but it will be largely the same as it

21   was in phase one, so if you prefer to just renew that

22   substantively as well, I'm happy to do that.

23          THE COURT:  I'm happy to note and preserve

24   your objection for the record.

08:45:24 25          I'll simply say I think the testimony on

1       Friday supports giving that instruction with the

2       modifications that were proposed.

3                   MR. MORRISON:  Then I don't think -- we're

4       good with everything else, and I don't think we have any

08:45:40   5       issues.

6                   MS. PUGH:  That's correct, Your Honor.

7                   THE COURT:  All right.  So for once we're

8       early then.

9                   MR. MORRISON:  I know.

08:45:49  10                   THE COURT:  I think we're just waiting on

11      the Jury then.

12                   So we'll stand in recess.  As soon as the

13      Jury is convened, and then I'll again do the same

14      practice, charge through the point of closing argument.

08:46:01  15      You can do your closing arguments.  I'll complete the

16      charge.  They'll deliberate, and we go from there.

17                   THE CLERK:  All rise.

18                   (Recess taken.)

19                   THE COURT:  Please be seated.

09:38:31  20                   Our last juror just arrived, so let's bring

21      in the Jury.

22                   (Jury in.)

23                   THE COURT:  Please be seated.

24                   Members of the Jury, you previously heard

09:40:44  25      my instructions at the end of the first phase of the

1    trial.

2              There are a few different issues I need to

3    instruct you on before you deliberate, and I will give

4    you a complete set of instructions again to have with you

09:40:58  5    in the Jury room.

6              For now, I just want to highlight some

7    important things for you to pay attention to before the

8    lawyers present closing arguments, including the

9    different instructions that apply based on the evidence

09:41:14 10    in this phase of the trial.

11              Again, you have two main duties as jurors.

12              The first is to decide what the facts are

13    from the evidence that you saw and heard here in court.

14              Deciding what the facts are is your job,

09:41:30 15    not mine, and nothing that I have said or done during

16    this trial was meant to influence your decision about the

17    facts in any way.

18              Your second duty is to take the law that I

19    give you, apply it to the facts, and decide if the

09:41:43 20    Government has proved the defendant guilty beyond a

21    reasonable doubt.

22              It is my job to instruct you about the law.

23    You are bound by the oath that you took at the beginning

24    of the trial to follow the instructions that I give you.

09:42:02 25              This includes the instructions that I gave

1    you before and during the trial.  All the instructions

2    are important, and you should consider them together as a

3    whole.

4              The lawyers will talk about the law during

5    their closing arguments, but if what they argue is

6    different from what I say, you must follow what I say.

7              What I say about the law controls.

8              Perform these duties fairly.  Do not let

9    any bias, sympathy or prejudice that you may feel towards

10   one side or the other influence your decision in any way.

11             As you know, the defendant has pleaded not

12   guilty to the crimes charged in the second superseding

13   indictment.  The indictment is not any evidence at all of

14   guilt.  It is just the formal way that the Government

15   tells a defendant what crimes he is accused of

16   committing.

17             It does not even raise any suspicion of

18   guilt.  Indeed, the defendant starts the trial with a

19   clean slate, with no evidence at all against him, and the

20   law presumes that he is innocent.

21             This presumption of innocence stays with

22   the defendant unless the Government presents evidence

23   here in court that overcomes the presumption and

24   convinces you beyond a reasonable doubt that he is

25   guilty.

1        This means that the defendant has no

2   obligation to present any evidence at all, or to prove to

3   you in any way that he is innocent.

4        It is up to the United States to prove that

09:43:33  5   he is guilty, and this burden stays on the Government

6   from start-to-finish.

7        You must find the defendant not guilty

8   unless the United States convinces you beyond a

9   reasonable doubt that he is guilty.

09:43:45 10        The Government must prove every element of

11   the crimes charged beyond a reasonable doubt.

12        Proof beyond a reasonable doubt does not

13   mean proof beyond all possible doubt.  Possible doubts,

14   or doubts based purely on speculation, are not reasonable

09:44:02 15   doubts.

16        A reasonable doubt is a doubt based on

17   reason and common sense.  It may arise from the evidence,

18   the lack of evidence, or the nature of the evidence.

19        Proof beyond a reasonable doubt means proof

09:44:15 20   which is so convincing that you would not hesitate to

21   rely and act on it in making the most important decisions

22   in your own lives.

23        If you are convinced that the Government

24   has proved the defendant guilty beyond a reasonable

09:44:29 25   doubt, say so by returning the corresponding guilty

1    verdict or verdicts.  If you are not convinced, say so by

2    returning a corresponding not guilty verdict or verdicts.

3              You must make your decision based only on

4    the evidence that you saw and heard here in court.  Do

09:44:50  5    not let rumors, suspicions, or anything else that you may

6    have seen or heard outside of court influence your

7    decision in any way.

8              The evidence in this case includes only

9    what the witnesses said while they were testifying under

09:45:03  10   oath, the exhibits allowed into evidence, and the

11   stipulations that the lawyers agreed to.  Nothing else is

12   evidence.

13             The lawyers' statements and arguments are

14   not evidence.  Their questions and objections are not

09:45:13  15   evidence.  My legal rulings are not evidence.  And my

16   comments, statements or questions are not evidence.

17             During the trial I did not let you hear the

18   answers to some of the questions that the lawyers asked.

19   You must completely ignore them.  Do not even think about

09:45:28  20   it.  Do not speculate about what a witness might have

21   said.  These things are not evidence, and you are bound

22   by your oath not to let them influence your decision in

23   any way.

24             Make your decision based only on the

09:45:41  25   evidence as I have defined it here, and nothing else.

1          During the trial you heard the lawyers and

2     witnesses mention individuals who were involved in this

3     investigation and who the United States also charged in

4     the second superseding indictment in this case.  These

5     references are not evidence of the guilt of Mr. Scott.

6     The other individuals involved in this investigation are

7     not on trial in this case, in this phase of it.

8          You should not draw any conclusion or

9     inference of any kind about the guilt of Mr. Scott from

10    the fact that any other person might have been

11    investigated or charged.  Those facts may not be used by

12    you in any way as evidence against the defendant on trial

13    here.

14          Another part of your job as jurors, I will

15    just remind you briefly, is to decide how credible or

16    believable each witness was.

17          This is your job; not mine.

18          It is up to you to decide if a witness's

19    testimony was believable, and how much weight you think

20    it deserves.  You are free to believe everything that a

21    witness said, or only part of it, or none of it at all,

22    but you should act reasonably and carefully in making

23    these decisions.

24          One more point as a reminder about

25    witnesses.  Sometimes jurors wonder if the number of

1    witnesses who testified makes any difference.  Do not

2    make any decisions based only on the number of witnesses

3    who testified.  What is more important is how believable

4    the witnesses were, and how much weight you think their

09:47:29  5    testimony deserves.

6                    Concentrate on that, and not the numbers.

7                    That concludes the part of the instructions

8    I will run through about your duties and the general

9    rules that apply.

09:47:46  10                    In criminal cases, again, you remember my

11    more complete set of those instructions from the first

12    phase of the trial, and you will have them with you as

13    you deliberate.

14                    In a moment, I will briefly explain the

09:47:59  15    elements of the crimes that the defendant is accused of

16    committing.

17                    Before I do that, I do want to emphasize

18    that Mr. Scott is only on trial for the particular crimes

19    with which he is charged in the second superseding

09:48:12  20    indictment.  Your job is limited to deciding whether the

21    United States has proved those crimes charged.

22                    Also, keep in mind that whether anyone else

23    should be prosecuted and convicted for those crimes is

24    not a proper matter for you to consider.  The possible

09:48:26  25    guilt of others is no defense to a criminal charge.

1          Your job is to decide if the Government has

2     proved the defendant guilty.  Do not let the possible

3     guilt of others influence your decision in any way.

4          Count 2 of the second superseding

09:48:53 5     indictment charges that the defendant Charles Scott

6     conspired with Paul Spivak and others from on or about

7     February 15th, 2021 through on or about June 7th, 2021,

8     to commit securities fraud in connection with the sale of

9     USLG stock.

09:49:09 10          A conspiracy is a kind of criminal

11     partnership.  For you to find the defendant guilty of a

12     conspiracy charge, the United States must prove each and

13     every one of the following elements beyond a reasonable

14     doubt.

09:49:23 15          First, two or more persons conspired or

16     agreed to commit the crime of securities fraud.

17          Two, the defendant knowingly and

18     voluntarily joined the conspiracy.

19          And, three, a member of the conspiracy

09:49:37 20     committed certain particular overt acts for the purpose

21     of advancing or helping the conspiracy.

22          It is a crime for two or more persons to

23     conspire or agree to commit a criminal act, even if they

24     never actually achieve their goal.

09:49:52 25          You must be convinced that the Government

1    has proved all of these elements beyond a reasonable

2    doubt in order to defined -- in order to find the

3    defendant guilty of the conspiracy charge.

4            I'm not going to go through each of the

09:50:06  5    instructions about those elements since they are the same

6    as previously given, but you will have those charges with

7    you.

8            I will simply note that with respect to the

9    third element about overt acts, you will again have a

09:50:20 10    different exhibit, Exhibit B this time, that lists the

11    overt acts at issue on Count 2.

12            Count 20 of the second superseding

13    indictment charges the crime of securities fraud.

14            To prove the defendant guilty of this

09:50:41 15    crime, the United States must prove each of the following

16    elements beyond a reasonable doubt.

17            First, in connection with the sale of USLG

18    stock, the defendant did any one of the following things.

19            A, employed any device, scheme or artifice

09:50:56 20    to defraud.

21            Or, B, made any untrue statement of a

22    material fact, or omitted to state a material fact

23    necessary to make the statements made in the light of the

24    circumstance under which they were made not misleading.

09:51:11 25            Or, C, engaged in any act, practice, or

1  course of business which operates or would operate as a

2  fraud or deceit upon any person.

3  To prove this first element, it is not

4  necessary for the United States to establish all three

09:51:29 5  types of unlawful conduct in connection with the purchase

6  or sale of USLG stock.  Any one will suffice for a

7  conviction, if you so find, but you must be unanimous as

8  to which type of unlawful conduct you find to have been

9  proven.

09:51:43 10  Second, the defendant acted willfully,

11  knowingly and with intent to defraud.

12  And third, the defendant knowingly used or

13  caused to be used any means or instrumentalities of

14  interstate commerce in furtherance of the fraudulent

09:51:59 15  conduct.

16  For you to find Mr. Scott guilty of

17  securities fraud, it is not necessary for you to find

18  that he personally committed the crime.  You may also

19  find him guilty if he intentionally helped or encouraged

09:52:22 20  someone else to commit the crime.

21  A person who does this is called an aider

22  and abettor, and again you have the full instruction that

23  I previously gave you and will have that with you in the

24  Jury room as you deliberate as well.

09:52:33 25  Counts 45 and 47 of the second superseding

1    indictment charge the defendant with wire fraud.

2              On these counts, the United States must

3    prove all of the following elements beyond a reasonable

4    doubt.

5              First, the defendant knowingly participated

6    and devised or intended to devise a scheme to defraud to

7    deprive another of money or property.

8              Two, the scheme included a material

9    misrepresentation or concealment of a material fact.

10             Three, the defendant had the intent to

11   defraud.

12             And, four, the defendant used or caused

13   another to use wires in interstate commerce in

14   furtherance of the scheme.

15             Again, I'm not going to go through all of

16   the definitions associated with each of those elements.

17   I previously did that, and you will have those full

18   instructions with you as you deliberate.

19             I will add only on this charge that for you

20   to find Mr. Scott guilty of wire fraud, it is not

21   necessary for you to find that he personally committed

22   the crime.  You may also find him guilty if he

23   intentionally helped or encouraged someone else to commit

24   the crime.  Again, this is called being an aider and

25   abettor.

1          That concludes the instructions explaining

2    the elements of the offenses at issue.

3          I do just want to touch on a few other

4    rules and special evidentiary matters that apply in this

09:54:09  5    phase of the trial and to evidence more generally.

6          You have heard the defendant Charles Scott

7    testify.  Earlier I talked to you about the credibility

8    or the believability of the witnesses, and I suggested in

9    the phase one a number of things for you to consider in

09:54:32  10    evaluating each witness's testimony.  Again, those will

11    be available to you in the full written instructions you

12    will have as you deliberate.

13          You should consider those same things in

14    evaluating the defendant's testimony.

09:54:45  15          With respect to a defendant's state of

16    mind, ordinarily direct proof of knowledge and fraudulent

17    intent is not available.  No one can read another

18    person's mind and tell what the person is thinking, and

19    it would be a rare case where it could be shown that a

09:55:08  20    person wrote or stated that, as of a given time in the

21    past, he committed an act with fraudulent intent.

22          Such direct proof is not required, but a

23    defendant's state of mind, including the ultimate facts

24    of knowledge and criminal intent, though subjective, may

09:55:26  25    be inferred indirectly from the surrounding

1    circumstances.

2              This may include by using circumstantial

3    evidence based on a person's outward manifestations, his

4    words, conduct, acts and all the other surrounding

09:55:39 5   circumstances disclosed by the evidence, and the rational

6    or logical inferences that may be drawn from them.

7              You may also consider the natural and

8    probable results of any acts that the defendant knowingly

9    did, and whether it is reasonable to conclude that the

09:55:53 10  defendant intended those results.

11             This, of course, is all for you to decide.

12             I already instructed you as to what

13   circumstantial evidence is, and the inferences that may

14   be drawn from it.

09:56:07 15            Those instructions apply here.

16             What is referred to as drawing inferences

17   from circumstantial evidence is no different from what

18   people normally mean when they say, "Use your common

19   sense."

09:56:25 20            Using your common sense means that in

21   deciding whether the defendant possessed or lacked an

22   intent to defraud, you do not limit yourself to what the

23   defendant said, but you also look at what he did and what

24   others did in relation to the defendant and, in general,

09:56:40 25  everything that occurred.

1          Circumstantial evidence, if believed, is of

2     no less value than direct evidence.  In either case, the

3     United States must prove the essential elements of the

4     crimes charged beyond a reasonable doubt.

09:56:53  5          I want to explain one more thing about

6     proving a defendant's knowledge.  No one can avoid

7     responsibility for a crime by deliberately ignoring the

8     obvious.

9          If you are convinced beyond a reasonable

09:57:16 10    doubt that the defendant ignored a high probability that

11    co-conspirators were misleading investors or artificially

12    inflating the value of USLG's stock in violation of the

13    security laws, then you may find that the defendant had

14    such knowledge, but to find this, you must be convinced

09:57:35 15    beyond a reasonable doubt that the defendant was aware of

16    the high probability that others were misleading

17    investors or artificially inflating the value of USLG

18    stock in violation of securities laws, and that the

19    defendant deliberately closed his eyes to what was

09:57:50 20    obvious.

21          Carelessness, negligence or foolishness on

22    his part is not the same as knowledge, and is not enough

23    to convict.  Of course, this is all for you to decide.

24          You have heard some recorded conversations

09:58:06 25    that were received in evidence, and you were given some

694

1        written transcripts of those recordings.

2                Keep in mind that the transcripts are not

3        evidence.  They were being given to you as a guide to

4        follow what was said.

09:58:25 5                The recordings are what was evidence.  If

6        you noticed any difference on what you heard in the

7        recordings and what you read in the transcripts, you must

8        rely on what you heard and not what you read.  And if you

9        could not hear or understand certain parts of the

09:58:39 10       recordings, you must ignore the transcripts as far as

11       those parts are concerned.

12                That concludes the part of my instructions

13       explaining the rules for considering some of the

14       testimony and evidence.

09:59:01 15               We'll now hear closing arguments from

16       counsel.  Again, the arguments from counsel are not

17       evidence, but they are intended to assist you in your

18       consideration of the evidence presented to you here in

19       court during the course of the trial.

09:59:14 20               With that, counsel, we're prepared for

21       closing argument.

22                You may proceed when you are ready.

23                MR. MORRISON:  Your Honor, could we have a

24       brief side-bar?

09:59:25 25               THE COURT:  Yes.

695

```
 1                    (Proceedings at side-bar:)
 2                    MR. MORRISON:  Just one thing on the Jury
 3       instructions.
 4                    I don't know when the time is to do this,
 5       if at all, but we had sent the revised language for
 6       deliberate ignorance.
 7                    THE COURT:  I thought I put it in there.
 8                    MR. MORRISON:  I think you read the version
 9       from phase one.
10                    THE COURT:  I thought -- did I?  I thought
11       I updated it.  I could swear to you I updated it.
12                    MR. MORRISON:  Yeah, it might be in the
13       document that's going back it's changed, but what you
14       just read was definitely the phase one version of the
15       language.
16                    THE COURT:  Okay.
17                    MR. MORRISON:  And so I don't know if you
18       can do a brief correction to that now.
19                    MR. DeVILLERS:  I think it would amplify
20       it.
21                    THE COURT:  I'm not inclined to amplify.
22       I'll send back the corrected version.
23                    MR. MORRISON:  Okay.  That's fine.
24                    THE COURT:  And I mean, if you want to
25       reference and put up the correct version, you can
```

1      certainly say, like, "You're going to have this version

2      of the instruction."

3                        MR. MORRISON:  Right.

4                        THE COURT:  Just don't beat me up too bad

5      in front of the Jury.

6                        MR. MORRISON:  Right.  Won't even mention

7      that.

8                        THE COURT:  But I will go confirm that I

9      corrected it because I know I corrected it.  Should have

10     been in this version, but I'll make sure of that before

11     we send it back.

12                        MR. MORRISON:  All right.  Thank you.

13                        (End of side-bar conference.)

14                        MS. MILLER:  May it please the Court,

15     counsel for Mr. Scott, Ladies and Gentlemen of the Jury,

16     defendant Charles Scott conspired with Paul Spivak and

17     others to defraud the investing public and to

18     artificially inflate the price of USLG shares.

19                        You've now had the benefit of seeing the

20     evidence, all of the evidence in this case.  You've seen

21     and heard from Mr. Spivak and Mr. Dean about how this

22     deal worked; that in exchange for sending a hundred

23     thousand shares to Jason Dean, Mr. Scott was going to

24     receive $25,000 and kick back $15,000 of those proceeds

25     to Mr. Spivak.

1          You saw the evidence that that's exactly

2     what Mr. Scott did.  And you also heard Mr. Scott's own

3     words, both in real-time as this deal was playing out in

4     the recordings when he was all too happy to get his own

10:02:41  5     little $0.30 of hope on this deal, and also his testimony

6     in court under oath in which somehow he could

7     inexplicably give a straight answer to even the simplest

8     of questions.

9          Ladies and Gentlemen, the evidence in this

10:03:01 10     case has established beyond a reasonable doubt that

11     defendant Scott committed the crimes charged against him

12     in the indictment.

13          Now, you're familiar with this structure

14     from the first phase.  We're starting with the securities

10:03:16 15     fraud scheme, and that encompasses multiple counts.

16          Count 2 is going to be your conspiracy

17     count, essentially how defendant Scott and others agreed

18     to and acted in furtherance of this securities fraud

19     scheme.

10:03:31 20          Count 22 is going to be your substantive

21     securities fraud count; in other words, how he actually

22     committed the crime.

23          And Counts 45 and 47 are wire fraud,

24     substantive counts of how defendant Scott committed those

10:03:49 25     crimes.

1          Keep in mind as we begin with conspiracy,

2    though, you can consider that evidence as it relates to

3    the substantive counts.

4          You're familiar now with these conspiracy

5    elements.  Defendant conspired or agreed to commit

6    securities fraud.  Defendant knowingly and voluntarily

7    joined the conspiracy.  And a member of the conspiracy

8    committed an overt act to advance or help the conspiracy.

9          We've got the same elements here, but a

10   different theory.  So Count 2, in phase two of this

11   indictment, the Government has alleged and has proven a

12   fraud on the market theory.  In other words, that

13   defendant Scott, along with Mr. Spivak, Mr. Church and

14   others, committed conspiracy fraud by conspiring to

15   devise a scheme to defraud the general investing public,

16   general potential investors in USLG, and they did this by

17   hiding three main things.

18         First, by hiding the fact that Mr. Spivak

19   had influence and control over the free-trading shares of

20   Mr. Scott and Mr. Church.

21         Second, by hiding that when Mr. Scott and

22   Mr. Church sold those free-trading shares to Jason Dean

23   and his cronies, they did so knowing full well that

24   Mr. Dean and his folks intended to illegally inflate the

25   price of USLG stock.

1          And third, by hiding the fact that proceeds

2     of those sales would go directly back to Paul Spivak,

3     someone who's not allowed to be involved in free-trading

4     shares at all.

5          So, when Mr. DeVillers talks to you about

6     direct misrepresentations to investors, lies about

7     commissions, lies about hold periods, that's not why

8     we're here in phase two, and that's not what the evidence

9     has established.

10          The evidence has established that

11    Mr. Scott, Mr. Spivak and others defrauded the market.

12    Agreement, knowledge and action.  Your three elements for

13    conspiracy.

14          Let's start with action and let's orient

15    ourselves in November, 2020.

16          November, 2020, Mr. Spivak needs money.

17    More than anything he wants to be on the NASDAQ, but he

18    knows in order to do so he's got to have a certain asset

19    value, a certain revenue value, and a certain stock

20    price.

21          So when Mr. Dean and his folks come in and

22    offer to help him artificially pump up that stock and

23    take those free-trading shares and sell them, he's more

24    than happy to do so.

25          But here's the problem for Mr. Spivak.  As

1    he well knows by this point, he can't have anything to do

2    with those free-trading shares.  And if he only sells

3    restricted stock to Jason Dean and those folks, that does

4    nothing to raise the open market stock price.

5                    And that's what he needs in order to get on

6    NASDAQ.

7                    So he has no ability to accomplish this

8    scheme without Mr. Scott and without Mr. Dean.

9                    So what do you see?  Mr. Dean says, "Are

10   there any freely tradeable blocks anyone would sell us?"

11                   Mr. Spivak, "Well, it depends on the price

12   but I've got these two trusted guys.  Can't find good

13   folks like that in your life."

14                   And so he reaches out to Mr. Scott and

15   Mr. Church, that old tried and true well of those two

16   trusted friends, and he brings them on board to sell

17   their free-trading shares to Jason Dean and his cronies.

18                   And that right there is what Mr. Scott

19   agreed to do with Mr. Spivak, and let's talk about that

20   agreement.

21                   A couple of details that you'll recall from

22   your Jury instructions, that the agreement doesn't have

23   to be in writing.  Can be unspoken, it can be verbal and,

24   quite frankly, that's what you probably expect in cases

25   like this.  No one's going to sit down and say, "I hereby

1    agree with you to defraud investors."

2              So you look at the circumstances.  You look

3    at what people intended, the natural consequences of

4    their actions and their words.

10:08:54  5          You don't have to agree on all the details.

6    It's possible that you don't know exactly how Mr. Spivak

7    or how Mr. Dean is going to artificially inflate the

8    price.  You might not know the mechanism.  Are they going

9    to use boiler rooms, call rooms, or are they going to put

10:09:15 10  out press releases, promotional materials?

11             But if you know that they're going to do

12   it, no one needs to know.  Knowingly joining intending to

13   advance the main goals, again you don't need to know

14   everything, and a slight role or connection may be

10:09:29 15  enough.

16             You don't have to be the top dog, you don't

17   have to be the ring leader in order to be guilty of

18   conspiracy like Mr. Scott is.

19             Now, you'll see this -- you'll see this

10:09:41 20  agreement -- before we turn to knowledge -- bear out

21   across the communications; defendant Scott's

22   communications and those of his co-conspirators.

23             You see in their text messages, you see in

24   their phone calls, you see in their meetings time and

10:09:58 25  time and time again over the course of a couple of short

1    months that frequency, that pattern, that communication.

2    That's where you see the evidence of exactly what they

3    agreed to.

4                    Now, quite frankly, there's not much doubt

5    in this case that Mr. Scott agreed to assist Mr. Spivak

6    and others in doing things.

7                    He agreed to and did sell a hundred

8    thousand shares to Jason Dean for $25,000, and he agreed

9    to and did send $15,000 to Mr. Spivak.

10                   So not much dispute that there's an

11    agreement.  And you can certainly find again, when you

12    look at those overt acts in your Jury instructions, that

13    someone in the conspiracy took an action on that list.

14                   So again, it boils down to that third

15    element of conspiracy:  Knowledge.  What defendant knew

16    when he was agreeing to take these actions and what he

17    knew as those actions were unfolding.

18                   Starting with March 10th, 2021, it's five

19    days after Mr. Spivak said, "Yep, I've got these trusted

20    guys," but he tells Mr. Dean, "I've got to call them

21    first, you know, just so they know you're on the team,

22    make sure they expect to hear from you."

23                   And you see Mr. Spivak is immediately off

24    to the races, reaching out to Mr. Scott and connecting

25    him with Mr. Dean.

1          That same day, Mr. Dean gets a chance to

2     call Mr. Scott and does.

3               (Tape playing).

4               MS. MILLER:  Mr. Spivak puts Mr. Scott and

10:12:53  5     Mr. Dean in touch for the express purpose of having

6     Mr. Dean sell his free-trading shares to -- I'm

7     sorry -- having Mr. Scott sell his free-trading shares to

8     Jason Dean.

9               And despite never having spoken to this

10:13:07 10     guy, all he needs is one vouch from Mr. Spivak to say,

11     "Yep, just tell me how you want to do it and how much

12     you're going to pay, and I'm good."

13               (Tape playing).

14               MS. MILLER:  "Sounds great.  Let's just

10:13:59 15     make sure the whole team is taken care of."  No

16     hesitancy, no confusion, no questions.

17               Mr. Scott from day one that first phone

18     call knows he's a part of the team.

19               And you see he follows up with his own text

10:14:12 20     to Mr. Dean, "Hey, great meeting with you and talking

21     with you per Paul's suggestion."

22               He's ready to go, ready to work for

23     Mr. Spivak and, in fact, the following day Mr. Dean sends

24     the Stock Purchase Agreement to Mr. Scott.

10:14:30 25               So again we have the urgency, frequency, no

1    questioning, no hesitation on behalf of Mr. Scott.

2              Five days later, March 15th, 2021, and this

3    time there's no signed Stock Purchase Agreement.  Already

4    Mr. Spivak is upset and he tells Mr. Dean, "Hey, raise

10:14:50  5    hell, figure out where this is, why isn't this signed,"

6    only five days later.

7              (Tape playing).

8              MS. MILLER:  Ask yourself, Ladies and

9    Gentlemen, if Mr. Spivak was just some intermediator,

10:15:09 10    just someone to make the connection between Mr. Scott and

11    Mr. Dean so that Mr. Scott could do everything he wanted

12    with his own free-trading shares absent any influence or

13    control over Mr. Spivak, why does Mr. Spivak care then?

14              Why is he concerned about when Charlie

10:15:27 15    signs the Stock Purchase Agreement?  Why does he -- why

16    does it matter to him?  Why does he need to call and

17    raise hell?

18              Well, it matters because he knows he's

19    getting a cut from that deal.  He knows it's part of the

10:15:40 20    plan.  This is no arm's length transaction.  This is a

21    prearranged coordinated sale directed by Mr. Spivak.

22              And why?  Because Spivak confirms "They're

23    holding onto the stock for me."  The plan was, until

24    Jason Dean and his crew came along, that it was going to

10:16:01 25    be Charlie Scott and Forrest Church who were the ones

1    running the stock promotion.

2              And you know that's the case because that's

3    what Forrest Church told you.  He told you that he and

4    Mr. Scott had reached out and they had discussed, "Hey,

10:16:16  5    here are our figures, here's our Excel spreadsheet for

6    the numbers that we can come up with, and let's seek

7    advice on whether we can do this."

8              But they decided at the end of the day, "We

9    don't look good in orange jumpsuits so let's let Mallion

10:16:34 10   do our dirty work."  And now here again they're more than

11   happy to let the new Mallion, Jason Dean and his crew,

12   continue to get their hands dirty and do that dirty work

13   for them.

14             Same day, what does Mr. Dean explain?

10:16:49 15   Well, he starts off with a concern about looking shady to

16   the brokers.  This is in the context of saying, "Hey,

17   this is why we're going to do a test transaction, because

18   we don't want to be too aggressive, we don't want to come

19   out of the gates with trying to sell a million shares

10:17:09 20   because that might get someone's attention.  So let's

21   start with smaller stock amounts and a smaller dollar

22   figure and make sure we can sneak this in under

23   everyone's radar."

24             How does Mr. Scott respond?

10:17:25 25             (Tape playing).

1          MS. MILLER:  So despite any concerns about

2     how shady this may look, as long as the plan is getting

3     the stock price high and making us all very wealthy,

4     Scott says, "Sure.  Sounds like a plan, man."

5          And you also heard in the same call, and

6     you can go back and listen to it yourselves, but

7     Mr. Scott is talking about how he spoke with Paul; how,

8     you know, when they talked, he and Paul discussed.  So

9     you know there are those additional communications going

10    on behind the scenes between Mr. Scott and Mr. Spivak,

11    keeping each other in the loop, Mr. Spivak pushing

12    Mr. Scott into these transactions.

13         And of course, Mr. Dean was sure to follow

14    up with Mr. Spivak as soon as he got off the phone with

15    Mr. Scott.  "I spoke to Charlie.  All is fine, good to

16    go."

17         Again, what's point of doing this if

18    Mr. Scott isn't orchestrating this deal in the first

19    place?

20         And sure enough, that same day, Paul gives

21    him hell.  And what does he get by giving him hell?  Same

22    day, the signed Stock Purchase Agreement, March 16th,

23    2021.

24         Mr. Spivak steps in, says, "Hey, Charlie,

25    what's taking so long?  Why you going so slow?"

1           This is the result of that.  That's how you

2     know that Mr. Spivak is behind the curtain on this.

3           And then you see the wire information going

4     out about a week later.  By the way, sent by Mr. Flood,

10:19:33  5     the same Mr. Flood of the May, 2020 arrest at the

6     CareClix facility for a serious crime that's not white

7     collar in nature.

8           He's the one that sends out the wire

9     instructions so that Mr. Dean's folks can get that 25,000

10:19:48 10     to Mr. Scott.

11           You also saw same exact thing from

12     Mr. Church.  Stock Purchase Agreement from Mr. Church,

13     followed by wire instructions, parallel time, parallel

14     agreement, parallel conduct.

10:20:04 15           That is what shows, Ladies and Gentlemen,

16     that these folks were all in it together.

17           And then a few days later, March 30th,

18     2021, they're running a promotional deal.  "You mentioned

19     before they were the ones who were thinking of running a

10:20:24 20     promo," and that's why they're holding onto the stock.

21           (Tape playing).

22           MS. MILLER:  "If we would have taken the

23     stock, it would have gone back and been Treasury stock.

24     That's why we knew we had to put it in friendly hands" of

10:21:54 25     Forrest Church and Charlie Scott.  That's their deal;

1    that's who they were.

2              And when you talk about that, he's talking

3    about that one-and-a-half million shares from that March,

4    2018 transaction.

10:22:05    5              He said, "Out of our 500 shareholders,

6    these are the two that had to take that stock for the

7    company."

8              Mr. Spivak has always thought and has

9    always structured that March, 2018 resolution of the

10:22:21 10    Mallion lawsuit that you heard about in phase one so that

11    he would get the benefit and he would get the proceeds.

12              He's always thought that that was his

13    stock.  That's why he put it in the hands of his two

14    trusted individuals, who it turns out were more than

10:22:37 15    happy to do his bidding.

16              And then you see the FBI wires coming in,

17    April 1st, 2021, $25,000 wired directly into Charlie

18    Scott's account.

19              And lo and behold, four days later, April

10:23:01 20    5th, $15,000 goes out of that same account directly to

21    USLG.

22              And you see here again that's the same

23    transfer and the same kickback.

24              Now, you also saw the same thing from

10:23:20 25    Forrest Church; that when he got his 25,000, he

1       immediately turned around and kicked back 15,000 to

2       Mr. Spivak.

3               Again, timing, pattern, consistency, all of

4       this demonstrates the agreement.

10:23:35  5       But also ask yourselves, Ladies and

6       Gentlemen, Mr. Scott said, "I wanted to sell this stock

7       because I wanted to put money in my pocket.  I wanted to

8       benefit me, have a little cash.  I wanted to benefit my

9       company CareClix first and foremost."

10:23:52 10       But yet when he gets $25,000 in a pure wire

11      from selling that stock, he turns around, he gives

12      two-thirds of it to Mr. Spivak.  How does that benefit

13      him?  How is that putting money into his pocket?  How is

14      that helping CareClix?

10:24:12 15       Well, it benefits Mr. Spivak, but it

16      benefits Mr. Scott because it's part of that evergreen

17      cycle of "We're going to continue to do this again.  I'm

18      going to put this money in under the papering over guise

19      of getting reinvestment in the company, but I'm going to

10:24:32 20      do that so I know that when that restricted stock becomes

21      free trading, I can just keep doing this over and over

22      and over again."

23              That's what he meant by putting money in

24      his pocket.  Not so that he just had some change, not so

10:24:46 25      that he could invest in CareClix.

1          First and foremost purchase out of his

2     account was to USLG.

3          And then of course, you saw the

4     subscription agreement, same day, doing exactly what

5     Spivak, Scott and Church said, but again to be clear this

6     is not just a legitimate investment.  He's not just

7     trying to help the company.  This is a coverup.  This is

8     papering over that kickback.

9          The only two times that you've heard about

10    Mr. Scott purchasing restricted shares in USLG is within

11    days of when he sells the free-trading shares.

12          If he's just an investor, if he just

13    believes in the company, if he just wants to maintain his

14    position and hold these restricted shares or gather them

15    up, why the timing?  Why four days after the sale of

16    free-trading stock?  Why at no other time when he was an

17    investor?  Unless, of course, it's connected to the sale

18    of free-trading stock and it's a prearranged agreement

19    with Mr. Spivak to make sure Mr. Spivak gets his proceeds

20    from those sales.

21          Now, let's move forward two weeks later,

22    April 13th, 2021, Mr. Spivak is getting impatient and he

23    knows that the money's come in, he knows that the sale

24    purchase -- or the stock purchases have been made.

25          Why isn't Dean running a promo yet?  So you

1    saw in the text messages and you heard in the

2    communications -- you can go back and listen to them

3    yourselves -- that he's pushing Dean, "Hey, I'm sitting

4    on these promotional releases and they are just gathering

10:26:43  5    dust.  When can I get this going?  When can we start?"

6              And at one point he said, "Let's get

7    everyone together on an e-mail chain so we can hurry up

8    and speed this up and make sure everyone is ready" and

9    then, "Oh, wait.  Dumb idea.  We don't put anything in

10:27:00  10    writing."

11              So Mr. Spivak calls Mr. Dean and he's like,

12    "Hey, what's the holdup?"  Remember, Mr. Spivak was

13    really upset with Mr. Dean on that one call.  He's like,

14    "What's going on?"

10:27:11  15              And Mr. Dean has to explain to Mr. Spivak,

16    "No, the holdup is on your guy.  Mr. Scott hasn't figured

17    out a way to send me the stock certificate yet."

18              Mr. Spivak is like, "Oh, so sorry about

19    that.  I can fix that.  Let me push Mr. Scott to figure

10:27:31  20    that out for you.  Let me call him and make sure

21    everything's okay."

22              And Mr. Dean and Mr. Scott also talk

23    following that conversation.  Again, the pattern shows

24    that it's Mr. Spivak acting as the intermediary,

10:27:55  25    Mr. Spivak controlling and directing these conversations,

1    dictating what happens to these shares, the pace, the

2    interest.

3              If Mr. Scott is just going to sell his

4    free-trading shares and do nothing with the proceeds but

5    keep them for himself, why should Mr. Spivak care?  It's

6    not an arm's length transaction.  This is so Mr. Spivak

7    can get his money.

8              (Tape playing).

9              MS. MILLER:  Looking to take it all out.

10   So now they are moving on.  They've done that $25,000

11   transaction, and Mr. Scott wants to know, "Hey, man, are

12   you serious about buying the rest of this?"

13             And also during that conversation, if you

14   recall, that's when they get interrupted, when

15   Mr. Scott's phone dies and Mr. Dean's like "What

16   happened," when he picks back up.

17             (Tape playing).

18             MS. MILLER:  So that's that conversation

19   that you know from the timing and from the communications

20   and the context, and that Mr. Spivak is reaching out

21   right in the middle of Mr. Dean's phone call with him to

22   say, "Hey, man, let's keep it moving."

23             So enter CareClix.  After Mr. Dean talks to

24   Mr. Scott about, "Hey, we're doing this deal for USLG and

25   you're going to sell your free-trading shares to me and

1    we're going to make sure you get that stock price up,"

2    they start talking about it in connection with

3    Mr. Scott's company CareClix.

4                    (Tape playing).

10:29:39 5            MS. MILLER:  He offers to do the same

6    thing.  He's going to take a base position in the stock

7    up front, and he's going to make the market aware that

8    this is a deal too good to be true, and "We're all going

9    to be really happy because we're all going to get money

10:29:58 10   in the outcome."

11                   And what does Mr. Scott say?

12                   (Tape playing).

13                   MS. MILLER:  "It's good to have options."

14   He's interested, I mean he's really interested.  After

10:30:11 15  all, this is a company that you heard from Mr. Hipple and

16   you heard from Mr. Scott was on caveat emptor, couldn't

17   trade, had issues with the SEC.

18                   Their CEO Dr. Korangy, one of Mr. Scott's

19   right-hand men, had made false and misleading statements

10:30:32 20  to the marketplace about their ability to treat COVID-19

21   during the pandemic.

22                   You saw that there were issues with getting

23   audited.  And Mr. Hipple, that guy who was barred from

24   the securities industry for five years, is the one trying

10:30:46 25  to right the ship, trying to "right the ship."

1                    But they're very interested because they

2          don't have any other financing options.  They don't have

3          any other ability to do this.

4                    And again, you see Mr. Spivak explaining,

10:31:07  5          "We're working together as a team.  That's why it's with

6          Charlie and Forrest, they are the ones that got the

7          free-trading shares," same insane conversation.

8                    And it bears noting, Ladies and Gentlemen,

9          that this is all at a time when Mr. Spivak and Mr. Scott

10:31:26 10          and Mr. Dean, they have no other motivation than

11          effectuating these stock sales and getting this money.

12                    Mr. Spivak doesn't know that he's being

13          recorded right now, so when he's repeating this pattern,

14          when he's discussing this agreement, when Mr. Scott then

10:31:41 15          takes the very same action within days that Mr. Spivak

16          and Mr. Scott have just described, that's how you know

17          that this was intentional.

18                    Back to April 19th, talking about CareClix.

19                    (Tape playing).

10:31:58 20                    MS. MILLER:  "I thought so."  Scott's

21          starting to realize what's good for the goose is good for

22          the gander, and he's starting to realize that, "Hey,

23          maybe what Dean has to offer USLG can work for me.

24          Sounds like a pretty good gig.  That's the way we like to

10:32:24 25          play."

1          He knows what they're up to.  Is he running

2     for the hills?  No, he's bringing him on board, wants

3     that money.

4          How does he go about bringing him on board?

10:32:35  5     "Would you mind installing Signal?  Signal is encrypted

6     for text messages and voice calls."

7          Mr. Scott said, "Signal's like brushing

8     your teeth" and so he's going to talk on Signal to

9     Mr. Dean because things are getting real, things are

10:32:53 10     getting serious.

11          Sounds like a legitimate business

12     operation?

13          (Tape playing).

14          MS. MILLER:  Doesn't even phase Mr. Scott

10:33:28 15     when Mr. Dean offers up a burner phone.  Of course you

16     have a burner phone.  Of course you're going to talk on

17     Signal.  Of course this is legitimate.  Use your common

18     sense, Ladies and Gentlemen.

19          (Tape playing).

10:33:47 20          MS. MILLER:  Same conversation here.  After

21     Mr. Scott's starting to say he's interested, after he's

22     saying, "Let's talk via Signal," he then says, "We see

23     how you operate.  We know what you're about.  We've heard

24     what you're going to do for USLG."

10:34:06 25          And what does he immediately talk about?

1    "We've got some free-trading shares."

2              He doesn't say, "Gee, would you like to buy

3    some restricted stock in CareClix?  How about those

4    convertible notes that Mr. Hipple, the shyster,

5    supposedly talked about?  No.

6              The form of investment here, the only form,

7    the only way to get money, as Mr. Scott knew, is through

8    free-trading shares.  Why?  Because Mr. Spivak set the

9    model.  Mr. Scott rolled in, saw how well it was doing,

10   and wants that for himself and his own company.

11             Yet he knows the company cannot raise money

12   through free-trading shares.  It can't.  The company can

13   only raise money through restricted shares.

14             So Mr. Scott knows he shouldn't be talking

15   to Mr. Dean about getting money through free-trading

16   shares.

17             And yet after seeing how Jason Dean

18   operates, that's exactly where he goes.

19                  (Tape playing).

20             MS. MILLER:  "We just haven't put out our

21   news."  Same thing Mr. Spivak was doing.  Sitting on

22   their press releases, sitting on their news, waiting

23   until the time that they could pretend that it was

24   current for ammunition to be used for pumping up the

25   stock price.

1          Mr. Scott:  "I guess we should talk more on

2     Signal, but I like your style, I like this guy," that he

3     would now want to distance himself from and say, "Oh,

4     wait, I didn't want anything to do with what he and

10:36:21  5     Mr. Spivak were doing."

6          Doesn't sound like it to me.  In fact, he

7     says, "Don't tell Paul."  Why?  Because he knows

8     Mr. Spivak has to get his deal done, but he wants his own

9     little cut, too, and he wants to make sure that

10:36:35 10     Mr. Spivak doesn't put the kibosh on that by saying, "No,

11     no, no, Mr. Dean and that money, Matt's money, that's all

12     going to be mine."

13          (Tape playing).

14          MS. MILLER:  "I have a pretty good idea of

10:37:13 15     what you're doing and how you do it, what you're looking

16     to achieve."

17          And then he says, "If I were you, I'd be

18     really interested in this."

19          This isn't the voice, these aren't the

10:37:23 20     words of someone saying, "No, no, no, please don't

21     promote stock for me, please.  I don't need you.  We're

22     going to be fine without you."

23          He's pumping himself up, he's pitching

24     himself saying, "Yeah, look at us.  We're good.  Bring

10:37:37 25     your money to me."  And how?  Through those free-trading

1    shares.

2              Now, in that time frame, you know that

3    Mr. Scott and Mr. Church -- I'm sorry -- Mr. Scott and

4    Mr. Spivak are still talking.  They've known each other

10:37:54  5    for 10 years now, "My brother from another mother," and

6    Mr. Spivak responds with a kissy face.

7              And it bears noting, as Special Agent Fry

8    said, these text message communications stopped prior to

9    this time; that they found more communications on

10:38:10 10    Mr. Dean's phone than on Mr. Spivak's phone, so again

11    evidence that they are concealing, that they are hiding,

12    they don't want the truth to be known about what they are

13    really planning, that Mr. Spivak is behind Mr. Scott's

14    sale of these free-trading shares.

10:38:25 15              Moving forward a couple of weeks now, we're

16    at May 14th, Mr. Dean starts talking about the press

17    releases to Mr. Scott.  "I'm going to get you hooked up

18    with my magician, the guy who can make anything trade."

19              (Tape playing).

10:39:09 20              MS. MILLER:  Bryan, the magician, who's

21    going to step in the first couple weeks of June for USLG

22    and make sure their stock price and their promotions go

23    up.

24              Mr. Spivak is not -- or Mr. Scott's not

10:39:45 25    running away from this.  What's he saying?  "Bryan's

1      going to love us, he's going to love CareClix, bring him

2      on," pitching himself, not walking away.  He's fully in.

3                  (Tape playing).

4                  MS. MILLER:  Then that same conversation

5      turns to USLG, and Dean says, "Hey, Bryan's asking me for

6      an update.  He wants to know are there going to be any

7      other free-trading shares in the market so that we can

8      figure out how big our promotion has to be, so that we

9      can account for what we have to manipulate, we can create

10     a program big enough to do."

11                 What does Scott say?  "I don't know about

12     Joe, but I have 1.7 million."

13                 Ladies and Gentlemen, why is he bringing up

14     Joe?  Forrest Church?  Forrest Joseph Church?  Joe

15     Church?  Is this, again, it's just him trying to dump his

16     shares, him trying to sell to Jason Dean who he thinks is

17     a legitimate investor or a legitimate purchaser of USLG

18     shares?

19                 Why, when Mr. Dean starts asking about how

20     many free-trading shares will be in the market at the

21     time of the promotion, does Mr. Scott immediately offer

22     up Joe?  Because he sees them as a package deal.  Because

23     he knows that when it comes to USLG free-trading shares,

24     it's Mr. Church and it's him.

25                 And so he's answering on behalf of them

1    both, consistent with their prearranged agreement with

2    Mr. Spivak.

3              That's why.

4              And in that same breath, just immediately

10:42:11  5    following that conversation where, "Oh, the free-trading

6    shares are me and Joe," he goes, "Not a good idea for

7    Mr. Spivak to be involved in my free-trading shares."

8              (Tape playing).

9              MS. MILLER:  Now, first of all, Ladies and

10:42:42 10    Gentlemen, that's much more than an introduction.

11    Mr. Spivak brought Mr. Dean specifically to Mr. Scott for

12    the express purpose of having him purchase those

13    free-trading shares.

14              And then he pushed him on the timing, he

10:42:58 15    pushed him on the stock purchase, he pushed him on the

16    proceeds.

17              That's what shows that he is influencing

18    and controlling those shares.  And it doesn't matter that

19    Mr. Scott acquired or purchased those shares back in 2012

10:43:12 20    when he was just an investor in the pre-public USLG.

21              Doesn't matter how he got them.  It's what

22    he's doing with them now and who has control and

23    influence over them.  And that person is Mr. Spivak.

24              And, yeah, well, he might be saying, "Oh,

10:43:30 25    no, these are -- these are my shares.  I mean, the

1   Supreme Court said that they're mine."  You know from his

2   actions that he did exactly what Spivak said he was going

3   to do, exactly what Spivak, Dean, Scott and Church agreed

4   they would do:  Sell the free-trading shares, send back

10:43:48  5   the money, keep doing the cycle over and over and over.

6           The proof is in the pudding with a little

7   bit of nutmeg sprinkled on top.  The actions speak louder

8   than words.  Mr. Scott's actions prove that agreement,

9   prove that knowledge, prove that intent to defraud.

10:44:07 10           And why?

11           (Tape playing).

12           MS. MILLER:  Why?  "Because Paul knows he

13   can trust me, because he knows I'll do what I said, he

14   knows I'm a brother from another mother."

10:44:34 15           That's why.

16           So four days later, the now infamous

17   in-person meeting with Mr. Spivak starts in the

18   conference room.  "Drop the phone.  Let's walk outside."

19   So before they go outside, this is a clip from that

10:44:52 20   portion.

21           (Tape playing).

22           MS. MILLER:  So they start doing some math.

23   Not my forte.  But as I understand it from what they're

24   saying, they're going to get $0.30 a share each -- "they"

10:45:21 25   being Mr. Scott and Mr. Church -- going forward from

1    Mr. Dean.

2                So they have six million shares, so about a

3    million-eight, $1.8 million because of that.

4                So each one, Mr. Scott and Mr. Church,

10:45:41  5    that's $900,000.  So this right there is what Mr. Spivak

6    expects of the deal going forward when Jason and his crew

7    take out, i.e. purchase, all of the remaining

8    free-trading shares from Mr. Scott and Mr. Spivak -- or

9    Mr. Church.

10:46:00 10                And keep that $0.30 figure in your mind

11    because it's going to come up in a moment.

12                But of course, the devil's in the details

13    and they're getting a little, a little too into the weeds

14    for Mr. Spivak's comfort, and so he drops the phone, we

10:46:19 15    go outside, and then they talk.

16                (Tape playing).

17                MS. MILLER:  They're going to get busted.

18    What do you do if you know you're going to get in

19    trouble?  You cover it up.

10:47:42 20                What's the first way they're going to cover

21    it up?  By making it not a specific fraction of six

22    million, so he throws out that, "Yeah, it will be about

23    1,587,032 shares."  Why?  Because that's not tied to a

24    direct percentage or a direct proportion.

10:48:01 25                What else are they going to do to assume

1    they are going to get busted?  Well, they are going to

2    come up with a consulting agreement.  What should that

3    be?  What would you like to do, RV sales?  How would you

4    like to explain your life?  That's what's going on here.

5                    (Tape playing).

6                    MS. MILLER:  Get your story straight,

7    prepare for getting caught.

8                    (Tape playing).

9                    MS. MILLER:  900 grand from Charlie, that's

10   the math that he's going to get at $0.30 a share.

11                    In order for Mr. Dean to get his commission

12   from Mr. Spivak, his kickback, he's got to make sure that

13   he gets Forrest and Charlie on board, and he says, "Get

14   all that stock bought up from them now.  As soon as I get

15   that 900,000 from Charlie I'm going to get their -- their

16   $0.15 back."

17                    And guess what?  That is when Mr. Dean and

18   how he makes his money.

19                    (Tape playing).

20                    MS. MILLER:  "And here's how we're going to

21   communicate.  FaceTime, can't be recorded."

22                    Mr. Dean offers up the bat phone.

23   Mr. Spivak says, "Yes, someone's always listening so

24   speak in another language if you have to.  I mean,

25   normally it's okay for phone calls, but if you're going

1    to talk about this, you've got to talk about something

2    real.  We don't want anyone to know.  Remember, we're

3    hiding this from Matt, the person who's going to purchase

4    the shares because we wouldn't want him to know that

5    Mr. Spivak is getting a kickback," and they're hiding it

6    from the Government because Mr. Spivak clearly knows he

7    can't be involved in the sale of free-trading shares and

8    that that's exactly what he's orchestrated with Mr. Dean.

9              So the following week is when Mr. Dean goes

10   out to Alexandria, Virginia to meet with Mr. Scott, and

11   they continue their series of discussions, both about

12   USLG and about CareClix.

13             And in that first opening, Mr. Scott is

14   explaining, "Look, I'm going to have so many of these

15   deals with Mr. Spivak he's the one who should be making

16   me rich," but then he says, "You know, you guys are going

17   to make a bunch of stuff, money on this.  I'm going to

18   get a little bit.  I'm super cool with that."

19             He also says, "Plus it continues."

20             He's super cool with it because he knows

21   this is part of the process, this is part of the cycle.

22   He's a good soldier, he's working hard for the boss, and

23   he knows that he will get a cut of that at the end of the

24   day.

25             (Tape playing).

1          MS. MILLER:  So here you've got

2    Mr. Spivak -- Mr. Scott describing Mr. Spivak as saying,

3    "There's a brotherliness between us, a brother is built

4    for the day of adversity."

10:53:48  5          And then you have Mr. Scott talking up that

6    same brotherly bond, that same relationship in the

7    context of dumping your cell phones and fleeing from the

8    police to a foreign jurisdiction.

9                Thick as thieves; reason for that phrase.

10:54:07 10          (Tape playing).

11          MS. MILLER:  "I was on the yacht."

12          Again, Mr. Spivak immediately reached out

13    and told Scott, "Hey, look at this great experience I

14    had.  These guys are the real deal.  Get in on it."

10:54:33 15          You see time and time again these

16    references to communications, to these back channel

17    discussions between Mr. Scott and Mr. Spivak.

18          This isn't just Mr. Scott who was misled by

19    Mr. Dean and thought that everything was going the right

10:54:48 20    way.  No.  He's working with Mr. Spivak.

21          You heard how Mr. Spivak discusses these

22    deals, the way he talks, the things he wants, his

23    priorities, and that's Mr. Scott's brother from another

24    mother.

10:55:04 25          Use your common sense and reason when

1    evaluating, is that someone who really doesn't know what

2    Mr. Spivak is up to?  Really wasn't looped into the

3    entirety of the deal?  Didn't have a clue why he was

4    selling these shares and was just some disinterested

5    investor?

6                    It's not.  It's someone with the intent to

7    defraud.

8                    (Tape playing).

9                    MS. MILLER:  "Paul wants me to sell

10    everything.  I'm all in.  No problem with that."

11                   There's no running from the hills here.

12    There's no confusion.  He's just ready and willing to do

13    it again, all for his best friend.

14                   And then there's the conversation when

15    Mr. Hipple gets on the phone, the general counsel who has

16    a securities fraud background, and Mr. Dean talks about

17    everything that his guy can do for CareClix.

18                   (Tape playing).

19                   MS. MILLER:  Mr. Dean explains, "This is

20    how my guy likes it," and then he gets to the point where

21    "But he wants a blend of freely tradeable shares."

22                   Mr. Scott says, "You know we're on the

23    phone."

24                   You heard him testify, Ladies and

25    Gentlemen, that someone walked into the room and that

1      he's acknowledging this invisible stranger, and that you

2      didn't hear a door open and you didn't hear Mr. Dean say

3      hello.  He just says, "Oh, okay."

4                     Again, this is a discussion that Mr. Scott

10:57:37  5      doesn't want to have about freely tradeable shares on the

6      phone; same reason that he asked Mr. Dean to go to

7      Signal, same reason he doesn't want to communicate this

8      in front of Mr. Hipple.

9                     Can't even trust Mr. Hipple with this

10:57:53 10      information.  And you heard Mr. Hipple say, "Yeah, I

11      actually didn't know about Mr. Scott's involvement with

12      USLG, and I didn't know that Mr. Spivak held shares."  He

13      certainly wasn't looped in here.  Why?  Because that was

14      Mr. Scott's deal.

10:58:07 15                     And then right after this, right after

16      Mr. Hipple hangs up the phone, here's what happens.

17                     (Tape playing).

18                     MS. MILLER:  "Josh controls 11 million

19      shares."

10:58:27 20                     That's the first thing that they start

21      talking about once Hipple's off the phone.  "We've got

22      these free-trading shares.  Let's figure out how to

23      monetize them."

24                     (Tape playing).

10:58:42 25                     MS. MILLER:  "He personally has a million

1    but he has a relationship with ten million."  Mr. Scott

2    acknowledges, "Yeah, he controls a bunch."

3              This is the exact same role, Ladies and

4    Gentlemen, that Mr. Scott was playing for Mr. Spivak:

10:59:17  5    Someone who controlled a large block of free-trading

6    shares for the company.

7              That's why they're talking about this.

8              (Tape playing).

9              MS. MILLER:  Mr. Spivak is proposing a deal

10:59:53 10   to Mr. Dean where he gives him access to Josh's 11

11   million free-trading shares, "Something like Paul's

12   doing."

13             That right there, the structure of what

14   he's willing to do with CareClix and with Mr. Flood's

11:00:13 15   free-trading shares is knowledge that he knew exactly

16   what was going on with Mr. Spivak and with USLG and what

17   they wanted to do with Mr. Scott's purported free-trading

18   shares.  Knowledge of the agreement, an agreement to do

19   what's wrong.

11:00:39 20             (Tape playing).

21             MS. MILLER:  They turn back to USLG, and

22   Mr. Scott says, "Yep, I've got these 1.7 million" and

23   then he says, "But you'll have no problem giving me my

24   little $0.30 of hope."

11:01:51 25             Where does that $0.30 of hope come from?

1    $0.30 comes from Mr. Spivak.

2              Remember in that walk and talk conversation

3    where Mr. Spivak says, "Yep, they're each going to get

4    their shares purchased at $0.30," that's how Mr. Scott is

5    going to get $900,000.

6              Mr. Dean didn't front that.  You're not

7    going to hear that in a recorded conversation with

8    Mr. Dean saying that.  So the only way Mr. Scott knew

9    about the terms, knew about that ongoing agreement and

10   arrangement to purchase the rest of the free-trading

11   shares and what that price would be, is from Mr. Spivak.

12   They were on the same page.  That's how you know they

13   were talking.

14             Mr. Scott was going to get his $0.30 of

15   hope and they were going to continue to do things, it

16   looks like.  Continue to sell those free-trading shares.

17   Continue to get those proceeds, kick back some to

18   Mr. Spivak, put a little in Mr. Scott's pocket just to

19   keep the evergreen cycle going, just to hide that

20   Mr. Spivak is the one selling and directing and

21   influencing the control of those shares.

22             And then Mr. Dean meets in person with

23   Mr. Spivak and discusses this plan.

24             (Tape playing).

25             MS. MILLER:  And here Mr. Spivak has

1    confirmed that plan, that Matt's going to buy out Charlie

2    and Forrest for $0.30 a share; that they're going to kick

3    back, under the guise of buying stock, at $0.15 a share,

4    and as soon as Mr. Spivak receives the 900,000 from

11:04:23  5    Mr. Scott, that's how Mr. Dean is going to get his cut.

6            But Mr. Spivak wants to make sure, "When we

7    do this, what all do we have to paper?  What's going to

8    be publicly available?"  Because they're hiding it from

9    Matt and they're hiding it from the Government.

11:04:41 10           How did they all make money on this deal?

11   They're going to raise the stock price up and they're

12   going to get a goddamn room set up someplace out of the

13   United States.  Everybody ends up happy, everybody making

14   money, and they paper it over with this:  The consulting

11:05:02 15   agreement for Mr. Dean, backdated to June 2nd, signed on

16   June 8th, with the handwritten explanation of how

17   Mr. Dean is going to be an expert in the company's

18   European expansion.

19           Total BS.  Total coverup that is here.  And

11:05:26 20   you know Mr. Scott knew at every stage what was going on

21   because of the communications, the pattern, and the

22   frequency, and his intimate knowledge of the terms and

23   conditions of that deal.

24           So to review conspiracy before we move on

11:05:41 25   to the substantive counts, again this agreement, not

1      going to see it written down.  Why?  Because most people

2      don't put illegal contracts together.  Most people don't

3      write down pieces of paper saying they're going to

4      defraud.

11:05:55    5              You don't need to know all of the details.

6      Defendant doesn't need to know every portion.  Slight

7      role or connection may be enough.  And the conspiracy

8      need not have succeeded.

9              And so the fact that the FBI thwarted them

11:06:10   10   and they didn't get to rip off hundreds of USLG

11     prospective investors in the marketplace, it's a good

12     thing, but it's not fatal to the conspiracy.  They

13     conspired when they agreed to do this, and the fact that

14     they didn't profit or that the FBI caught them before

11:06:31   15   they could run away with the market's money, not a

16     problem for this count.

17              And a single overt act by any conspirator

18     is sufficient.

19              So let's turn now to the substantive

11:06:50   20   counts.

21              The first count, the first substantive

22     count is securities fraud.  And as you know, that has

23     three elements.

24              First, there's one of three types of

11:06:59   25   fraudulent conduct.

1          Second, that the defendant acted willfully,

2     knowingly, and with the intent to defraud; in other

3     words, he meant to do it.

4          And third, that a means or instrumentality

5     of interstate commerce was used.

6          We can get rid of the first one or, I'm

7     sorry, the last one first because that's stipulated to.

8     And you'll see that still in your Jury instructions, that

9     the parties have agreed that that's satisfied.

10         So let's talk about the three types of

11    fraudulent conduct.

12         As you know from your Jury instructions,

13    the Government may prove any one of these three types of

14    fraudulent conduct:  That the defendant employed any

15    device, scheme or artifice to defraud; or that there were

16    material misstatements or omissions of facts; or that

17    they engaged in an act operating as a fraud.

18         Here in this phase two for securities

19    fraud, it's this first one that the Government has

20    proven, that the defendant employed a device, scheme or

21    artifice to defraud.

22         And that scheme, as I mentioned before,

23    comes from Mr. Scott, Mr. Spivak, Mr. Church and others

24    agreeing to hide all of Mr. Spivak's interest and control

25    in these shares, hide his involvement in the promotional

1   activity, and hide the kickback from the general

2   investing public.

3                  It's called fraud on the market.

4                  And so that is the first element that is

11:08:28   5   satisfied here.

6                  And fraud includes, Ladies and Gentlemen,

7   all efforts and means to take advantage of others.  There

8   doesn't have to be a specific way.  It prohibits all

9   kinds of manipulative and deceptive acts.

11:08:44  10                  So wouldn't you think about whether the

11   average investor, someone who's going into the

12   marketplace and wanting to purchase this stock, would

13   have wanted to know that the same person selling that

14   stock was actually selling it when it was orchestrated by

11:09:02  15   the company; that the company wasn't allowed to get any

16   proceeds of that sale, but that they would; that the

17   press releases and the timing of the promotions of those

18   press releases were fake; and that all of this was being

19   done to show the investor that the stock was worth more

11:09:20  20   than it ever was, causing them to buy higher?

21                  That's something that the average person

22   would have wanted to know, and that's manipulative and

23   that's deceptive and that's fraud.

24                  And it can relate to any deceptive or

11:09:36  25   manipulative practice with respect to USLG stock.

1          And when I said before you're not going to

2     hear in this phase that -- from individual investors who

3     come up and say, "I was told the whole period was X," or

4     "I wasn't told about this commission," that's not what

5     we're talking about here.

6          We're talking about putting fake

7     information into the marketplace for the prospective USLG

8     investor.

9          And then finally, that "In connection with"

10     portion of that first element just requires some nexus or

11     relationship between the fraudulent conduct and the

12     purchase or sale of securities.

13          So here again, that misleading information

14     going into the marketplace, that conflict of interest,

15     that double dealing in being on the promotional side as

16     well as being on the selling side of the free-trading

17     stock, all of that is in connection with the prospective

18     purchase of those securities.

19          And the problem is because Mr. Spivak, as

20     the CEO, can't be involved in the free-trading shares.

21     And yet, the same people who are going to promote his

22     stock are the same people that purchased it from

23     Mr. Scott and Mr. Church.

24          That's not being disclosed to the marketing

25     public.

1            And the second element requires intent,

2    that the defendant meant to do it.  It means acting with

3    bad purpose to disregard the law, having the intent to

4    deceive.

5            Now, you've heard throughout this trial

6    questions and testimony about "Well, you didn't

7    ultimately mean for anyone to lose their money."

8            That's not intent to defraud.  Intent is,

9    "Did you mean to tell the truth or did you mean to hide

10   the facts?"  Intent to deceive.

11           And Mr. Scott might have said, "Yeah, well,

12   I didn't want anyone to lose money," but he certainly had

13   his own intent to profit.

14           And when you look at what caused that

15   intent to profit, the facts and circumstances and

16   communications that gave rise to it, his agreement to

17   allow Mr. Spivak to dictate what he did with his

18   free-trading shares, the kickback, all of that is intent

19   to defraud.

20           And then the Government doesn't have prove

21   that the defendant specifically knew his actions are

22   unlawful.  So he doesn't have to know that in so doing,

23   it was a violation of 10b-5 of the Securities & Exchange

24   Act.  No.  Just that he intended to deceive.

25           I already mentioned that this is stipulated

1    and per your Jury instructions you can, therefore, find

2    that that instruction -- or that element is satisfied.

3                   So the count for securities fraud is Count

4    20, and it's the April 1st, 2021 $100,000 sale -- I'm

11:12:40  5    sorry -- 100,000 share sale to Mr. Dean of those USLG

6    stock shares for which he got $25,000 in proceeds.

7                   And you know that Mr. Scott willfully

8    defrauded as part of the scheme to defraud because when

9    he sent over that 100 -- those 100,000 shares to

11:13:09  10    Mr. Dean, he did so knowing that Mr. Dean was going to

11    hold those shares and use them as part of a press

12    promotion to artificially inflate the price.

13                   He also did so knowing that Mr. Spivak was

14    orchestrating those transactions, and yet as the CEO of

11:13:28  15    USLG he could not have any involvement in that

16    transaction.

17                   Turning now to wire fraud, it's similar but

18    not quite the same.  In this one, still a scheme, but a

19    scheme to defraud or -- I'm sorry -- to defraud, to

11:13:47  20    deprive another of money.

21                   So here it's just, "I wanted somebody's

22    money and I used the wrong means to get it."  Doesn't

23    even have to be in connection with the sale of

24    securities.  Just how do you go about getting someone's

11:13:59  25    money under false or fraudulent pretenses?

1           Second element is that the scheme included

2   a material misrepresentation, a fraudulent pretense, or a

3   concealment of material fact.

4           Again, the defendant had the intent to

5   defraud, and again the defendant used interstate wires in

6   furtherance of the scheme.

7           And here, depriving another of money need

8   not succeed or profit, so the fact that Mr. Scott ended

9   up giving $15,000 to Mr. Spivak, doesn't matter.  Could

10  have given the money to charity.  He could have not made

11  any money at all.  Don't need to succeed or profit.

12          Didn't have to obtain it for himself.

13  Could have given it to CareClix.  Could have given it on

14  behalf of Spivak.  And that's what you see here, that he

15  obtained that $15,000 essentially on Mr. Spivak's behalf.

16          A material misrepresentation can be made

17  with reckless indifference to the truth.  It includes

18  half-truths, knowing concealments of material facts, and

19  capable of influencing the decision of a person of

20  ordinary comprehension.

21          The material misrepresentations here are

22  what we just talked about:  Misrepresenting that these

23  are arm's length transactions; misrepresenting, hiding

24  the fact that it's Mr. Spivak orchestrating these sales;

25  that it's Mr. Spivak directing the promotion of this

1    stock price; that it is those stock promoters who

2    themselves have now purchased free-trading shares and

3    have an interest in whether the price goes high that are

4    the same ones driving it up.

5                    Those are all things that an average

6    ordinary person would want to know before they bought a

7    stock.

8                    They'd want to know if that price actually

9    reflected the value of the company, or if it was a

10   product of somebody else's orchestration, someone else's

11   manipulations.

12                   So that's easily satisfied.

13                   And then for the same reasons that you can

14   find the defendant intended to defraud with respect to

15   the securities fraud count, you can so find that for wire

16   fraud.

17                   And the counts here are Count 45, April

18   1st, 2021.  Here it's the $25,000 purchase of the 100,000

19   shares.  Essentially this is the FBI's transfer of that

20   money through an originating bank to Mr. Scott's Navy

21   Federal Credit Union account.

22                   And then Count 47 is the April 5th, 2021

23   kickback that Mr. Scott then made to USLG, that $15,000

24   going from his Navy Federal Credit Union account to

25   USLG's Huntington Bank account.

1          Now, Ladies and Gentlemen, the touchstone

2     of all of these counts, all of these violations that the

3     Government has proven in this trial is the defendant's

4     knowledge.  That's really what's at issue here.

5          But the Judge instructed you that it's

6     impossible to read someone's mind.  But you can infer

7     knowledge, you can infer intent from what someone says

8     and doesn't say, from what someone does and doesn't do,

9     and from the natural consequences of those things, the

10    natural results and outputs of what you see by someone's

11    words, someone's actions, someone's inactions.

12         The communications prove Mr. Scott's

13    knowledge.  His own words and actions confirm it.

14         We already went through the things that

15    Mr. Scott said.  "Just tell me how you want to do it and

16    how much you're going to get paid.  I know what you're

17    about, and I'm on board."

18         And at the end of the day, he was willing

19    to do Mr. Spivak's bidding for his $0.30 of hope and to

20    keep this thing rolling.

21         And compare that, Ladies and Gentlemen,

22    what you heard on the recording to what you heard from

23    the stand; that Mr. Scott couldn't get through a single

24    question without confusion, clarification, hedging,

25    lying.

1          Even the most basic questions, "Do you have

2      the ability to monitor and control everyone in the

3      world?"

4          Ask yourself, using your own experience

11:18:42  5      dealing with folks, when you speak with someone, is that

6      the measure of someone who's hiding something, the

7      measure of someone telling the truth?

8          Talk about what he did.  Mr. Scott did

9      exactly what Mr. Spivak said he would do, what Mr. Dean

11:19:02 10      said he would do, what Mr. Church said he would do:  He

11      allowed Jason Dean to give him $25,000 in exchange for a

12      hundred thousand shares in USLG, and he took that 25,000

13      and he kicked back 15, just like Mr. Church said, just

14      like Mr. Spivak, just like Mr. Dean.

11:19:26 15          That's what he did.  That was the

16      agreement.  And he agreed to do it again and again for

17      all of his shares.

18          What else did he do?  More of what he

19      didn't do, he wanted to conceal.  He doesn't like to talk

11:19:45 20      on the phone, period.  Wanted to use Signal.  He wanted

21      to make sure that these communications were confidential.

22          You saw that from his co-conspirator

23      Mr. Spivak, "Let's walk outside; use the bat phone; only

24      communicate on iPhone, FaceTime, things that can't be

11:20:08 25      recorded."

1    The average person that is doing lawful

2    things in their business endeavors isn't that concerned.

3    And let's be clear, it's not a concern

4    about sharing CareClix's confidential information.

5    Mr. Scott was all too willing to let Mr. Hipple get on

6    the phone with Mr. Dean and sing the praises of that

7    company, including talking about companies that they have

8    business deals with and this and that and the other

9    thing.

10    It's not about business.  It's about who

11    can really listen in, who really has the ability to do

12    that.

13    The Government.  The Government doesn't

14    care about your business secrets.  The Government cares

15    if you're committing a crime.  And so when they're

16    talking about, "Let's hide this, let's move to Signal,

17    let's walk outside," the purpose is so they don't get

18    caught; not so they don't accidentally reveal a secret

19    about telemedicine.

20    It's the defendant's own words and actions

21    that carry the day here.

22    Now, the Judge instructed you that you can

23    also prove knowledge by proving deliberate ignorance.

24    If the defendant ignored a high probability

25    of a given fact -- here that Mr. Scott's co-conspirators

1    were defrauding the general investing public and

2    artificially inflating USLG share prices, or that they

3    planned to do so -- then you can find that the defendant

4    had such knowledge.

5           Two ingredients.  Defendant was aware of a

6    high probability, and the defendant deliberately closed

7    his eyes to what was obvious.

8           Now, sure, Charlie Scott wanted the USLG

9    promotion, wanted the USLG deal to be legit.  He was

10   hoping that Jason Dean could make him a lot of money and

11   he could finally get all of the things that he claimed

12   that he deserved from USLG.

13          But when you look at what he knew and when

14   he knew it, and how many times he would have had to close

15   his eyes or how many times he should have walked away,

16   you will know that there's a high probability that he

17   ignored the fact that Jason Dean was running an illegal

18   pump and dump.

19          And you can find then that he had such

20   knowledge.

21          So let's talk about that.  Mr. Scott said,

22   "I was selling light bulbs for 10 years and I only made

23   20, $30,000 and was in the hole."

24          Sign number one, this company does not have

25   revenues.  This company is not doing well.

1        Sign number two.  The 2000 lawsuit, he was

2   going to be involved in settling a lawsuit against

3   Richard Mallion.  He knew from the lawsuit that

4   Mr. Mallion was barred from the securities industry.  He

11:23:13   5   knew that Mr. Mallion was using his wife's name, using

6   shell entities, all to reach out to investors.

7        And he knew that his brother from another

8   mother who filed this lawsuit had called Mr. Mallion a

9   crook and said, "I'm not going to be involved with this

11:23:35 10   guy.  I wouldn't have contracted with him had I known

11   what he was about."

12        But yet, Mr. Scott worked to resolve this

13   lawsuit on Mr. Spivak's behalf, a lawsuit that he wasn't

14   a party to, a lawsuit that he paid $50,000 for, and ended

11:23:52 15   up with one-and-a-half million shares at $0.03 a share.

16        Why is he benefitting from the resolution

17   of a lawsuit that he wasn't named in, that he wasn't a

18   party to?  That's not how lawsuits work.

19        It's the people to the party -- to the

11:24:11 20   lawsuit that actually have to make the resolution; not

21   Mr. Scott on his behalf.

22        But yet when his best friend sued

23   Mr. Mallion, he was going to find a way to help him out

24   of it.

11:24:22 25        So you heard him from the stand.  Did he

help?  Well, he might have helped.  He thinks he helped.

He might have done him a favor, twice, and that favor,

twice, was that Mr. Spivak said, "Oh, I can't send money

to Mr. Mallion because of this lawsuit, because I have a

conflict of interest, so you go ahead and send

Mr. Mallion this money for me."

So Mr. Scott does exactly that.  On March

23rd, 2018, he sends to the penny $4,567.58.  Sends it

over to Mr. Mallion that he received from USLG.

And then he does the same thing, he gets

$29,000 from USLG on April 6th, 2018, and he sends it

over, $29,000 to the T, to Richard Mallion again.

But look what he does.  First, on that

April 6th, 2018, the USLG memo says, "100 hours

professional consultation."

But you heard from Mr. Scott on the stand

that he was supposedly just an investor, an investor and

someone who owned a distributorship.

He never said, "I did professional

consultation for USLG," so that's a lie there.

And then when Mr. Scott sends it over to

Mr. Mallion, he puts in the memo line, "Richard Bernstein

invoice to cover management consulting."

Now, let's talk about that memo line for a

minute.  You heard Mr. Scott's testimony.  You heard what

1     he said about that memo line.  Well, first of all, he

2     doesn't remember writing it.  But if he did write it, he

3     thinks he only wrote the back part of it "to cover

4     management consulting fees," because he thought Richard

5     Mallion was an actual management consultant for USLG.

6            Richard Mallion, the same guy that USLG and

7     his best friend had just sued.

8            "But, wait, if he didn't write it, then

9     maybe it was Josh, Josh of the 'serious crime not white

10    collar in nature' who wrote that.  And if it was Richard

11    Bernstein, I mean I knew him as Richard Bernstein at one

12    point so maybe it was Richard Mallion."

13            But we just saw, Ladies and Gentlemen, that

14    it was Richard Mallion named in the suit that he was

15    trying to help, and that was just one example.  He

16    couldn't get his story straight about whether he helped

17    with the lawsuit.

18            He did two favors, he did one favor, this

19    was a favor, but he didn't think the 1.5 million was

20    related to settling the lawsuit.  "Oh, but maybe it was,"

21    when he realized that it sounds like someone who is

22    hedging, someone who is scared to tell the truth, someone

23    who is trying to keep their story straight.

24            This is his wire.  He put "Richard

25    Bernstein."  He knew he was talking about Richard

1    Mallion.  What's the purpose of covering this up?

2                Sign number three.  You know the phrase

3    "Fool me once"?  Keeps going though.  You heard from

4    Mr. Church that they sought advice on whether they could

5    run call rooms to promote stock, and they came to the

6    conclusion, "We don't look good in orange jumpsuits.  Not

7    a good idea."

8                They turn to Richard Mallion, still working

9    with Jason Dean now, let him get his hands dirty this

10   time.  That was sign number four.

11               How about this one?  He sends $100,000 -- a

12   hundred thousand worth of stock to Thomas Collins.  Never

13   got paid for it.  Never got the stock.

14               Or how about this one?  He sends another

15   hundred thousand to Donna Mallion.  Never got paid for

16   that either.  Donna by the way, Richard Mallion's wife;

17   not Donna Bernstein.

18               These people, these associates of

19   Mr. Spivak, he claims he's just getting ripped off, he

20   claims he's just a victim, he claims he didn't know what

21   was going on, but he told you he knew Mallion was sued by

22   the SEC.  What are we on; seven, now?  I'm out of

23   fingers.

24               He knew USLG was getting sued by the SEC.

25               How many coincidences are enough, Ladies

1    and Gentlemen?  And yet now he claims he didn't know

2    Mr. Spivak and Mr. Dean were running an illegal pump and

3    dump scheme.

4                Talk about the very essence of burying your

11:29:02  5    head in the sand.  Use your reason and common sense, your

6    everyday experience engaging with people, interacting,

7    trying to determine if someone is telling you the truth

8    or pulling something over on you.

9                Ask yourself what makes sense when you look

11:29:23  10   at how the communication, when you look at how the

11   actions, when you look at how the patterns, the

12   testimony, the frequency, all line up together.

13               Ask yourself the mark of whether someone is

14   telling the truth.

11:29:38  15               Ladies and Gentlemen, the Government has

16   established that defendant Scott acted knowingly at all

17   times in connection with his activities with the

18   co-conspirators and in connection with the sale and

19   purchase of USLG stock.

11:29:55  20               He knew that Mr. Spivak was influencing his

21   free-trading shares.  He allowed that to happen.

22               He knew that Mr. Dean was running an

23   illegal pump and dump.  And yet he sold him his shares.

24               And he knew that Mr. Spivak wanted

11:30:13  25   kickbacks from that sale, and yet he sent him the

1   $15,000.

2                So when Mr. Scott agreed to and did sell

3   those shares to Mr. Dean, and when he agreed to and did

4   kick back those proceeds to Mr. Spivak, he committed the

11:30:33 5   crimes charged against him in the indictment.

6                There have been a lot of distractions, a

7   lot of excuses in this case, but the evidence before you,

8   all of the evidence before you, the only evidence before

9   you establishes beyond a reasonable doubt that defendant

11:30:52 10  Scott is guilty of these crimes.

11               We ask you to return that verdict.

12               Thank you.

13               THE COURT:  Ladies and Gentlemen, we will

14  take a short break, then resume with closing arguments.

11:31:02 15               We'll take a break, 10 minutes, maybe 15.

16  As soon as you are ready to resume, we will.

17               So we will stand in recess.

18               THE CLERK:  All rise.

19               (Jury out.)

11:31:45 20               THE COURT:  Please be seated.

21               We stand in recess.

22               (Recess taken.)

23               THE COURT:  Please be seated.

24               Let's bring the Jury back in.

11:48:35 25               (Jury in.)

1          THE COURT:  Please be seated.

2          Mr. DeVillers, you may proceed when you are

3    ready.

4          MR. DeVILLERS:  Thank you, Your Honor.

5          Well, it does look like we've finally come

6    to some agreement between the Government and Mr. Scott,

7    and that is this is all about proving what he intended.

8    That's what it's about.

9          Did he intend to defraud?  That's what this

10   case is about.

11         You know this.  You've gone through this

12   before.  You've gone through the elements of the offense.

13   This isn't a civil case.  This isn't an SEC violation.

14   This is they must prove to you beyond a reasonable doubt

15   that he intended to defraud.

16         I've never seen an investigation where

17   people worked so hard not to find that out.

18         Three years ago, he was arrested.  They

19   never even tried before that to ask him questions.  They

20   never even -- they just specifically and purposely

21   decided not to find out what he was thinking, not to find

22   out what he was doing.

23         He was indicted on a false premise, all the

24   way back from 2016, the first element, the first overt

25   act in this case.  If they just asked him, "Hey, you

1    invested and had a scheme with Mallion and Spivak in

2    2016?  No, I bought this in 2012.  I had nothing to do

3    with that."

4              And it kept building and building and

5    building, because they didn't ask him anything.

6              You had an undercover with Charles Scott

7    for days and hours and hours on the phone, in person,

8    with other individuals.  Where did he discuss anything

9    about a pump and dump scheme?

10              He had every opportunity to do this.  And

11    you would know what Charlie felt, what Charlie thought.

12              Where did they show that, oh, yeah, it's

13    really controlled by Mallion -- or by Spivak, his stock?

14              When they tried to get him to say that, he

15    pushed back.  "I'll do what I want with my stock.  This

16    has nothing to do with Spivak."

17              Where did they talk about this illegal

18    promoting with Mr. Scott?  They had every opportunity to

19    do so.  They didn't.  They didn't even try.  They just

20    put a guy in there, tried to reel him in on stuff because

21    he's going to invest in CareClix, what he cares about,

22    but there's nothing about a pump and dump scheme.

23              In fact, the idea of a pump and dump scheme

24    completely defies logic, and we'll get to that in a

25    second.

1          For three years, Charlie Scott has waited

2     for this day, the end of this trial.  For three years.

3          For four weeks, you hear the Government

4     attack his character.  Not the witnesses, by the way.

5     The witnesses, their witnesses didn't attack his

6     character.  They attacked his character; that is, the

7     Government in opening statement, closing arguments, and

8     by their questions.

9          Somehow he's a bad person because he didn't

10    Google some guy that had an SEC violation a decade

11    before.  Somehow he's a bad person because he worked with

12    a guy that got arrested for something that has nothing to

13    do with Mr. Scott or his job or his business, but that's

14    why he's a bad person, that's why you should convict him.

15         He's a bad person because he admires Elon

16    Musk?

17         Charles Scott testified in this case, not

18    because he cares what the Government thought of him,

19    because they never cared about what he had to say, they

20    didn't want to know what he had to say.  He testified

21    because it was important for him after all this that you

22    knew who he was, that you knew what he had to say, that

23    you knew what he intended or didn't intend.

24         I find it strange that they really are

25    saying that his intent wasn't for Mr. Dean and his rich

1    people to invest with CareClix.  That is 95 percent of

2    the conversation that they had with this guy Mr. Dean.

3              They cherry-picked things, but they are

4    hours and hours, even Mr. Dean says that, they spent

5    their time talking about CareClix, how they should invest

6    in it, how they should take this money.

7              They reel him in.  They're the ones lying.

8    They have no intent ever to invest in CareClix.  They

9    want him to think so.  They want to get access to him.

10   They want to try to get him to say things that he never

11   said; in fact, he said the opposite of.

12             You have tapes, you had Dean's own

13   testimony, you had Charlie's testimony, you had

14   Mr. Hipple's testimony.

15             Nowhere is there any evidence that

16   Mr. Scott or anybody from CareClix wanted Mr. Dean or his

17   people to promote CareClix.  So I don't know where

18   they're coming from.

19             They must be saying Mr. Dean is lying, too,

20   because I specifically asked Mr. Dean, "Didn't Charlie

21   Scott tell you that he didn't need you or want you to

22   promote CareClix?"

23             The answer was yes.

24             So either their own witness is lying.  You

25   can tell from the tapes he's trying to get them to do

that, and they don't want any interest in it.  They have
no interest in it.  They're listening to him because they
want him to invest in CareClix.

Selling Charlie's free-trading shares.  He
bought the shares.  He bought them in 2012.  He bought
them in 2018.  He bought more restricted stock in 2018.
And by the way, he bought restricted stock in August of
2018 as well, and it wasn't around any time when he was
selling free-trading stock.

And you heard that, you heard Charlie get
his back up as if Mr. Scott had something to do with his
free-trading shares.  He tells Dean -- they tried to spin
it to something I don't know, but he tells Dean, "I'll do
what I want to do with my stock."

Even Spivak has to admit that.  He wants
Mr. Dean to think that he controls Mr. Scott's stock.
Absolutely he wants him to think that.  He's bloviating
about it.  But he doesn't, and they don't have any
evidence at all to suggest he does.

In fact, they have evidence just the
opposite.  What does -- on May 18th, finally Spivak has
to admit that he doesn't actually control the stock.  He
says, "They're not that controllable.  I mean, they
invested in the company awhile ago."

Spivak wants him to do it, wants him to

1   sell his stock.  He knows that Charlie wants to sell his

2   stock, too, and reinvest in USLG and make some money.

3                 He also knows, because that's crystal

4   clear, that Charlie really wants them to invest in

11:57:38   5   CareClix.

6                 And here's the -- here's the -- I can't

7   believe they just maybe act like we're not going to pay

8   attention to this statement, but when he's talking, when

9   Spivak is talking to Dean, he makes it clear that Charlie

11:57:54  10   doesn't know what Mr. Dean's up to.  I mean it's on the

11   tape.  You'll have it.  Play it.  He says on May 21st,

12   "If Charlie knew what you were up to, you're going to

13   make your job almost impossible."

14                 I don't know what else we need to talk

11:58:13  15   about.  He doesn't know what this guy's up to.

16                 He definitely knows, we're not denying

17   that, we said in opening he said he knows they're going

18   to promote USLG stock; he knows that he's going to buy

19   USLG stock back hoping that promotion of that stock will

11:58:31  20   eventually make money in the long return.  It's

21   restricted stock he's buying.

22                 He can't sell it.  He's got to hold onto

23   it, but in the long-term that's what he wants to do.

24   That's the win-win.

11:58:42  25                 Okay.  Buying the restricted USLG stock.

1    He wanted to keep his position.  He still believes in

2    USLG, he still believes in the products they are making.

3    The light bulbs are going down, but there are other

4    things that are going on.

11:58:59  5              He's in it for the long-term.  You don't

6    buy restricted stock if you're not in it for the

7    long-term.  If you're looking to dump stock, you don't

8    buy restricted stock.

9              And here's the -- in fact, the idea is to

11:59:13  10   promote the company, to reinvest in the company, to help

11   the company grow.  And Spivak knows that.  And he needs

12   him to sell his restricted stock, and he wants him to buy

13   back into USLG, no doubt about that.  We're not denying

14   that.

11:59:31  15             But it's about what's in his mind.  In his

16   mind, buying the restricted stock will grow the company

17   and he keeps a long-term investment.

18             And he knows, but he thinks otherwise; he

19   knows that if Dean screws up and tells him something

11:59:46  20   different, he's not going to sell that free-trading

21   stock.

22             So he coaches him.  Remember?  He's about

23   to go, as Dean's about to go to Virginia, to D.C. and

24   tour CareClix, and try to get more of this stock, so what

12:00:00  25   does Spivak tell him?  "You've got to tell him, hey,

1    you're helping the company to build, you know.  You tell

2    him, hey, you're going to buy today, and tomorrow it's

3    going to go -- it's going to go to a dollar."

4                    Right?

12:00:18   5             So he's buying the restricted stock that he

6    can't sell for a long-term investment.

7                    Now, here's their entire case is evolving

8    Charlie knows about a pump and dump of some sort.  So it

9    sounds like the plan is for Dean to somehow illegally

12:00:35  10   promote the stock -- zero evidence that Charlie's aware

11   of that -- and that artificially and illegally inflate

12   the price, and that they dump all the free-trading stock

13   and leave everyone hanging with it that's holding onto

14   it.

12:00:47  15             In other words, the people that have

16   restricted stock.

17                    Why would he buy restricted stock if he

18   knew that?  It defies logic.

19                    Reasonable doubt is based on logic and

12:01:01  20   common sense.  This defies their entire theory.  It makes

21   no sense.

22                    And there's no evidence that he thinks it's

23   going into Spivak's pocket; zero.  They didn't provide

24   any evidence to that effect.

12:01:15  25             And he never attempted to hide any of this,

1    right?  It's not like he's using his wife or a friend to

2    go buy back restricted stock.  He's using his own bank

3    account.  He's showing that he's buying the stock, the

4    free-trading stock.  He's showing that he's -- or the

5    restricted stock.

6              He's showing that he's selling the stock.

7    He's not doing anything to hide any of this.

8              Spivak was involved in the sale of

9    Charlie's free-trading shares.  That's what they are

10   desperate for you to believe, that he's in control.

11             We don't deny that he told him, "Hey, I've

12   got a guy who will buy this stuff.  That's a good idea."

13             No, we're not denying that at all.

14             We're not denying the fact that he talked

15   to him about buying restricted stock at $0.15 a share.

16   You know why?  Because that's what it was being sold at,

17   $0.15 a share.

18             There isn't some sort of no hidden

19   agreement.  That's what other people were buying

20   restricted stock for at the time, $0.15 a share.  That's

21   what Dean bought restricted stock for, $0.15 a share.

22             Okay.  One, Spivak had no control over

23   Charlie's unrestricted stock.

24             Two, the Government wants you to believe

25   that was some sort of fraud, that was the fraud, that he

1    somehow introduced a guy and made him available to buy

2    stock.

3                      This -- this is not -- this is not a

4    securities civil case.  This is not a violation of some

12:02:54  5    securities regulation.

6                      They are saying that he committed a crime

7    to defraud people, all right?

8                      Whether Spivak had some sort of duty to

9    report that, that he introduced Charles Scott to someone

12:03:09  10    to buy stock, that's on -- that's on Spivak.  If it was

11    some big plan to defraud somebody, that's on Charlie, but

12    there's no evidence of that.

13                     Remember, Dean testified that he got in

14    trouble for a civil case.  Remember, he said, "Yeah, I

12:03:27  15    had an SEC violation.  It was I recklessly allowed others

16    to commit fraud."

17                     Remember he testified, "No, I didn't go to

18    prison for it.  No, no, it's not a -- it's not a felony.

19    I lost my broker's license."  That's what he got from it.

12:03:43  20                     It wasn't a crime.

21                     They have to prove he intended to defraud

22    somebody, and they failed.

23                     All right.  I don't know if they're still

24    saying this but I think they are, that he somehow through

12:04:01  25    osmosis knew that Dean was going to illegally promote

1    stock, that is by fraud, by deception.

2           There is no discussion on that.  When I got

3    up in opening statement, I said, "Guys, listen, listen to

4    this, you're going to hear all these tapes and you're not

5    going to hear any talk about that," and you didn't.

6           You didn't.

7           You got Scott bloviating about things that

8    he's not even a part of these conversations, he's not a

9    part of a text chain, he's not on any of this.  And again

10   it's like they want you to convict him not on what he

11   thought or what he intended or what he said or what he

12   heard, but on what Spivak said.

13          Nothing in hours and hours and hours of

14   recordings.

15          You know, if they really did, if they

16   really wanted to know what Charlie had to say, you had

17   all this time.  They tried to reel him in by showing him

18   the bait of, "Hey, we're going to invest a bunch of

19   money."

20          Flat out ask him.  You know, we've got all

21   these sort of manipulative means.  "We're going to be

22   able to promote this stock.  We're going to be able to,

23   you know, get call rooms up and going, and we're not

24   going to tell them about the restricted -- how long

25   restricted.  We're not going to tell them about our

1    commission."

2                    They didn't do that, because they know if

3    they did that he'd say no.

4                    What's he say even in the tape, even the

12:05:43  5    first time he meets on the phone, talks to Mr. Dean,

6    what's he say?  "Yeah, I'll sell my stock.  Just tell me

7    how much you want to pay for it, but -- but keep it

8    clean."

9                    Is that somebody that's involved in some

12:05:58  10    sort of plan to defraud anybody?  Like, why would he even

11    say that?

12                    Okay.  The encrypted Signal device.  All

13    right.  Remember, he's coming in, this is all happening

14    on the phone, and I think on the 16th when he's talking

12:06:16  15    to Hipple and to Charlie and to other people, he's going

16    to be there on the 26th.  They're going to disclose all

17    sorts of stuff about CareClix.

18                    And what do they do before?  They make him

19    sign an NDA.  He signed an NDA, a nondisclosure

12:06:36  20    agreement, legally binding.

21                    They asked him to go ahead and get Signal

22    so when they talk it can be -- when they talk about

23    CareClix, when they talk about the people that are

24    working with CareClix, these are the companies, they want

12:06:48  25    to keep it confidential.

1          They don't want -- when he's talking to

2     Hipple on the phone, that's Hipple's phone; it's not

3     Dean's phone.

4          He doesn't care about Hipple's phone.  He

5     cares what Dean is going to do with his phone or who is

6     going to listen in on Dean or who is going to take Dean's

7     stuff.

8          He doesn't care about Hipple.  Hipple's

9     already on the team.  Hipple's already a part of

10    CareClix.

11         And more, more important than that, Ladies

12    and Gentlemen of the Jury, they have everything he said

13    to Dean.  It isn't like, "Oh, you said something on

14    Signal," and they don't have it.

15         They have it all.  They have every second

16    of every word of every minute that he talked to Mr. Dean

17    and the other people from CareClix.

18         Oh, the plan was to -- they had this plan,

19    he and Spivak, to leave the country if they ever got in

20    trouble, like he was going to leave with Spivak, he's

21    going to leave his wife, his daughter, his farm, his

22    entire business behind and flee the country.  And to

23    where?  Where all people flee the country that commit

24    crimes, France?

25         They talked on May 26th, they talked with

1      Hipple, they talk with Dean, they had a conversation,

2      they talked about a lot of different things.  And what

3      happens the next day from Mr. Hipple and from Charlie?

4      They talk, and Hipple smelled a rat.  Hipple said, "Don't

12:08:22    5      work with these guys, these guys are nothing, don't talk

6      to them."

7                      And he never did again.  This is May 26th.

8                      They're still undercover up until June, I

9      think the arrest is June 10th or something along those

12:08:36   10      lines.  There's no conversations with Charlie and Dean

11      ever again.  They're done.

12                      And on cross-examination, the Government

13      asked Charlie question over question about, like, really,

14      really complicated sort of SEC rules and regulations, and

12:08:55   15      he tried to answer them the best he could.

16                      But what's he say?  "This is why I hire

17      lawyers to know this stuff.  This is why I have Hipple.

18      This is why I talk to Petitti."  And there's evidence of

19      this over and over and over again, that he's relying on

12:09:11   20      them to tell him what's right and what's wrong, because

21      he doesn't want to get in trouble.  He wants to do the

22      right thing.

23                      "Oh, how does -- how does Spivak know he's

24      going to buy the shares for $0.30 or sell the shares for

12:09:32   25      $0.30?"  Do you remember that?  How could he possibly

1    have known that?  It's because that's what they were

2    selling for.

3              This isn't like something where -- it's

4    free-trading stock.  You can get on a computer and look

5    at what it's selling for.

6              Mr. Dean said it was selling on the open

7    market for $0.30 a share.  Everyone knew what it was

8    selling for.  It wasn't something planned by Spivak, and

9    certainly not Charlie.

10             It's really not that complicated.

11             Same with the restricted stock.  We knew

12   what it was being sold for.

13             In the very -- the document that they

14   showed, the Government, it was Church buying same day

15   restricted stock, it was Scott buying restricted stock,

16   and there were two other people also buying restricted

17   stock.

18             Evidence that -- they pull up the lawsuit.

19   I don't know how many pages the complaint in the lawsuit

20   is, but somehow he was supposed to have read the

21   complaint of the lawsuit in 2018?  And that somehow, that

22   makes him a bad person, too, by the way.  It makes him a

23   bad person.

24             It's probably not a wise person for doing

25   that, but it's a bad person that he's trying to put these

1    guys back together.

2                    And he's not hiding who he's sending the

3    money -- it says Bernstein on it.  I don't know, he

4    doesn't remember who did it, what they said, but it's the

12:10:53  5    same thing.  It's for a consulting fee.

6                    It says for a consulting fee going to

7    Charlie; it says for a consulting fee Bernstein going

8    from Charlie to him.

9                    We don't deny it.  We didn't deny it in the

12:11:06 10    first trial.  They didn't ask Mallion about it, right?

11                    They didn't want you to know it was

12    something having to do with just helping out with the

13    lawsuit.  They wanted you to think then, remember, that

14    it was a kickback to Mallion.  The problem with that is

12:11:17 15    now they realize they can't do that because he actually

16    never sold stock during that time period.

17                    We've been through the promotion, too.

18    Yeah, he looked to promote stock, USLG stock, legally

19    with Church, back and forth with attorneys, back and

12:11:33 20    forth with attorneys.

21                    One of their ideas, like, "No, I don't

22    think we should do that."  Done.  Done.  Stopped.

23                    They want you to believe, oh, yeah, no,

24    he -- then he started working with Mallion because they

12:11:43 25    knew Mallion was promoting stock.

1        We've been through this.  In 2018, after

2   June, 2018, all the way through 2019, yeah, Church was

3   buying -- selling stock through Mallion.  Yeah, Church

4   was making money during that time period by selling

12:11:59  5   free-trading stocks.

6        He wasn't.  He didn't.

7        The next time from June of 2000 -- June 6th

8   of 2018, all the way through 2019 -- 2021, he held onto

9   all this free-trading stock.  The next free-trading stock

12:12:19 10   he ever sold was not on the market; it was to the FBI.

11        Ask yourself is this -- is this the type of

12   evidence that we want to use to convict somebody?  Not

13   just Charlie, but anybody.  Is this the nature and

14   quality of evidence that's acceptable?

12:12:54 15        The Judge has instructed you, reasonable

16   doubt is based on reason and common sense.  It may arise

17   from the evidence, the lack of evidence, or the nature of

18   the evidence.  Proof beyond a reasonable doubt means

19   proof so convincing that you would not hesitate -- yes,

12:13:13 20   and I'm saying not hesitate -- to rely and act on it

21   making the most important decisions in your own life.

22        Now, the Government may not like it, but

23   that's -- that's the burden.  And if this is -- the

24   nature of this evidence, you go back there and you

12:13:30 25   consider it all, and you're hesitating, that's a not

1    guilty.

2              We're asking you to read a man's mind for

3    intent.  That's tough to do, don't get me wrong.  But

4    they have to prove to you beyond a reasonable doubt that

12:13:45  5    Charlie intended to defraud.  That's what this boils down

6    to.

7              You know it.  You've been through the

8    instructions.

9              I will say we all recognize the sacrifice

12:13:57 10    you've given the past four weeks to this day.  That's a

11    lot.  And it is absolutely crystal clear you guys paid

12    attention to everything.

13              And we want to let you know we appreciate

14    that.  We ask you to do one more thing, and that is to

12:14:14 15    come back with a just verdict.

16              Thank you.

17              THE COURT:  Any rebuttal from the United

18    States?

19              MR. MORRISON:  Yes, Your Honor.

20              May I have one moment.

21              Thank you.

22              I'll get my lapel mic.

23              (Pause.)

24              MR. MORRISON:  You guys are looking at me

12:15:02 25    apprehensively.  You've seen the post-it method before.

1    Trying to get it organized here.

2              So they want you to believe, with only the

3    slightest glancing references to bits and pieces of his

4    testimony, that you should probably ignore all that; that

12:15:35    5    you should probably pretend you didn't hear him sit up

6    there for hours and lie to you repeatedly, and that he

7    didn't lie to you repeatedly because he knows he's guilty

8    and he knows what he did was wrong.

9              They want to take advantage of the fact

12:15:53   10    that we didn't play every single one of the many hours of

11    recordings.

12              So he tells you that after May 26th, there

13    are no more conversations, never spoke to him again,

14    right?  Mr. Hipple said, "I, you know, took one look at

12:16:08   15    this guy and I said these are sharks.  These are sharks.

16    Ignore them."

17              Okay.  Well, it's true, we didn't play you

18    any more recordings from after May 26th, but you do have

19    evidence that they spoke and they were quite friendly and

12:16:21   20    they kept talking business.

21              So I'm just going to read to you a little

22    bit from Government's Exhibit 1326.  They want to pretend

23    like there were no more conversations.  Go to Page 18,

24    you'll see that they coordinate that meeting on May 26th.

12:16:34   25              And right after that it's, "Hey, buddy, can

1        I call you real quick on the other line?  Wrapping up in

2        a week -- wrapping up the week in a few minutes and

3        wanted to check in."  That's from Jason Dean.

4                    "Can I call you back on the other line?"

12:16:47  5      He's getting a call two days later from Mr. Scott.

6                    Mr. Scott, "I'll call you right back.

7                    "Okay.  Open for a couple minutes."

8                    He says, "I have" -- Jason Dean says, "I

9        have a short window to chat and move things forward right

12:17:00 10      now.  Call either line."  And then follows it up after

11       the call with, "Thanks for calling.  Enjoy the ceremony,

12       and have a good weekend," on June 4th.

13                    So this idea that after this phone -- after

14       this meeting on May 26th, they want to sell you a false

12:17:15 15      bill of goods that that was it.

16                    Mr. Hipple gives him sage advice, he says,

17       "Well, look, I know from all my experience" -- violating

18       10b-5 -- "that you should avoid this guy, don't get

19       involved with these sharks."

12:17:27 20                    If that's true, why did they keep talking?

21       Why did they want to mislead you about that?

22                    Mr. DeVillers wants you to believe that he

23       has to have the intent to defraud a particular investor.

24       He wants to rewrite the Jury instructions that the Judge

12:17:46 25      has given you.

1          Look at the Jury instructions.  As AUSA

2     Miller pointed out, the "making a specific false

3     representation to a specific investor" is one of three

4     options for violating the securities fraud statute.

5          There's also engaging in a scheme and

6     artifice to defraud, and that is what he and Mr. Spivak

7     and Mr. Church and others were up to.

8          He also talked about how you should judge

9     this case by Mr. Dean's prior civil matter; that because

10     he had a civil matter where he admitted to recklessly

11     defrauding or allowing fraud to occur, you should infer

12     that's what Mr. Scott is up to and, therefore, he

13     shouldn't have a criminal conviction.

14          They're ignoring that Mr. Dean also

15     testified that he does have a securities fraud

16     conviction, and he has it for concealing commissions he

17     received as part of a securities fraud scheme, in much

18     the same way that Mr. Scott tried to conceal the money

19     that he was moving around for Mr. Spivak in this scheme.

20          He also points out that at some point he

21     says "Keep it clean."  Like here, if I'm handing off a

22     pile of drugs, I can just pretend, "Hey, these aren't

23     drugs.  There we go.  I said it's not drugs; therefore, I

24     don't know it's drugs," right?

25          Saying "keep it clean" is the type of thing

1    you say when you know somebody is doing something dirty.

2    You don't tell someone to keep it clean when you know

3    that it's a clean transaction.  Why would you need to say

4    that?

12:19:22  5              Ask yourself why did he say the things he

6    said.

7              Similarly, Mr. DeVillers would have you

8    believe that because the country he's fleeing to is

9    France and not Mexico -- or, I don't know, where do

12:19:41 10   criminals love to go?  You know, they go to sea shells, I

11   don't know -- because it's not someplace with a noted

12   extradition problem, that it must not be about law

13   enforcement.

14             Go back and listen to that clip.  And he

12:19:56 15   says the sheriff came to his house, there's a freakout.

16   What does Mr. Spivak say?  "Get rid of your damn cell

17   phone.  Get yourself up here.  Get a ride.  Don't drive

18   yourself."  Right?  "Don't be in your own car.  Get up

19   here.  We're going to be in France tomorrow."

12:20:13 20             Maybe sea shells the day after.  Who knows?

21             That is clearly about fear of law

22   enforcement.

23             He had it, and he still has it.

24             So one of the points of confusion that I

12:20:30 25   really want to make sure to clear up here is about where

1    CareClix fits in all of this because I think it's

2    actually a fair point they're making.

3              Look, CareClix, this case isn't really

4    about CareClix.  The Government spent too much time

12:20:43  5    talking about CareClix.  Mr. Dean spent too much time

6    talking about CareClix.  As Mr. Dean told you, Special

7    Agent Fry told you, they follow the lead they are given.

8    They walk through the open doors.

9              Okay?  And CareClix is a door, as he has

12:20:59 10    now told you, he wanted open and he wanted them walking

11    through.

12              This case isn't about trying to defraud

13    investors in CareClix.  But what you heard about CareClix

14    confirms exactly what his intent was.  And he told you

12:21:12 15    himself his intent was to get money; to get money.

16              That is not a defense to securities fraud.

17    That's one of the elements.

18              What he said in those CareClix meetings

19    over and over again was that he understood what was going

12:21:35 20    on with respect to USLG, and he wanted to bring that over

21    here.

22              Now, it's true he said at one point, "I

23    don't think I need promotion for CareClix right now."

24              That's because right now when he said it

12:21:48 25    was a time when they couldn't even trade that stock, as

1    you heard.  They had that skull and crossbones warning on

2    there.

3                  What's the point of putting out press

4    releases?  So we're going to hold them, accumulate them,

5    build them up and save them for later for when we can get

6    this pump going.  Right?  And of course, that's not the

7    pump that's at issue in this case.

8                  But his willingness to talk about that and

9    to make those plans and to say he's doing it just like

10   they're doing with USLG tells you that he knew what was

11   going on with USLG.

12                  And on that subject, they talk about Signal

13   as though, hey, once you sign an NDA, that's a perfect

14   explanation for using Signal.  Right?

15                  No one's accusing him of a crime just

16   because he likes Elon Musk.  It's just not really a great

17   reason to suddenly tell the person you're conspiring with

18   to commit securities fraud that they need to move over to

19   Signal in their communications.  That's the point about

20   Elon Musk.

21                  They had -- if it's really about business

22   intelligence or business secrets, why do they have a long

23   phone call about all of the financials with Bob Hipple on

24   the phone, only to cut it off the second somebody starts

25   talking about free-trading shares?

1          You heard him.  "We're on the phone."  And

2    I encourage you, please, let me get the exhibit number

3    for you, because I would love for you to go back and

4    listen to that one.

12:23:17  5          "We're on the phone" is not the type of

6    thing that you say when somebody walks in.  And it's

7    especially what you hear on that day, right, "We're on

8    the phone, you know," he's saying that to Mr. Dean

9    because who responds?  Not somebody bringing in a stack

12:23:38 10    of papers at the door and was like, "Oh, sorry, I

11    interrupted."

12          No, you don't hear that.  You don't hear a

13    door open.  You don't hear another voice come in.

14    Instead, you hear Mr. Dean say, "Oh, yeah, okay.  Shhh.

12:23:47 15    Be quiet now.  I won't keep talking about that."

16          And then one of the other big

17    misconceptions that I want to clear up is again about the

18    phrase "pump and dump."  This conspiracy is about the

19    pump.  It is not about the dump.

12:24:05 20          And we have said all along that this isn't

21    some situation where they're pumping the price up and

22    selling everything they own.  They own too much to do

23    that.  Right?

24          Mr. Spivak has, I don't know, he's up to,

12:24:18 25    what, 40, 50 million shares at this point after giving

1     himself those 28 million shares?  He can't do that, and

2     he's the leader of this conspiracy, right?

3                     So this isn't about your classic pump and

4     dump, but it is about manipulating the price up.  And you

12:24:33  5   hear them talk about that over and over again.

6                     And what you hear is that they are on the

7     same team, and they are on the same team on the three

8     grounds that AUSA Miller pointed out to you.

9                     Mr. Spivak is influencing and controlling

12:24:46 10   the direction of not only Mr. Scott's free-trading

11    shares, but Mr. Church's, as Mr. Church himself told you,

12    that these things were sold with the specific knowledge

13    that Mr. Dean would inflate their price.

14                    And further, that the proceeds would be

12:25:04 15   going back to Mr. Spivak, even though he's not supposed

16    to be involved in the sale of free-trading shares.

17                    He had a real hard time discussing that

18    because he couldn't decide which way he felt about it.

19                    He had said on recording, "We shouldn't

12:25:21 20   have Paul involved.  He's not supposed to be doing this."

21    And you heard that.

22                    But then when he's asked about it on the

23    stand, he can't give a straight answer.  He is dancing

24    around for way more time than any of us would have liked

12:25:33 25   it to go, about why that is, whether that's true, what

1    the rule is, whether it's just about how much Mr. Spivak

2    can sell in a quarter or a month or whatever it is, or

3    whether he is, in fact, as he eventually came to admit,

4    not supposed to be involved because he's an officer or

5    Director.

6              So he started off, I'll point out to you

7    Paragraph -- Page 41 here, he says, "As to whether he

8    could be involved in free trading, in the sale of

9    free-trading shares of USLG" -- this is me asking --

10   "leaving aside what conversations you would or wouldn't

11   have had, what's your understanding of whether he could

12   or couldn't be involved?"

13             "Oh, my understanding is that -- my

14   understanding is that -- as an officer of a company --"

15             "Yes."

16             "-- or CEO?  I don't think he can be."

17             Eventually, he did give us a straight

18   answer on that, right, and he went on to say, "Yeah, he's

19   an officer and he's a Director," right?  "I know he can't

20   be involved in that."

21             But it got uncomfortable for him because he

22   knew that Mr. Spivak had been involved.

23             What did he say?  He says -- they are

24   talking about going forward with the plans.

25             And I said, "Now, we agreed earlier it was

1      your understanding that Paul could not be involved in the

2      sale of free-trading stock for USLG, right?"

3                  "Answer:  I'm fine.  I just -- I'm not

4      interested in that.  I wasn't interested.  I didn't talk

12:26:58  5      about that stuff.  I don't know about that."

6                  So having gone through way too long to get

7      to the point where we're real clear that Mr. Spivak can't

8      be involved, now he's just trying to -- he doesn't want

9      to talk about it, he isn't interested in it, doesn't want

12:27:13 10      to answer that question.

11                  And then he finally comes around again to

12      admit, after being pressed, "Actually, okay.  I

13      understood that CEOs and officers of companies and

14      Directors cannot be involved in free-trading stock."

12:27:26 15                  Oh, good.  All right.  We're back on level

16      terms.

17                  And specifically that Mr. Spivak checked

18      all those boxes, right?  Officer and Director, yeah.

19                  All right.  Now, now we're getting

12:27:40 20      somewhere.

21                  And so I said at some point, "I take your

22      point and agree with it, that a legitimate officer would

23      not be involved in someone else selling free-trading

24      shares of stock."

12:27:49 25                  "Answer:  Right."

1               "But that's because they are not allowed to

2 be involved in other people's sales of free-trading

3 stock, right?"

4               "Right."

12:27:56 5               Okay.  You'd think we're all set, right?

6               But then when I asked, "Mr. Spivak's

7 involved in the sale of his free-trading stock," and I

8 said, "Even though he's not supposed to be involved in

9 such sales," he says, "Who?"

10               "Mr. Spivak."

11               "Answer:  I mean, I don't know anything

12 about that."

13               Having clarified three times that

14 Mr. Spivak can't be involved in selling free-trading

12:28:22 15 shares, he then, when pressed on the details of the

16 transaction with Mr. Dean, suddenly, "I don't know

17 anything about that; I can't answer that."

18               He's hiding the truth because he's a

19 fraudster.  And he may not have started that way.  He may

12:28:37 20 have started with good intentions once upon a time,

21 helping Mr. Spivak, but by being with him for so long and

22 he was in for a penny and he got himself in for a pound,

23 he knew he had to get that money out.  And he told you

24 himself that his goal was to make money.  That's what he

12:28:54 25 said his goal was.

1          And on the topic of talking about

2     free-trading shares, listen to 451F, right?  You have

3     first that part that I mentioned earlier.  You don't hear

4     any door opening.  You just hear his response.

5          Then what does he say about that?  He

6     finally is confronted with what he hears, and he says, "I

7     think someone walked into the office.  I think someone

8     walked into the office."

9          That was him coming up with that excuse

10    right in the moment, right as he sat up right there, but

11    he hadn't listened closely.  He didn't know that you

12    actually can't hear anything like that happening in that

13    recording, so please listen closely to that recording as

14    you go through.

15          Now, Mr. DeVillers started with this is all

16    about intent to defraud, and he told you if Charlie -- he

17    wants you to listen to the recording where Mr. Spivak is

18    pressing on Mr. Dean to get this deal done, saying,

19    "Well, if Charlie knows everything you're going to do,

20    you're going to have a hard time."

21          No question that happened, right?  That's

22    not a secret.

23          The question is why did it happen, okay?

24          And when you listen to the details of that

25    recording, what Mr. Spivak is saying is you might have a

1    hard time getting it for the same price because if he

2    knows the price is about to be a dollar, four dollars,

3    why is he going to sell for $0.30, right?

4            So the idea is not that he's not going to

12:30:45  5    sell like he's supposed to.  The idea is that it's going

6    to be harder to get it for quite that low a price.

7            And when you listen to that recording, what

8    you can tell is that Mr. Spivak is desperate to get this

9    deal done, he wants to push it through, but he's actually

12:31:01  10    sort of bluffing with Mr. Dean.

11            He wants this deal to happen and he wants

12    it to happen quick, but what you hear over and over again

13    on the recordings with Mr. Scott himself, and with

14    Mr. Spivak, is two things.

12:31:12  15            With Mr. Spivak, it's over and over again,

16    "He's on the team, we're on the same team."  They are a

17    team here, okay?

18            And do you hear something different from

19    Mr. Scott?  No, you don't.  You hear it over and over

12:31:25  20    again.

21            On March 10th, they explain the plan.  They

22    go over it.  That's 430D.

23            On April 30th he says, "Well, we see how

24    you operate.  We have a pretty good idea of how you do

12:31:41  25    it."  Right?

1    If he doesn't actually know what's going

2    on, why is he saying those things, "I see how you

3    operate.  I have a pretty good idea of how you do it."

4    Moving forward to 5/14, this is when I

12:31:54  5    confronted him about this on the stand.  He said, "I

6    didn't know about Bryan pushing the stock up.  I don't

7    remember anything about that."

8    He sat there and listened to it, and then

9    he said, "Yeah, okay, I guess he did tell me that, that

12:32:07 10   it was Bryan, the magician, who was going to push the

11   price up ever higher."

12   And his response then is -- they're talking

13   about how many free-trading shares is he going to leak

14   out into the market.  And again, as AUSA Miller pointed

12:32:20 15   out, if he's not a member of this team, how does he know

16   in that moment to say, "Well, I don't know about Joe,"

17   right, "but I've got 1.7 million"?

18   He knows that Joe is his partner in this.

19   He knows that Joe Church is his -- kind of on a little

12:32:36 20   tandem bicycle.  They're riding along together.  Right?

21   What Joe's doing, he's doing.  They're doing this

22   together.

23   Moving forward to May 18th, you get

24   Mr. Spivak then saying, laying it out, "As you buy the

12:32:53 25   shares from them, they're going to pay it over to me at

1    $0.15 a pop," just as they already had at that point.

2              Then going forward to the 26th, here again

3    he talks over and over again, his own words, "I know what

4    you're doing.  I'm going to get my money, and I am super

12:33:10  5    cool with it.  Plus it continues."

6              He's referring to that plan for this to

7    keep going over and over again.

8              And at the end of that call, in 451G, he

9    says, "We could do something" -- because he's talking

12:33:30 10    about how concerned he is.

11              You know, "Easy to get you paid, Mr. Dean,

12    but how do we get money back to this company?  How do we

13    get money back to the company."

14              What's his answer here?  Right?  And again,

12:33:42 15    he's talking about CareClix here when you get to that

16    point.  What's his answer to that problem?  "Oh, we could

17    do something like Paul is doing," right?  "Something like

18    Paul is doing, if Josh did something," right?

19              So he's talking about recreating at

12:33:55 20    CareClix the same arrangement that they have over at

21    USLG.

22              Josh is his Charlie and his Forrest, right?

23              "And over here we're going to have the plan

24    where I'm going to route things through Josh, and Josh is

12:34:09 25    going to buy back restricted stock in exactly the same

1    way that I, Charlie, and Forrest are buying that

2    restricted stock from USLG, to pay those commissions."

3                And you heard him sit up there himself and

4    admit that he basically knew what the plan was with the

12:34:29 5    shares he was selling.  He didn't want to, but he did.

6                What he said was -- I said, "So you didn't

7    understand the sale of your stock to have any connection

8    at all to him promoting stock?"  Mr. Dean, that is.

9                And he goes, "Well, I believe that he was

12:34:46 10   going to promote the stock."

11               "Okay.  And did you understand that there

12   was any connection between his promoting the stock and

13   your selling him the stock?"

14               "Answer:  There had to be.  There was some

12:34:55 15   connection."

16               "So that's a yes, there was a connection?"

17               "Hmm?"

18               "Question:  There was a connection then?"

19               "Answer:  Yeah.  He said they wanted to see

12:35:06 20   whether or not the thing would work or something, so I

21   guess there was a connection."

22               He didn't want to admit it, but he knew it.

23   And again, he admitted later that it was Bryan, the

24   magician, who was going to make that happen.

12:35:17 25               Turning to Mr. Church, you heard in closing

1    arguments last time around Mr. Church was their star

2    witness, right?

3                  They said at the very end, big, big sum and

4    conclusion for them is, "Ask Mr. Church was Charlie Scott

12:35:39  5    trying to do the right thing?"  Right?

6                  Back then, it was about 2016 to 2019, and

7    Mr. Church, his answer was yes, right?  I acknowledge

8    that.  Okay.

9                  That's how you know Mr. Church is not out

12:35:51 10    here to just make the Government happy.  That's how you

11    know Mr. Church is not out here to throw Mr. Scott under

12    the bus.  When he was pressed, he gave what he said was

13    his honest answer that Mr. Scott was, in 2016 to '19,

14    trying to do what was right.

12:36:08 15                  But when they tried that same thing here as

16    to this time period, when they had crossed all these

17    lines together, Mr. Church's answer was not the same.

18    Mr. Church's answer was, "No, things had changed, and

19    Charlie and I both were just about getting out with as

12:36:26 20    much money as we could."

21                  And when you're considering Mr. Church's

22    testimony, look at the Judge's instructions on

23    considering an accomplice's testimony.

24                  Yes, you should always be more skeptical of

12:36:40 25    someone in those shoes, right?  In the same way, I submit

1    to you, that when Mr. Scott sat up there testifying, he's

2    got a lot riding on that testimony as well.

3                    MR. DeVILLERS:  Objection, Your Honor.

4                    May we approach?

12:36:52  5                    (Proceedings at side-bar:)

6                    MR. DeVILLERS:  It's not the same

7    instruction.  It's a completely different instruction.

8                    MR. MORRISON:  I didn't say it was the same

9    instruction.

12:37:04 10                    MR. DeVILLERS:  You did say, you said it

11    was the same instruction.

12                    THE COURT:  Let's get what he said.

13                    MR. DeVILLERS:  It was an honest mistake.

14                    THE COURT:  He's saying in the same way

12:37:20 15    when considering the testimony.

16                    He's not talking about the instruction.

17    He's talking about the jury's consideration.

18                    So those are two different things, but the

19    credibility instruction, which is where he's about to go,

12:37:32 20    is fair game.

21                    MR. DeVILLERS:  I agree with that, but it

22    seemed to me that the thing was it's the same thing he's

23    talking part and parcel about, he's talking about the

24    accomplice instruction and saying that's the same as the

12:37:47 25    testimony of --

1          THE COURT:  Well, I don't think that's what

2     he's saying.

3          There's also the actual instruction about

4     the defendant's testimony.

12:37:54  5          MR. DeVILLERS:  Yeah.

6          THE COURT:  All of which they'll have so.

7          MR. DeVILLERS:  Okay.

8          THE COURT:  All right.

9          (End of side-bar conference.)

12:38:07 10          MR. MORRISON:  So I was saying, think about

11     what his incentives were when he was sitting up there

12     trying to explain away the things that he had done.

13          But turning back to Mr. Church, you're

14     instructed to consider whether his testimony -- how it

12:38:19 15     fits with the other pieces of evidence that you have.

16          And Mr. Church's testimony lines up with

17     the written record, both his own e-mails that you saw,

18     right?  You saw 931, I think it was, where he's setting

19     up this plan to start their own promotional campaign.

12:38:37 20          You saw the e-mail that he exchanged with

21     Ms. Petitti who tells him, "Yeah, if you guys become an

22     officer or Director of USLG, then I suppose you could be

23     involved in soliciting stock sales."

24          Think about the flow of funds, right?

12:38:52 25     Everything Mr. Church told you lined up with exactly what

1    he and Mr. Scott did with their money at Mr. Spivak's

2    directions.

3              And think about what Mr. Spivak himself

4    said on recording before he knew this case was coming,

5    right?  He said, "They," Charlie and Forrest, "were going

6    to do what you, Mr. Dean, are going to do.  They were

7    going to run a promotional campaign.  They were looking

8    into getting these boiler rooms going."

9              Most importantly, when you are thinking

10   about conspiracy, the Judge has instructed you that even

11   a slight connection is enough, right?

12             You don't have to be Mr. Spivak to be a

13   conspirator.  He's the head of the team, no question,

14   right?  The question is whether you're on the team; not

15   whether you're a star of the team, not whether even a

16   starting player on the team, right?

17             How many players are on the Browns?  Over a

18   hundred, right?  Not every player on the Browns is Myles

19   Garrett.  Not every player on the Cavs is LeBron James.

20   In fact, zero of them are anymore, right, unfortunately.

21   But you can be sitting on the bench and still be on the

22   team, right?  You can have an injured leg for a little

23   while and you're still on the team.

24             Mr. Scott may have sat out some passages of

25   play, Mr. Scott may have had a smaller role than some of

1    his co-conspirators, but he was on that team, just as

2    Mr. Spivak told you over and over again and just as his

3    own words revealed repeatedly.

4              So two final points.

5              First, Josh.  Josh, right?  Josh, the guy

6    he wants to blame for a $29,000 wire being sent to

7    Mr. Mallion using the wrong name.

8              And just take a step back from that.  When

9    you're in there looking at Government's Exhibit 710,

10   lining out the flow of those funds, consider that that

11   $29,000 wire with the fake name that he chose to put on

12   there is just one piece of that thing.  Right?

13             First, you have that exact number, 4 -- I'm

14   not going to get the number right -- 4,367.59, or

15   whatever it is, that's purportedly for reimbursement for

16   travel that USLG is sending to Mr. Scott.  That's not

17   true because then Mr. Scott goes and sends it right along

18   to Mr. Mallion, right?

19             Next, you have USLG sending Mr. Scott

20   $29,000 for 100 hours of professional consultation, but

21   as you heard Mr. Scott tell you himself, he never did any

22   work for USLG at all; was never compensated for services.

23   All he was was a distributor, buying and selling light

24   bulbs, and an investor.

25             And then you get to the wire where he's

1    just sitting up there flailing around, cannot figure out

2    how to explain it, and over the course of about five

3    minutes finally comes to the point of, "Well, but this is

4    your personal bank account sending $29,000 to a Richard

12:42:05 5   Mallion company.  How do you explain how you list it as

6    Richard Bernstein?"

7                He said, "I don't know.  I might not have

8    sent it."

9                "You might not have sent it?  Well, who did

12:42:14 10   you let send $29,000 wires from your personal bank

11    account?"

12                And he comes up with "Josh.  Josh sometimes

13    did."

14                Ask yourself, do you believe that in the

12:42:23 15   slightest?

16                Do you believe in the slightest that Josh

17    Flood, who had nothing to do with USLG, has all his other

18    issues, that he really would have trusted him to send

19    $29,000 to Richard Mallion/Bernstein/Legacy Global

12:42:43 20   Investments?

21                How would he even know to do that?  How

22    would he know to write the wrong name on the memo line?

23    It does not make sense because it was the floundering

24    efforts of a man trying to explain away the things that

12:42:56 25   he had done.

1          And on top of all that, he claimed that

2     through this whole lawsuit that he helped settle -- and

3     we will not make you guys read through the transcript on

4     this again, but he went back and forth, did he help

12:43:13  5     settle the lawsuit, did he not help settle the lawsuit.

6          There were times when he was "Definitely I

7     helped."  There were times when he was, "Well, I may have

8     helped, but I couldn't know what's in Mr. Spivak's mind,"

9     which was not the question at all.

12:43:25 10          At the end of the day, on top of all that,

11     he claimed not to know that Mr. Mallion was barred from

12     the SEC -- barred from participating in the securities

13     industry.

14          And of course, that's a bad thing for him

12:43:36 15     because he kept being involved with him after that.

16          At the end of the day, you know that he was

17     lying about Mr. Mallion because he's guilty.  You know

18     that he was lying about whether or not he really knew

19     that Mr. Spivak could be involved in the sale of

12:43:55 20     free-trading shares because he's guilty, because

21     Mr. Spivak was involved in the sale of the free-trading

22     shares.

23          He set the whole thing up.  He orchestrated

24     not only the sale, but also the kickbacks thereafter.

12:44:07 25          He sat up there and for over an hour he

1    lied to you repeatedly, and he did all of that because

2    he's guilty.

3                    And so at this time we ask you to return

4    the only verdict that is consistent with all the evidence

12:44:20  5    that you have heard in this case over both of these

6    phases, and that is that Mr. Scott is guilty of both the

7    conspiracy that occurred in 2021 and the counts of

8    securities fraud and wire fraud that relate to that

9    conspiracy.

12:44:34 10                    Thank you very much, all of you, for your

11    time and attention.

12                    Thank you.

13                    THE COURT:  Ladies and Gentlemen, let me

14    finish my instructions to you by explaining a few things

12:44:46 15    about your deliberations in the Jury room and your

16    possible verdicts.

17                    Again, during the trial you worked on the

18    Court's schedule.  As you deliberate, we will follow the

19    schedule that you set for your deliberations.

12:45:00 20                    Remember that you must make your decision

21    based only on the evidence that you saw and heard here in

22    court.

23                    During your deliberations you must not

24    communicate with or provide information to anyone by any

12:45:12 25    means about this case.

1          You may not use any electronic device or

2     media or application such as a telephone, cell phone,

3     Smartphone, iPhone, Blackberry or computer, the Internet,

4     any Internet service or enabled device or any text or

5     instant messaging service any, chat room, blog or

6     website, no application such as Facebook, My Space,

7     LinkedIn, YouTube, Twitter or X, Instagram, WhatsApp,

8     Snapchat and so on, to communicate to anyone any

9     information about the case or to conduct any research

10    about the case until I accept your verdict and you are

11    finally discharged from serving as a juror.

12          In other words, you cannot talk to anyone

13    on the phone, correspond with anyone, or electronically

14    communicate with anyone about the case.  You can only

15    discuss the case in the Jury room, with your fellow

16    jurors, during deliberations.

17          I expect you will inform me as soon as you

18    become aware of another juror's violation of these

19    instructions.

20          Again, we have these rules not to

21    inconvenience you, but to ensure that the case is decided

22    based only on the evidence and the law presented to you

23    here in the courtroom so that all the parties receive a

24    fair trial.

25          A juror who violates these restrictions

1    jeopardizes the fairness of the proceedings, and a

2    mistrial could result which would require the entire

3    trial process to start over.

4                    Remember that if you elected to take notes

5    during the trial, your notes should be used only as aids

6    of your memory.  You should not give your notes greater

7    weight than your independent recollection of the

8    evidence.

9                    You should rely on your own independent

10   recollection of the evidence or lack of evidence, and you

11   should not be unduly influenced by the notes of other

12   jurors.  Notes are not entitled to any more weight than

13   the memory or impression of each juror.

14                   Whether you took notes or not, each of you

15   must form and express your own opinion as to the facts of

16   the case.

17                   Your verdict, whether it is guilty or not

18   guilty, must be unanimous.

19                   To find the defendant guilty of a

20   particular count, every one of you must agree that the

21   United States has overcome the presumption of innocence

22   with evidence that proves his guilt beyond a reasonable

23   doubt.

24                   To find the defendant not guilty of a

25   particular count, every one of you must agree that the

1    Government has failed to convince you beyond a reasonable

2    doubt.

3              Either way, guilty or not guilty, your

4    verdict must be unanimous as to each count against the

12:47:45  5    defendant.

6              If you decide that the United States has

7    proved the defendant guilty of any charge, then it will

8    be my job to decide what the appropriate punishment

9    should be.

12:47:56 10              Deciding what the punishment should be is

11   my job; not yours.  It would violate your oaths as jurors

12   even to consider the possible punishment in deciding your

13   verdict.

14              Your job is to look at the evidence, and

12:48:08 15   decide if the Government has proved the defendant guilty

16   beyond a reasonable doubt.

17              I have again prepared verdict forms that

18   you should use to record your verdicts on each count.

19   There are four counts, so I will read the forms to you.

12:48:25 20              I think you know how they work from your

21   deliberations in phase one.

22              The first form addresses Count 2.  It

23   reads, "We, the jury, in this case unanimously find the

24   following:  With respect to the charge in Count 2 of the

12:48:42 25   second superseding indictment that from on or about

1       February 15th, 2021 through on or about June 7th, 2021,

2       defendant Charles Scott conspired with others to commit

3       securities fraud in violation of 18, U.S.C., Section 371,

4       we find the defendant Charles Scott," and then there's a

12:49:01  5       line for "guilty" or "not guilty."

6                   Your foreperson will check the appropriate

7       box.  There's a line for twelve jurors each to sign and

8       date that form.

9                   On Count 20, the form reads as follows:

12:49:18  10      "We, the jury, in this case unanimously find the

11      following:  With respect to the charge in Count 20 of the

12      second superseding indictment that defendant Charles

13      Scott committed securities fraud in violation of federal

14      law in connection with the purchase and sale of USLG

12:49:34  15      securities on or about April 1st, 2021, we find the

16      defendant Charles Scott" -- there is a line for "guilty,"

17      there is a line for "not guilty."  You will check the

18      appropriate box.  There's a line for each of you to sign

19      and date that form.

12:49:48  20                  In Count 45, the verdict form reads:  "We,

21      the jury, in this case unanimously find the following

22      with respect to the charge in Count 45 of the second

23      superseding indictment that defendant Charles Scott

24      committed wire fraud in violation of 18, U.S.C., Section

12:50:08  25      1343 on or about April 1st, 2021, we find the defendant

1    Charles Scott," there is a line for "guilty," there is a

2    line for "not guilty."

3              You will check the appropriate box.

4    There's a line for each juror to sign, and that form

5    should be dated as well.

6              And finally, Count 47, the verdict form

7    reads as follows:  "We, the jury, in this case

8    unanimously find the following:  With respect to the

9    charge in Count 47 of the second superseding indictment

10   that defendant Charles Scott committed wire fraud in

11   violation of 18, U.S.C., Section 1343 on or about April

12   5th, 2021, we find the defendant Charles Scott," there is

13   a line for "guilty," there is a line for "not guilty."

14   You will check the appropriate box.  There's a line for

15   all twelve of you to sign, and that verdict form should

16   be dated as well.

17              If you decide that the United States has

18   proved the charge or charges against the defendant beyond

19   a reasonable doubt, say so by having your foreperson mark

20   the appropriate place on the form.

21              If you decide that the United States has

22   not proved the charge or charges against the defendant

23   beyond a reasonable doubt, say so by having your

24   foreperson mark the appropriate place on the forms.

25              Each of you should then sign the forms, put

1     the date on them, and return them to me in open court.

2                Let me finish by repeating something you've

3     heard earlier.  Nothing that I have said or done during

4     this trial was meant to influence your decision in any

12:51:42 5     way.  You decide for yourselves if the Government has

6     proved the defendant guilty of each charge beyond a

7     reasonable doubt.

8                In a moment, the Court will ask our

9     alternate jurors to report to the Jury room on the lower

12:51:59 10    level and remain there in case you are needed to

11    deliberate.  To our four alternate jurors, please report

12    to the lower level of the courthouse and wait there for

13    further instructions.

14                Further, you are instructed not to disclose

12:52:13 15    what your verdict might have been or discuss anything

16    about this case until you have heard that a verdict has

17    been announced in open court, the entire case is finally

18    complete, and you are discharged from all your duties.

19                Ladies and Gentlemen of the Jury, in the

12:52:29 20    Jury room you will have a copy of these instructions.

21    Also, the Court is working with counsel to prepare the

22    exhibits admitted into evidence, and you will receive

23    those as well shortly.

24                As we discussed at the outset of our time

12:52:41 25    together and your service in this case, we ask each one

1    of you to use the same level of commitment and

2    conscientiousness you would want if you or one of your

3    friends or family was charged with a crime.  Carefully

4    consider the evidence, and apply the law as I have given

12:52:57  5    it to you in these instructions consistent with the oath

6    you have taken as jurors.

7                    Ladies and Gentlemen, the case is now in

8    your hands for a verdict.

9                    THE CLERK:  All rise.

12:53:06 10                   (Jury out.)

11                   THE COURT:  Please be seated.

12                   Again, I think we still have your contact

13   information, make sure Angela has it, and if you would

14   provide the exhibits to her, as soon as we have any word

12:53:53 15   from the Jury we will let you know.

16                   Unless there's anything else we should take

17   up before we adjourn, we will stand in recess.  And I'll

18   let you know as soon as we hear anything from the Jury.

19                   (Proceedings concluded at 12:54 p.m.)

                           -  -  -  -

20                     C E R T I F I C A T E
                    I certify that the foregoing is a correct
21   transcript from the record of proceedings in the
     above-entitled matter.

22
     **/s/Susan Trischan**
23   /S/ Susan Trischan, Official Court Reporter
     Certified Realtime Reporter
24   7-189 U.S. Court House
     801 West Superior Avenue
25   Cleveland, Ohio 44113
     (216) 357-7087